# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Case No. 1:25-cv-10910-ADB

American Association of University
Professors-Harvard Faculty; et al.,

      Plaintiffs,

v.

UNITED STATES DEPARTMENT
OF JUSTICE; et al.,

      Defendant.

_____/

## [PROPOSED] AMICUS CURIAE BRIEF

Plaintiffs position boils down to this: a professor advocacy group at Harvard, organized as a 501(c)(6) trade association, declares itself the "injured party" in a federal lawsuit and hires private counsel to seek judicial relief on behalf of a non-party institution - Harvard University - that is barred by *res judicata* from relitigating the very issues resolved in *Students for Fair Admissions*, 600 U.S. 181 (2023). The suit demands injunctions affecting federal funding streams to Harvard, even though Harvard itself has *not* joined the case. Instead of preserving plausible deniability, Harvard's administration turns around and publicly endorses the lawsuit to its student body as a courageous defense of First Amendment values, ironically jeopardizing other students federal aid in the process by naming an algorithmically complex series of Defendants, all to defend funding

tied to policies the Supreme Court has already ruled unconstitutional originating from the same District Court. Meanwhile, due to those same DEI-driven gatekeeping standards, individuals like me, who are now fluent enough in federal litigation to file amicus briefs for sport, are typically barred from even speaking in court without a bar card... So allow me to offer this as a rebuttal:

## I.   PLAINTIFF ACKNOWLEDGES THEY LACK STANDING

1. Despite styling the action as a challenge to federal agency conduct, Plaintiffs do not allege institutional harm to themselves, nor do they bring this suit on behalf of the only party directly affected in the relief requested - Harvard University.

2. While an organization *may* conceivably litigate on behalf of an institution if expressly authorized, neither the American Association of University Professors ("AAUP") nor its Harvard Chapter assert any such authority here.

3. *Harvard has not entered an appearance,* submitted a declaration, or joined the litigation in *any* formal capacity.

4. Yet the Complaint devotes the majority of its content to Harvard-specific grievances and ultimately requests relief that applies solely to Harvard's funding status and internal policy discretion.

5. This incongruity is fatal to standing, as Plaintiffs seek judicial remedies for a non-party without possessing legal capacity or permission to do so.

6. More troubling still, Harvard **publicly misrepresented** the nature of this lawsuit, stating on its official university website: *"Moments ago, we filed a lawsuit to halt the funding freeze because it is unlawful and beyond the government's authority."*[1]

---

[1] https://www.harvard.edu/president/news/2025/upholding-our-values-defending-our-university/

2

7. That statement is objectively false. Harvard is *not* a named plaintiff. It has not joined this case.

8. Nonetheless, the Complaint spends over 50 pages detailing alleged harms to Harvard while vaguely attributing standing to the AAUP, and in the prayer for relief, it expressly requests remedies on behalf of Harvard.

9. This alone functions as a de facto admission that Plaintiffs are asserting the rights of a non-party - rights they have neither standing nor legal authority to litigate.

10. Worse still, Harvard is jurisdictionally barred from initiating this suit on its own due to principles of *res judicata*.

11. The constitutionality of Harvard's race-conscious policies has already been litigated through the District Court, the Court of Appeals, and ultimately the Supreme Court in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023).

12. To return to court now under the label of "AAUP" instead of "Harvard University" and request relief for the same institution, on materially indistinguishable facts, constitutes either:

- a collateral attack on a final judgment (barred by *res judicata*), or
- an attempt to exploit the appearance of injury without the legal capacity to assert it (barred by **Article III**)

13. Plaintiffs are trying to do indirectly what Harvard cannot do directly.

14. That is the *very definition* of **bad-faith litigation**, and it further exposes this case as an attempt to relitigate a settled constitutional issue under cover of third-party advocacy.

15. This maneuver is not just procedurally defective, it is a deliberate circumvention of standing doctrine and finality.

16. Plaintiffs invoke Harvard's name, reputation, and alleged injury while shielding Harvard from scrutiny, jurisdiction, and consequence.

17. These tactics *undermine the integrity* of **Article III** and cannot survive under even the most generous interpretation of standing jurisprudence.

## II. PLAINTIFFS LACK STANDING (2)

1. Plaintiffs - two 501(c)(6) trade associations - lack standing to invoke this Court's jurisdiction to compel federal regulatory intervention on behalf of Harvard University, a non-party to this suit and a party barred by *res judicata* from relitigating the issues previously resolved in *Students for Fair Admissions*, 600 U.S. 181 (2023).

