# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

                  *Plaintiff,*

      v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
NATIONAL INSTITUTES OF HEALTH;
ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the United States
Department of Health and Human Services;
UNITED STATES DEPARTMENT OF
JUSTICE; PAMELA J. BONDI, in her
official capacity as Attorney General of the
United States; UNITED STATES
DEPARTMENT OF EDUCATION; LINDA
M. MCMAHON, in her official capacity as
Secretary of the United States Department of
Education; UNITED STATES GENERAL
SERVICES ADMINISTRATION;
STEPHEN EHIKIAN, in his official capacity
as Acting Administrator of the United States
General Services Administration; UNITED
STATES DEPARTMENT OF ENERGY;
CHRISTOPHER A. WRIGHT, in his official
capacity as Secretary of the United States
Department of Energy; UNITED STATES
NATIONAL SCIENCE FOUNDATION;
SETHURAMAN PANCHANATHAN, in his
official capacity as Director of the United
States National Science Foundation; UNITED
STATES DEPARTMENT OF DEFENSE;
PETER B. HEGSETH, in his official capacity
as Secretary of the United States Department
of Defense; NATIONAL AERONAUTICS
AND SPACE ADMINISTRATION; JANET
E. PETRO, in her official capacity as Acting
Administrator of the National Aeronautics
and Space Administration; UNITED
STATES DEPARTMENT OF
AGRICULTURE; BROOKE L. ROLLINS,

Case No. 1:25-cv-11048

**FIRST AMENDED
COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

in her official capacity as Secretary of
Agriculture; UNITED STATES
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT; and SCOTT
TURNER, in his official capacity as
Secretary of Housing and Urban
Development,

*Defendants*.

## INTRODUCTION

1.    Scientific advancement and the pursuit of knowledge fuel America's innovation, economic success, and global leadership. The commitment to expanding human understanding is foundational at American universities, including Harvard, the Nation's oldest institution of higher learning. Since its founding nearly four centuries ago, Harvard's students, faculty, and researchers have helped identify and solve some of society's most pressing problems. Those pathbreaking and life-saving advancements are due in part to the longstanding collaboration between universities such as Harvard and the federal Government dating back to the Second World War. Millions of Americans are healthier and safer as a result. Federal funding has enabled researchers at Harvard to develop novel drugs to fight Parkinson's and Alzheimer's diseases, engineer nanofibers to protect servicemembers and first responders, support American astronauts in space, and design an artificial intelligence system that can be used to diagnose and treat cancer.

2.    In recent months, the federal Government has launched a broad attack on the critical funding partnerships that make this invaluable research possible. To date, the Government has— with little warning and even less explanation—slashed billions of dollars in federal funding to universities across America, including Brown, Columbia, Cornell, Princeton, the University of Pennsylvania, and Northwestern. This case involves the Government's efforts to use the withholding of federal funding as leverage to gain control of academic decisionmaking at Harvard.

3.    On April 11, 2025, citing concerns of antisemitism and ideological capture, the Government identified ten conditions Harvard must satisfy to receive federal research funding already committed to by the Government and relied on by Harvard, its researchers, and its affiliates (the "April 11 Letter," attached as Exhibit A). Ex. A at 2, 4. The Government dictated that Harvard "reform and restructur[e]" its governance to "reduc[e] the power" of certain students, faculty, and administrators. *Id.* at 2. It required that Harvard hire a third-party to conduct an "audit" of the viewpoints of Harvard's student body, faculty, and staff. *Id.* at 3-4. Then, based on the results of this university-wide viewpoint audit, Harvard must "hir[e] a critical mass of new faculty" and "admit[] a critical mass of students" to achieve "viewpoint diversity" in "each department, field, or teaching unit"—to the Government's satisfaction as determined in the Government's sole discretion. *Id.* And the Government has demanded that Harvard terminate or reform its academic "programs" to the Government's liking. *Id.* at 4.

4.    All told, the tradeoff put to Harvard and other universities is clear: Allow the Government to micromanage your academic institution or jeopardize the institution's ability to pursue medical breakthroughs, scientific discoveries, and innovative solutions.

5.    Harvard is committed to "combatting antisemitism, one of the most insidious forms of bigotry"[1] and to "broaden[ing] the intellectual and viewpoint diversity within [its] community."[2] Harvard is actively undertaking structural reforms to do both. And while important steps have been taken, Harvard acknowledges that there is still "much work to do."[3] Harvard also fully recognizes

---

[1]    Alan M. Garber, *Our Resolve*, Harvard Univ.: Off. of the President (Mar. 31, 2025), https://perma.cc/4UC7-E65V.

[2]    Alan M. Garber, *The Promise of American Higher Education*, Harvard Univ.: Off. of the President (Apr. 14, 2025), https://perma.cc/L4G7-J8UB.

[3]    Garber, *Our Resolve*, *supra* n.1.

the requirement that it comply with all federal laws, including Title VI of the Civil Rights Act of 1964.

6.     But, as Harvard made clear in a letter to the Government (attached as Exhibit B), "[n]either Harvard nor any other private university can allow itself to be taken over by the federal government." Ex. B at 3. In the words of Harvard's President, Alan M. Garber, "[t]he University will not surrender its independence or relinquish its constitutional rights."[4] "No government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue."[5]

7.     In response to Harvard's defense of its own constitutional freedoms, the federal Government announced that it was freezing "$2.2 billion in multiyear grants and $60M in multiyear contract value to Harvard University" (the "April 14 Freeze Order," attached as Exhibit C). Ex. C at 2. Within hours of the April 14 Freeze Order, Harvard began receiving stop work orders. And the situation is getting worse. On April 20, it was reported that the Government is "planning to pull an additional $1 billion of [Harvard]'s funding for health research."[6] On May 5, the Secretary of Education, purporting to speak on behalf of every agency and department, announced an "end of new grants for the University," and directed that "Harvard should no longer seek GRANTS from the federal government, since none will be provided," and "Harvard will cease to be a publicly funded institution" (the "May 5 Letter" or "May 5 Freeze Order," attached as Exhibit D). Ex. D at 3-4. That announcement reiterated the Government's earlier demands and

---

[4]    Garber, *The Promise of American Higher Education*, *supra* n.2; *see also Research Funding*, Harvard Univ., https://www.harvard.edu/research-funding.

[5]    Garber, *The Promise of American Higher Education*, *supra* n.2.

[6]    Douglas Belkin & Liz Essley Whyte, *Trump Administration Irate at Harvard, Plans to Pull Additional $1 Billion in Funding*, Wall St. J. (Apr. 20, 2025), https://tinyurl.com/5e7r7abm.

said it was based, among other things, on the Government's assessment of Harvard's "academic rigor," admissions requirements and practices, grading systems, faculty hiring, teaching, and course construction. *Id.* at 2. The April 14 Freeze Order and May 5 Freeze Order are collectively referred to herein as the "Freeze Orders."

8.      Following in the footsteps of the April 14 and May 5 Freeze Orders, Harvard began, starting on May 6, to receive institution-wide termination notices for various agencies, invoking the earlier April 11 and 14 communications. On May 6, for example, the National Institutes of Health sent Harvard a letter stating that it was terminating all of Harvard's grant funding from that agency based on "the University's unwillingness to take corrective action or implement necessary reforms" and that Harvard's grant "awards no longer effectuate agency priorities" because of "recent events at Harvard University involving antisemitic action" and "Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students" (the "May 6 Letter" or "May 6 NIH Termination Letter," attached as Exhibit E). Ex. E at 2-3. The letter states that "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action," but "no corrective action is possible here." *Id.* at 3.

9.      Similarly, on May 9, the United States Department of Agriculture sent Harvard a letter announcing the termination of awards (the "May 9 letter" or "May 9 USDA Termination Letter," attached as Exhibit F).

10.     On May 12, other agencies followed suit. Harvard received analogous letters from the United States Department of Energy (the "May 12 Energy Termination Letter," attached as Exhibit G), United States Department of Defense (the "May 12 DoD Termination Letter," attached as Exhibit H), the National Science Foundation (the "May 12 NSF Termination Letter," attached

as Exhibit I), and the United States Department of Housing and Urban Development (the "May 12 HUD Termination Letter," attached as Exhibit J) (collectively, the "May 12 Letters" or "May 12 Termination Letters"). And the Department of Education has sent individual grant termination notices.

11.    Defendants' actions are unlawful. The First Amendment does not permit the Government to "interfere with private actors' speech to advance its own vision of ideological balance," *Moody v. NetChoice*, 603 U.S. 707, 741 (2024), nor may the Government "rely[] on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech," *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 189 (2024) (citation omitted). The Government's attempt to coerce and control Harvard disregards these fundamental First Amendment principles, which safeguard Harvard's "academic freedom." *Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007). A threat such as this to a university's academic freedom strikes an equal blow to the research conducted and resulting advancements made on its campus.

12.    The Government's actions flout not just the First Amendment, but also federal laws and regulations. The Government has expressly invoked the protections against discrimination contained in Title VI of the Civil Rights Act of 1964 as a basis for its actions. Make no mistake: Harvard rejects antisemitism and discrimination in all of its forms and is actively making structural reforms to eradicate antisemitism on campus. But rather than engage with Harvard regarding those ongoing efforts, the Government announced a sweeping freeze of current and future funding for medical, scientific, technological, and other research that has nothing at all to do with antisemitism and Title VI compliance. Moreover, Congress in Title VI set forth detailed procedures that the Government "shall" satisfy before revoking or refusing to grant or continue federal funding based

on discrimination concerns. 42 U.S.C. § 2000d-1. Those procedures effectuate Congress's desire that "termination of or refusal to grant or to continue" federal financial assistance be a remedy of last resort. *Id.* The Government made no effort to follow those procedures—nor the procedures provided for in Defendants' own agency regulations—before freezing Harvard's federal financial assistance.

13.    These fatal procedural shortcomings are compounded by the arbitrary and capricious nature of Defendants' abrupt and indiscriminate decision. Even before the freezes and terminations, the Government had threatened to terminate up to $8.7 billion in federal funding not just to Harvard, but also to preeminent Boston hospitals such as Massachusetts General Hospital, Beth Israel Deaconess Medical Center, Brigham and Women's Hospital, Boston Children's Hospital, and the Dana-Farber Cancer Institute. These hospitals are independent corporate entities with their own boards of directors or trustees and their own separate officers, leadership, and management. They are not under Harvard's control. The hospitals have no control over Harvard's enforcement of Title VI requirements, and vice versa. These hospitals have their own tax identification numbers, endowments, and accounts. And they seek and receive federal financial assistance directly from federal agencies, not through Harvard.

14.    The Government has not identified—and cannot identify—any rational connection between antisemitism concerns and the medical, scientific, technological, and other research it has frozen or terminated that aims to save American lives, foster American success, preserve American security, and maintain America's position as a global leader in innovation. Nor has the Government acknowledged the significant consequences that the indefinite freeze and termination of billions of dollars in federal research funding will have on Harvard's research programs, the

beneficiaries of that research, and the national interest in furthering American innovation and progress.

15.    The Government has not characterized any of its actions as a "termination of or refusal to grant or to continue assistance" under 42 U.S.C. § 2000d-1. But the effect of the Government's decisions is the same. Under whatever name, the Government has ceased the flow of funds to Harvard as part of its pressure campaign to force Harvard to submit to the Government's control over its academic programs. That, in itself, violates Harvard's constitutional rights. But the Government has also failed to engage in the statutorily mandated process Congress required under Title VI before funds are cut off, which provides independent grounds for declaring the freeze and subsequent termination unlawful. By accepting federal funds, Harvard agreed to abide by the provisions in Title VI and the relevant agencies' corresponding regulations. But Harvard's agreement is not a blank check for agencies to impose the Government's recent, unrelated demands as a condition of continued funding. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) ("[T]he legitimacy of Congress' power to enact Spending Clause legislation rests . . . on whether the recipient [of federal funds] voluntarily and knowingly accepts the terms of that contract," and "[r]ecipients cannot knowingly accept the deal with the Federal Government unless they would clearly understand the obligations that would come along with doing so." (cleaned up)).

