# EXHIBIT 7



U.S. General Services Administration

May 27, 2025

Dear Agency Senior Procurement Executive:

Re: Review for Termination or Transition of Harvard University Contracts

The U.S. General Services Administration (GSA) is assisting all federal agencies in a review for termination or transition of their federal government contracts with Harvard University and affiliates. This review aligns with the Administration's directive that all federal contracted services steadfastly uphold and advance agency strategic priorities.

As you know, being a counterparty with the federal government comes with the deep responsibility and commitment to abide by all federal laws and ensure the safeguarding of taxpayer money. As fiduciaries to the taxpayer, the government has a duty to ensure that procurement dollars are directed to vendors and contractors who promote and champion principles of nondiscrimination and the national interest.

As relevant here, GSA understands that Harvard continues to engage in race discrimination, including in its admissions process and in other areas of student life. The statistical evidence of Harvard's racial discrimination in their admissions - as revealed in *Students for Fair Admissions v. Harvard* - is shocking, to say the least. For applicants in the top academic decile, admissions rates varied significantly by race. In this decile, admissions rates were: 56% for African Americans; 31% for Hispanics; 15% for Whites; 13% for Asians. The Supreme Court, in its decision on the case, rebuked Harvard's long-standing policy and practice of discriminating on the basis of race. Harvard has shown no indication of reforming their admissions process - to the contrary, Harvard now has to offer a remedial math course, which has been described as "middle school math", for incoming freshmen. These are the direct results of employing discriminatory factors, instead of merit, in admission decisions.

Since then, troubling revelations have come to light regarding Harvard and its affiliates' potential discriminatory hiring practices and possible violations of Title VII of the Civil Rights Act of 1964. Harvard is suspected of engaging in a pattern or practice of disparate treatment in hiring, promotion, compensation, and other personnel related actions.

Additionally, discriminatory practices have been exposed at the Harvard Law Review, where internal documents that have been made public detail the pervasive and explicit racial discrimination in the publication's article selection and editor appointment process.

GSA is also aware of recent events at Harvard University involving anti-Semitic action that suggest the institution has a disturbing lack of concern for the safety and wellbeing of Jewish students. Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of its students has at times grounded day-to-day campus operations to a halt, deprived Jewish students of learning and research opportunities to which they are entitled, and profoundly alarmed the general public.

To wit, Harvard has endorsed troubling decisions by associated organizations, further indicating Harvard's lack of commitment to nondiscrimination and our national values and priorities. This includes a Harvard faculty committee reviewing and approving the decision by the Harvard Law Review to award a $65,000 fellowship to a protester who faced criminal charges for assaulting a Jewish student on campus. A second protester, who was similarly charged for his role in the assault, was chosen by the Harvard Divinity School to be the Class Marshal for commencement. Harvard's actions in this case are a clear signal of tolerance for, if not outright endorsement of, student-on-student violence. At best, this sort of leadership suggests staggering incompetence; at worst, it's deliberate malice disguised as ignorance.

In light of this deeply troubling pattern, each agency should consider its contracts with Harvard University and determine whether Harvard and its services efficiently promote the priorities of the agency. Agencies should also, of course, consider various provisions of the Federal Acquisition Regulation (FAR), including, without limitation, provisions such as FAR 52.203-13(b)(2)(ii), which requires contractors to "otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law."

We recommend that your agency terminate for convenience each contract that it determines has failed to meet its standards, and transition to a new vendor those contracts that could be better serviced by an alternative counterparty. Going forward, we also encourage your agency to seek alternative vendors for future services where you had previously considered Harvard.

Please provide a report to the FAS Commissioner of your actions or intended actions with respect to each referenced contract by June 6, 2025 using the following intake form.

If your agency determines that any such contract cannot be terminated for convenience or an extension is needed for the transition period, please provide a reason in the space provided on the intake form with the name of the Senior Procurement Executive (non-delegable) making such determination.

We look forward to assisting you with terminating or transitioning these contracts.

Sincerely,

Josh Gruenbaum
FAS Commissioner

**U.S. General Services Administration**
1800 F Street NW
Washington, DC 20405
www.gsa.gov