## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

    Plaintiff,

  v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et al.

    Defendants.

Case No. 1:25-cv-11048

## BRIEF OF AMICUS CURIAE HARVARD UNDERGRADUATE PALESTINE SOLIDARITY COMMITTEE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

LEAVE TO FILE GRANTED ON JUNE 6, 2025

## **TABLE OF CONTENTS**

INTERESTS OF AMICUS CURIAE ............................................................................... 1

SUMMARY OF ARGUMENT ...................................................................................... 1

ARGUMENT ............................................................................................................... 4

    I.    Title VI Does Not Prohibit Speech Activity Against Genocide and in Support of the Rights of Palestinians To Live in Equality.............................................................. 4

    II.   Policies That Discriminate Against Palestinian Students and Students Associated with Palestinians Violate Title VI ...................................................................... 6

CONCLUSION ............................................................................................................ 10

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ----------------------------------------------------------------- 7

*Barrett v. Whirlpool Corp.*, 556 F.3d 502 (6th Cir. 2009) ----------------------------------------------- 8

*Def. for Children Int'l-Palestine v. Biden*, 714 F. Supp. 3d. 1160 (N.D. Cal. 2024) ---------------- 2

*Eyal Yakoby v. Trs. of the Univ. of Pa.*, No. 23-4789, 2025 U.S. Dist. LEXIS 103709 (E.D. Pa. June 2, 2025) ------------------------------------------------------------------------------------------------------ 5

*Felber v. Yudof*, 851 F. Supp. 2d 1182 (E.D. Cal. 2011) --------------------------------------------------- 5

*Latinos Unidos de Chelsea En Accion (LUCHA) v. Sec'y of Hous. & Urban Dev.*, 799 F.2d 774 (1st Cir. 1986) --------------------------------------------------------------------------------------------------------- 7

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 980 F.3d 157 (1st Cir. 2020) ----------------------------------------------------------------------------------------------------------------- 7

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977) ------- 7, 8

## STATUTES

42 U.S.C. § 2000d ------------------------------------------------------------------------------------------------------------- 7

## OTHER AUTHORITIES

Application of Convention on Prevention and Punishment of Crime of Genocide in the Gaza Strip (*S. Afr. v. Isr.*), Order (Jan. 26, 2024) ---------------------------------------------------------------- 1

*Legal Consequences Arising From the Policies and Practices of Israel in the Occupied Palestinian Territory, Including East Jerusalem*, Advisory Opinion (Jul. 19, 2024) ------------- 1

## INTERESTS OF AMICUS CURIAE

The Harvard Undergraduate Palestine Solidarity Committee (PSC) at Harvard University is a student organization dedicated to supporting the Palestinian struggle for self-determination, justice, and equality through advocacy and non-violent actions. PSC submits this brief to contest the unlawful demands of the Trump administration and Harvard's adoption and enforcement of the International Holocaust Remembrance Alliance (IHRA) definition of antisemitism, which enables actionable discrimination against Palestinian students and those who advocate on their behalf.

## SUMMARY OF ARGUMENT

Over the past twenty months, an increasing number of people have been protesting Israel's violations of Palestinian rights. Tens of thousands of university students from universities across the United States[1] have engaged in protests, sit-ins, marches, and calls for academic institutions to divest from corporations complicit in Israel's violations of international law[2] on the conviction that Israel is committing, and the United States is supporting, a genocide in Gaza.[3] At Harvard

---

[1] Jay Ulfelder, *Crowd Counting Consortium: An Empirical Interview of Pro-Palestine Protests at U.S. Schools*, Harvard Kennedy School, Ash Center for Democratic Governance and Innovation (May 30, 2024), https://ash.harvard.edu/articles/crowd-counting-blog-an-empirical-overview-of-recent-pro-palestine-protests-at-u-s-schools/.

[2] The International Court of Justice (ICJ) has found that Israel's continued presence in the occupied Palestinian territory is illegal and affirmed the obligation of states "to take steps to prevent trade or investment relations that assist in the maintenance of the illegal situation created by Israel in the Occupied Palestinian Territory." *Legal Consequences Arising From the Policies and Practices of Israel in the Occupied Palestinian Territory, Including East Jerusalem*, Advisory Opinion, ¶ 278 (July 19, 2024), https://www.icj-cij.org/sites/default/files/case-related/186/186-20240719-adv-01-00-en.pdf.

