**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>                      Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>                      Defendants. | Civil Action No. 1:25-cv-11048-ADB |

**BRIEF OF *AMICI CURIAE* AMERICAN COUNCIL ON EDUCATION
AND 27 OTHER HIGHER EDUCATION ORGANIZATIONS
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(Leave to File Granted June 5, 2025 – Dkt. 85)**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

INTEREST OF *AMICI CURIAE* ..................................................................................................1

ARGUMENT ...................................................................................................................................1

    I.   THE ADMINISTRATION'S FUNDING FREEZE IS AN UNLAWFUL EFFORT TO CIRCUMVENT IMPORTANT LIMITS ON EXECUTIVE POWER ...........................................................................................3

        A.  The Executive Branch Improperly Seeks To Leverage Grant Funding To Control A University's Governance And Operations ..........................3

        B.  Congress Can And Has Provided Procedures For Legitimate Law Enforcement Involving Higher Education Institutions ............................................5

    II.  INSTITUTIONAL AUTONOMY IS A FOUNDATIONAL PRINCIPLE IN AMERICAN LAW, AND IT BENEFITS THE NATION AS A WHOLE ......................................................................................................6

        A.  The First Amendment Protects Academic Institutions From Unwarranted Government Intrusion ........................................................................7

        B.  Institutional Autonomy Provides Concrete Benefits To The Nation .......................8

        C.  The Administration's Actions Threaten Institutional Autonomy ...........................9

CONCLUSION ..............................................................................................................................10

CERTIFICATE OF SERVICE

ADDENDUM – LIST OF *AMICI CURIAE*

## TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla,*
    490 F.3d 1 (1st Cir. 2007) ................................................................................... 7, 8

*Cuesnongle v. Ramos,*
    713 F.2d 881 (1st Cir. 1983) ...................................................................................... 7

*Delaney v. Town of Abington,*
    890 F.3d 1 (1st Cir. 2018) ........................................................................................ 10

*Jenner & Block LLP v. U.S. Dep't of Justice,*
    __ F. Supp. 3d __, 2025 WL 1482021 (May 23, 2025) ............................................. 6

*Keyishian v. Board of Regents of Univ. of State of N.Y.,*
    385 U.S. 589 (1967) .............................................................................................. 7, 8

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) .............................................................................................. 4, 5

*National Rifle Ass'n of Am. v. Vullo,*
    602 U.S. 175 (2024) .................................................................................................. 5

*Perry v. Sindermann,*
    408 U.S. 593 (1972) .................................................................................................. 5

*Shelton v. Tucker,*
    364 U.S. 479 (1960) ................................................................................................ 10

*Sweezy v. State of New Hampshire,*
    354 U.S. 234 (1957) .................................................................................................. 7

*United States v. Alvarez,*
    567 U.S. 709 (2012) ................................................................................................ 10

*Whitney v. California,*
    274 U.S. 357 (1927) ................................................................................................ 10

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) .................................................................................................. 6

**CONSTITUTIONAL PROVISION**

U.S. Const. amdt. V ......................................................................................................... 5

# **TABLE OF AUTHORITIES—Continued**

Page(s)

**STATUTES:**

20 U.S.C. § 1232a ........................................................................................................... 4

42 U.S.C. § 2000d ........................................................................................................... 5
    d-1 ............................................................................................................................ 5
    d-2 ............................................................................................................................ 5

**REGULATION**

34 C.F.R. subtitle B, part 100 .......................................................................................... 5

**OTHER AUTHORITIES:**

Philippe Aghion et al., *The Governance and Performance of Research Universities: Evidence from Europe and the U.S.*, National Bureau of Economic Research (Apr. 2009) ......................................................................... 8

Jonathan R. Cole, *The Great American University* (2010) ............................................. 10

*From Campus to Combat: How University Research is Revolutionizing Defense Technology*, EnvZone (Dec. 16, 2024) ...................................................... 9

Letter from Sec. Linda E. McMahon to Dr. Alan Garber (May 5, 2025) ........................ 3

