**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>           Plaintiff,<br><br>     v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br>et al.,<br><br>           Defendants. | Case No. 1:25-cv-11048<br>Leave to File Granted:<br>ECF 104, June 6, 2025 |

**BRIEF OF MIDDLE EAST STUDIES ASSOCIATION OF NORTH AMERICA, INC.**
**AS AMICUS CURIAE IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT**

MIDDLE EASTERN STUDIES ASSOCIATION OF NORTH AMERICA, INC.,

/s/ *Darryl Li*
Darryl Li
*Pro Hac Vice*
1126 E. 59th St.
Chicago, IL 60637
T: 773-702-4001
darrylli@protonmail.com

*/s/ Corey Martin*
Corey S. Martin (BBO #686100)
HM Law, P.C.
24 Shipyard Drive, Suite 202
Hingham, MA 02043
T: 781-789-8070
cmartin@myhmlaw.com

**TABLE OF CONTENTS**

**INTEREST OF** *AMICUS CURIAE*……………………………………………………………….1

**SUMMARY OF ARGUMENT** …………………………………………………………………1

**ARGUMENT**……………………………………………………………………………………..3

    I.       The First Amendment Prohibits the Government from Indirectly Punishing Speech by Coercing Third Parties………………………………………………………............3

    II.      Title VI of the 1964 Civil Rights Act Does Not and Cannot Require Universities to Suppress Speech, Including Scholarship, for Criticizing Zionism……………............6

**CONCLUSION**………………………………………………………………………………10

# TABLE OF AUTHORITIES

**CASES**

*Bantam Books v. Sullivan*, 372 U.S. 58, 67 (1963)……………………………………………..2

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001)…………………………………….3

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188, 189 (2024)……………..……………2, 3, 4

*New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)…………………………………….4

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 342, n. 4 (2018)…..3

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972)………………………………………………..3

*Rutan v. Republican Party of Ill.*, 497 U.S. 62, 77-78 (1990)…………………………………..3

*Smith v. California*, 361 U.S. 147, 154 (1959)………………………………………………….4

**STATUTES**

42 U.S.C. § 2000d…………………………………………………………………………………2

42 U.S.C. § 2000d-1………………………………………………………………………………2

**REGULATIONS**

Exec. Order No. 14188, 90 Fed. Reg. 8847 (Feb. 3, 2025)………………………………………1

**SECONDARY SOURCES**

Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, Harv. L. Rev. Forum 9 (forthcoming June 2025), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5271044..........................................9

Itamar Mann & Lihi Yona, *Defending Jews from the Definition of Antisemitism*, 71 UCLA L. Rev. 1150 (2024)………………………………..……………..…………….9

Writings of James Madison Vol. 5 at 269, 272 (G. Hunt ed.1901)…………...…………..3, 4

**OTHER AUTHORITIES**

Michael C. Bender, *Secretary Supports Talks On Clash With Harvard*, N.Y. Times, A12 (May 19, 2025), available at https://www.nytimes.com/2025/05/17/us/politics/linda-mcmahon-harvard-trump.html………......................................................……..……….....…………………..5

Sebastian B. Connolly & Julia A. Karabolli, *Harvard Divinity School Suspends Religion, Conflict, and Peace Initiative*, THE HARVARD CRIMSON (Apr. 2, 2025), available at https://www.thecrimson.com/article/2025/4/2/religion-conflict-peace-initiative-paused/......5-6

Letter from Federal Task Force Letter to Columbia University (March 13, 2025), available at https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf..................................................................................................................................2

MESA Board Open Letter to US and Canadian College and University Presidents, (Dec. 18, 2023), https://mesana.org/advocacy/letters-from-the-board/2023/12/18/open-letter-to-us-and-canadian-college-and-university-presidents..................................................................................1

MESA Committee on Academic Freedom, Letter to Harvard University protesting the dismissals of the director and associate director of the Center for Middle Eastern Studies (Mar. 31, 2025), available at https://mesana.org/advocacy/committee-on-academic-freedom/2025/03/31/letter-to-harvard-university-protesting-the-dismissals-of-the-director-and-associate-director-of-the-center-for-middle-eastern-studies...............................................5

The Office for Community Conduct at Harvard University, "Frequently Asked Questions" (Last Accessed June 8, 2025), available at https://perma.cc/3NKYLD97.......................................8-9

Atalia Omer, *I'm an Israeli Professor. Why is my work in Harvard's antisemitism report?* THE GUARDIAN online (May 9, 2025), available at https://www.theguardian.com/commentisfree/2025/may/09/im-an-israeli-professor-why-is-my-work-in-harvards-antisemitism-report..............................................................................8