2. Plaintiffs instead attempt to bootstrap standing by referencing AAUP's national membership, claiming: "AAUP has approximately 44,000 members... including a large number of faculty members who rely on federal grants."

3. But this assertion is *refuted* by AAUP's own audited financial statements.

4. In 2022, the organization disbursed only $114,230 in grants - or approximately **$2.60 per member**. In 2023, grant disbursements fell to $64,166, or just **$1.46 per member**.[2]

5. Even worse, Note 7 of the audit confirms that these grants were not disbursed broadly across higher education, but were largely used internally to fund AAUP's own programs. The AAUP Foundation granted money back to AAUP itself. This is not a disbursement-driven institution—it is a closed-loop funding mechanism.[3]

---

[2] https://www.aaup.org/sites/default/files/2023_AAUPFoundation_Audit_0.pdf
[3] *Id.*

4

6. Plaintiffs *cannot* claim standing on the basis of "faculty reliant on federal grants" when their own foundation acts as a performative passthrough, recycling minimal grant funds back into the same organizational structure.

7. Meanwhile, AAUP's financial disclosures undercut any theory of financial distress.

8. As of December 31, 2023, AAUP held $10.47 million in net assets, including $3.2 million in cash and $9.9 million in investments. There is no plausible financial harm - only posturing.[4]

9. Plaintiff's revenue base remains secure: they reported $535,325 in deferred membership revenue for 2023 indicating a committed, prepaid member base unaffected by the so-called chilling effect.[5]

10. At the same time, Plaintiffs settled a $2.2 million debt owed to the AFT - a politically affiliated union - for less than half its value ($1 million), raising substantial questions about coordinated litigation strategy, preferential treatment, or undisclosed interest alignment.[6]

11. If there is any genuine financial risk, it lies not in the challenged conduct, but in AAUP's own fiduciary exposure, including a $2.23 million postretirement benefit obligation and an actuarial loss of $544,692 in 2023 alone, absorbed just to stabilize their books.[7]

12. And yet, despite filing this case in the name of academic freedom, AAUP's 2023 financials show they spent **exactly $0 on academic freedom programming.**

13. Their largest program expenditures went to "member services" ($5.3 million) and G&A ($2.6 million), while **only $30,760[8] was spent on education** - a *comical* amount for an organization claiming to defend educational values.

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*

14. This is not an advocacy group acting in good faith. It is a top-heavy bureaucracy seeking to reframe operational self-interest as systemic civil rights enforcement.

15. Plaintiff's claims do not arise from a concrete, particularized injury. They arise from policy disagreement, strategic grievance, and reputational rehabilitation.

16. That is not standing. It is litigation by proxy and it should be adjudicated accordingly.

## III. THE COMPLAINT FAILS TO STATE A CLAIM UNDER RULE 12(b)(6)

1. The Complaint should be dismissed under Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), because it *alleges no plausible legal theory*, no concrete injury to Plaintiffs, and *no causal link between any Defendant and a final agency action reviewable under* 5 U.S.C. § 704.

2. Instead of alleging actionable harm, Plaintiffs have submitted a sprawling, 64-page policy polemic, an editorial disguised as leadership.

3. It substitutes political grievances for legal claims, speculative fear for standing, and social commentary for statutory injury.

4. The Complaint itself *concedes* that the challenged actions were directed at Harvard University, a non-party which has neither filed suit nor formally authorized Plaintiffs to act on its behalf (Compl. ¶¶ 1–9, 94–98).

5. AAUP and its Harvard chapter assert no institutional standing and cannot bootstrap jurisdiction by piggybacking on third-party injuries.

6. Plaintiffs cite campaign websites, podcasts, and social media commentary - statements by Donald Trump, JD Vance, and others who are not defendants (¶¶ 31–39).

7. Even public statements by Defendant Terrell predate his appointment and lack operative legal effect (¶ 37).

6

8. The core of the APA claim rests not on final agency action, but on a speculative "chilling effect" from an April 3 letter containing "nine demands" (¶ 94), despite Plaintiffs' own admission that no enforcement proceeding was initiated, no formal finding was issued, no administrative record exists, and no statutory funding was revoked (¶¶ 87, 98–100, 117–131).

9. Plaintiffs *simultaneously* claim a First Amendment injury from *too much* federal intervention (¶¶ 183–196) while also faulting Defendants for doing *too little* to suppress antisemitic speech. The contradiction speaks for itself.

10. Rather than plead coherent legal theories, Plaintiffs scatter buzzwords - Title VI, due process, arbitrary and capricious action - without tethering them to facts or showing legal injury to the represented parties.