16.    Defendants' actions threaten Harvard's academic independence and place at risk critical lifesaving and pathbreaking research that occurs on its campus. And they are part of a broader effort by the Government to punish Harvard for protecting its constitutional rights. In the month since Harvard rejected the Government's initial demands, the Government has launched multiple investigations and other actions against Harvard. Although the Government has indicated

that it has made several attempts to contact the University, at no time has it rescinded the draconian demands laid out in the April 11 Letter. Indeed, the Government has only doubled down, reupping the same demands in the May 5 Letter while noting that the "Administration's priorities have not changed." Ex. D at 4. Meanwhile, it has only ratcheted up funding cuts, investigations, and threats that will hurt students from every state in the country and around the world, as well as research that improves the lives of millions of Americans.

17.    Plaintiff President and Fellows of Harvard College ("Harvard") brings this civil action under the Constitution of the United States, the Administrative Procedure Act, and Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d-2, to enjoin Defendants from exceeding the bounds of their legal authority and to protect Harvard's constitutional rights.

## PARTIES

18.    Plaintiff President and Fellows of Harvard College is a non-profit corporation commonly known as Harvard University. Harvard is a private research university and the oldest institution of higher learning in the United States. It provides undergraduate and graduate instruction to more than 24,000 enrolled students annually across 13 schools, and it produces cutting-edge research in fields such as oncology, epidemiology, biotechnology, and many others. Advancements at Harvard have made Americans healthier and safer, increased our knowledge of the world, and made our nation more secure.

19.    Defendant United States Department of Health and Human Services ("HHS") (including all subagencies over which HHS exercises legal control) is an executive department of the United States. The National Institutes of Health ("NIH") is an agency within HHS.

20.    Defendant Robert F. Kennedy, Jr. is the Secretary and head of Defendant HHS. He is sued in his official capacity.

21.    Defendant United States Department of Justice ("DOJ") (including all subagencies

over which DOJ exercises legal control) is an executive department of the United States.

22.     Defendant Pamela J. Bondi is the Attorney General of the United States and the head of Defendant DOJ. She is sued in her official capacity.

23.     Defendant United States Department of Education (including all subagencies over which the United States Department of Education exercises legal control) is an executive department of the United States.

24.     Defendant Linda M. McMahon is the Secretary and head of Defendant United States Department of Education. She is sued in her official capacity.

25.     Defendant United States General Services Administration ("GSA") (including all subagencies over which GSA exercises legal control) is an agency of the United States.

26.     Defendant Stephen Ehikian is the Acting Administrator of Defendant GSA. He is sued in his official capacity.

27.     Defendant United States Department of Energy (including all subagencies over which the United States Department of Energy exercises legal control) is an executive department of the United States.

28.     Defendant Christopher A. Wright is the Secretary and head of Defendant United States Department of Energy. He is sued in his official capacity.

29.     Defendant United States National Science Foundation ("NSF") (including all subagencies over which NSF exercises legal control) is an agency of the United States.

30.     Defendant Sethuraman Panchanathan is the Director and head of Defendant NSF. He is sued in his official capacity.

31.     Defendant United States Department of Defense ("DoD") (including all subagencies over which DoD exercises legal control) is an executive department of the United States.

32.     Defendant Peter B. Hegseth is the Secretary and head of Defendant DoD. He is sued in his official capacity.

33.     Defendant National Aeronautics and Space Administration ("NASA") (including all subagencies over which NASA exercises legal control) is an agency of the United States.

34.     Defendant Janet E. Petro is the Acting Administrator of Defendant NASA. She is sued in her official capacity.

35.     Defendant United States Department of Agriculture ("USDA") (including all subagencies over which USDA exercises legal control) is an executive department of the United States.

36.     Defendant Brooke L. Rollins is the Secretary and head of Defendant USDA. She is sued in her official capacity.

37.     Defendant United States Department of Housing and Urban Development ("HUD") (including all subagencies over which HUD exercises legal control) is an executive department of the United States.

38.     Defendant Scott Turner is the Secretary and head of Defendant HUD. He is sued in his official capacity.

### JURISDICTION AND VENUE

39.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this civil action arises under the Constitution of the United States and federal statutes, including Title VI of the Civil Rights Act of 1964, as amended, *see* 42 U.S.C. § 2000d-2. The Court is authorized to

award the requested relief under 5 U.S.C. §§ 702, 703, 705, and 706; 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 1988; and through the equitable powers of this Court.

40.     Harvard does not seek money damages or an order mandating specific performance of any contract. Instead, it seeks an order declaring unlawful and setting aside sweeping agency action taken in violation of Harvard's constitutional rights under the First Amendment and its rights guaranteed by statute and regulation. Therefore, this Court has jurisdiction over Harvard's claims.

41.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and officers of the United States acting in their official capacities, a substantial part of the events or omissions giving rise to the claims occurred in this District, Plaintiff resides in this District, and no real property is involved.

## BACKGROUND

### Federally Funded Research at Harvard University

42.     Harvard University is the oldest institution of higher learning in the United States and one of the world's leading research universities. For decades, universities like Harvard have conducted research identified by the federal Government as essential to advancing the boundaries of human knowledge and improving the lives of Americans. While this partnership traces back to our country's founding, the partnership between the Government and universities grew stronger during and after the Second World War, as the Government increasingly recognized that universities can help achieve scientific and technological advances that benefit the public.[7]

---

[7]     Ronald Brownstein, *Trump's Drive Against Top Universities Could Carry a Big Economic Cost*, CNN (Apr. 13, 2025), https://perma.cc/HR4S-5MC2.

43.    Federal funding for university research serves as a cornerstone of the American research system. It is an essential resource for the groundbreaking discoveries made today by Harvard's faculty and staff, leading not only to scientific advancement and innovation, but also to the country's economic growth. Today, Harvard's federally funded research includes particular strengths in oncology, immunology, neuroscience, molecular biology, genomics, quantum science, and other areas of technology that support our national economy and defense.

44.    Harvard's researchers, in collaboration with the federal Government, have pioneered groundbreaking innovations that make millions of people in our country healthier and safer across a wide range of medical, engineering, scientific, and other fields. Their research includes, for example:

- *Cancer Research*: Harvard's cancer research includes identifying mechanisms that drive disease development at all stages including tumor metastasis; developing new therapeutic approaches with the goal of preventing, targeting and suppressing cancer at every stage; mapping the metabolic signaling pathways that drive the association of cancer with other diseases to restore proper cellular function and enhance prevention; and developing a new machine learning method to model the behavior of all 25,000 human genes as they respond to high-intensity treatments like chemotherapy, which the National Cancer Institute cited as an advancement in basic cancer research that will lay the groundwork for future clinical breakthroughs.

- *Infectious Diseases Research*: Harvard researchers study infectious diseases to better understand and address the global threat of multidrug-resistant infections; develop new tools for global pandemic prevention; discover new therapeutic antibodies and small molecules to treat or cure viral diseases; and develop enhanced approaches to monitor disease outbreaks and to predict patterns of spread.

- *Microbiome Research*: Harvard's microbiome research includes developing new frontiers in precision medicine that can help individuals reduce their risk of cancer and other diseases by better understanding and leveraging our bodies' relationship with the multitude of bacteria and other microorganisms that contribute to human health and disease.

- *Toxin Reduction Research*: Harvard's toxin reduction research includes studying the harm from microplastics on sperm counts and fertility, and developing life-saving guidance for those exposed to high levels of toxins, including firefighters, individuals working in environments with high exposure potentials (*e.g.*, members of the military, miners, and chemical factory workers), and children in rural communities.

- *Neurological Research*: Harvard's neurological research includes identifying numerous modifiable risk factors for Parkinson's disease, multiple sclerosis, and other neurological diseases including conditions that are generally age-related, such as Alzheimer's (and other forms of dementia) and stroke, which creates the potential to significantly cut disease incidence and reduce healthcare costs. Other research involves efforts to better understand the role of infections in seeding neurodegenerative disorders, with important implications for prevention, diagnosis, and treatment. And other research involves studying the long-term neurologic effects of radiation and chemotherapy-based treatment on young children who survived cancer and identifying treatments to improve outcomes that also reduce the impact of therapy-related collateral damage, which is also relevant to adult cancer survivors.

- *Biotechnology*: Harvard's biotechnology research includes studying how spaceflight, including space-related radiation, affects blood cell formation in astronauts on the upcoming Space Station and ARTEMIS missions. That research is also developing a new class of anesthetics that could lead to breakthroughs in the care of wounded servicemembers in the field that would obviate the need for trained anesthesiologists or hospitalization. And it is advancing organ chip technology to further understanding of, among other things, illnesses and injuries that result from high doses of radiation.

- *Technological Innovation*: Additional research at Harvard supports innovations in quantum computing, artificial intelligence and machine learning, nanomaterials, microchip design, biomechanics, chemical engineering, next-generation batteries, computer science, "smart" living environments for the elderly, and more.

- *Other Military Advancements and National Security*: Harvard also dedicates research to reducing the short- and long-term consequences of traumatic battlefield related injuries; developing soft robotics for enhancing battlefield performance; creating compact and rapidly deployable (foldable) bridges and other structures for military use; developing radiation countermeasures and limb regeneration; and developing hack-resistant computer networks, rapid infectious agent diagnostics, and ways to combat antibiotic resistance.

45.    Federal funding for university research typically flows through a grant process administered by federal agencies. *See, e.g.*, 42 U.S.C. § 241(a)(3) (authorizing NIH to "make grants-in-aid to universities" for research support). As NIH explains, it is "the largest public funder of biomedical research in the world," investing "most of its nearly $48 billion budget in medical research seeking to enhance life and to reduce illness and disability."[8] Through the appropriations process, Congress establishes the annual budgets for research-focused federal agencies like NIH, NSF, NASA, and others that fund university research. *See, e.g.*, Further Consolidated

---

[8]    *Grants & Funding*, Nat'l Insts. of Health, https://perma.cc/B6CV-TKP7.

Appropriations Act, Pub. L. No. 118-47, 138 Stat. 460, 656-60 (2024) (appropriating funds for NIH research); Consolidated Appropriations Act, Pub. L. 118-42, 138 Stat. 25, 157-63 (2024) (appropriating funds for NSF and NASA research). These appropriations directly determine how much money is available to universities and other research institutions for research grants that are most often awarded on a competitive basis.

46.     Pursuant to Congress's directives, the federal Government fuels critical research at Harvard, which is one of the nation's leading recipients of NIH grants. Along with investments by the universities themselves, these grants secure the funding necessary to pursue biomedical research and other research endeavors across the University. Numerous Harvard professors, including Nobel laureates, rely on NIH and other federal funding for their work.[9] Federally funded research at Harvard has led to life-altering advancements in improving cancer diagnoses.[10] It supports brain health and trauma research for veterans.[11] And federal funding has supported projects focused on understanding neurodegenerative disease and creating a new class of antibiotics to treat infections.[12] It has also enabled Harvard researchers to study how spaceflight affects blood cell formation in astronauts on upcoming missions.[13]

---

[9]     *8 Harvard Medical School Researchers Receive NIH Awards*, Harvard Med. Sch. (Oct. 26, 2023), https://perma.cc/MNX2-V67K; *NIH Grantees Win Nobel Prizes*, NIH Record (Oct. 25, 2024), https://perma.cc/H99M-23YU (recognizing NIH-funded Harvard professor Gary Ruvkun for his 2024 Nobel Prize); *OER Congratulates Recent Nobel and Lasker Award Winners*, NIH Off. of Extramural Rsch. (Oct. 1, 2009), https://perma.cc/JL4W-R5ZN (congratulating NIH-funded Harvard professor Jack Szostak for his 2009 Nobel Prize).

[10]    *See* Ekaterina Pesheva, *A New Artificial Intelligence Tool for Cancer*, Harvard Med. Sch. (Sept. 4, 2024), https://perma.cc/LLU4-Y4U8.

[11]    *See Comprehensive Brain Health and Trauma Program*, Home Base, https://perma.cc/Q9UW-M5V7.

[12]    *See* Sy Boles, *NIH Funding Delivers Exceptional Economic Returns,* Harvard Gazette (Mar. 11, 2025), https://tinyurl.com/ar3ajssj.

[13]    *Human Organs-on-Chips*, Wyss Inst., https://perma.cc/AT2S-99ST.