[3] Since October 7, 2023, Israel has killed at least 51,100 Palestinians in Gaza—including 15,613 children—and injured more than 116,000 people. U.N. Off. for Coordination of Humanitarian Affs. (OCHA), *Reported Impact Snapshot: Gaza Strip* (Apr. 22, 2025), https://www.ochaopt.org/content/reported-impact-snapshot-gaza-strip-22-april-2025. In January 2024, the ICJ found that Israel's assault on the Palestinian people in Gaza plausibly constitutes genocide. *Application of Convention on Prevention and Punishment of Crime of Genocide in the Gaza Strip* (*S. Afr. v. Isr.*), Order, ¶ 54 (Jan. 26, 2024), https://www.icj-cij.org/sites/default/files/case-related/192/192-20240126-ord-01-00-en.pdf. A U.S. district court echoed that finding in a case brought to enjoin the then-U.S. president, secretary of state, and defense secretary from aiding and abetting Israel's genocide, stating that evidence indicated "that the ongoing military siege in Gaza is intended to eradicate a whole people and therefore plausibly falls within the international prohibition against genocide," "implor[ing] Defendants to examine the results of their unflagging support of the military siege against the Palestinians in Gaza," and stating that "[i]t is every individual's

---

1

University, Palestinian students have been advocating for their people's right to exist free from apartheid, genocide, and other violations of international law. They have done so in a manner that echoes past social justice movements. During the civil rights movement, Black Americans and their allies engaged in similar protests demanding equal rights.[4] Today's movement for Palestinian rights is likewise supported by non-Palestinians, including a significant number of Jewish students, Jewish faculty, and Jewish organizations.[5]

Pro-Palestine advocacy has been aggressively targeted by defenders of Israel, including U.S. government officials in both parties and the current presidential administration.[6] On April 11, citing a failure to protect students from purported antisemitic harassment and other alleged violations of Title VI of the Civil Rights Act of 1964 arising from anti-apartheid and anti-genocide protests on Harvard's campus, the Trump administration issued demands to Harvard. The demands included terminating "support and recognition" of various student organizations dedicated to advocacy for Palestinian rights including PSC, Harvard Graduate Students 4 Palestine, Law Students 4 Palestine, and Students for Justice in Palestine and "disciplin[ing] . . . active members of those student organizations."[7] After Harvard rejected the government's demands, the federal government announced that it had frozen $3.2 billion in grants and contracts with the university.[8]

---

obligation to confront the current siege in Gaza.". *Def. for Children Int'l-Palestine v. Biden*, 714 F. Supp. 3d. 1160, 1163, 1167 (N.D. Cal. 2024), *aff'd,* 107 F.4th 926 (9th Cir. 2024) (dismissed on jurisdictional grounds).
[4] *The White Southerners Who Fought US Segregation*, BBC, (Mar. 12, 2019), https://www.bbc.com/news/world-us-canada-47477354.
[5] Peter Beinart, *Trump Doesn't Want to Protect All Jewish Students — Just Those on His Team*, N.Y. TIMES (Apr. 28, 2025), https://www.nytimes.com/2025/04/28/opinion/jewish-student-protesters-gaza.html.
[6] *See A New Generation for Liberation: Historic Student Protests Defy University Crackdowns*, PALESTINE LEGAL (2025) https://palestinelegal.org/s/Palestine-Legal-2024-Year-in-Review-Report.
[7] Letter from Josh Gruenbaum, Comm'r of the Fed. Acquisition Serv., General Servs. Admin. and Sean R. Keveny, Acting General Counsel, U.S. Dep't Health & Human Servs., and Thomas E. Wheeler, Acting General Counsel, U.S. Dept. of Educ., to Dr. Alan M. Garber, President, Harvard Univ. and Penny Pritzker, Lead Member, Harvard Corp. (Apr. 11, 2025), https://www.harvard.edu/research-funding/wp-content/uploads/sites/16/2025/04/Letter-Sent-to-Harvard-2025-04-11.pdf.
[8] First Amended Complaint for Declaratory and Injunctive Relief (hereinafter "FAC") ¶ 7.

In response, Plaintiff Harvard University brings the present action challenging the suspension of funding, in part by arguing that it has already taken steps "to address antisemitism on campus."[9] But many of these steps—which include incorporating the controversial IHRA definition of antisemitism into the university's disciplinary policies, codifying Zionism as a protected class, allowing a partnership with a Palestinian university to lapse, and suspending the PSC[10]—neither "address antisemitism" nor further Title VI. In fact, adopting the IHRA definition, granting special status to Zionism, and penalizing pro-Palestinian student groups risks *violating* the Title VI rights of Palestinians on campus.