John F. Kennedy, Message on Education (Feb. 6, 1962) ............................................ 4, 8

Michael W. McConnell, *Academic Freedom in Religious Colleges and Universities*, 53 Law & Contemporary Problems 303 (1990) .................................. 9

Linda McMahon, CNBC Interview (May 28, 2025) ...................................................... 4

Gustavo Morello, *The Catholic Church and Argentina's Dirty War* (2015) ................. 10

Fran O'Leary, *University ag innovation hubs under threat*, FarmProgress (June 22, 2021) .......... 9

Jo Ritzen, *University autonomy: Improving educational output* (Mar. 2016) ............... 8

J.D. Vance, *The Universities are the Enemy* (Nov. 2, 2021) ......................................... 9

**INTEREST OF *AMICI CURIAE***

*Amicus* American Council on Education, joined by 27 associations of colleges, universities, educators, trustees, and other representatives of higher education in the United States, submits this amicus brief in support of Harvard University. A list of all *amici* is in the addendum to this brief. *Amici* submit this brief to explain the chilling effect the Administration's actions will have on all of higher education and the cost to society as a whole.

**ARGUMENT**

The Executive Branch has made an unprecedented attempt to punish a university it disagrees with for not ceding control over the institution to the Administration. America's colleges and universities are not part of the federal government. Of course, they must abide by all applicable laws—federal, state, and local. But their receipt of research grants or other funding support does not obligate them to adopt the governance structure or balance of viewpoints demanded by any federal official. The same rules apply today that have for centuries: Under the First Amendment of the Constitution, federal officials cannot dictate how colleges and universities structure their governance, educate their students, and serve their communities—just as they similarly lack the power to do so with other non-federal organizations, entities, or individuals. In the context of higher education, this institutional autonomy has driven innovation, contributed to our Nation's strength and prosperity, and resulted in a remarkable spectrum of colleges and universities in this country—from religious schools, to community colleges, to trade schools, to online schools, to small liberal arts schools, to large research institutions. The Administration's actions reverberate far beyond Harvard and jeopardize the richness of this spectrum, which has long been one of our country's greatest strengths.

The Administration's actions also undermine the separation of powers implemented by America's Founding Fathers to protect everyone from tyranny. The Executive Branch is not empowered to punish or, at the extreme, destroy any citizen or institution for refusing to accede to unlawful demands. To be sure, no college or university is perfect. Like all organizations, they must listen to criticism and respond to legitimate concerns. Moreover, if and when educational institutions violate federal laws, they should be held accountable through the processes Congress prescribed. But the Executive Branch cannot act without regard to those lawful processes. Here, the Administration has made its real purpose clear: to retaliate for a university's refusal to embrace illegitimate demands and deter other institutions from doing the same.

The Administration's actions jeopardize the foundation of a national research system that has made higher education in the United States the envy of the world. That system has contributed enormously to our Nation's economic strength, global competitiveness, national security, and technological innovation. If federal officials in 2025 are permitted to force universities to cater to whoever holds the political power of the moment, it will happen again and again, in 2028, 2032, 2036, and beyond, to the detriment of this Nation. Future federal funding freezes could target research that contradicts a particular administration's claims, universities that are politically unpopular or have a religious mission, or colleges that refuse to hire faculty who are friends of the administration. Nothing less is at stake here than the ongoing ability of universities to tackle our toughest medical, scientific, and technological challenges, to train our country's workforce, and to teach our future leaders. This Court should reject the Administration's attempt to bypass Congress and the First Amendment and grant Harvard's motion for summary judgment.

## I. THE ADMINISTRATION'S FUNDING FREEZE IS AN UNLAWFUL EFFORT TO CIRCUMVENT IMPORTANT LIMITS ON EXECUTIVE POWER.

### A. The Executive Branch Improperly Seeks To Leverage Grant Funding To Control A University's Governance And Operations.