Letter from Zachary Pelchat, Team Leader, U.S. Dep't of Educ. Office of Civil Rights, to U.C. Berkeley Chancellor Robert J. Birgeneau, OCR Case No. 09-2-2259 (Aug. 19, 2013), found at: http://news.berkeley.edu/wp-content/uploads/2013/08/DOE.OCR_.pdf ............................7

Presidential Task Force on Combating Antisemitism and Ant-Israeli Bias, Harvard University, "Final Report" at 165 (Apr. 29, 2025), available at: https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-Report-4.29.25.pdf....................................8

Gerald A. Reynolds, Assistant Secretary U.S. Dep't of Educ. Office for Civil Rights, "First Amendment: Dear Colleague" [OCR-00028] (Jul. 28, 2003), available at https://www.ed.gov/about/offices/list/ocr/firstamend.html......................................................6-7

Yonat Shimron, *Harvard Divinity School Pauses Religion and Conflict Educational Initiative, Cuts Its Staff*, RELIGION NEWS DISPATCHES (Apr. 3, 2025), available at https://religionnews.com/2025/04/03/harvard-divinity-school-pauses-religion-conflict-and-peace-initiative-and-cuts-staff/…………….............................…….................................6

**INTEREST OF *AMICUS CURIAE***

The Middle East Studies Association of North America, Inc. (MESA) is a 501(c)(3) nonprofit membership scholarly association of faculty, students, and researchers interested in the study of the Middle East. MESA has an interest in defending the rights of its members who study, teach and conduct scholarship to speak and associate freely in ways informed by their study of the Middle East. MESA established its Committee on Academic Freedom decades ago to protect our members' First Amendment rights. Dozens of our members are current or recent affiliates of Harvard University, including faculty and students. Thus, we have a well-established interest in the protection of the First Amendment rights of students, researchers and scholars at Harvard in the field of Middle East Studies.

**SUMMARY OF ARGUMENT**

The past 20 months have witnessed unprecedented threats to freedom of expression in the scholarly field of Middle East studies in the United States. As university and college campuses witnessed broad-based protests in support of the Palestinian people, Middle East studies programs, scholars, and students have become prominent targets for pro-Israel backlash. Middle East studies is no stranger to politicized pressures[1], but the advent of the Trump administration has ushered in an unprecedented level of interference and harassment from the federal government. Through the establishment of an interagency "Federal Task Force to Combat Antisemitism" led by the Department of Justice (hereafter "Federal Task Force") pursuant to Exec. Order No. 14188, 90 Fed. Reg. 8847 (Feb. 3, 2025), the Trump administration has directed a bevy of administrative agencies to launch investigations into colleges and universities using

---

[1] *See* MESA Board Open Letter to US and Canadian College and University Presidents, (Dec. 18, 2023), https://mesana.org/advocacy/letters-from-the-board/2023/12/18/open-letter-to-us-and-canadian-college-and-university-presidents, attached hereto as Exhibit A.

1

pretextual and overbroad allegations of anti-semitism, weaponizing Title VI of the 1964 Civil Rights Act. *See* Feb. 28, 2025 Federal Task Force Press Release at ECF 59-12.

The most prominent targets of the Federal Task Force thus far have been Columbia University and Harvard University. In both pressure campaigns, government demands for university administrators to crack down on academic programs devoted to the study of the Middle East have played a prominent part. *Compare* the "April 11 Letter" at ECF 59-1 (Accusing, without basis, numerous programs including the Harvard Center for Middle Eastern Studies ("CMES") of "fuel[ing] antisemitic harassment or reflect[ing] ideological capture" and demanding reform of said programs) *with* March 13, 2025 Letter from Federal Task Force to Columbia University Leaders (demanding that Columbia University place its department of Middle East, South Asian, and African Studies into academic receivership).[2]

Here, the Defendants' demands violate core First Amendment protections by threatening funding cuts and other sanctions to coerce Harvard into changing how it manages the speech of its faculty and students, particularly those exercising their rights to free speech and association informed by teaching, research and scholarship about the Middle East and, more specifically, the Israel-Palestine conflict. *See* Plaintiff's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("SOF"), ECF 71 at ¶¶ 19-42; *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188, 189 (2024) (the government may not "use the power of the State to punish or suppress disfavored expression" nor use threats of "'legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech" *quoting Bantam Books v. Sullivan*, 372 U.S. 58, 67 (1963)). Defendants have done all this in the name of Title VI, but without having made a single factual finding to support their repeated allegations of

---

[2] Available at https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf.

antisemitism. *See* 42 U.S.C. § 2000d; 42 U.S.C. § 2000d-1; SOF, ECF 71 at ¶¶ 27-28, 38-39; *see also* First Am. Compl. Exhibits at ECF 59-1, 59-4 through 59-11, 59-13 through 59-16.