11. Their references to *Students for Fair Admissions* (¶ 146) ignore the Supreme Court's binding rejection of race-based admissions and ask this Court to treat academic dissent as judicial review.

12. In truth, **the Complaint functions as a scavenger hunt masquerading as a pleading.**

13. Plaintiffs invite the Court to sift through vague rhetoric, assemble inferences, and retroactively construct legal theories - an inversion of the pleading standards required by Rule 8.

14. Their claims collapse under the weight of contradiction: the APA claim cites no legal consequence; the First Amendment theory invokes both overreach and underreach; and their Spending Clause argument relies not on statutory enforcement but on offhand remarks by people who are not even parties to this suit.

15. Worse still, Plaintiffs use others protected speech - academic debate, public commentary, and political discourse - as alleged evidence of unconstitutional bias.

7

16. This circular logic seeks to criminalize disagreement under the guise of civil rights enforcement.

17. The Court is not being asked to review final agency action, it's being asked to:

- interpret vague political sentiment as de facto regulation,

- override the executive's implementation of Supreme Court precedent, and

- assume jurisdiction over generalized ideological objections to the end of affirmative action.

18. This is not judicial review. It is institutional trolling cloaked in legalese.

## IV. PLAINTIFFS MASK INSTITUTIONAL OPACITY AS CONSTITUTIONAL INJURY

1. Harvard's financial records from FY2020[9], FY2021[10], FY2022[11], FY2023[12] reveal what Plaintiffs actively avoid acknowledging: this is not a fragile institution under threat, it is a sovereign financial power, strategically manipulating litigation to protect ideological positioning, not operational survival.

2. Across four years of filings - including through a global pandemic - Harvard's financials show consistent surpluses, liquidity reserves exceeding $9 billion, stable endowment distributions, and no actual operational threat traceable to the challenged conduct.

3. In FY2023, Harvard held $50.7 billion in endowment assets and distributed $2.2 billion to operations - making up 37% of all operating revenue.

4. In FY2022, despite a market loss of -1.8%, Harvard still recorded a $406 million operating surplus, and held $10.2 billion in liquid assets.

---

[9] https://finance.harvard.edu/files/fad/files/fy20_harvard_financial_report.pdf
[10] https://finance.harvard.edu/files/fad/files/fy21_harvard_financial_report.pdf
[11] https://finance.harvard.edu/files/fad/files/fy22_harvard_financial_report.pdf
[12] https://finance.harvard.edu/files/fad/files/fy23_harvard_financial_report.pdf

8

5. In FY2021 - during the COVID-19 pandemic - Harvard's endowment grew by $11.3 billion, with a 33.6% return, ending the year with $53.2 billion in value.[13]

6. Even in FY2020, when revenue declined sharply due to COVID-related closures, Harvard posted only a $10 million operating deficit, while maintaining over $40 billion in endowment assets.[14]

7. Notably, in each of these years, Harvard maintained:

- Hundreds of millions in surplus cash
- Multi-billion-dollar credit capacity
- A funded postretirement benefit liability in the billions
- And no suspension of its research or educational programs.[15]

8. The notion that vague federal inquiries or "ideological chilling" jeopardize Harvard's academic or fiscal viability is therefore facially contradicted by its own reports.

9. Plaintiffs are not defending vulnerable faculty or underfunded programs—they are defending narrative control, cloaked in federal standing doctrine.

10. What's even more telling, these reports reveal **zero direct funding** for "academic freedom" programming, even as Plaintiffs invoke that phrase as a core injury-in-fact. Instead, Harvard's spending was directed toward:[16]

- Over $5 billion in administrative and compensation costs
- Massive capital projects including **LEED-certified buildings**
- Strategic endowment reallocations and early retirements

---

[13] https://finance.harvard.edu/files/fad/files/fy21_harvard_financial_report.pdf
[14] https://finance.harvard.edu/files/fad/files/fy20_harvard_financial_report.pdf
[15] *Id.*
[16] *Id.*

9

11. These are not indicators of repression. They are indicators of unapologetic financial dominance - and the reason Harvard and its affiliate Plaintiffs seek to litigate in abstract, speculative terms, rather than allow their real numbers to be weighed against their claims.

## V. HARVARD AND AAUP ARE NOT DEFENDING THE CONSTITUTION—THEY ARE ENGINEERING THE EXIT STRATEGY FROM IT

1. While Plaintiffs frame this lawsuit as a defensive reaction to alleged federal overreach, the record reflects a far more troubling reality: Harvard University and the American Association of University Professors are not victims of unconstitutional state action - they are active agents of institutional erosion, working to displace legal doctrine, dissolve equitable remedy, and restructure the architecture of public governance for private gain.