47.     Harvard's research programs—funded in part by Defendants—serve as training grounds for the next generation of scientific, technological, medical, and public health leaders, with grants supporting the work of thousands of graduate students and postdoctoral fellows.

**Title VI and Federal Financial Assistance**

48.     Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI permits an agency, under detailed conditions, to enforce this substantive provision by terminating or suspending federal financial assistance.

49.     If an agency wants to freeze federal financial assistance to universities based on alleged civil rights violations under Title VI, then it must follow a detailed and mandatory statutory framework. The Supreme Court has referred to these procedural limits as "elaborate restrictions on agency enforcement." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).

50.     No action to terminate or refuse to grant or continue federal financial assistance may be taken "until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1; *see Adams v. Richardson*, 351 F. Supp. 636, 641 (D.D.C. 1972) ("The underlying thrust of the statute requires that the agency involved . . . attempt at the outset to secure compliance by voluntary means, if such method is reasonably possible. This course involves negotiation, and negotiation takes time."); *cf. Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486-89 (2015) (discussing similar procedural requirement in Title VII context).

51.     If the agency determines that voluntary compliance is not possible, then it must initiate formal proceedings, specifically a hearing, and must make express findings on the record

before terminating or refusing to grant or to continue federal financial assistance. 42 U.S.C. § 2000d-1; *see Washington Legal Found. v. Alexander*, 984 F.2d 483, 484 (D.C. Cir. 1993). The agency head must file "a full written report of the circumstances and the grounds for such action" with the relevant committees in the House and Senate. 42 U.S.C. § 2000d-1. Further, the action does not "become effective until thirty days have elapsed after the filing of such report." *Id.*

52.    The agency Defendants' regulations layer on top of the statutory text of 42 U.S.C. § 2000d-1 and provide additional details on procedural requirements for any termination or refusal to grant or to continue federal financial assistance based on Title VI. *E.g.*, 45 C.F.R. § 80.8-.10 (HHS); 34 C.F.R. § 100.8 (Education); 41 C.F.R. § 101-6.211-1 to -4 (GSA); 28 C.F.R. § 42.108 (DOJ). These regulations are binding on the agencies that issued them.

53.    Defendants know and are capable of following these mandatory procedural steps. On the very same day as the April 11 Letter, DOJ's Civil Rights Division sent Harvard a letter announcing that it was "commencing a compliance review investigation of Harvard University [specifically Harvard Medical School] pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*," and noting that "[i]f we conclude that Harvard University is violating Title VI, we will inform you and work with you to secure compliance by informal voluntary means. 28 C.F.R. §§ 42.107 & 42.108."[14]

---

[14]    Letter from Harmeet K. Dhillon, Assistant Att'y Gen., Civ. Rights Div., U.S. Dep't of Just., to Jennifer O'Connor, Vice President & Gen. Couns., Harvard Univ. (Apr. 11, 2025).

**The University's Response to Antisemitism on Harvard's Campus**

54.    On October 7, 2023, the terrorist organization Hamas conducted a surprise attack on Israeli citizens, killing and brutalizing thousands of Israelis and Americans and taking more than 240 people hostage.[15] This began an ongoing war between Israel and Hamas.[16]

55.    The escalating conflict in the Middle East dominated headlines around the globe. In the United States, protests erupted on university campuses across the country. Like other schools, Harvard experienced increased tensions among members of its campus community, including students.[17] Members of the Jewish and Israeli communities at Harvard reported treatment that was vicious and reprehensible.

56.    Harvard has made policy and other changes over the last year aimed at ensuring its campus is safe, fair, and welcoming to Jewish and Israeli students. Harvard has adopted new accountability procedures and clarified policies; imposed meaningful discipline on those who violate applicable policies; enhanced programs designed to address bias and promote ideological diversity and civil discourse; hired staff to support these programs and support students; and enhanced safety and security measures.

57.    In January 2024, then-interim President Garber and the Deans of Harvard's schools issued Guidance on Protest and Dissent under the University-wide Statement on Rights and

---

[15]    Josef Federman & Issam Adwan, *Hamas Surprise Attack Out of Gaza Stuns Israel and Leaves Hundreds Dead in Fighting, Retaliation*, Associated Press (Oct. 7, 2023), https://tinyurl.com/mr2m7hek.

[16]    *Id.*

[17]    J. Sellers Hill & Nia L. Orakwue, *Harvard Student Groups Face Intense Backlash for Statement Calling Israel 'Entirely Responsible' for Hamas Attack*, Harvard Crimson (Oct. 10, 2023), https://perma.cc/Z3K4-QJKF.

Responsibilities.[18] This Guidance made clear that protests are not permitted in classrooms, libraries, dormitories, dining halls, Harvard offices, or other places where they "would interfere with the normal activities of the University."[19] It also reiterated that protests may not interfere "with the free flow of vehicular, bicycle, or pedestrian traffic" on campus.[20]

58.    In August 2024, Harvard issued updated information on Rules for Use of Campus Spaces,[21] which expressly prohibit, among other things, structures such as tents, unauthorized exhibits and displays, and excessive noise.[22]

59.    In September 2024, Harvard released Guidance explaining that online "doxing" violates the University's prohibition on "intense personal harassment" and constitutes bullying under its Non-Discrimination and Anti-Bullying Policies.[23]

60.    In November 2024, Harvard issued a "Frequently Asked Questions" statement ("FAQs") on "Protests in Libraries" explaining how its Protest and Dissent Guidelines found in the University-wide Statement on Rights and Responsibilities apply to protests in Harvard's libraries. The FAQs underscore that when a library space is used to "express a shared message,"

---

[18]    *Statement of Interim President and Deans on University Rights and Responsibilities*, Harvard Univ.: Off. of the President (Jan. 19, 2024), https://perma.cc/2ND4-HHDV.

[19]    *Id.*

[20]    *Id.*

[21]    *Rules for Use of Campus Spaces*, Harvard Univ.: Off. of the Exec. Vice President (Aug. 1, 2024), https://perma.cc/3HTH-S4B2.

[22]    *Campus Use Rules*, Harvard Univ.: Off. of the Exec. Vice President, https://perma.cc/2M4M-ZS2C.

[23]    *Guidance on Addressing Online Harassment*, Harvard Univ.: Off. of the President (Sept. 5, 2024), https://perma.cc/25YW-EFN2.

even if the participants are silent, the demonstration "interfere[s] with the room's purpose as a place of study and research" and violates University policies.[24]

61.    Harvard has also made changes to clarify the scope of prohibited conduct aimed at Jewish and Israeli students. In January 2025, Harvard committed to take account of the International Holocaust Remembrance Alliance's ("IHRA") definition of antisemitism in its anti-harassment policies and disciplinary proceedings.[25] The United States, as a member of IHRA, uses this definition and has encouraged other governmental and international organizations to use it. Harvard is one of only a few universities to have adopted the IHRA definition.

62.    In March 2025, Harvard released updated "Frequently Asked Questions" clarifying that both Jewish and Israeli identities are covered by the University's Non-Discrimination and Anti-Bullying Policies, that the IHRA definition of antisemitism will be used, and that IHRA examples will be considered in assessing incidents.[26] The guidance also made clear that the Non-Discrimination policy applies to conduct targeting Zionists.[27]

63.    Harvard has taken action to enforce these policies in response to campus incidents in the current academic year. During the fall 2024 semester, Harvard suspended library access for dozens of students and faculty members who violated University policies in connection with protests in Harvard's college, law school, and divinity school libraries.[28] In March 2025, Harvard

---

[24] *Frequently Asked Questions: Protests in Libraries*, Harvard Libr. (Dec. 10, 2024), https://perma.cc/AK9P-GPHH.

[25] Vimal Patel, *Harvard Adopts a Definition of Antisemitism for Discipline Cases*, N.Y. Times (Jan. 21, 2025), https://tinyurl.com/2mannmaw.

[26] *Frequently Asked Questions*, Harvard Univ.: Off. for Cmty. Conduct, https://perma.cc/3NKY-LD97.

[27] *Id.*

[28] *See* Neil H. Shah, *Faculty Members Suspended From Harvard's Main Library After 'Study-In' Protest*, Harvard Crimson (Oct. 25, 2024), https://perma.cc/D3RV-8HJR; S. Mac Healy &

terminated a University employee who tore down Chabad posters (which showed images of Israeli hostages) in violation of Harvard's policy against "'tampering with or removing' approved displays."[29] And in April 2025, Harvard suspended the undergraduate Palestine Solidarity Committee and banned the organization from hosting public events until July due to violations of Harvard's Campus Use Rules.[30]

64. Well before the Government's engagement, Harvard had initiated steps to address antisemitism on campus. Recognizing the seriousness of this issue, Harvard has taken and will continue to take steps to do so in the future.

65. Concurrently with these changes, a Presidential Task Force on Combating Antisemitism ("Harvard Task Force") was formed on January 19, 2024, by President Garber and was charged with "identifying the root causes of and contributing factors to bias-based behaviors on campus," "evaluating evidence regarding the characteristics and frequency of these behaviors," and "recommending approaches to combat bias and to mitigate its impact on campus."[31]

66. The Harvard Task Force released its preliminary recommendations on June 6, 2024.[32] The Harvard Task Force observed that, since October 2023, Jewish and Israeli students

---

Saketh Sundar, *HLS Banned 60 Students From Its Library for a 'Study-In.' Dozens Just Did It Again*, Harvard Crimson (Oct. 25, 2024), https://perma.cc/GH98-8GAJ; Rachael A. Dziaba & Aisatu J. Nakoulima, *Students Suspended from Harvard Divinity School Library After Pray-In*, Harvard Crimson (Nov. 13, 2024), https://perma.cc/3RPA-TVNH.

[29] Samuel A. Church & Cam N. Srivastava, *Librarian Who Removed Chabad Poster Is No Longer Employed at Harvard*, Harvard Crimson (Mar. 10, 2025), https://perma.cc/U4VJ-AYTJ.

[30] Samuel A. Church, Elyse C. Goncalves & Cam N. Srivastava, *Harvard Places Palestine Solidarity Committee on Probation Over Tuesday HOOP Rally*, Harvard Crimson (Apr. 3, 2025), https://perma.cc/SR8Q-K6CA.

[31] *Announcement of Presidential Task Forces*, Harvard Univ.: Off. of the President (Jan. 19, 2024), https://perma.cc/45XJ-4NSV.

[32] *See generally* Presidential Task Force on Combating Antisemitism, Harvard Univ., *Preliminary Recommendations* (June 6, 2024), https://perma.cc/PD6T-7DGN.

had been subject to incidents of "shunning, harassment, and intimidation" on campus.[33] In response, the Harvard Task Force proposed "short-term actionable items" including releasing a statement clarifying Harvard's values, strengthening anti-bullying policies, and fostering constructive dialogue on campus.[34] Harvard has already acted on these recommendations.

67.    On April 29, 2025, the Harvard Task Force released its full report and detailed recommendations for ongoing reforms to ensure the safety and inclusion of Harvard's Jewish and Israeli student populations.[35] Harvard continues to update and enforce its policies and procedures to protect Jewish and Israeli members of the Harvard community while permitting the free and open exchange of ideas.

### Defendants' Actions Threatening Harvard's Federal Research Funding

68.    On February 3, 2025, DOJ announced the formation of a multi-agency Task Force to Combat Antisemitism ("Federal Task Force") including representatives from the Department of Education, HHS, and other agencies, led by Senior Counsel to the Assistant Attorney General for Civil Rights, Leo Terrell.[36]

69.    On February 26, 2025, a news article reported Terrell as saying, "When you see universities start losing millions of dollars in federal funding, you're going to see a change in their behavior."[37] A few days later, Terrell stated in a Fox Business clip he later shared on X, "I've

---

[33]    *Id.* at 1.

[34]    *Id.* at 1-5.

[35]    Alan M. Garber, *Update on Presidential Task Forces*, Harvard Univ.: Off. of the President (Apr. 29, 2025), https://perma.cc/YMG7-74VF.

[36]    Press Release, U.S. Dep't of Justice, *Justice Department Announces Formation of Task Force to Combat Anti-Semitism* (Feb. 3, 2025), https://perma.cc/Z4UV-HB2Y.