Advocacy for Palestinian human rights, including speech that zealously criticizes Israel and its policies, is neither objectively offensive nor does it target members of a protected group, and thus cannot ground a "hostile environment" claim merely because some students disagree with, are offended by, or feel isolated by the political messages being expressed. In short, Title VI does not and cannot require universities to suppress criticism of the policies of a state merely because some members of a protected group take offense to that criticism. And as this matter demonstrates, when a university selectively censors or punishes speech that advocates for Palestinian human rights, that conduct threatens the Title VI rights of Palestinian students and others who advocate on their behalf. This is particularly so when the suppression is motivated by a discriminatory purpose. There is compelling evidence that such a purpose exists with respect to state, institutional, and third-party efforts to silence Palestinians advocating for equal rights and an end to genocide.

---

[9] FAC ¶ 64.

[10] FAC ¶¶ 61-63; Declaration of Peggy Newell ("Newell Decl.") ¶¶ 11-13, 18, 23, Plaintiff's Motion for Summary Judgment, ECF No. 73.

As such, the Court should grant Plaintiff's motion for summary judgment but clarify that censoring Palestinians and criticism of Israeli policies is not required by Title VI and creates separate Title VI concerns.

## ARGUMENT

I.    **Title VI Does Not Prohibit Speech Activity Against Genocide and in Support of the Rights of Palestinians To Live in Equality**

The DOE Office for Civil Rights (OCR), which enforces Title VI, has long recognized that "to be prohibited by the statutes within OCR's jurisdiction, [harassment] must include something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive."[11] Title VI protects students from "prohibited discrimination" and does not "restrict the exercise of expressive activities or speech that are protected under the First Amendment," which is "particularly relevant in the university environment, where academic freedom fosters the robust exchange of ideas."[12]

OCR and federal courts have specifically found speech activity criticizing Israel's mistreatment of Palestinians, like a film on Palestine, a teach-in on Gaza, street theatre depicting Palestinians navigating Israeli army checkpoints, T-shirts encouraging students to support Palestine and debates concerning university divestment from companies that support Israel's human rights abuses, to be "robust and discordant expression" that regularly takes place on college campuses, and that it does not constitute actionable harassment.[13] The expression of views critical of Israel—even where it personally offends—is not actionable harassment under Title VI.

---

[11] Gerald A. Reynolds, Asst. Sec'y, U.S. Dep't of Educ. Off. for C.R., *First Amendment: Dear Colleague* (July 28, 2003), https://www.ed.gov/about/offices/list/ocr/firstamend.html.

[12] Letter from Zachary Pelchat, Team Leader, U.S. Dep't of Educ., to Robert J. Birgeneau, Chancellor, Univ. of Cal. Berkeley (Aug. 19, 2013), https://news.berkeley.edu/wp-content/uploads/2013/08/DOE.OCR_.pdf.

[13] *See* Peter Schmidt, *Education Dept. Investigates Complaint of Anti-Semitism at UC-Santa Cruz*, CHRONICLE OF HIGHER EDUC. (Mar. 14, 2011), http://www.chronicle.com/article/Education-Dept-Investigates/126742. The complaint alleged that UC Santa Cruz violated Title VI by allowing what it described as anti-Israel events to take

Defendants have not specifically alleged what actions they believe created a severe or pervasive hostile environment for Jewish students in violation of Title VI—or what educational programs or activities were limited or denied by such acts. However, from the government's April letter to Harvard threatening defunding, in which it demanded the suspension of every student group with "Palestine" in its name, it appears the government is asserting that student speech activity critical of Israel's policies toward Palestinians—or Palestinians merely associating together—created the "hostile environment" for Jewish students in violation of Title VI. To the extent Harvard selectively penalizes groups based on their association with Palestinians, that would provide substantial evidence of a Title VI violation.