The Administration's correspondence with Harvard leaves no doubt that it seeks to punish the university for refusing to cede control over its internal affairs and to "reform" the institution's perceived ideological alignment. *See* Dkt. 70 ("Harvard Br.") at 11-15. These goals—seizing control of a university's internal governance and operations to reconfigure its perceived ideological balance—are un-American. They are not, have never been, and never can be legitimate governmental aims under our constitutional system. If the Executive Branch is permitted to demand this of Harvard, it can demand it of any college or university in America.

The Administration's April 3 demand letter—sent shortly before the freeze was imposed—requires Harvard to "make meaningful governance reform" designed to "empower[]" those that the Administration deems "devoted to the scholarly mission of the University" and to "reduc[e] the power" of leaders the Government considers "more committed to activism than scholarship." Dkt. 1-1 at 2. Harvard has been told, as well, that it must convince a federally approved auditor that "each department, field, or teaching unit" is "individually viewpoint diverse" or else hire "a critical mass of new faculty" and admit "a critical mass of students" to meet the Administration's benchmark for "viewpoint diversity" *Id.* at 3-4.

Shortly after the freeze was announced, the Secretary of Education sent an acrimonious letter confirming the Administration's intention to force Harvard to reshape its governance and operations. *See* Letter from Sec. Linda E. McMahon to Dr. Alan Garber (May 5, 2025).[1] The letter attributes Harvard's supposed governance failures to the fact that the leader of its Board is

---

[1] *Available at* https://perma.cc/2VP2-4PFC.

a member of the opposite political party. *See id.* at 2-3. And it takes issue with all manner of operational decisions over which federal regulators have no valid authority, including Harvard's "standardized testing requirements," its "grading system," and its mathematics curriculum. *Id.* at 1. In a televised interview discussing Harvard's lawsuit on May 28, 2025, Secretary McMahon stated that "universities should continue to be able to do research as long as they … are in sync, I think, with the Administration." CNBC Interview at 1:27.[2]

These actions are radically incompatible with the constitutional separation of powers and the strictures of the First Amendment. Congress, which controls the power of the purse, has passed no statute purporting to allow the Executive Branch to micromanage all aspects of any university. On the contrary, as federal education funding increased, Congress consistently provided that "[n]o provision of any applicable program shall be construed to authorize any" federal officer "to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution." 20 U.S.C. § 1232a. This statute codifies a presidential message to Congress over 60 years ago, affirming that "[t]he control and operation of education in America" must not accrue to the federal government, but instead "remain the responsibility of the State and local governments and private institutions." John F. Kennedy, *Message on Education* (Feb. 6, 1962).[3]

The First Amendment protects private universities—as it does all citizens—from governmental efforts to engineer a "better balancing" of "the marketplace of ideas." *Moody v. NetChoice, LLC*, 603 U.S. 707, 732-733 (2024). "[I]n case after case," the Supreme Court "has barred the government from" efforts "to rejigger the expressive realm." *Id.* at 733. "However imperfect the private marketplace of ideas" might be, it is a "worse proposal" for "the

---

[2] *Available at* https://perma.cc/Q6FU-E3TU.
[3] *Available at* https://perma.cc/P24L-BS7S.

4

government itself [to decide] when speech was imbalanced" and coerce "speakers to provide more of some views or less of others." *Id.*

Equally important, the Executive Branch may not cloak efforts to achieve these impermissible goals in a pretense of lawful authority over grant funding. Even where the Executive Branch enjoys some measure of delegated discretion over government benefits, such as grant funding, it "'may not deny [that] benefit to a person on a basis that infringes" the Constitution. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). This flows from the broader "principle that a government official cannot do indirectly what she is barred from doing directly." *National Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). In other words, because the Administration may not directly dictate a university's governance and operations, it may not wield its grantmaking authority to the same end.

### B. Congress Can And Has Provided Procedures For Legitimate Law Enforcement Involving Higher Education Institutions.

None of this makes universities and colleges beyond reproach or above the law. As active participants in "the marketplace of ideas," *Moody*, 603 U.S. at 732, universities should be receptive to thoughtful criticism and accountable when they fall short. In addition, Congress has mandated that colleges and universities receiving federal funding must comply with federal laws—including that they do not unlawfully discriminate in violation of Title VI, *see* 42 U.S.C. § 2000d. These obligations are enforced through procedures dictated by statute and regulation, but consistent with the constitutional guarantee of due process. *See, e.g.*, 42 U.S.C. §§ 2000d-1, 2000d-2; 34 C.F.R. subtitle B, part 100; U.S. Const. amdt. V; *accord* Harvard Br. 32-37.