## ARGUMENT

### I. THE FIRST AMENDMENT PROHIBITS THE GOVERNMENT FROM INDIRECTLY PUNISHING SPEECH BY COERCING THIRD PARTIES

The First Amendment prohibits government officials from indirectly coercing or interfering with the expressive choices made by private speakers or institutions. *See Vullo*, 602 U.S. at 188-89. Hence, government officials cannot "wield [their] power to threaten enforcement actions" or financial retaliation to pressure private entities, even regulated entities, into suppressing their own or other people's speech or into disassociating from disfavored speakers. *Id.* at 188, 191-93. Government officials also cannot condition the receipt of government benefits on a private party's agreement to waive their First Amendment rights. *See Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 342, n. 4 (2018) (the government cannot produce "a result it could not command directly", quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 77-78 (1990) ("What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly."); *Perry*, 408 U.S. at 597 (the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests– especially, his interest in freedom of speech."). Courts have interpreted the First Amendment to prohibit these more subtle and sometimes informal efforts to restrict speech because they have recognized that any other conclusion would allow the First Amendment to become a "simple semantic exercise[,]" *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001), or a mere "parchment barrier[]", 5 WRITINGS OF JAMES MADISON 269, 272 (G. Hunt ed.1901), to government censorship. This is because, were it otherwise, the government could use the

expansive economic and regulatory levers of the state to pressure private parties into censoring themselves even when they could not directly command it. *See id.* And yet, as the Supreme Court recognized over sixty years ago, private "self-censorship, [when] compelled by the State[]" is "hardly less virulent for being privately administered." *Smith v. Cal.*, 361 U.S. 147, 154 (1959). It poses as great a threat to the independence of the marketplace of ideas as official state censorship does—and in some respects, poses a greater threat by obscuring the governmental source of the constraints—on the "uninhibited, robust, and wide-open" public debate the First Amendment is supposed to enable. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Therefore, the Court has made clear that, under the First Amendment, a "government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Vullo*, 602 U.S. at 190.

While the Plaintiff—the President and Fellows of Harvard College—rightly stands up for the interests of the university's administration, its free speech and association interests are not necessarily the same as those of the entire university community, which consists of thousands of students, faculty, and staff—many of whom study, research, and teach about the Middle East. Yet it is precisely that broader set of rights that is a central target of Defendants' behavior, which they hope to suppress through pressuring the Harvard administration.

Indeed, there is already explicit evidence that the Defendants' actions have coerced Harvard into chilling the First Amendment rights of its university community. On February 27th, the Federal Task Force notified Harvard that it was "aware of allegations that your institution may have failed to protect Jewish students and faculty members from unlawful discrimination" and demanded a meeting within 30 days with "with relevant administrators, faculty, staff members, and any on-campus Jewish stakeholder groups." Feb. 27, 2025 Letter to Harvard from

Task Force, ECF 59-11 at 1-2. The Federal Task Force did not provide any specific examples or facts to support the "allegations" to which the Federal Task Force was made aware. Nonetheless, in the final week of March—just before the government's deadline—Harvard took steps to shut down or curtail at least three academic programs connected to the Middle East:

1. Harvard administrators forced out both the director and associate director of CMES without due process based on secondhand complaints that an event it sponsored regarding the recent war in Lebanon lacked sufficiently balanced viewpoints—thus abrogating the scholarly independence of one of the premier research centers in our field. *See* MESA Committee on Academic Freedom, Letter to Harvard University protesting the dismissals of the director and associate director of the Center for Middle Eastern Studies (Mar. 31, 2025), attached hereto as Exhibit B. Defendant McMahon later took credit on behalf of the government for this act of speech-based punishment, boasting: "We have forced [plaintiff's] hand to do that." Michael C. Bender, *Secretary Supports Talks On Clash With Harvard*, N.Y. TIMES, A12 (May 19, 2025).

2. Harvard ended a collaboration between its public health and human rights program and Birzeit University, the oldest university in the West Bank. In its communications with the government, Harvard listed "changed partnerships" as among the "measures the university will be taking against antisemitism." April 14 Letter from Harvard Attorneys, ECF 59-2 at 1. Harvard has since referred to the end of its relationship with Birzeit as part of efforts to placate Defendants. *See* Newell Declaration, ECF 73 at ¶¶ 22-23.