2. If anything, it is the public - not the Plaintiffs - that have suffered systemic injury.

3. At a time when Ivy League institutions *could have led* the nation through post-pandemic constitutional rebuilding, novel jurisprudential innovation, or fiduciary accountability reform, Harvard and its affiliates chose instead to divert billions in endowment capital into backdoor financial systems and legal workarounds designed to avoid scrutiny, automate enforcement, and entrench power.

4. The clearest manifestation of this strategy came during COVID-19, when Harvard and like-minded actors began quietly adopting "*smart contract*" architecture through **Uniform Commercial Code (UCC)** amendments at the state level - an approach that *entirely bypasses* federal common law development, despite implicating commerce that is unequivocally interstate in nature.

8. The core of the APA claim rests not on final agency action, but on a speculative "chilling effect" from an April 3 letter containing "nine demands" (¶ 94), despite Plaintiffs' own admission that no enforcement proceeding was initiated, no formal finding was issued, no administrative record exists, and no statutory funding was revoked (¶¶ 87, 98–100, 117–131).

9. Plaintiffs *simultaneously* claim a First Amendment injury from *too much* federal intervention (¶¶ 183–196) while also faulting Defendants for doing *too little* to suppress antisemitic speech. The contradiction speaks for itself.

10. Rather than plead coherent legal theories, Plaintiffs scatter buzzwords - Title VI, due process, arbitrary and capricious action - without tethering them to facts or showing legal injury to the represented parties.

11. Their references to *Students for Fair Admissions* (¶ 146) ignore the Supreme Court's binding rejection of race-based admissions and ask this Court to treat academic dissent as judicial review.

12. In truth, **the Complaint functions as a scavenger hunt masquerading as a pleading.**

13. Plaintiffs invite the Court to sift through vague rhetoric, assemble inferences, and retroactively construct legal theories - an inversion of the pleading standards required by Rule 8.

14. Their claims collapse under the weight of contradiction: the APA claim cites no legal consequence; the First Amendment theory invokes both overreach and underreach; and their Spending Clause argument relies not on statutory enforcement but on offhand remarks by people who are not even parties to this suit.

15. Worse still, Plaintiffs use others protected speech - academic debate, public commentary, and political discourse - as alleged evidence of unconstitutional bias.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 26, 2025, I caused a true and correct copy of the **MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF**, together with the following exhibits:

- **Exhibit A**: [Proposed] Amicus Curiae Brief (Case No. 1:25-cv-11048-ADB),
- **Exhibit B**: Declaration Clarifying Procedural Posture,
- **Exhibit C**: [Proposed] Amicus Curiae Brief (Case No. 1:25-cv-10910-ADB),

to be submitted via UPS to the Clerk of the United States District Court for the District of Massachusetts for docketing. Upon docketing, notice and access will be provided to all counsel of record via the Court's CM/ECF electronic filing system, pursuant to Rule 5(b) of the Federal Rules of Civil Procedure.

Respectfully submitted,

Robert A. Pietz
pietzreceipts@gmail.com
(754)-277-9578
Independence, MO 64056

Dated: April 25, 2025

5. As Harvard Law School itself conceded in a 2018 institutional publication[17]:

   - "The code can either be the sole manifestation of the agreement between the parties or might complement a traditional text-based contract..."

   - "The fact that an agreement is rendered only in code... presents no particular barrier to contract formation..."

   - "Smart contracts cannot include ambiguous terms nor can certain potential scenarios be left unaddressed."

6. These acknowledgments directly contradict core tenets of American contract law - that agreements are:

   - Interpreted through human language;

   - Understood and negotiated in context;

   - And reformed, rescinded, or challenged, when necessary, through equitable doctrines.

7. Harvard's approach displaces all of that. It favors pre-programmed, immutable digital outcomes, which cannot be amended, interpreted, or equitably voided without prior code-based authorization: "A smart contract cannot easily be amended or terminated unless the parties incorporate such capabilities during the creation of the smart contract..."[18]

8. That eliminates doctrines such as mutual rescission, novation, mistake, estoppel, or judicial reformation. In practice, it automates corporate dominance while removing meaningful public remedy.