[37]    Akiva Van Koningsveld, *Head of DOJ Antisemitism Task Force: We'll Put Hamas Supporters in Jail 'for Years,'* Jewish News Syndicate (Feb. 26, 2025), https://perma.cc/5327-BU4R.

targeted ten schools. Columbia, Harvard, Michigan, UCLA, USC. Let me tell you what we're going to do. We're going to take away your funding."[38] These statements echo earlier comments made by Terrell and President Donald J. Trump. President Trump's campaign website touted his plan "to reclaim our once great educational institutions from the radical Left and Marxist maniacs,"[39] including by threatening to "take the billions and billions of dollars that we will collect by taxing, fining, and suing excessively large private university endowments" from "Harvard and other once-respected universities."[40] And prior to Terrell's appointment as Senior Counsel to the Assistant Attorney General for Civil Rights and head of the Federal Task Force, he promised that "Harvard will lose much more [funding] effective January 2025" because "America will no longer fund Jew Hating Schools!"[41]

70.    On February 27, 2025, Harvard received a letter (attached as Exhibit K) from the Federal Task Force. That letter requested a meeting "within 30 days with relevant administrators, faculty, staff members, and any on-campus Jewish stakeholder groups" to help the Federal Task Force "fully and objectively evaluate the allegations and determine what further action, if any, may be warranted." Ex. K at 3.

71.    On February 28, 2025, the Federal Task Force issued a press release (attached as Exhibit L) announcing its plans to visit ten university campuses, including Harvard, to gather information about allegations of antisemitic incidents as it considers whether remedial action is warranted.

---

[38]    @TheLeoTerrell, X.com (Feb. 28, 2025, 11:48 AM ET), https://perma.cc/5NBW-B6P5.

[39]    *Agenda47: Protecting Students from the Radical Left and Marxist Maniacs Infecting Educational Institutions*, DonaldJTrump.com (July 17, 2023), https://perma.cc/7VKE-VN89.

[40]    *Agenda47: The American Academy*, DonaldJTrump.com (Nov. 1, 2023), https://perma.cc/WFL2-Y262.

[41]    @TheLeoTerrell, X.com (Oct. 20, 2024, 3:33 PM ET), https://perma.cc/9WUM-PKHK.

72.     In the weeks following DOJ's letter to Harvard requesting a meeting and the Federal Task Force's press release announcing campus visits, Harvard worked with Government officials to schedule an on-campus meeting. A campus visit was scheduled for late April 2025.

73.     On March 31, 2025, Harvard received a letter from GSA (the "March 31 Letter," attached as Exhibit M). The March 31 Letter announced a federal review of more than $8.7 billion in federal research grants to Harvard and "its affiliates," Ex. M at 2—an apparent reference to Boston-area teaching hospitals and their affiliated professional corporations or group medical practices that employ Harvard Medical School faculty, but which are entirely independent entities and are *not* part of Harvard.

74.     The March 31 Letter linked the review of funding to Defendants' allegations about antisemitism on Harvard's campus: Harvard is "being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment." *Id.* The cover e-mail (attached as Exhibit N) transmitting the letter to President Garber further confirmed: "This review is being conducted in support of President Trump's Executive Order, 'Additional Measures to Combat Anti-Semitism.'" Ex. N at 2. And Defendants' press release announcing the review offered even further confirmation: the review of funding is "part of an investigation aimed at eliminating anti-Semitic harassment on college campuses."[42] The press release referred to a "similar ongoing

---

[42]   Press Release, U.S. Dep't of Health and Human Servs., *HHS, ED, and GSA Initiate Federal Contract and Grant Review of Harvard University* (Mar. 31, 2025), https://tinyurl.com/4nzf3zth (cleaned up).

review of Columbia University,"[43] and linked to another press release concerning "ongoing investigations for potential violations of Title VI of the Civil Rights Act" at Columbia.[44]

75.    On April 1, 2025, at a private lunch, President Trump proposed canceling all federal funds promised to Harvard. According to an anonymous source, President Trump asked, "What if we never pay them? . . . Wouldn't that be cool?"[45]

76.    On April 3, 2025, Harvard's President received another e-mail (attached as Exhibit O). The e-mail's subject line was "Official Notice: Task Force to Combat Anti-Semitism Letter of Demands to Harvard University." Ex. O at 2. The e-mail stated: "I am sending you an official notice of pre-conditions your institution must comply with in order to be in good standing and continue to be the recipient of federal taxpayer dollars." *Id.*

77.    A letter accompanying the e-mail (the "April 3 Letter," attached as Exhibit P) described "several broad, non-exhaustive areas of reform that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars." Ex. P at 2. The proposed reforms included governance reforms "to foster clear lines of authority"; oversight of "biased programs that fuel antisemitism" to "improve viewpoint diversity"; and efforts "to shutter" diversity, equity, and inclusion ("DEI") programs that "teach" certain things. *Id.* at 2-3. The April 3 Letter further stated that Harvard had "failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and

---

[43]    *Id.*

[44]    Press Release, U.S. Gen. Servs. Admin., *HHS, ED and GSA Respond to Columbia University's Actions to Comply with Joint Task Force Pre-conditions* (Mar. 24, 2025), https://perma.cc/F45D-N5VG.

[45]    Michael C. Bender, Alan Blinder, & Jonathan Swan, *Inside Trump's Pressure Campaign on Universities*, N.Y. Times (Apr. 14, 2025), https://tinyurl.com/2uummfbb.

Title VII of the Civil Rights Act of 1964" and closed by calling for "immediate cooperation in implementing these critical reforms" as a prerequisite for continued federal funding. *Id.*

78.      On April 11, 2025, HHS, GSA, and the Department of Education sent another letter to President Garber. Ex. A. The April 11 Letter, which "incorporates and supersedes" the April 3 Letter, similarly laid out a list of conditions to "maintain Harvard's financial relationship with the federal government," including the following:

- "**Viewpoint Diversity in Admissions and Hiring**. . . . [T]he University shall commission an external party . . . to *audit the student body, faculty, staff, and leadership* for viewpoint diversity, such that each department, field, or teaching unit *must be individually viewpoint diverse*. . . . Harvard must *abolish all criteria, preferences, and practices, whether mandatory or optional, throughout its admissions and hiring practices*, that function as ideological litmus tests. Every department or field found to lack viewpoint diversity *must be reformed by hiring a critical mass of new faculty* within that department or field who will provide viewpoint diversity; every teaching unit found to lack viewpoint diversity *must be reformed by admitting a critical mass of students* who will provide viewpoint diversity."

- "**Governance and leadership reforms**. . . . Harvard must make meaningful governance reform and restructuring . . . [including] empowering tenured professors and senior leadership, and, from among the tenured professoriate and senior leadership, exclusively those most devoted to the scholarly mission of the University and committed to the changes indicated in this letter; *reducing the power held by students and untenured faculty*; [and] *reducing the power held by faculty (whether tenured or untenured) and administrators* more committed to activism than scholarship."

- "**Discontinuation of DEI**. The University must immediately shutter all diversity, equity, and inclusion (DEI) programs, offices, committees, positions, and initiatives, under whatever name, and stop all DEI-based policies, including DEI-based disciplinary or speech control policies, under whatever name . . . through *structural and personnel changes*" and "demonstrate that it has done so to the satisfaction of the federal government."

- "**International Admissions Reform**. . . . [T]he University must reform its recruitment, screening, and admissions of international students to *prevent admitting students* hostile to the American values and institutions inscribed in the U.S. Constitution and Declaration of Independence . . . through *structural and personnel changes*."

- "**Student Discipline Reform and Accountability**. . . . In the future, funding decisions for student groups or clubs *must be made exclusively by a body of University faculty accountable to senior University leadership*. In particular, Harvard *must end support and recognition* of those student groups or clubs that engaged in anti-Semitic activity since October 7th, 2023, including the Harvard Palestine Solidarity Committee, Harvard Graduates Students 4 Palestine, Law Students 4 Palestine, Students for Justice in Palestine, and the National Lawyers Guild, and discipline and render ineligible the officers and active members of those student organizations."

- "**Transparency and Monitoring**. . . . The University must . . . , to the satisfaction of the federal government, disclose the source and purpose of all foreign funds; cooperate with the federal government in a forensic audit of foreign funding sources and uses, including how that money was used by Harvard, its agents, and . . . third parties acting on Harvard's campus." On a quarterly basis through the end of 2028, "the University shall submit to the federal government a report—certified for accuracy—that documents its progress on the implementation of the[se] reforms."

Ex. A at 2-6 (emphases added).

79.     The April 11 Letter stated the Government's expectation of "immediate cooperation in implementing these critical reforms" if the University wanted to "maintain Harvard's financial relationship with the federal government." *Id.* at 2, 6.

80.     On April 14, 2025, Harvard declined to accede to the Government's demands. In a letter to the Government, Harvard's lawyers said, "Neither Harvard nor any other private university can allow itself to be taken over by the federal government." Ex. B at 3. Because the April 11 Letter "presents demands that, in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court," the response said, "Harvard is not prepared to agree to demands that go beyond the lawful authority of this or any administration" and "will not accept the government's terms." *Id.* at 2-3.

81.     President Garber, in a statement to the Harvard community that day, wrote, "Although some of the demands outlined by the government are aimed at combating antisemitism,

the majority represent direct governmental regulation of the 'intellectual conditions' at Harvard."[46] He also explained, "No government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue."[47]

**Defendants Cut Harvard's Research Funding**

82.     Just hours after Harvard rejected the Government's demands for control over its academic enterprise, the Federal Task Force "announc[ed] a freeze on $2.2 billion in multi-year grants and $60M in multi-year contract value to Harvard University." Ex. C at 2. The April 14 Freeze Order cited "[t]he harassment of Jewish students" and "the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges." *Id.*

83.     The Government immediately began implementing the April 14 Freeze Order. Within hours, Harvard began receiving stop work orders.

84.     A few days later, reports surfaced that the Director of NIH's Office of Policy for Extramural Research Administration had informed other officials at NIH that the agency had "received confirmation from HHS/IOS to hold off on making awards to schools where the funds have been frozen, i.e., Columbia, Brown, Northwestern, Cornell, Weill-Cornell, Harvard."[48] The Director also noted that "HHS/IOS has stated that we should not provide any communications to these schools about whether or why the funds are frozen."[49]

---

[46]   Garber, *The Promise of American Higher Education*, *supra* n.2.

[47]   *Id.*

[48]   @maxdkozlov, X.com (Apr. 18, 2025, 4:24 PM ET), https://perma.cc/A6L3-M43C.

[49]   *Id.*

85.    On April 20, 2025, it was reported that the "Trump administration has grown so furious with Harvard University" that "it is planning to pull an additional $1 billion of the school's funding for health research."[50]

86.    On May 2, 2025, President Trump escalated the Government's demands, posting on social media: "We are going to be taking away Harvard's Tax Exempt Status. It's what they deserve!"[51]

87.    On May 5, 2025, the Secretary of Education sent Harvard another letter, which the Department of Education publicly released, stating that "Harvard should no longer seek GRANTS from the federal government, since none will be provided," that "Harvard will cease to be a publicly funded institution," and that "today's letter marks the end of new grants for the University." Ex. D at 3-4. The May 5 Freeze Order said the action was based, among other things, on the Government's assessment of Harvard's "academic rigor," admissions requirements and practices, grading systems, faculty hiring, and course construction. *Id.* at 2.[52]

88.    On May 6, 2025, NIH sent Harvard a letter announcing the termination of $2.2 billion[53] in awards, invoking 2 C.F.R. § 200.340(a)(4) and stating that Harvard's grant "awards no longer effectuate agency priorities" because of "recent events at Harvard University involving antisemitic action" and "Harvard's ongoing inaction in the face of repeated and severe harassment

---

[50] Belkin & Whyte, *Trump Administration Irate at Harvard*, *supra* n.6.

[51] @realDonaldTrump, Truth Social (May 2, 2025, 7:25 AM), https://tinyurl.com/35wu7kpk.

[52] As of the filing of this Complaint, the Government agreed to also include, in the Administrative Record that will be filed on May 19, 2025, all non-privileged documents directly or indirectly considered in issuing the May 5 Letter, the May 6 Letter, the May 9 Letter, and the May 12 Letters.