Harvard PSC, Harvard Graduates Students 4 Palestine, Law Students 4 Palestine, and Students for Justice in Palestine are student organizations that advocate for the rights of Palestinians,[14] including the right to live as equal citizens (by, e.g., ending apartheid).[15] This

---

place on campus. The events included a screening of the documentary *Occupation 101* and a talk by a former IDF soldier and a Holocaust survivor critical of Israel's policies. In March 2011, OCR opened an investigation in response to the 2009 complaint. After a two-year factual investigation, OCR dismissed the complaint. Letter from Zachary Pelchat, Team Leader, U.S. Dep't of Educ., to Carole E. Rossi, Chief Campus Counsel, Univ. of Cal. Santa Cruz (Aug. 19, 2013), https://static1.squarespace.com/static/548748b1e4b083fc03ebf70e/t/6810ec2cda1b7f2235bbcded/1745939588108/2013.08.19+OCR+Letter+to+UC+Santa+Cruz.pdf]; *see* Letter from Zachary Pelchat, Team Leader, U.S. Dep't of Educ., to Robert J. Birgeneau, Chancellor, Univ. of Cal. Berkeley (Aug. 19, 2013), https://news.berkeley.edu/wp-content/uploads/2013/08/DOE.OCR_.pdf (dismissing Title VI complaint alleged that campus speech activities like advocacy for resolutions to divest from companies complicit in Israel's human rights abuses and street theatre depicting Israeli army mock checkpoints aimed at demonstrating one aspect of Palestinian life under Israeli occupation amounted to "robust and discordant expression" that regularly takes place on college campuses, and constituted protected speech). This complaint was filed after a federal Title VI lawsuit filed against UC Berkeley was dismissed because the alleged incidents, which included distributing leaflets critical of Israel were "pure political speech and expressive conduct" "regarding matters of public concern" and protected by the First Amendment. *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1187-88 (E.D. Cal. 2011); see also *Eyal Yakoby v. Trs. of the Univ. of Pa.*, No. 23-4789, 2025 U.S. Dist. LEXIS 103709, at *18-19 (E.D. Pa. June 2, 2025) ("At worst, Plaintiffs accuse Penn of tolerating and permitting the expression of viewpoints which differ from their own.").

[14] *See, e.g.*, *Our Mission*, HARVARD UNDERGRADUATE PALESTINE SOLIDARITY COMMITTEE, https://harvardundergraduatepalestinesolidaritycommittee.com/mission-2; Jo B. Lemann and Asher J. Montgomery, *New Student Group Aims to Unite Pro-Palestine Advocates Across Harvard's Graduate Schools*, THE HARVARD CRIMSON (Apr. 21, 2023), https://www.thecrimson.com/article/2023/4/21/pro-palestine-graduate-group/.

[15] Amnesty Int'l, *Israel's Apartheid Against Palestinians: Cruel System of Domination and Crime Against Humanity*, Index. No. MDE 15/5141/2022 (Feb. 1, 2022), https://www.amnesty.org/en/documents/mde15/5141/2022/en/; Human Rights Watch, *A Threshold Crossed: Israeli*

advocacy involves criticizing Israel and its violence against Palestinians.[16] It also involves criticizing Harvard's support for Israel.[17] Such views may have been discomforting for students who support Israel's policies and the military assault on Gaza. But that does not make the speech actionable under Title VI. For example, many white parents who supported segregation were discomforted—even frightened—by the prospect of Black children attending schools with their children. But advocacy for the rights of Black Americans to live as equal citizens was not anti-white any more than advocacy for the equal rights of Palestinians is anti-Jewish. In fact, it is opposition to equal rights of Black people that is discriminatory, just as opposition to equal rights for Palestinians is discriminatory. That is why a significant percentage of the members of the above-mentioned clubs are themselves Jewish and oppose the oppression of Palestinians, just as a significant number of white Americans opposed segregation.

## II.    Policies That Discriminate Against Palestinian Students and Students Associated with Palestinians Violate Title VI

The Trump administration alleges that Harvard violated its Title VI obligations. But the Trump administration's demands, and Harvard's prior conduct, threaten the Title VI rights of Palestinian students and others who advocate on their behalf.

Title VI of the Civil Rights Act of 1964 states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To sustain a claim under the statute, a complainant would

---

*Authorities and the Crimes of Apartheid and Persecution* (Apr. 27, 2021), https://www.hrw.org/report/2021/04/27/threshold-crossed-israeli-authorities-and-crimes-apartheid-and-persecution.

[16] *See, e.g.*, Hiral M. Chavre and Samuel A. Church, *Harvard College Palestine Solidarity Committee Urges Boycott of Israel Trek,* THE HARVARD CRIMSON (Nov. 12, 2024), https://www.thecrimson.com/article/2024/11/12/psc-urges-boycott-israel-trek/.