At times, the Administration has suggested its actions are designed to promote compliance with Title VI and punish Harvard for not sufficiently preventing "antisemitic harassment." Dkt. 1-1 at 4; *see also* Dkt. 1-3 (citing the "harassment of Jewish students" in

5

announcing the funding freeze). *Amici* condemn antisemitism, and all forms of discrimination based on race, ethnicity, or heritage, in the strongest possible terms. All students and faculty should feel welcome and safe on our Nation's campuses and never subjected to harassment.

Here, the Administration has not acted through *any* of the prescribed processes for enforcing Title VI. *See* Harvard Br. 32-38. Instead, it summarily imposed a "freeze on $2.2 billion in multi-year grants and $60M in multi-year contract value" via a press release posted to the U.S. Department of Education's website. Dkt. 1-3. The Administration's refusal to use the lawful process for enforcing Title VI—combined with its unlawful demands for Harvard to cede control over the institution—leaves no doubt that this funding freeze is pretextual and not truly about Title VI enforcement. *See Jenner & Block LLP v. U.S. Dep't of Justice*, __ F. Supp. 3d __, 2025 WL 1482021, at *19 (May 23, 2025) (noting "the President may not evade the 'extensive regulation' governing EEOC proceedings" by imposing penalties on a law firm via Executive Order while citing unsubstantiated allegations of discrimination). "[T]he equilibrium established by our constitutional system" does not permit the Executive Branch to take enforcement "measures incompatible with the expressed or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-638 (1952) (Jackson, J., concurring).

## II.   INSTITUTIONAL AUTONOMY IS A FOUNDATIONAL PRINCIPLE IN AMERICAN LAW, AND IT BENEFITS THE NATION AS A WHOLE.

The Administration's actions in this case threaten to—and are designed to—erode the autonomy of our Nation's higher education institutions. That institutional autonomy is rooted in the First Amendment and has been a critical source of the Nation's success. The Court should reject the Administration's efforts to subvert higher education to the federal government's political leadership of the moment.

### A. The First Amendment Protects Academic Institutions From Unwarranted Government Intrusion.

Under the First Amendment, the "classroom is peculiarly the marketplace of ideas," and the "Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (quotation marks and parentheses omitted). As a result, the Constitution "establishes a zone of First Amendment protection for the educational process," including "host institutions." *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007) (*AEPPR*) (quotation marks and brackets omitted).

This First Amendment protection safeguards the "essential freedoms of a university," which include making its own academic decisions about what is taught, how, by whom, and to whom. *Sweezy v. State of New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in the result) (quotation marks omitted); *accord AEPPR*, 490 F.3d at 9-10. "Scholarship cannot flourish in an atmosphere of suspicion and distrust," giving institutional autonomy a "vital role in a democracy" by ensuring "[t]eachers and students … remain free to inquire, to study and to evaluate, [and] to gain new maturity and understanding." *Sweezy*, 354 U.S. at 250 (plurality op.).

The First Circuit has explicitly recognized the First Amendment's protections for the "institutional autonomy" of educational institutions. *AEPPR*, 490 F.3d at 10 n.4. It has held that this constitutional guarantee is implicated when government actors undertake to "supervis[e] the conduct of basic university affairs." *Cuesnongle v. Ramos*, 713 F.2d 881, 884-885 (1st Cir. 1983). And it has held that these First Amendment protections are violated when a government actor purports to interfere with the institution's "right to determine for itself what may be taught and how it shall be taught." *AEPPR*, 490 F.3d at 19 (quotation marks omitted).

7

**B.      Institutional Autonomy Provides Concrete Benefits To The Nation.**

Institutional autonomy is important precisely because it "assures our educational system of the freedom, the diversity and the vitality necessary to serve our free society fully."  John F. Kennedy, Message to Congress (Feb. 6, 1962).