3. Harvard suspended its Religion, Conflict, and Peace Initiative, part of the Religion and Public Life program at Harvard Divinity School. *See* Sebastian B. Connolly & Julia A. Karabolli, *Harvard Divinity School Suspends Religion, Conflict, and Peace Initiative*,

5

> THE HARVARD CRIMSON (Apr. 2, 2025). Moreover, Harvard reportedly cut the program's sole staff position – held, incidentally, by the only Palestinian American staffer at Harvard Divinity School. *See* Yonat Shimron, *Harvard Divinity School Pauses Religion and Conflict Educational Initiative, Cuts Its Staff*, RELIGION NEWS DISPATCHES (Apr. 3, 2025).

While Harvard appears to have taken these steps in anticipation of the Federal Task Force's deadline, such efforts clearly failed to mollify Defendants. On April 11th, Defendants threatened to cut funds to Harvard unless it "commission[s] an external party, which shall satisfy the federal government as to its competence and good faith," to audit a stunning range of academic units and programs that they allege "reflect ideological capture," including the three programs mentioned *supra*: CMES, the Religion and Public Life program at Harvard Divinity School, and the public health school's human rights program. April 11 Letter, ECF 59-1 at 3. The inclusion of these programs in Defendants' April 11 audit demand only confirmed that preemptive obedience invites further coercion—a lesson that came at the expense of the faculty, students, and staff whose First Amendment interests were sacrificed.

## II. TITLE VI OF THE 1964 CIVIL RIGHTS ACT DOES NOT AND CANNOT REQUIRE UNIVERSITIES TO SUPPRESS SPEECH, INCLUDING SCHOLARSHIP, FOR CRITICIZING ZIONISM

The Trump administration has invoked Title VI of the 1964 Civil Rights Act as a basis for its actions, alleging that Harvard has "failed to protect American students and faculty from antisemitic violence and harassment." April 3 Letter, ECF 59-16 at 1. The Department of Education's Office for Civil Rights, which has long enforced Title VI in the higher education context, has recognized that harassment "must include something beyond the mere expression of views, words, symbols that some person finds offensive." Gerald A. Reynolds, Assistant

6

Secretary U.S. Dep't of Educ. Office for Civil Rights, "First Amendment: Dear Colleague" [OCR-00028] (Jul. 28, 2003).[3] Title VI protects students from "prohibited discrimination" and does not "restrict the exercise of expressive activities or speech that are protected under the First Amendment," which is "particularly relevant in the university environment, where academic freedom fosters the robust exchange of ideas." Letter from Zachary Pelchat, Team Leader, U.S. Dep't of Educ. Office of Civil Rights, to U.C. Berkeley Chancellor Robert J. Birgeneau, OCR Case No. 09-2-2259 (Aug. 19, 2013).[4]

Here, the Plaintiff has persuasively argued that the Trump administration's cancellation of federal funding is in flagrant contravention of Title VI's procedural requirements. *See* Memorandum in Support of Plaintiff's Motion for Summary Judgment 32-38 ("Plaintiff's MSJ Memo"), ECF 70 at 32-38. Yet by jumping immediately to Title VI's procedural aspects, Plaintiff appears to accept at face value the Defendants' most sensationalist allegations, claiming that "[m]embers of the Jewish and Israeli communities at Harvard experienced treatment that was vicious and reprehensible," without any further elaboration or substantiation, or any acknowledgment of the possibility that at least some allegations of antisemitism may have been unfounded and politically motivated. Plaintiff's MSJ Memo, ECF 70 at 7.[5] Harvard's hasty embrace of Defendants' flawed framing of antisemitism only harms its own cause, as well as the First Amendment rights of the university community. As Plaintiff correctly points out, the Trump administration's actions in this case are not based on an express finding on the record.

---

[3] Available at https://www.ed.gov/about/offices/list/ocr/firstamend.html.
[4] Available at https://news.berkeley.edu/wp-content/uploads/2013/08/DOE.OCR.pdf.
[5] An earlier filing contains a nearly identical sentence with one important difference, claiming that "[m]embers of the Jewish and Israeli communities at Harvard *reported* treatment that was vicious and reprehensible." First Am. Compl., ECF 59 at ¶ 55 (emphasis added). It is unclear how the factual record developed in this case since then would support the shift from conveying reports of "vicious and reprehensible" treatment to treating those reports as fact. *See* SOF ¶¶ 18, 43-48, 97-100.