---

[17] https://corpgov.law.harvard.edu/2018/05/26/an-introduction-to-smart-contracts-and-their-potential-and-inherent-limitations/
[18] *Id.*

9. And critically, Harvard and its affiliates pushed these developments not through federal legislative debate or appellate litigation - but by burying them inside state-by-state UCC amendments, all while continuing to claim state court venue and refusing to acknowledge that:

- These contracts routinely span multiple jurisdictions;
- Their parties operate across state and national borders;
- And the technological framework itself is inherently interstate and international.

10. As their own article states: "There is no federal contract law in the United States; rather, the enforceability and interpretation of contracts is determined at the state level."[19]

11. Yet smart contracts "operate across decentralized, international platforms" and therefore undermine the traditional structure of venue, choice-of-law, and jurisdiction.

12. This isn't legal modernization – it is contractual deregulation disguised as technological innovation.

13. It is a calculated abandonment of mutuality and equity, masked behind automation and digital convenience.

14. Meanwhile, Harvard offloads its public-facing obligations - such as student housing, academic governance, and sustainability commitments into parallel infrastructure models, financed through:

- Green bond issuances (e.g., Series 2022A and 2022B);
- LEED-branded construction projects developed in-house;
- And nonprofit-to-nonprofit capital cycling that evades traditional oversight, while claiming public virtue.

---

[19] *Id.*

15. The same institution that refuses to reform its own housing administration due to internal policy disagreement instead builds its own housing network, ties it to bond market rates, and simultaneously lobbies for "smart contract" implementation at the state level - displacing both tenant rights and judicial interpretability in favor of automated lease enforcement.

16. To be clear: this is not academic leadership. This is financial and legal exit behavior, a carefully executed institutional hedge against democratic accountability, judicial equity, and contract theory itself.

17. And when those systems fail - or attract criticism - Harvard and the AAUP do not reform, they frivolously litigate.

18. They flood federal courts with speculative ideological claims, frame themselves as civil rights victims, and convert constitutional litigation into a procedural smokescreen to preserve reputational capital while delaying substantive reform.

*19. Plaintiffs claim to **defend** the **Constitution**. In truth, they are designing the workaround - digitally, financially, jurisdictionally, and ideologically while simultaneously undermining and **disrespecting the very document that enables their existence in the first place**.*

## V. CONCLUSION

*Amicus* is not aligned with any political party, ideology, or administration. This brief does not defend any individual official or institutional actor. It defends the *constitutional standard*. Plaintiffs Complaint fails to identify any reviewable agency action, any concrete injury traceable to Defendants, or any plausible theory of relief under settled law. Harvard, the institution at the center of the Complaint, is not a party to the case and is barred by *res judicata* from relitigating the constitutional issues previously resolved in *Students for Fair Admissions*. The AAUP, meanwhile, lacks the authority, standing, or financial posture to assert injury on Harvard's behalf.

13

Their filings confirm this. The Complaint reads not as a legal claim, but as an editorial, an ideological proxy maneuver to reframe narrative loss as constitutional harm. More broadly, this lawsuit exemplifies a deeper institutional pattern: Harvard and its affiliates, including the AAUP, are not safeguarding the Constitution, they are engineering their exit from it. They have abandoned traditional legal doctrine in favor of digitally enforced contracts via Uniform Commercial Code amendments, circumvented federal jurisdiction through state-level financial engineering, and used litigation not to resolve injury but to delay accountability. At a time when they could have helped steward legal clarity and public trust, they chose to fortify power through opaque instruments and performative grievance. The result is a misuse of Article III courts for reputational recovery. That is not standing. That is structural distortion. The Court should dismiss the Complaint in its entirety.

Respectfully submitted,
*Amicus Curiae, pro se*

**Robert A. Pietz**
pietzreceipts@gmail.com
(754) 277-9578
Independence, MO 64056

Dated: April 23, 2025

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 26, 2025, I caused a true and correct copy of the **MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF**, together with the following exhibits:

- **Exhibit A**: [Proposed] Amicus Curiae Brief (Case No. 1:25-cv-11048-ADB),
- **Exhibit B**: Declaration Clarifying Procedural Posture,
- **Exhibit C**: [Proposed] Amicus Curiae Brief (Case No. 1:25-cv-10910-ADB),

to be submitted via UPS to the Clerk of the United States District Court for the District of Massachusetts for docketing. Upon docketing, notice and access will be provided to all counsel of record via the Court's CM/ECF electronic filing system, pursuant to Rule 5(b) of the Federal Rules of Civil Procedure.

Respectfully submitted,

Robert A. Pietz
pietzreceipts@gmail.com
(754)-277-9578
Independence, MO 64056

Dated: April 25, 2025