[53] *See* Jon Michael Raasch, *Trump Escalates War on Harvard by Officially Terminating $2.2B in Federal Grants*, Daily Mail (May 7, 2025), https://perma.cc/9QKQ-2H5W.

and targeting of Jewish students." Ex. E at 2-3. The letter stated that "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action," but "no corrective action is possible here." *Id.* at 3. NIH claimed that "no modification of the projects could align the projects with agency priorities" because of "the University's unwillingness to take corrective action or implement necessary reforms." *Id.*

89.     On May 9, 2025, USDA sent Harvard a similar letter announcing the termination of awards and stating that Harvard's grant "awards no longer effectuate agency priorities" because of "recent events at Harvard University involving antisemitic action" and "Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students." Ex. F at 2. The letter asserted that "no modification of the projects could align the projects with agency priorities" because of "the University's unwillingness to take corrective action or implement necessary reforms." *Id.*

90.     On May 12, 2025, Harvard received letters from the Department of Energy, DoD, NSF, and HUD announcing the respective agencies' terminations of Harvard's awards. Ex. G; Ex. H; Ex. I; Ex. J.

91.     The May 12 Energy Termination Letter invoked 2 C.F.R. § 200.340(a)(4) and stated that Harvard's grant "awards no longer effectuate[]" agency priorities because of "recent events at Harvard involving antisemitic action" and "Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students." Ex. G at 2. The letter asserted that "no modification of the Harvard projects could align the projects with agency priorities and any continued funding of the projects is inconsistent with [the Department of Energy's] stewardship of American taxpayer funds and would be inconsistent with [the Department of Energy's] overall mission and goals" because "Harvard has refused to take immediate, definitive,

and appropriate remedial action." *Id.* The letter also cited 2 C.F.R. § 200.343 and stated that "costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient during the termination of this award are not allowable." *Id.* at 3.

92.     The May 12 DoD Termination Letter invoked 2 C.F.R. § 200.340(a)(4) and stated its "awards to Harvard University no longer effectuate agency priorities of the DoD" because of "recent events at Harvard University involving antisemitic action" and "Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students." Ex. H at 2. That letter also cited 2 C.F.R. § 200.344 and stated that "[c]osts resulting from financial obligations incurred after termination are not allowable." *Id.*

93.     The May 12 NSF Termination Letter stated that "[t]he agency has determined that the termination of certain awards is necessary because they are not in alignment with current NSF priorities and/or programmatic goals." Ex. I at 2. As the basis for its termination, NSF asserted that "Harvard continues to engage in race discrimination including in its admissions process, and in other areas of student life, as well as failing to promote a research environment free of antisemitism and bias." *Id.* NSF's letter states "[t]his is the final agency decision and not subject to appeal." *Id.*

94.     The May 12 HUD Termination Letter invoked 2 C.F.R. § 200.340(a)(4) and stated that Harvard's "awards no longer effectuate agency priorities." Ex. J at 2. The letter contained no explanation as to which agency priorities had changed or why Harvard's grant awards were no longer in alignment with agency priorities.

95.     On May 13, 2025, the Federal Task Force issued a press release claiming "Harvard University has repeatedly failed to confront the pervasive race discrimination and anti-Semitic harassment plaguing its campus," and stating that "[t]he Task Force fully supports the Trump

Administration's multi-agency move to cut funding to Harvard, demonstrating the entire Administration's commitment to eradicating discrimination on Harvard's campus."[54]

96.     The Government's repeated assertion that Harvard has refused to take remedial action ignores the "meaningful reforms" Harvard is undertaking to "eliminate antisemitism and other forms of hate from [its] campus," which have been detailed publicly.[55]

97.     The Office of Management and Budget's ("OMB") Uniform Guidance (which applies to all federal Government agencies that award research grants) and specific HHS regulations (which apply directly to NIH, among other HHS subagencies) require the awarding agency to reimburse award recipients within 30 calendar days of a request for reimbursement, unless the awarding agency "reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3); 45 C.F.R. § 75.305(b)(3). Allowable payments may be delayed under the Uniform Guidance only where the recipient (i) "has failed to comply with the terms and conditions of the Federal award," or (ii) "is delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6). Similarly, under HHS regulations, the withholding of allowable payments is permitted only under specific circumstances, including where the recipient "has failed to comply with the project objectives, Federal statutes, regulations, or the terms and conditions of the Federal award"; the recipient "is delinquent in a debt to the United States"; or under other specified circumstances. 45 C.F.R. § 75.305(b)(6). If a recipient fails to comply with federal statutes, regulations, or the terms and conditions of a federal award, HHS may impose additional conditions, which (i) must be imposed with respect to a "*specific award*," (ii) do not include the delay of

---

[54]   Press Release, U.S. Dep't of Health & Human Servs., *Joint Task Force to Combat Anti-Semitism Statement on Additional Harvard Actions* (May 13, 2025), https://perma.cc/99B4-AG8Z.

[55]   Letter from Alan M. Garber, President, Harvard Univ., to Linda E. McMahon, Sec'y of Educ., U.S. Dep't of Educ. (May 12, 2025), https://perma.cc/Y7F9-C7FD.

reimbursement, and (iii) may be imposed only with *notice to the recipient, justification for the additional conditions, and an explanation of the "nature of the action needed to remove" them.* 45 C.F.R. § 75.207 (emphases added); *see also* 45 C.F.R. § 75.371. Only if and when the HHS entity "determines that noncompliance cannot be remedied by imposing additional conditions" may HHS withhold payments. 45 C.F.R. § 75.371. Importantly, any "payment withheld for failure to comply with Federal award conditions, but without suspension of the Federal award, must be released to the [recipient] upon subsequent compliance." 45 C.F.R. § 75.305(b)(6)(iii).

98.    Unless and until the April 14 and May 5 Freeze Orders are dissolved, and the Government's subsequent implementation of those Orders in the Termination Letters enjoined or vacated, Harvard will suffer widespread disruption of its research operations, with Harvard—and those faculty, staff, and students whose salaries are supported by the frozen or terminated funding—not knowing when, or if, existing funding will resume or whether it will be available in the future. This disruption threatens the integrity and continuity of ongoing research studies supported by the frozen or terminated funding, as well as their future viability. At this point, for example, Harvard does not know whether to end employment of anyone whose salary was supported by the frozen or terminated funding or what its future hiring decisions should look like. Nor does it know whether to expend funds to retain such items as cell cultures and other living and perishable materials used in research or to continue maintenance of research supplies and equipment tied to the frozen or terminated funding.

### Consequences of the Government's Actions

99.    The effect of Defendants' actions is to eliminate billions of dollars for Harvard's federally funded research. Over time, the school will be forced to either (i) reduce or halt ongoing research projects mid-stream and terminate employment contracts with researchers, staff, and administrators, or (ii) to make other cuts to departments or programs.

100.    If Harvard continues to replace the frozen and terminated funding from its own resources, it will be forced to reduce the number of graduate students it admits and the number of faculty and research staff it pays to conduct research. It will be unable to continue procuring and maintaining cutting-edge supplies, equipment, and facilities for research. Without the federal funding at issue, Harvard would need to operate at a significantly reduced level. And Harvard's overall reputation as a premier research institution will suffer, compromising its ability to recruit and retain talent, secure future funding, and maintain its relationships with other institutions.

101.    Harvard is one of Massachusetts' largest employers. Consequently, the Government's actions will also cause economic harm to the Boston area and the Commonwealth. And the impact will be felt in other states as well. As a recipient of federal research funding, Harvard issues subawards to institutions across America, including St. Jude Children's Research Hospital, the University of Alabama, and Baylor College of Medicine.

102.    Harvard frequently collaborates with state and local partners on regional initiatives to fuel spending in the local economy. The freezes and terminations will reduce, delay, or eliminate much of this activity.

103.    The freezes and terminations will chill Harvard's exercise of its First Amendment rights. Harvard will be unable to make decisions regarding its faculty hiring, academic programs, student admissions, and other core academic matters without fear that those decisions will run afoul of government censors' views on acceptable levels of ideological or viewpoint diversity on campus.

104.    Notably, the freezes and terminations are part of a broader effort by the Government to punish Harvard for protecting its constitutional rights. In the month since Harvard's April 14 letter and statement, the Government has launched multiple investigations and other actions

against Harvard. On April 16, 2025, for example, DHS threatened Harvard's eligibility to enroll international students.[56] On April 17, 2025, the House Committee on Oversight and Government Reform announced an investigation into Harvard.[57] Also on April 17, 2025, the Department of Education sent a records request to Harvard.[58] On April 24, 2025, President Trump derided Harvard as "an Anti-Semitic, Far Left Institution" and "a threat to Democracy."[59] And the President has announced, "We are going to be taking away Harvard's Tax Exempt Status. It's what they deserve!"[60]

105.    The freezes and terminations also will adversely affect the broader landscape of American scientific and medical research and economic innovation by undermining critical research initiatives and interrupting ongoing scientific and other research. By halting the flow of federal funding, present and future, the freezes and terminations create a ripple effect extending beyond Harvard's campus by stifling job creation in the research sector across the nation, reducing intellectual property development, and delaying scientific and medical advances that boost the national economy and improve patient care. The economic implications are substantial, as each suspended research project hinders the cultivation of the scientific talent that drives the United States' global competitiveness in research and development. As President Garber put it, "[f]or the

---

[56]    Samuel A. Church & Cam N. Srivastava, *DHS Threatens to Revoke Harvard's Eligibility to Host International Students Unless It Turns Over Disciplinary Records*, Harvard Crimson (Apr. 17, 2025), https://perma.cc/775F-QA32.

[57]    Dhruv T. Patel & Grace E. Yoon, *House Oversight Committee Launches Investigation into Harvard, Requests Documents Related to Trump's Demands*, Harvard Crimson (Apr. 17, 2025), https://perma.cc/U3KP-RNLD.

[58]    Press Release, U.S. Dep't of Educ., *U.S. Department of Education Initiates Records Request from Harvard University After Discovering Inaccurate Foreign Financial Disclosures* (Apr. 18, 2025), https://perma.cc/94K2-BQS7.

[59]    @realDonaldTrump, Truth Social (Apr. 24, 2025, 9:33 AM), https://tinyurl.com/5zun98cf.

[60]    @realDonaldTrump, Truth Social (May 2, 2025, 7:25 AM), https://tinyurl.com/35wu7kpk.

government to retreat from these partnerships now risks not only the health and well-being of millions of individuals, but also the economic security and vitality of our nation."[61] These harms are irreparable absent judicial intervention.

## CLAIMS

## COUNT 1

## VIOLATION OF THE FIRST AMENDMENT
### (ADMINISTRATIVE PROCEDURE ACT CAUSE OF ACTION)

106.    Harvard incorporates by reference the allegations of the preceding paragraphs.

107.    Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

108.    The Government threatened to terminate Harvard's federal funding unless Harvard restructured its internal governance, changed its hiring and admissions practices to strike Defendants' preferred balance of viewpoints, and modified what it teaches its students to align with Defendants' views. For example, the demands required Harvard to modify its hiring and admissions practices to achieve a particular balance of viewpoints in every "department," "field," and "teaching unit." Ex. A at 3. In other words, the Government wielded the threat of withholding federal funds in an attempt to coerce Harvard to conform with the Government's preferred mix of viewpoints and ideologies. Defendants sent Harvard the April 11 Letter and, when Harvard refused the demands, ordered the freeze of billions of dollars in current federal funding. After Harvard filed this lawsuit, Defendants announced the end of future federal funding and termination of Harvard's grants.

---

[61]    Garber, *The Promise of American Higher Education*, *supra* n.2.

109.    Defendants' freeze and termination of Harvard's federal funding constitutes final agency action because it "mark[s] the 'consummation' of the . . . decisionmaking process" and "determines" the "rights [and] obligations" of parties and is backed by "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

110.    The First Amendment provides that the federal Government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

111.    "[A]cademic freedom" is "a special concern of the First Amendment" and receives heightened protection. *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967).