[17] *See, e.g.*, Cam N. Srivastava and William Y. Tan, *Harvard Student Government Approves PSC Petition for Referendum on Israel Divestment,* THE HARVARD CRIMSON (Apr. 10, 2024), https://www.thecrimson.com/article/2024/4/10/divestment-petition-israel-palestine/.

have to demonstrate that the institution receiving federal assistance acted with discriminatory intent. *Latinos Unidos de Chelsea En Accion (LUCHA) v. Sec'y of Hous. & Urban Dev.*, 799 F.2d 774, 783 (1st Cir. 1986) (citing *Guardians Assn v. Civil Service Comm'n of the City of New York*, 463 U.S. 582 (1983)). Facially neutral policies constitute intentional discrimination where decision-makers adopt such policies at least in part because of their adverse effects on identifiable groups. *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Intentional discrimination may be proven through direct or circumstantial evidence. *See Alexander v. Sandoval*, 532 U.S. 275, 306–07 (2001); see also *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 980 F.3d 157, 185 (1st Cir. 2020) (recognizing that Title VI's protections are coextensive with the Equal Protection Clause of the Fourteenth Amendment). Moreover, students associated with members of a protected group have a Title VI right not to be discriminated against for their advocacy on behalf of that group. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513–14 (6th Cir. 2009) (advocacy on behalf of a protected group alone is sufficient to formulate a Title VII claim based on association).

Under *Arlington Heights*, Harvard's IHRA adoption and other policies that penalize criticism of Israel on campus will likely violate Title VI.  In *Arlington Heights*, the Court identified five non-exclusive factors relevant to assessing intent: (1) the discriminatory impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the decision; (4) departures from the normal procedural sequence; and (5) the legislative or administrative history, especially contemporary statements by decision-makers. *Arlington Heights*, 429 U.S. at 266–68. While space does not allow for a full consideration of each factor, there is ample evidence—the scope of which would emerge with discovery—that adoption of IHRA and other policies which limit speech supporting Palestinian rights are motivated by an

intent to selectively silence Palestinians and students who advocate on behalf of Palestinians. Such action cannot be required by, and indeed appears to violate, Title VI.

Harvard's pattern of actions to quell criticism of Israel have disproportionately targeted Palestinians and will continue to disproportionately impact Palestinians on campus. In November 2023, Harvard Law Review blocked the publication of an article by a Palestinian doctoral student that it had already commissioned, edited, fact-checked, and prepared for publication in an act of censorship totally unprecedented at the publication.[18] The article, which argued for a formal recognition of the historical and ongoing harms suffered by Palestinians, would have been the first by a Palestinian scholar to be published in the Review. In April 2024, amidst the wave of student protests on campuses across the country, Harvard suspended PSC, the primary student organization for Palestinians engaged in campus advocacy, for the rest of the semester.[19] It subsequently sanctioned the organization again in April 2025, preventing the club from engaging in any activities.[20] In January 2025, Harvard Medical School cancelled a planned lecture on wartime healthcare and a subsequent panel featuring patients from Gaza who were being treated in Boston and their families, purportedly on the grounds that the event was "one-sided." The

---

[18] Natasha Lennard, *Harvard Law Review Editors Vote to Kill Article About Genocide in Gaza,* THE INTERCEPT (Nov. 21, 2023), https://theintercept.com/2023/11/21/harvard-law-review-gaza-israel/.

[19] Michelle N. Amponsah and Joyce E. Kim, *Harvard Suspends Palestine Solidarity Committee Amid Wave of Protests on College Campuses,* THE HARVARD CRIMSON (Apr. 23, 2024), https://www.thecrimson.com/article/2024/4/23/harvard-psc-suspended/.