By ensuring that "laws [do not] cast a pall of orthodoxy over the classroom," *Keyishian*, 385 U.S. at 603, institutional autonomy creates "breathing space" for the full spectrum of colleges and universities: public and private institutions, religiously affiliated institutions, community colleges, science and engineering schools, liberal arts colleges, and more.  *Id.* at 604.  This allows prospective students and faculty members to affiliate with institutions that have missions and curricular offerings that meet their particular needs.

This competitive environment both drives innovation and forms the mosaic that *is* American higher education.  Researchers have noted that "U.S. universities are obvious positive outliers in performance on the international indices" and have pointed to empirical evidence showing "autonomy and competition increase the inventive output" of universities.  Philippe Aghion et al., *The Governance and Performance of Research Universities: Evidence from Europe and the U.S.*, National Bureau of Economic Research, 1, 28 (Apr. 2009)[4]; *see also* Jo Ritzen, *University autonomy: Improving educational output* (Mar. 2016) (concluding that "[u]niversity autonomy is likely to strengthen universities' ability to improve graduates' competencies and research output" and constitutes an "important means to promote sustainable economic growth").[5]

The resulting innovation at American universities has delivered concrete societal benefits.  Independent research drives national achievement in biomedical engineering,

---

[4] *Available at* https://perma.cc/F9KA-DVEW.
[5] *Available at* https://perma.cc/4NB4-HYJU.

8

technological development, agricultural processes, and more. Universities are able to deliver agricultural innovations—such as corn hybrids, soybean varieties, and even the Honeycrisp apple—because they can pursue research with federal funds without fear that the government will control the fruits of their innovation. *See* Fran O'Leary, *University ag innovation hubs under threat*, FarmProgress (June 22, 2021).[6] The Department of Defense has a long history of benefitting from research projects led by universities, who are able to take on the kind of "high-risk, high-reward research projects" that the private sector cannot. *From Campus to Combat: How University Research is Revolutionizing Defense Technology*, EnvZone (Dec. 16, 2024).[7] Institutional autonomy also provides room for religious institutions to flourish, as they can ensure their faculty "teach and research within the parameters of the religious tradition." Michael W. McConnell, *Academic Freedom in Religious Colleges and Universities*, 53 Law & Contemporary Problems 303, 306 (1990).

      **C.**    **The Administration's Actions Threaten Institutional Autonomy.**

The Administration's actions over the past few months have put institutions to a stark choice: cede to the Executive Branch's demands or face crippling governmental retaliation. This threat was previewed by the Vice President's 2021 speech titled "The Universities are the Enemy," in which he said "we have to honestly and aggressively attack the universities in this country." J.D. Vance, *The Universities are the Enemy* (Nov. 2, 2021).[8] Such unconstitutional conduct jeopardizes the free marketplace of ideas and creates an environment where institutions must work to appease the political regime of the day, or else. If not enjoined, the Administration's retributive approach will intimidate and impede institutions from exercising

---

[6] *Available at* https://www.farmprogress.com/technology/university-ag-innovation-hubs-under-threat.
[7] *Available at* https://perma.cc/XX26-TAD8.
[8] *Available at* https://perma.cc/QP8B-L58G.

9

their First Amendment rights.  *See Delaney v. Town of Abington*, 890 F.3d 1, 8 (1st Cir. 2018).

Regardless of political affiliation, the Administration's action raises grave constitutional concerns.  Even if one agrees with the current Administration's view that Harvard is subject to "ideological capture," Dkt. 1-1, what happens when the shoe is on the other foot down the road?  The pendulum of politics will inevitably swing in another direction.  When it does, are colleges and universities forced to swing with it?  It is not hyperbole to say that future administrations could stifle scientific advances deemed "antithetical to the state's political ideology"—much as the Soviet Union did in the 1930s.  Jonathan R. Cole, *The Great American University* 347-349 (2010).  Religious universities whose teachings do not align with preferred Executive Branch messaging could be targeted—much as Argentina's military junta attacked dissident Catholic seminarians in the 1970s.  *See* Gustavo Morello, *The Catholic Church and Argentina's Dirty War* 13-16 (2015).  The concern is that real, and the stakes are that high.  This is why it is so important to remember and vigorously support the premise that—in *this* country—the remedy for viewpoints the government disfavors must be "more speech, not enforced silence."  *United States v. Alvarez*, 567 U.S. 709, 727-728 (2012) (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)).