7

*See* First Am. Compl. ¶¶ 146-151; *see also* SOF ¶¶ 18, 43-48, 97-100. Instead, the Trump administration's most consistent factual allegation of antisemitism at Harvard, repeated verbatim across multiple agency communications, simply quotes conclusory language from the final report of Harvard's own Presidential Task Force on Antisemitism and Anti-Israeli Bias (hereafter "Harvard Task Force Report"). *See* May 6 NIH Letter, ECF 59-5 at 2; May 9 USDA Letter, ECF 59-6 at 1; May 12 Energy Letter, ECF 59-7 at 1; May 12 DOD Letter, ECF 59-8 at 1; May 19, 2025 Termination Letter from Centers for Disease Control and Prevention, ECF 74-6 at 1. Yet, the Harvard Task Force "did not act 'as an investigative body,' it did not require 'corroborating evidence,' and its report is not 'a definitive conclusion.'" Plaintiff's MSJ Memo, ECF 70 at 9 (quoting from the Harvard Task Force Report). Nor is the Harvard Task Force Report's analysis of certain events free from controversy. In one instance, the Harvard Task Force negatively cited a speaker for "commending Jewish pro-Palestinian activists" while misleadingly omitting the fact that the speaker herself identifies as an Israeli Jew. *See* Presidential Task Force on Combating Antisemitism and Ant-Israeli Bias, Harvard University, "Final Report" at 165 (Apr. 29, 2025)[6]; *see also* Atalia Omer, *I'm an Israeli Professor. Why is my work in Harvard's antisemitism report?* THE GUARDIAN online (May 9, 2025).

      More disturbingly, Plaintiff has seemingly accepted the government's overbroad and politicized weaponization of antisemitism, adopting policies that are incompatible with Title VI and that would make independent, rigorous scholarship on the Middle East impossible. In March 2025—presumably acting with the 30 day deadline set by the Federal Task Force in mind—Harvard changed its non-discrimination policy to cover "conduct targeting Zionists." Newell Decl., ECF 73 at ¶ 13. The new policy considers Zionism to be a "protected characteristic"

---

[6] Available at: https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-Report-4.29.25.pdf.

equivalent to race or religion on the basis that "[f]or many Jewish people, Zionism is a part of their Jewish identity." The Office for Community Conduct at Harvard University, "Frequently Asked Questions" (Last Accessed June 8, 2025), available at https://perma.cc/3NKYLD97 (prohibiting "derogatory, demeaning, or hostile materials based on one or more protected or perceived protected characteristics (e.g., Jewish, Zionist, Arab, or Muslim identity)"). Yet courts have consistently rejected Title VI claims that seek to protect subjectively held beliefs.[7] *See* Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, HARV. L. REV. F. 9 (forthcoming June 2025) ("a conception of what 'race' means that would extend to cultural practices, as opposed to immutable characteristics, runs headlong into a wall of contrary caselaw") (internal quotations omitted). Scholars in Jewish studies recognize that Zionism is a political project subject to a long tradition of contestation within the Jewish tradition itself. The presence of anti-Zionist and non-Zionist Jewish traditions demonstrates that anti-Zionism cannot and should not be conflated with anti-Jewish discrimination. *See, e.g.*, Itamar Mann & Lihi Yona, *Defending Jews from the Definition of Antisemitism*, 71 UCLA L. REV. 1150 (2024). None of this is to deny deeply rooted historical connections that some Jewish communities have with the land that is now ruled by the state of Israel; but making this connection a basis for rights to sovereignty conferred on *all* Jews worldwide is a political and constitutional set of commitments, rather than an intrinsic attribute of identity subject to Title VI protection. One can debate whether this set of arrangements is normatively justified or assess the analytical benefits and limitations of comparing it with colonial situations such as apartheid South Africa or the United States. But for Middle East studies and other scholarly communities, treating critique of Zionism as a form of unlawful

---

[7] Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5271044.

discrimination is the equivalent of imposing Creationism on biologists or Flat Earthism on geographers: it forecloses questions foundational to our field that make independent and rigorous scholarship possible.

## CONCLUSION

Consistent with the considerations set forth above, the Court should grant Plaintiff's Motion for Summary Judgment.

Dated: June 9, 2025

Respectfully submitted,

    */s/ Darryl Li*
Darryl Li, *Pro Hac Vice*
1126 E. 59th St.
Chicago, IL 60637
(773) 702-4001
darrylli@protonmail.com

   */s/ Corey Martin*
Corey Sullivan Martin, Bar # 686100
HM Law, P.C.
24 Shipyard Dr., Ste. 202
Hingham, MA 02043
cmartin@myhmlaw.com

*Counsel for amicus curiae Middle East Studies Association of North America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the undersigned submitted the foregoing document with the clerk of court for the District of Massachusetts, using the CM/ECF system of the court. I, undersigned counsel, hereby certify the foregoing document will be sent electronically to the registered participants as identified on the NEF or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ Corey Martin_____

Corey Martin BBO #686100