112.    This freedom protects "not only students and teachers, but their host institutions as well." *Garcia-Padilla*, 490 F.3d at 8 (citation omitted). As the Supreme Court has recognized, "[a]cademic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also . . . on autonomous decisionmaking by the academy itself." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985) (citations omitted). Colleges and universities have a constitutionally protected right to "manage an academic community and evaluate teaching and scholarship free from [governmental] interference." *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012) (citation omitted). After all, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

113.    A "funding condition" that seeks to curtail academic freedom can therefore "result in an unconstitutional burden on First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*AID*"), 570 U.S. 205, 214 (2013). The Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*,

408 U.S. 593, 597 (1972). Nor may the Government threaten "a third party 'to achieve the suppression' of disfavored speech." *Vullo*, 602 U.S. at 180-81, 188-91. The Government also cannot mandate its own preferred balance of viewpoints. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256-58 (1974). "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody*, 603 U.S. at 741-42.

114.    The Government's demands on Harvard cut at the core of Harvard's constitutionally protected academic freedom because they seek to assert governmental control over Harvard's research, academic programs, community, and governance.[62] And they bear no relation to Harvard's federal funding. *See AID*, 570 U.S. at 214-15 (Government may not "leverage funding to regulate speech outside the contours of the program itself"). The Government's demands seek to overhaul Harvard's governance, control Harvard's faculty hiring, and dictate what faculty may teach Harvard students. Put simply, the conditions seek to supplant Harvard's "autonomous decisionmaking." *Ewing*, 474 U.S. at 226 n.12.

115.    Restrictions on Harvard's programs violate the First Amendment by seeking to restrict what Harvard's faculty may teach students. *See Garcia-Padilla*, 490 F.3d at 8 (recognizing a "zone of First Amendment protection for the educational process itself" (citation omitted)). The "classroom with its surrounding environs is peculiarly the 'marketplace of ideas'" that the First Amendment is designed to safeguard. *Healy v. James*, 408 U.S. 169, 180-81 (1972).

116.    Restrictions on whom Harvard may hire also violate the First Amendment. It is Harvard's—not the Government's—"prerogative 'to determine for itself on academic grounds

---

[62]    *See, e.g.*, Eugene Volokh, *"The Trump Administration's Unconstitutional Hate Mail to Harvard," by Prof. Genevieve Lakier (Chicago)*, Reason (Apr. 6, 2025), https://perma.cc/K3W6-LB94.

who may teach,'" and this discretion "is an important part of our long tradition of academic freedom." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 47 (2d Cir. 2000) (citation omitted).

117.    Further, the Government's requirement that Harvard modify its hiring and admissions practices to achieve the Government's preferred balance of viewpoints in every "department," "field," and "teaching unit" (Ex. A at 3-4;[63] *see* Ex. D at 2-3) regulates the "recipient" and is far "'outside the scope of the federally funded program[s]'" for medical, scientific, and other research, *AID*, 570 U.S. at 218 (citation omitted). Although Harvard recognizes the importance of viewpoint diversity and the need to promote it,[64] the First Amendment makes clear that the authority to achieve that objective rests with the University rather than the Government.

118.    Likewise, the Government lacks authority to dictate which student groups Harvard may recognize and fund. The Government "may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741.

119.    Restrictions on Harvard's ability to manage its own internal leadership likewise violate the First Amendment because leadership decisions shape how the University speaks and acts. Those decisions are at the core of the "autonomous decisionmaking" and independent management needed to maintain "[a]cademic freedom." *Ewing*, 474 U.S. at 226 n.12; *see Blasdel*, 687 F.3d at 816 (universities have First Amendment right to "manage an academic community" (citation omitted)).

---

[63]    *See* @realDonaldTrump, Truth Social (Apr. 16, 2025, 6:05 AM), https://tinyurl.com/yww6nfw7 ("Harvard has been hiring almost all woke, Radical Left, idiots and 'birdbrains' who are only capable of teaching FAILURE to students and so-called 'future leaders.'")

[64]    Garber, *The Promise of American Higher Education*, *supra* n.2 ("As we defend Harvard, we will continue to . . . broaden the intellectual and viewpoint diversity within our community.").

120.    Defendants' April 3, April 11, and May 5 Letters target academic content that Harvard professors "teach students." Ex. P at 3; *see* Ex. A at 3-5; Ex. D at 2-3. That too is unlawful. *E.g.*, *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542-43 (N.D. Cal. 2020) (preliminarily enjoining executive order that "appear[ed] to require universities that accept federal grants to curtail promotion of [certain] concepts through teaching").

121.    Defendants' freeze and termination of federal funding also violates the First Amendment because it is direct retaliation for Harvard's April 14 letter and statement refusing to comply with the Government's demands, as well as Harvard's protected decision to file this lawsuit. The First Amendment "prohibits government officials from subjecting an [entity] to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up). To succeed on a First Amendment retaliation claim, a plaintiff must "prove that (1) [it] engaged in constitutionally protected conduct, (2) [it] was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012); *see Hartman v. Moore*, 547 U.S. 250, 260-61 (2006) (similar).

122.    Harvard engaged in constitutionally protected conduct when it refused to comply with the Government's demands and announced that decision in its April 14 letter and statement. Just hours later, Defendants subjected Harvard to adverse action by freezing $2.2 billion in multi-year grants and $60 million in multi-year contracts previously awarded to Harvard. And then the Government blacklisted Harvard from future awards of federal funding and subsequently terminated existing grants. Harvard's protected conduct was a substantial and motivating factor for the freeze. In particular, Defendants issued the Freeze Orders *because* Harvard refused to comply with the demands, *because* Harvard issued the April 14 letter and statement, and *because*

Harvard filed this lawsuit. The causal link between Defendants' retaliatory motive and Defendants' adverse action is evident from, among other things: the minuscule amount of time that elapsed between Harvard's April 11 letter and statement and the freeze (only a few hours); Defendants' striking deviation from the procedures that govern funding suspensions under Title VI (*see infra* Count 3); Defendants' previous threats to pull funding if Harvard refused to comply with the demands (including on March 31, April 3, and April 11); the decision by the Secretary of Education to prohibit Harvard from receiving any future federal grants; and the termination of that funding without following any of the requisite procedures.

123.    Defendants' Freeze Orders, Termination Letters, and attendant conditions on Harvard's federal funding trigger strict scrutiny because they seek to leverage Harvard's federal funding to indirectly infringe Harvard's constitutionally protected academic freedom.

124.    Defendants' Freeze Orders, Termination Letters, and attendant conditions also trigger strict scrutiny because they are speaker-, content-, and viewpoint-based. The conditions expressly apply to Harvard only; they apply because of the "ideological" conditions at Harvard, Ex. A at 2; Ex. D at 2-3; and they specify exactly how Harvard should exercise its constitutionally protected autonomous decisionmaking. Unless Harvard does exactly what the Government wants in the way the Government wants and achieves the precise balance of viewpoints the Government wants, Harvard stands to lose billions of dollars in federal funding.

125.    Where, as here, "the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

126.    Defendants cannot reasonably argue that the conditions they seek to impose on Harvard are "the least restrictive means of achieving a compelling [governmental] interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted).

127.    The conditions are overbroad because they seek to impose a massive consequence unless an enormous amount of constitutionally protected academic freedom is curtailed. And that curtailment is not sufficiently related to the Government's previously-identified concerns about antisemitism.

128.    The conditions are also overbroad because Defendants have ignored less restrictive alternatives. For example, the Government has not explained why it could not have worked with Harvard in a voluntary manner, as Title VI and regulations require, prior to freezing or terminating funding entirely. And even if a freeze or termination were warranted, which it is not, the Government has not explained why a more targeted reduction, tailored to the programs and purported discrimination at issue, would have been insufficient to achieve its objectives.

129.    The conditions are further overbroad because they will chill a wide swath of protected speech. The "government [cannot] proscribe unprotected [speech] through a regulation that simultaneously encompasses a substantial amount of protected [speech]." *Seals v. McBee*, 898 F.3d 587, 596 (5th Cir. 2018).

130.    Harvard also has a reasonable fear that Defendants will terminate or freeze additional federal funding, as they have threatened to do. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165-66 (2014).

131.    For these reasons, this Court should declare Defendants' actions unlawful and enjoin Defendants from engaging in future terminations, suspensions, or refusals to grant or to continue funding or work pursuant to the Freeze Orders and Termination Letters.

132.    Defendants' actions must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

133.    If Defendants' actions are not declared unlawful, set aside, and enjoined, Harvard will suffer substantial injury, including irreparable injury.

## COUNT 2

## VIOLATION OF THE FIRST AMENDMENT
## (EQUITABLE CAUSE OF ACTION — *ULTRA VIRES*)

134.    Harvard incorporates by reference the allegations of the preceding paragraphs.

135.    Even if the prerequisites of review under the Administrative Procedure Act were not satisfied, federal courts have the "equitable power[]" to "enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015); *see also R.I. Dep't of Env't. Mgmt. v. United States*, 304 F.3d 31, 42-43 (1st Cir. 2002) ("district court[s]" retain the "nonstatutory" power "to review agency action that is *ultra vires*" and provide equitable relief unless Congress precludes that review).

136.    As alleged in Count 1, Defendants' demands that Harvard restructure its internal governance, change its hiring and admissions practices, and modify what it teaches its students to align with Defendants' views, or else lose federal funding, violate the First Amendment. The Constitution forecloses any lawful authority for Defendants' actions.

137.    Because Defendants' actions in imposing viewpoint-based conditions on Harvard's funding and terminating funding agreements violate the First Amendment, those actions lack lawful authority. This Court should declare them unconstitutional and *ultra vires*.

138.    Because Defendants' actions are unconstitutional and *ultra vires*, this Court should enjoin Defendants in their official capacities from imposing the Freeze Orders and Termination Letters.

139.    If Defendants' actions are not declared unlawful, set aside, and enjoined as

unconstitutional and *ultra vires*, Harvard will suffer substantial injury, including irreparable injury.

## COUNT 3

### IN EXCESS OF STATUTORY AUTHORITY (VIOLATION OF 42 U.S.C. § 2000d-1) (ADMINISTRATIVE PROCEDURE ACT CAUSE OF ACTION)

140.    Harvard incorporates by reference the allegations of the preceding paragraphs.

141.    The APA provides that a court must "hold unlawful and set aside" final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

142.    Defendants' freeze and termination of federal financial assistance constitutes "[a]gency action made reviewable by statute" under 5 U.S.C. § 704 and 42 U.S.C. § 2000d-2.

143.    Defendants' freeze and termination of federal financial assistance constitutes final agency action because it "mark[s] the 'consummation' of the . . . decisionmaking process" and "determines" the "rights [and] obligations" of parties and is backed by "legal consequences." *Bennett*, 520 U.S. at 177-78 (citations omitted).

144.    Defendants imposed the freeze and termination of federal financial assistance because of alleged antisemitism on Harvard's campus. Antisemitism at Harvard was the reason given by the federal Government in the March 31, April 3, and April 11 Letters, and in the April 14 Freeze Order. *See* Ex. M at 2, Ex. P at 2, Ex. A at 2, 4. The May 5 Freeze Order and Termination Letters echoed these same concerns. *See, e.g.*, Ex. D at 2-3; Ex. E at 2-3; Ex. F at 2; Ex. G at 2; Ex. H at 2, Ex. I at 2.

145.    This basis for freezing or terminating federal financial assistance falls within Title VI. Title VI prohibits discrimination on the basis of "race, color, or national origin" in programs and activities receiving federal financial assistance. 42 U.S.C. § 2000d. Both the judicial and executive branches have interpreted discrimination against Jews as discrimination based on race

or shared ancestry covered under Title VI. *See, e.g.*, *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1261 (7th Cir. 1990); Exec. Order No. 13,899, 84 Fed. Reg. 68,779 (Dec. 11, 2019) ("It shall be the policy of the executive branch to enforce Title VI against prohibited forms of discrimination rooted in anti-Semitism.").

146.    Title VI delineates specific procedures that an agency must follow to "terminat[e] . . . or refus[e] to grant or to continue assistance" based upon alleged violations of Title VI. 42 U.S.C. § 2000d-1. Defendants have ordered the freeze or termination of Harvard's federal financial assistance without following these mandatory procedures.