[20] Samuel A. Church, Elyse C. Goncalves, and Cam N. Srivastava, *Harvard Places Palestine Solidarity Committee on Probation Over Tuesday HOOP Rally,* THE HARVARD CRIMSON (Apr. 3, 2025), https://www.thecrimson.com/article/2025/4/3/psc-probation-university-hall-rally/.

patients were Palestinian children aged one, six, and fourteen.[21] When the event's organizers tried to host it as a student group instead, they were also denied permission from the university.[22]

The IHRA definition, which Harvard formally adopted as part of a private settlement,[23] encourages precisely this type of anti-Palestinian discrimination. Though the main text of the definition is relatively benign, the illustrative examples—seven of the eleven of which pertain to criticism of Israel—make clear they are aimed at preventing Palestinians from speaking about their oppression.[24] One example suggests that it would be antisemitic to claim the founding of Israel, a historical event that Palestinians call the Nakba (catastrophe) because it displaced hundreds of thousands of Palestinians on the basis of their ethnicity, was a racist endeavor.[25] If applied, this means that if Harvard students wished to organize an event featuring Holocaust and Nakba survivors, the Palestinians would be prevented from talking about the Nakba as racially motivated ethnic cleansing, but not the Holocaust survivors.

Moreover, these policies, adopted in response to pressure from outside advocacy groups seeking to prevent opposition to genocide,[26] represent a departure from normal procedures. Harvard's free speech guidelines affirm that "punishments" must "not be used to discourage the

---

[21] Yahir Santillan-Guzman, *The Canceled HMS Panel Is a Failure of Empathy*, THE HARVARD CRIMSON (Feb. 4, 2025), https://www.thecrimson.com/article/2025/2/4/aguilar-harvard-medical-patient-gaza-empathy/ ("After the patient clinic last week was cancelled, I learned that the reason from our dean was concerns that hearing only from Palestinian patients and their families would be one-sided and divisive.").
[22] Elyse C. Goncalves and Akshaya Ravi, *Harvard Medical School Cancels Class Session With Gazan Patients, Calling It One-Sided,* THE HARVARD CRIMSON (Jan. 23, 2025), https://www.thecrimson.com/article/2025/1/23/hms-cancels-gaza-patient-panel/.
[23] FAC ¶ 61.
[24] *Working Definition of Antisemitism*, INTERNATIONAL HOLOCAUST REMEMBRANCE ALLIANCE, https://holocaustremembrance.com/resources/working-definition-antisemitism (last visited June 2, 2025).
[25] *Id.* ("Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.").
[26] Harvard's adoption of IHRA resulted from a lawsuit filed by the Brandeis Center—whose chairman, Kenneth Marcus, is a former Trump official—which targeted speech activity critical of Israel.

specific content of legitimate political dissent[.]"[27] Upon information and belief, pursuant to these guidelines Harvard has never singled out any country for exception from criticism.

Though the university purports to be addressing antisemitism, conflating criticism of Israel with antisemitism via a politicized definition does not make it so, any more than it would be an act of anti-Russian discrimination to protest Russia's invasion of Ukraine or anti-Hindu discrimination to protest India's human rights violations in Kashmir. Indeed, it is *only* Palestinians on campus, and those advocating on their behalf, who are constrained from engaging in political critiques of their own peoples' subjugation, dispossession, and killing.

## **CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiff's motion for summary judgment without affirming that the University has upheld its obligations under Title VI by adopting IHRA.

Dated: June 9, 2025

Respectfully submitted,

Radhika Sainath

Ragini N. Shah (BBO# 671382)
SUFFOLK UNIVERSITY LAW SCHOOL
IMMIGRANT JUSTICE CLINIC
120 Tremont Street Suite 150E
Boston, MA 02108
(617) 305-1651

Radhika Sainath*
Dylan Saba*
PALESTINE LEGAL
55 Exchange Pl, Suite 402
New York, NY 10005
(312) 964-2667
radhika@palestinelegal.org
dsaba@palestinelegal.org

*Admitted Pro Hac Vice

*Counsel for Amicus Curiae for
Harvard Undergraduate Palestine Solidarity Committee*

---

[27] Harvard Faculty of Arts and Sciences, *Free Speech Guidelines Handbook* 5 (Adopted on Feb. 13 and May 15, 1990),
https://handbook.college.harvard.edu/sites/projects.iq.harvard.edu/files/collegehandbook/files/fas_free_speech_guidelines.pdf.

**LOCAL RULE 7.1 CERTIFICATION**

I hereby certify that counsel for amicus curiae has conferred with counsel for the parties.

The Government does not oppose the motion and Harvard did not provide its position before I

filed.

Dated: June 9, 2025                                  Respectfully submitted,

                                                     */s/ Radhika Sainath*
                                                     Radhika Sainath

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the

registered participants on the Notice of Electronic Filing (NEF).

Dated: June 9, 2025                                  Respectfully submitted,

                                                     */s/ Radhika Sainath*
                                                     Radhika Sainath