Relatively speaking, Harvard is fortunate.  It has substantial resources to resist these incursions on its autonomy through litigation.  Other institutions are far worse positioned to withstand the Administration's blunt approach, even for a short time.  It is imperative this Court reconfirm that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."  *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).

## CONCLUSION

For the foregoing reasons, this Court should grant Harvard's motion for summary judgment.

Respectfully submitted,

| | |
|---|---|
| Stephanie J. Gold* | */s/ Gregory F. Noonan* |
| Jessica L. Ellsworth* | Gregory F. Noonan (BBO #651035) |
| Reedy C. Swanson* | Kayla H. Ghantous (BBO #709197) |
| HOGAN LOVELLS US LLP | HOGAN LOVELLS US LLP |
| Columbia Square | 100 High Street, 20th Floor |
| 555 Thirteenth Street, NW | Boston, MA 02110 |
| Washington, DC 20004 | (617) 371-1000 |
| (202) 637-5496 | gregory.noonan@hoganlovells.com |
| stephanie.gold@hoganlovells.com | kayla.ghantous@hoganlovells.com |
| jessica.ellsworth@hoganlovells.com | |
| reedy.swanson@hoganlovells.com | Counsel for *Amici Curiae* |

*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 9, 2025.

/s/ *Gregory F. Noonan*
Gregory F. Noonan

## ADDENDUM – LIST OF *AMICI CURIAE*

**American Council on Education**

https://www.acenet.edu/About/Pages/default.aspx

**ACPA-College Student Educators International**

https://myacpa.org/who-we-are/

**American Association of Colleges of Nursing**

https://www.aacnnursing.org/about-aacn

**American Association of Collegiate Registrars and Admissions Officers**

https://www.aacrao.org/who-we-are

**American Association of Community Colleges**

https://www.aacc.nche.edu/about-us/

**American Dental Education Association**

https://www.adea.org/home/about/about-adea

**Association of American Law Schools**

https://www.aals.org/about/

**Association of American Medical Colleges**

https://www.aamc.org/about-us

**Association of American Universities**

https://www.aau.edu/who-we-are-americas-leading-research-universities

**Association of Community College Trustees**

https://www.acct.org/about

**Association of Governing Boards of Universities and Colleges**

https://agb.org/about-us/

**Association of Jesuit Colleges and Universities**

https://ajcunet.edu/about/

**Association of Research Libraries**

https://www.arl.org/who-we-are/

A1

**College and University Professional Association for Human Resources**

https://www.cupahr.org/about/

**Council for Advancement and Support of Education**

https://www.case.org/about-case

**Council for Opportunity in Education**

https://coenet.org/about-coe/

**Council of Independent Colleges**

https://cic.edu/about/what-we-do/

**Council on Governmental Relations**

https://www.cogr.edu/mission-statement

**Council on Social Work Education**

https://www.cswe.org/about-cswe/

**EDUCAUSE**

https://www.educause.edu/about

**Middle States Commission on Higher Education**

https://www.msche.org/about-us/

**NAFSA: Association for International Educators**

https://www.nafsa.org/about

**National Association for College Admission Counseling**

https://www.nacacnet.org/who-we-are/

**National Association of Independent Colleges and Universities**

https://www.naicu.edu/about-naicu/

**National Association of Student Financial Aid Administrators**

https://www.nasfaa.org/About_NASFAA

**Phi Beta Kappa**

https://www.pbk.org/about

**Southern Association of Colleges and Schools Commission on Colleges**

https://sacscoc.org/

**WASC Senior College and University Commission**

https://www.wscuc.org/about/