147.    Defendants did not advise Harvard of any failure to comply with a requirement imposed by Section 2000d-1.

148.    Defendants did not provide Harvard with any opportunity to comply by voluntary means before freezing and terminating federal financial assistance.

149.    Defendants did not afford Harvard an opportunity for a hearing before freezing and terminating federal financial assistance.

150.    Defendants did not make an express finding on the record after any such hearing before freezing and terminating federal financial assistance.

151.    Defendants did not submit a written report to the appropriate House and Senate committees thirty days before freezing and terminating federal financial assistance.

152.    Rather, Defendants are purporting to immediately freeze current and future funds. That is, whereas Congress specified that Defendants must follow the delineated statutory procedures *first* and freeze or terminate federal financial assistance *after* (and then only as a last resort), here Defendants have done the precise opposite: they issued the Freeze Orders (with no process or opportunity for voluntary compliance) and used those freezes and subsequent

terminations as leverage to negotiate. Such action is flatly unlawful and contrary to statutory authority.

153.    What is more, Title VI does not permit wholesale freezing of a recipient's federal financial assistance. Instead, it requires that a "refusal to grant or to continue assistance" be "limited in its effect to the *particular* program, or part thereof*, in which . . . noncompliance has been so found*." *Id.* (emphasis added). Defendants have made no finding of Title VI noncompliance within the various research programs that are subject to the Freeze Orders and Termination Letters.

154.    Further, Defendants' actions offer no explanation of how any alleged violation is connected to the remedy chosen by the government. That explanation is necessary to determine whether the freezes and terminations affected only particular programs or parts of programs where alleged violations purportedly exist.

155.    Defendants' April 3 Letter also mentioned unspecified "alleged violations of . . . Title VII of the Civil Rights Act of 1964." Ex. P at 2. But Title VII does not authorize administrative enforcement through a funding freeze. And Defendants do not have the requisite authority to enforce Title VII here. Instead, Title VII establishes a judicial enforcement scheme centered on the Equal Employment Opportunity Commission and the courts. *See* 42 U.S.C. § 2000e-5(f)-(g).

156.    For these reasons, this Court should declare that Defendants' actions are "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C); set those actions aside; and enjoin Defendants and their agents, employees, and all persons acting under their direction or control from taking any action as to Harvard, including by terminating, freezing, or refusing to grant or to continue Harvard's federal financial assistance.

157.    In the alternative, the Court should postpone the effective date of the freeze. *See* 5 U.S.C. § 705.

158.    If Defendants' actions are not declared unlawful, set aside, and enjoined, Harvard will suffer substantial irreparable injury.

## COUNT 4

### FAILURE TO FOLLOW DEFENDANTS' OWN REGULATORY PROCEDURES (ADMINISTRATIVE PROCEDURE ACT CAUSE OF ACTION)

159.    Harvard incorporates by reference the allegations of the preceding paragraphs.

160.    The APA requires this Court to hold unlawful and set aside final agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "without observance of procedure required by law," *id.* § 706(2)(D).

161.    Defendants' freeze and termination of federal financial assistance constitutes "[a]gency action made reviewable by statute" under 5 U.S.C. § 704 and 42 U.S.C. § 2000d-2.

162.    Defendants' freeze and termination of federal financial assistance constitutes final agency action because it "mark[s] the 'consummation' of the . . . decisionmaking process" and "determines" the "rights [and] obligations" of parties and is backed by "legal consequences." *Bennett*, 520 U.S. at 177-78 (citations omitted).

163.    An agency "must abide by its own regulations." *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641, 654 (1990) (citing *Vitarelli v. Seaton*, 359 U.S. 535, 547 (1959)).

164.    Defendants' regulations require them to follow specific procedures for freezing or terminating federal financial assistance based on alleged violations of Title VI. *E.g.*, 45 C.F.R. § 80.2 (HHS and NIH); 45 C.F.R. § 611.1 (NSF); 32 C.F.R. § 195.1 (DoD); 10 C.F.R. § 1040.1 (Energy); 34 C.F.R. § 100.2 (Education); 41 C.F.R. § 101-6.203 (GSA); 28 C.F.R. § 42.103 (DOJ); 14 C.F.R. § 1250.101 (NASA); 24 C.F.R § 1.8 (HUD); 7 C.F.R. § 15.8 (USDA).

165.    Defendants failed to comply with their own regulations before freezing and terminating Harvard's federal financial assistance.

166.    Defendants' regulations require them to provide notice before freezing or terminating federal financial assistance based on alleged violations of Title VI. *E.g.*, 45 C.F.R. § 80.8(c) (HHS and NIH); 45 C.F.R. § 611.8(c)(1) (NSF); 32 C.F.R. § 195.9(c) (DoD); 10 C.F.R. § 1040.89-9(c)(1) (Energy); 34 C.F.R. § 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. § 42.108(c)(1) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(1) (HUD); 7 C.F.R. § 15.8(c)(1)  (USDA).

167.    Defendants did not provide the required notice to Harvard before freezing and terminating Harvard's federal financial assistance.

168.    Defendants' regulations require them to attempt to secure compliance "by voluntary means" before freezing or terminating federal financial assistance based on alleged violations of Title VI. *E.g.*, 45 C.F.R. § 80.8(c) (HHS and NIH); 45 C.F.R. § 611.8(c)(1) (NSF); 32 C.F.R. § 195.9(c) (DoD); 34 C.F.R. § 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. § 42.108(c)(1) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(1) (HUD); 7 C.F.R. § 15.8(c)(1) (USDA); *see* 10 C.F.R. § 1040.89-9(c)(1) (Energy) (similar).

169.    Defendants did not lawfully attempt to secure compliance by voluntary means before freezing and terminating Harvard's federal financial assistance.

170.    Defendants' regulations require them to provide an "opportunity for hearing" before freezing or terminating federal financial assistance based on alleged violations of Title VI. *E.g.*, 45 C.F.R. § 80.8(c) (HHS and NIH); 45 C.F.R. § 611.8(c)(2) (NSF); 34 C.F.R. § 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. §42.108(c)(2) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(2) (HUD); 7 C.F.R. § 15.8(c)(2) (USDA); *see* 32 C.F.R.

47

§ 195.9(c) (DoD) ("opportunity for a hearing"); 10 C.F.R. § 1040.89-9(a)(1) (Energy) (same). Defendants' regulations require them to hold hearings before a specific agency official or a "hearing examiner" in accordance with specific, formal procedures that Defendants have promulgated. 45 C.F.R. § 80.9(b) (HHS and NIH); 45 C.F.R. § 611.9(b) (NSF); 34 C.F.R. § 100.9(b) (Education); 32 C.F.R. § 195.10(b) (DoD); 28 C.F.R. § 42.109(b) (DOJ); 14 C.F.R. § 1250.108(b) (NASA); 7 C.F.R. § 15.9(d) (USDA); *see* 10 C.F.R. §§ 1040.121 to 1040.124 (listing Energy's procedures); 41 C.F.R. §§ 101-6.212-1 to 101-6.212-5 (listing GSA's procedures); 24 C.F.R. § 180.100-805 (listing HUD's procedures).

171.    Defendants did not provide Harvard an opportunity for a hearing before freezing and terminating Harvard's federal financial assistance, nor did they comply with any of the formal procedural requirements for such a hearing set out in their regulations.

172.    Defendants' regulations require them to make "an express finding on the record" before freezing or terminating Harvard's federal financial assistance based on alleged violations of Title VI. *E.g.*, 45 C.F.R. § 80.8(c) (HHS and NIH); 45 C.F.R. § 611.8(c)(2) (NSF); 10 C.F.R. § 1040.114(c) (Energy); 34 C.F.R. § 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. § 42.108(c)(2) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(2) (HUD); 7 C.F.R. § 15.8(c)(2) (USDA); *see* 32 C.F.R. § 195.9(c) (DoD) (similar).

173.    Defendants did not make express findings on the record before freezing and terminating Harvard's federal financial assistance.

174.    Defendants' regulations require them to "file[] with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action" before freezing or terminating Harvard's federal financial assistance based on alleged violations of Title VI. *E.g.*, 45 C.F.R.

§ 80.8(c) (HHS and NIH); 34 C.F.R. § 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 32

C.F.R. § 195.9(c) (DoD); 28 C.F.R. § 42.108(c)(4) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24

C.F.R. § 1.8(c)(4) (HUD); 7 C.F.R. § 15.8(c)(4) (USDA); *see* 45 C.F.R. § 611.8(c)(4) (NSF)

(similar); 10 C.F.R. § 1040.114(e) (Energy) (similar).

175.    Defendants did not file full written reports in the House and Senate before freezing

and terminating Harvard's federal financial assistance based on alleged violations of Title VI.

176.    Defendants' regulations prohibit them from freezing or terminating federal

financial assistance based on alleged violations of Title VI at any time before "the expiration of 30

days after" filing reports in the House and Senate. *E.g.*, 45 C.F.R. § 80.8(c) (HHS and NIH); 32

C.F.R. § 195.9(c) (DoD); 10 C.F.R. § 1040.114(e) (Energy); 34 C.F.R. § 100.8(c) (Education); 41

C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. § 42.108(c)(4) (DOJ); 14 C.F.R. § 1250.107(c) (NASA);

24 C.F.R. § 1.8(c)(4) (HUD); 7 C.F.R. § 15.8(c)(4) (USDA); *see* 45 C.F.R. § 611.8(c) (NSF)

(similar).

177.    Defendants froze and terminated Harvard's federal financial assistance before the

expiration of 30 days after filing reports in the House and Senate.

178.    Defendants' regulations require that any freeze or termination of federal financial

assistance based on alleged violations of Title VI "shall be limited in its effect to the particular

program, or part thereof, in which such noncompliance has been so found." *E.g.*, 45 C.F.R.

§ 80.8(c) (HHS and NIH); 45 C.F.R. § 611.8(c) (NSF); 32 C.F.R. § 195.9(c) (DoD); 34 C.F.R.

§ 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. § 42.108(c) (DOJ); 14 C.F.R.

§ 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(4) (HUD); 7 C.F.R. § 15.8(c)(4) (USDA); *see* 10

C.F.R. § 1040.114(e) (Energy) (similar).

179.    Defendants froze and terminated Harvard's federal financial assistance without limiting the effect of this action to any particular program or part thereof.

180.    Defendants' regulations require them to follow specific procedures if they seek to "effect compliance" with Title VI using "any other means authorized by law." 45 C.F.R. § 80.8(d) (HHS and NIH); 45 C.F.R. § 611.8(d) (NSF); 10 C.F.R. § 1040.115 (Energy); 34 C.F.R. § 100.8(d) (Education); 28 C.F.R. § 42.108(d) (DOJ); 14 C.F.R. § 1250.107(d) (NASA); 24 C.F.R. § 1.8(d) (HUD); 7 C.F.R. § 15.8(d) (USDA); *see* 32 C.F.R. § 195.9(d) (DoD) (similar); 41 C.F.R. § 101-6.211-4 (GSA) (similar).

181.    Defendants did not attempt to effect compliance with Title VI using any means other than immediately freezing and terminating Harvard's federal financial assistance.

182.    Instead, Defendants sought to "effect compliance" with Title VI only by "means" of freezes (and corresponding termination of federal financial assistance). Because they did so, their own regulations require them to follow all of the procedures just discussed—including voluntary compliance, notice, hearing, findings on the record, and a report to Congress. *E.g.*, 45 C.F.R. § 80.8 (HHS and NIH); 45 C.F.R. § 611.8 (NSF); 32 C.F.R. § 195.9 (DoD); 10 C.F.R. §§ 1040.89-9, 1040.114 to.115 (Energy); 34 C.F.R. § 100.8 (Education); 41 C.F.R. §§ 101-6.211-3 to -4 (GSA); 28 C.F.R. § 42.108 (DOJ); 14 C.F.R. § 1250.107 (NASA); 24 C.F.R. § 1.8 (HUD); 7 C.F.R. § 15.8 (USDA).

183.    Even if Defendants had attempted to "effect compliance" with Title VI using "other means authorized by law," Defendants failed to comply with the specific procedures that their own regulations require in connection with those "other means." 45 C.F.R. § 80.8(d) (HHS and NIH); 45 C.F.R. § 611.8(d) (NSF); 32 C.F.R. § 195.9(d) (DoD); 10 C.F.R. § 1040.115 (Energy); 34 C.F.R. § 100.8(d) (Education); 28 C.F.R. § 42.108(d) (DOJ); 14 C.F.R. § 1250.107(d) (NASA);

24 C.F.R. § 1.8(d) (HUD); 7 C.F.R. § 15.8(d) (USDA); *see* 41 C.F.R. § 101-6.211-4 (GSA) (similar).

184.    Specifically, Defendants failed to attempt to secure compliance by "voluntary means," failed to notify Harvard "of its failure to comply and of the action to be taken," took action before "the expiration of at least 10 days from the mailing of such notice," and failed to make "additional efforts . . . to persuade [Harvard] to comply with the regulation and to take such corrective action as may be appropriate." 45 C.F.R. § 80.8(d) (HHS and NIH); *see* 45 C.F.R. § 611.8(d) (NSF) (similar); 32 C.F.R. § 195.9(d) (DoD) (similar); 10 C.F.R. § 1040.115 (Energy) (similar); 34 C.F.R. § 100.8(d) (Education) (similar); 41 C.F.R. § 101-6.211-4 (GSA) (similar); 28 C.F.R. § 42.108(d) (DOJ) (similar); 14 C.F.R. § 1250.107(d) (NASA) (similar); 24 C.F.R. § 1.8(d) (HUD) (similar); 7 C.F.R. § 15.8(d) (USDA) (similar).

185.    The March 31, April 3, April 11, May 5, May 6, May 9, and May 12 Letters do not constitute efforts at voluntary compliance. Not one of the letters identified a Title VI violation or a specific measure Harvard could take to rectify the alleged violation.

186.    Defendants' actions also further violate the Uniform Guidance, 2 C.F.R. § 200.305(b)(3), (6), as implemented by the relevant agencies. For example, HHS regulations implementing the Uniform Guidance require payment under active grants within 30 days. 2 C.F.R. § 200.305(b)(3); 45 C.F.R. § 75.305(b)(3). Delay is permissible only under certain circumstances delineated in the applicable regulations and only after notice and an opportunity to cure. 2 C.F.R. § 200.305(b)(6); 45 C.F.R. § 75.207; 45 C.F.R. § 75.305(b)(6). Defendants have provided no notice and no opportunity to cure.

187.    The May 6 NIH Termination Letter, May 12 Energy Termination Letter, May 12 DoD Termination Letter, and May 12 HUD Termination Letter invoked 2 C.F.R. § 200.340(a)(4)

and stated that Harvard's "awards no longer effectuate agency priorities." Ex. E at 2; Ex. G at 2; Ex. H at 2; Ex. J at 2. The May 9 USDA Letter and May 12 NSF letter similarly purported to cancel Harvard's grant awards because they "no longer effectuate agency priorities," Ex. F at 2, and because "they are not in alignment with current NSF priorities and/or programmatic goals." Ex. I at 2. But the letters purported to terminate some grants to which that provision does not apply. Defendants have not articulated any change in agency priorities justifying wholesale termination of Harvard's award across every subject matter and area of research.

188.    That provision does not authorize an end-run around Title VI, or related regulations for enforcing Title VI's requirements, which provide a far more specific set of procedures. In their termination letters, Defendants cited "antisemitic action" on campus and "the University's unwillingness to take corrective action or implement necessary reforms" as the basis for terminating federal financial assistance. Ex. E at 3; Ex. F at 2; *see* Ex. G at 2 (similar); Ex. H at 2 (similar); Ex. I at 2 (similar). But Defendants did not identify Title VI violations or follow the relevant statutory and regulatory procedures for Title VI enforcement.

189.    Instead, Defendants' invocations of 2 C.F.R. § 200.340(a)(4) are post-hoc rationalizations for Defendants' earlier failure to follow Title VI procedures and regulations before freezing Harvard's federal financial assistance.

190.    Defendants' actions must be declared unlawful, vacated and "set aside" under 5 U.S.C. § 706(2)(A) and (D), and enjoined.

191.    In the alternative, the Court should postpone the effective date of the freezes and terminations. *See* 5 U.S.C. § 705.

192.    If Defendants' actions are not declared unlawful, set aside, and enjoined, Harvard will suffer substantial injury, including irreparable injury.

## COUNT 5

## ARBITRARY AND CAPRICIOUS AGENCY ACTION
## (ADMINISTRATIVE PROCEDURE ACT CAUSE OF ACTION)

193.    Harvard incorporates by reference the allegations of the preceding paragraphs.

194.    The APA requires this Court to hold unlawful and set aside any final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

195.    Defendants' freeze and termination of federal financial assistance constitutes "[a]gency action made reviewable by statute" under 5 U.S.C. § 704 and 42 U.S.C. § 2000d-2.

196.    Defendants' freeze and termination of federal financial assistance constitutes final agency action because it "mark[s] the 'consummation' of the . . . decisionmaking process" and "determines" the "rights [and] obligations" of parties and is backed by "legal consequences." *Bennett*, 520 U.S. at 177-78 (citations omitted).

197.    Defendants' actions are arbitrary and capricious because they are neither "reasonable [nor] reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted). They are not the product of "reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 52 (1983).

198.    Defendants' actions "entirely fail[] to consider . . . important aspect[s] of the problem." *Id.* at 43; *see also DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020). They ignore the significant consequences the freezes and terminations will have on researchers, the University, and the public.

199.    Defendants' actions are arbitrary and capricious because Defendants failed to "articulate a satisfactory explanation for [their] action[s]" and demonstrated no "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation

omitted). Defendants have articulated no rational nexus between combatting antisemitism and the medical, scientific, and other research funding at hand. Defendants' actions are unreasoned and unexplained.

200. Defendants' actions are also arbitrary and capricious because they neglected to "take[] into account" the "serious reliance interests" that the awards of funding "engendered." *Regents of the Univ. of Calif.*, 591 U.S. at 30 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). For decades, Harvard has relied on the well-established process for federal financial assistance in its budgeting and financial planning, including with respect to staffing, infrastructure, facility and equipment purchases, and long-term investment decisions.

201. Defendants' actions are also arbitrary and capricious because they failed to consider reasonable, obvious alternatives to an *en masse* freezes and terminations of Harvard's federal financial assistance. *See Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986).

202. Defendants' Termination Letters constitute an invalid post hoc rationalization. *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("[T]he *post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action.").

203. For these reasons and others, Defendants' actions must be declared unlawful; vacated and "set aside" as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); and enjoined.

204. In the alternative, the Court should postpone the effective dates of the freezes and terminations. *See* 5 U.S.C. § 705.

205.     If Defendants' actions are not declared unlawful, set aside, and enjoined, Harvard will suffer substantial injury, including irreparable injury.

### COUNT 6

### VIOLATION OF STATUTORY AND CONSTITUTIONAL AUTHORITY (EQUITABLE CAUSE OF ACTION — *ULTRA VIRES*)

206.     Harvard incorporates by reference the allegations of the preceding paragraphs.

207.     "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327. Accordingly, even if the prerequisites of review under the APA were not satisfied, federal "district court[s]" retain the "nonstatutory" power "to review agency action that is *ultra vires*" and provide equitable relief unless Congress precludes that review. *R.I. Dep't of Env't Mgmt.*, 304 F.3d at 42-43. Congress has not precluded non-statutory judicial review of this agency action.

208.     As alleged in Count 3, Defendants have no statutory authority to make an end run around the procedures mandated by Congress in Title VI.

209.     Defendants also cannot rely on any inherent constitutional authority under Article II of the Constitution to terminate or freeze Harvard's research funding.

210.     Congress has appropriated funds to support research through federal funding administered by NIH, NSF, NASA, and other agencies. *See, e.g.*, Further Consolidated Appropriations Act, Pub. L. No. 118-47, 138 Stat. 460, 656-60 (2024) (appropriating funds for NIH research); Consolidated Appropriations Act, Pub. L. 118-42, 138 Stat. 25, 157-63 (2024) (appropriating funds for NSF and NASA research). Because Defendants do not have any inherent authority to terminate or freeze appropriated federal funding to Harvard other than through specified procedures, this Court should declare that their actions are *ultra vires*.

211.    Defendants also lack any legal basis to prohibit Harvard from seeking future grant funding. Harvard has a protected liberty interest in its reputation as a responsible grant recipient, and Defendants cannot revoke that interest without affording Harvard even "the slightest opportunity to respond to those charges." *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 964 (D.C. Cir. 1980). Defendants' actions are therefore *ultra vires* in contravention of Harvard's right to due process.

212.    Because Defendants' actions are *ultra vires*, this Court should enjoin Defendants in their official capacities as federal officers from enforcing the freezes and terminations.

213.    If Defendants' actions are not declared unlawful, set aside, and enjoined as *ultra vires*, Harvard will suffer substantial, irreparable injury.

## PRAYER FOR RELIEF

For these reasons, Plaintiff respectfully requests an order:

a.    expediting the resolution of this action to prevent further harm to Plaintiff;

b.    declaring unlawful Defendants' Freeze Orders, Termination Letters, and attendant unconstitutional conditions in the April 3, April 11, May 5, May 6, May 9, and May 12 Letters, as well as any terminations of, freezes of, or refusals to grant or to continue federal funding undertaken pursuant to those agency actions;

c.    vacating and setting aside Defendants' Freeze Orders, Termination Letters, and attendant unconstitutional conditions in the April 3, April 11, May 5, May 6, May 9, and May 12 Letters, as well as any terminations of, freezes of, or refusals to grant or to continue federal funding undertaken pursuant to those agency actions;

d.    postponing the effectiveness of the Freeze Orders, Termination Letters, and attendant unconstitutional conditions in the April 3, April 11, May 5, May 6, May

9, and May 12 Letters, as well as any terminations of, freezes of, or refusals to grant or to continue federal funding undertaken pursuant to those agency actions;

e.       permanently enjoining Defendants, their agents, and all persons acting in concert or participation with Defendants from implementing, maintaining, or in any way giving effect to the Freeze Orders, Termination Letters, and attendant unconstitutional conditions in the April 3, April 11, May 5, May 6, May 9, and May 12 Letters, as well as any terminations of, freezes of, or refusals to grant or to continue federal funding undertaken pursuant to those agency actions;

f.       permanently enjoining Defendants from violating Plaintiff's First Amendment rights;

g.       permanently enjoining Defendants from terminating, freezing, or refusing to grant or to continue any federal funding at issue in this case without complying with federal law, including the requirements of Title VI and agency regulations;

h.       entering judgment in favor of Plaintiff;

i.       awarding Plaintiff its reasonable costs and attorney's fees in accordance with law, including but not limited to 42 U.S.C. § 1988; and

j.       issuing any and all other such relief as the Court deems just and proper.

Dated: May 13, 2025

William A. Burck*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
williamburck@quinnemanuel.com

Robert K. Hur*
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
rhur@kslaw.com

Joshua S. Levy (BBO #563017)
Mark Barnes (BBO #568529)*
John P. Bueker (BBO #636435)
Elena W. Davis (BBO #695956)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Joshua.Levy@ropesgray.com
Mark.Barnes@ropesgray.com
John.Bueker@ropesgray.com
Elena.Davis@ropesgray.com

Douglas Hallward-Driemeier
(BBO #627643)
Stephen D. Sencer*
ROPES & GRAY LLP
2009 Pennsylvania Avenue, NW
Washington, DC 20006
Douglas.Hallward-Driemeier@ropesgray.com
Stephen.Sencer@ropesgray.com

Respectfully submitted,

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky (BBO # 655908)
Scott A. Keller*
Jonathan F. Cohn*
Mary Elizabeth Miller* (BBO # 696864)
Shannon G. Denmark*
Jacob B. Richards (BBO # 712103)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com
scott@lkcfirm.com
jon@lkcfirm.com
mary@lkcfirm.com
shannon@lkcfirm.com
jacob@lkcfirm.com

Katherine C. Yarger*
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
katie@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
josh@lkcfirm.com

Danielle K. Goldstein*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
danielle@lkcfirm.com

*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

Counsel for Plaintiff certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiff hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ *Steven P. Lehotsky*
Steven P. Lehotsky