## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

               Plaintiff,

v.                                                              No. 1:25-cv-11048-ADB

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et al.,

               Defendants.

## BRIEF OF *AMICI CURIAE* FORMER UNITED STATES AGENCY OFFICIALS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .............................................................................................................iii

INTEREST OF THE *AMICI CURIAE* ........................................................................................ 1

INTRODUCTION ............................................................................................................................. 1

STATUTORY AND REGULATORY REQUIREMENTS IN TITLE VI ENFORCEMENT ........ 2

DECADES-LONG ADHERENCE TO THESE REQUIREMENTS ............................................. 4

DISREGARD FOR THESE REQUIREMENTS IN THE CASE OF HARVARD ........................ 9

CONCLUSION ................................................................................................................................ 10

# TABLE OF AUTHORITIES

**Cases** ................................................................................................................. **Page(s)**

*Cannon v. Univ. of Chi.*,
    441 U.S. 677 (1979) ........................................................................................1

*Crawford Fitting Co. v. J.T. Gibbons, Inc.*,
    482 U.S. 437 (1987) ........................................................................................4

*Mohasco Corp. v. Silver*,
    447 U.S. 807 (1980) ........................................................................................4

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ........................................................................................4

*Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*,
    No. 1:18-cv-01568-TDC, Mem. in Supp. of ..................................................8

**Statutes and Regulations**

2 C.F.R. § 200.340 *et seq* ........................................................................3, 10

7 C.F.R. § 15.6(c) ....................................................................................2, 10

10 C.F.R. § 1040.104 .....................................................................................2

14 C.F.R. § 1250.106(c) ................................................................................2

24 C.F.R. § 1.7(c) ..........................................................................................2

28 C.F.R. § 50.3 ............................................................................................2

32 C.F.R. § 195.8(c) ......................................................................................2

34 C.F.R. § 100.7 *et seq* ........................................................................2, 3, 8

41 C.F.R. § 101-6.210-3 ................................................................................2

45 C.F.R. § 80.7(c) ........................................................................................2

45 C.F.R. § 611.7(c) ......................................................................................2

42 U.S.C. § 2000d *et seq* ......................................................................1, 2, 3, 4

**Other Authorities**

110 Cong. Rec. 2498 (1964) ..........................................................................3

Edward B. Fiske, *Reagan Record in Education, Mixed Results*, N.Y. Times, Nov. 14, 1982, https://www.nytimes.com/1982/11/14/education/reagan-record-in-education-mixed-results.html?smid=url-share............................................................................6

Matt Vogel, *Bias to Box Graters: Jewish Life Then & Now at UVM*, The Times of Israel (Dec. 7 2024, 5:22 PM), https://blogs.timesofisrael.com/bias-to-box-graters-jewish-life-then-now-at-uvm/ ...................................................................................7

Reginald Stuart, *Mississippi Town Divided Over 2 Ousted Coaches*, N.Y. Times, April 8, 1982, https://www.edweek.org/ education/ed-to-withhold-funds-from-mississippi-district/1982/03 ...............................................................................8

Tom Migra, *ED to Withhold Funds From Mississippi District*, EducationWeek, March 21, 1982, https://www.edweek.org/education/ed-to-withhold-funds-from-mississippi-district/1982/03 ...............................................................................8

U.S. Dep't of Educ. *Annual Report, Fiscal Year 1982*, https://files.eric.ed.gov/fulltext/ED622013.pdf ....................................................................7

U.S. Dep't of Educ., OCR, *Annual Report, Fiscal Year 2019*, https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2019.pdf............................................................................8

## INTEREST OF THE *AMICI CURIAE*

*Amici* are former officials of United States agencies who were responsible for enforcing Title VI, 42 U.S.C. § 2000d *et seq*. Collectively, they have served in career and noncareer positions in Republican and Democratic administrations from the 1970s through January of this year, and they have enforced Title VI's protections through thousands of investigations. This includes investigations into antisemitism on university campuses. *Amici* are identified in Ex. A.

## INTRODUCTION

Under Title VI's enforcement scheme, fund termination is an option of last resort. It is "like dropping an atom bomb: everyone gets hurt." Ex. B, D. Tatel Decl. ¶ 7. *See also, e.g.*, *Cannon v. Univ. of Chi.*, 441 U.S. 677, 705 n.38 (1979) ("Congress itself has noted the severity of the fund-cutoff remedy and has described it as a last resort"). The statute itself and its implementing regulations require a rigorous process before an agency may terminate funds:

1) Agencies must investigate to determine whether discrimination exists;

2) Agencies must make every effort to end discrimination through voluntary means;

3) If voluntary resolution is not possible, recipients must have a chance to present their case to a neutral decision-maker whose findings are subject to judicial review; and

4) Before terminating, the agency must provide a report to Congress and wait 30 days.

These core constraints protect the interests of funding recipients like Harvard, maintain delivery of services to the ultimate beneficiaries of federal programs as much as possible, and limit the ability of the executive branch to unilaterally terminate Congressionally approved funding.

As illustrated in the attached declarations of Judge David Tatel (ret.) and Assistant Secretary Catherine E. Lhamon, the process mandated by Title VI has worked time and again, and as a direct result, termination of federal funds has been rare. *Amici* are aware of none under Title VI since 1982. Following the law by complying with the mandated process is not a partisan issue—

every prior administration, regardless of politics, has followed these requirements faithfully.

Until now. In terminating all federal financial assistance to Harvard, Defendants have violated Title VI's procedural and remedial requirements as no administration has ever done.

**STATUTORY AND REGULATORY REQUIREMENTS IN TITLE VI ENFORCEMENT**

*Investigation.* Because an agency may terminate funds for Title VI non-compliance only for a recipient "as to whom there has been an express finding on the record" of non-compliance, 42 U.S.C. § 2000d-1, regulations mandate an investigation to determine whether a violation occurred, *see* 34 C.F.R. § 100.7(c).[1]

*Voluntary Compliance.* Title VI prohibits termination of funds unless an agency "has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1. *See also, e.g.*, 34 C.F.R. § 100.8(c). Department of Justice (DOJ) enforcement guidelines, applicable government-wide, likewise require "[e]fforts to secure voluntary compliance . . . undertaken at the outset in every noncompliance situation and . . . pursued through each stage of enforcement action." 28 C.F.R. § 50.3 at I.C.

If an agency cannot secure voluntary compliance and concludes that fund termination is necessary, it must proceed to the administrative hearing process, described herein. If the agency decides not to pursue fund termination, it can also facilitate enforcement by referring the matter to DOJ for litigation, as described below. Both paths provide for judicial review.

*Adjudication—Notice, Hearing, Findings, and Appeal.* The administrative hearing process begins with giving notice, which, according to the regulations, must identify "the action

---

[1] Citations here are to Department of Education regulations, but the other Defendants have comparable (often identical) regulations. *See* 7 C.F.R. § 15.6(c) (USDA); 32 C.F.R. § 195.8(c) (Defense); 10 C.F.R. § 1040.104 (Energy); 41 C.F.R. § 101-6.210-3 (GSA); 45 C.F.R. § 80.7(c) (HHS & NIH); 24 C.F.R. § 1.7(c) (HUD); 14 C.F.R. § 1250.106(c) (NASA); 45 C.F.R. § 611.7(c) (NSF).

proposed to be taken, the specific provision under which . . . it is to be taken, and the matters of fact or law asserted as the basis . . . ." 34 C.F.R. § 100.9(a). The agency must set a hearing before a hearing officer or allow the recipient at least twenty days to request one. *Id.* If a hearing is waived, the agency must allow submission of "written information and argument." *Id.* The recipient has the right to counsel. *Id.* at § 100.9(c). The agency must adhere to sections five through eight of the Administrative Procedure Act, which address Adjudication, Ancillary Matters, Hearings, and Decisions. *Id.* at § 100.9(d)(1). The hearing must follow evidentiary rules and principles designed to "assure production of the most credible evidence available," and it must allow cross-examination. *Id.* at § 100.9(d)(2). The hearing officer must issue written findings, *id.*, which may be appealed within the agency, *id.* at § 100.10(e). By statute, a termination is subject to judicial review. 42 U.S.C. § 2000d-2; *see also* 34 C.F.R. § 100.11.

**Written Report to Congress.** Even with formal findings of discrimination in hand, an agency may not terminate funds until thirty days after providing "a full written report of the circumstances and the grounds for such action" with relevant committees in Congress. 42 U.S.C. § 2000d-1; 34 C.F.R. § 100.8(c). The reporting requirement and waiting period were incorporated in Title VI as a check on the extraordinary power of a single agency head to terminate funding by "bring[ing] into play other minds." 110 Cong. Rec. 2498 (Feb. 7, 1964).

**Alternative of Referral to DOJ.** Instead of pursuing the termination process above, an agency may refer a matter to the DOJ for possible litigation, 34 C.F.R. § 100.8(a), which affords the recipient the procedural protections of a hearing before a federal judge.

**Office of Management and Budget (OMB) Termination Regulation.** The statutory and regulatory scheme described above is the exclusive path for terminating funds for non-compliance with Title VI. OMB regulation 2 C.F.R. § 200.343, which Defendants cited in this case, does not

allow agencies to circumvent the Title VI fund termination process. A regulation can never supersede a statute. *See, e.g.*, *Mohasco Corp. v. Silver*, 447 U.S. 807, 825 (1980). The Title VI statute requires pre-termination procedures, as described above. *See* 42 U.S.C. § 2000d-1. As the Court made clear in *Mohasco*, an agency cannot issue regulations inconsistent with a statutory mandate. And even if the Title VI statute and the OMB regulation had the same authority, which they do not, the specific process Title VI demands would control over the general OMB termination regulation. *See e.g.*, *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444 (1987); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384–85 (1992).

### DECADES-LONG ADHERENCE TO THESE REQUIREMENTS

The attached declarations from Judge David Tatel (ret.) and Catherine E. Lhamon describe what the government's careful adherence to Title VI requirements has looked like in practice. They show how the requirements of investigation, negotiation, and full administrative process when voluntary compliance is not possible help agencies combat discrimination while maintaining funding for program beneficiaries as much as possible and preventing unilateral executive action to terminate Congressionally approved funds. These declarations accurately reflect the processes used consistently across administrations.

Before serving on the D.C. Circuit, Judge Tatel was the director of the Office for Civil Rights ("OCR") in the U.S. Department of Health, Education, and Welfare ("HEW") from 1977 to 1979.[2] D. Tatel Decl. ¶ 2. Catherine E. Lhamon was the Assistant Secretary heading OCR at the Department of Education from 2013 to 2017 and again from 2021 to 2025. C. Lhamon Decl. ¶ 2.

Judge Tatel and Asst. Sec. Lhamon both speak to the central importance of attempting to reach voluntary resolutions after thorough investigations. Judge Tatel states:

---

[2] HEW was the predecessor of the Departments of Education and of Health and Human Services.

> No matter how egregious the discrimination, the statute bars the government from cutting off federal funds unless there is no genuine chance of a voluntary resolution. . . . The possibility of terminating funds was there, but never the goal. Fund termination was to be used as a matter of last resort, only when all efforts at negotiating a voluntary resolution had been exhausted.

D. Tatel Decl. ¶ 6. Asst. Sec. Lhamon explains:

> The goal of the thorough investigation and resolution process . . . is to evaluate whether unlawful discrimination occurred and if so to reach voluntary resolutions to redress those injuries and prevent their recurrence . . . . Termination of funds was, as is required in statute and regulation, a last resort, and . . . we never needed to take this step.

C. Lhamon Decl. ¶ 8. OCR under Judge Tatel and Asst. Sec. Lhamon conducted careful investigations to comply with the statutory scheme. Judge Tatel explains that he spent nearly a year overseeing an investigation of racial segregation in the Chicago public schools, leading to a 102-page report detailing OCR's findings. D. Tatel Decl. ¶¶ 11–12. Asst. Sec. Lhamon describes OCR's months-long investigation of alleged antisemitism at the University of Vermont ("UVM"), including interviews of campus officials, students, and staff, and the review of anti-discrimination policies and procedures, records of antisemitic incidents, social media posts, and media coverage. C. Lhamon Decl. ¶ 22. This comprehensive approach is typical of investigations conducted into antisemitism at many universities during Asst. Sec. Lhamon's tenure. *Id*. ¶ 13.

Judge Tatel and Asst. Sec. Lhamon explain how they sought to reach voluntary resolutions as Title VI mandates, and how doing so allowed them to secure meaningful agreements. They explain that a benefit of the statutorily mandated negotiation process is allowing OCR to learn about a school community's specific needs. Negotiating based on those needs—instead of preconceived ideas of what will work—"best effectuate[s] a remedy that works in practice." C. Lhamon Decl. ¶ 16. Asst. Sec. Lhamon "repeatedly saw this process work to remedy discrimination, including antisemitism in the higher education context." *Id.* The UVM negotiation is a case in point. "OCR staff spent extensive time in discussions with UVM to understand their

concerns and constraints," and reached an effective agreement. *Id.* ¶ 28.

Judge Tatel devoted at least half his time to trying to reach voluntary resolutions, involving schools in the development of goals, and then asking schools to help determine how to meet those goals in light of their own circumstances. D. Tatel Decl. ¶ 21. He traveled to rural school districts in Arkansas and Texas that had fired just Black teachers during desegregation. And to negotiate an end to segregation in public colleges in southern states, he met with governors, members of Congress, and education officials. OCR's efforts to negotiate with public colleges took months or years but produced agreements with five of six states. *Id.* ¶ 16–18. Judge Tatel was not able to reach a voluntary agreement with North Carolina, but he made every effort. He met frequently with Governor Jim Hunt, with the head of the UNC system, and with many more officials, sometimes in North Carolina and even at their homes. He exchanged many draft agreements and memoranda with officials in an effort that lasted more than 18 months. *Id.* ¶ 20. When negotiations failed, UNC was afforded full process through an administrative hearing and in court, and ultimately reached agreement under the Reagan administration. *See, e.g.*, Edward B. Fiske, *Reagan Record in Education, Mixed Results*, N.Y. Times, Nov. 14, 1982, https://www.nytimes.com/ 1982/11/14/education/reagan-record-in-education-mixed-results.html?smid=url-share.  OCR  has been careful to use the negotiation process through presidential administrations to craft remedies that respect universities' academic freedom. *Id*. ¶ 20; C. Lhamon Decl. ¶ 7

OCR's enforcement at UVM demonstrates the power of the Title VI enforcement scheme to combat discrimination. A voluntary resolution was reached with UVM in 2023 after months of negotiations. The results have been transformative for UVM's Jewish students. C. Lhamon Decl. ¶ 27. In December 2024, the director of UVM Hillel wrote in *The Times of Israel*:

> Last year was chaos. The previous few years were exceedingly difficult. . . . I can honestly say that this year, things are markedly better. . . . Last year I coordinated extra security and

> regularly coordinated with UVM Police to ensure our students were safe. This year, it's
> quieter thanks to UVM's policy and procedural changes to keep our entire community safe
> . . . At this moment, and now into our future Jewish life at UVM is thriving.

*Id.* ¶ 27; https://blogs.timesofisrael.com/bias-to-box-graters-jewish-life-then-now-at-uvm/. By
following the statutorily mandated process, OCR under Asst. Sec. Lhamon secured many similar
voluntary agreements with other colleges and universities to address antisemitism and other types
of religious discrimination based on shared ancestry. *Id.* ¶ 6.

If a voluntary resolution cannot be reached, those charged with Title VI enforcement have
recognized that they may not terminate funds without completing a formal adjudicatory process
within the agency. *See, e.g.,* D. Tatel Decl. ¶ 6; C. Lhamon Decl. ¶ 14–15. Instead of pursuing fund
termination, they may also refer the matter to DOJ for possible litigation. D. Tatel Decl. ¶ 15; C.
Lhamon Decl. ¶ 15. Either way, recipients of funding are afforded substantial procedural
protections. D. Tatel Decl. ¶ 6, 15; C. Lhamon Decl. ¶ 14–15.

These pre-termination protections serve important interests: they avoid unnecessarily
inflicting harm on other program recipients, D. Tatel Decl. ¶ 15, and they check the ability of the
executive to prioritize punishment over remediation. As Judge Tatel points out, good faith
negotiations "demonstrate[d] that the government was committed to eliminating discrimination,
not punishing the university." D. Tatel Decl. ¶ 23.

While both declarants served under Democratic presidents, adherence to Title VI's
protections was also consistent across Republican administrations. A Department of Education
report from 1982, when now-Justice Clarence Thomas was Assistant Secretary for Civil Rights,
explains that for "99 percent of [civil rights] cases involving an initial finding of violation, the
recipient came into compliance on a voluntary basis." U.S. Dep't of Educ. Annual Report, Fiscal
Year 1982 at 80, https://files.eric.ed.gov/fulltext/ED622013.pdf. In one case involving the race-

based firing of coaches in Perry County, Mississippi, the district refused voluntary compliance. OCR, under Assist. Sec. Thomas, did terminate funds, but only after following the mandatory process, receiving a ruling from a hearing officer that the district had violated Title VI, and working for more than a year to secure voluntary compliance. *See, e.g.*, Reginald Stuart, *Mississippi Town Divided Over 2 Ousted Coaches*, N.Y. Times, April 8, 1982, https://www.nytimes.com/1982/04/08/us/mississippi-town-divided-over-2-ousted-coaches.html; Tom Mirga, *ED to Withhold Funds From Mississippi District*, EducationWeek, March 21, 1982, https://www.edweek.org/education/ed-to-withhold-funds-from-mississippi-district/1982/03. Three times in 1982 when OCR could not reach a voluntary resolution (including two involving segregation in higher education), it referred the cases to DOJ for enforcement. Fiscal Year 1982 Report at 81.

The first Trump administration also adhered to Title VI's procedural requirements. As the administration itself explained, Title VI "require[s] federal agencies to ensure compliance first through voluntary means," and "[i]f that fails, a federal agency may initiate enforcement proceedings that could lead to the termination of federal funding. *See* 34 C.F.R. § 100.8." *Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*, No. 1:18-cv-01568-TDC, Mem. in Supp. of Dep't of Educ.'s MTD, Dkt. 49-1, at 10 (D. Md. Feb. 11, 2019). From 2017 through 2019, the Department of Education's OCR reached 520 voluntary compliance agreements providing for reform in Title VI cases, without ever resorting to fund termination. U.S. Dep't of Educ., OCR, *Annual Report, Fiscal Year 2019*, https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/ report-to-president-and-secretary-of-education-2019.pdf, at 26.

Steadfast adherence to Title VI's procedural requirements has not been a partisan issue, but a hallmark of federal civil rights offices across administrations. *Amici* are not aware of any instance until now where an agency has terminated funds without following the mandated process.

**DISREGARD FOR THESE REQUIREMENTS IN THE CASE OF HARVARD**

In contrast with the conduct of every previous administration, the government's approach here is flatly incompatible with the law. The administration raised allegations of antisemitism at Harvard, and then, despite ample evidence that Harvard could and wanted to comply voluntarily, terminated funds across Harvard's programs less than two months after its initial communication without any of the pre-termination process that Title VI and the regulations mandate.

***Investigation and Voluntary Compliance.*** The administration first suggested Harvard had failed to comply with Title VI and Title VII[3] in a February 27, 2025 letter, in which DOJ wrote it was "aware of allegations that [Harvard] may have failed to protect Jewish students and faculty members from unlawful discrimination, in potential violation of the statutes that we enforce." Dkt. 59-11 at 2. In subsequent communications, the administration reiterated its allegations about possible antisemitism. *See* Dkt. 59-13, 16. Harvard responded by detailing the steps it had taken to combat antisemitism and said it would continue to make "lasting and robust structural, policy, and programmatic changes to ensure that the university . . . continues to abide in all respects with federal law . . . ." *See* Dkt. 59-2 at 2. Rather than conducting an investigation sufficient to enable it to articulate specific Title VI violations, the government moved swiftly to fund termination. The statute and regulations prohibit this course. As Asst. Sec. Lhamon and Judge Tatel's declarations make clear, agencies must seek voluntary compliance even when recipients' statements suggest they may not comply. Here, the evidence shows that Harvard was voluntarily undertaking steps to combat antisemitism when Defendants terminated funding.

---

[3] Title VII, unlike Title VI, does not provide a statutory mechanism for terminating federal funds to remedy discrimination.

*Adjudication—Notice, Hearing, Findings, and Appeal; Written Report to Congress; Alternative Referral to DOJ.* As described above, where efforts at voluntary compliance fail, the statute and regulations mandate a pre-deprivation process, including, critically, a hearing before a neutral decision-maker subject to judicial review. Patently, no such process was afforded here. There was no administrative hearing, and so no finding. Congress was not notified. The DOJ referral process was not used. In short, Title VI's procedural requirements were ignored.

*OMB Regulation Concerning Grant Termination.* Moreover, while some of Defendants' termination letters ostensibly relied on the OMB regulation, 2 C.F.R. § 200.340(a)(4), saying that the awards "no longer effectuate[] the program goals or agency priorities," Dkt. 59-7, *see also, e.g.*, Dkt. 59-5-6, 8-10,[4] as far as *amici* know, the deficiency the letters identified was alleged race discrimination and antisemitism. *See, e.g.*, Dkt. 59-5 (letter terminating NIH funding because of the "NIH policy" in light of allegations about "race discrimination" and "antisemitic action" at Harvard). *See also, e.g.*, Dkt. 59-6-9 (similar letters from USDA, Department of Energy, Department of Defense, and the National Science Foundation). If the only basis for termination was a potential Title VI violation, then termination must comply with Title VI's pre-termination mandates, and the OMB regulation cannot be relied on to circumvent the statute.

## CONCLUSION

For the reasons set forth above, *Amici* respectfully submit that Defendants have not adhered to the requirements of Title VI and Defendants' own regulations.

---

[4] The Department of Education termination letter, Dkt. 59-4, refers to neither Title VI nor 2 C.F.R. § 200.340(a)(4) explicitly, but it suggests funding is being terminated for non-compliance with Title VI. *See* Dkt. 59-4 at 1 ("Harvard is engaging in a systemic pattern of violating federal law"); 3 (seeking a return to merit-based admissions and hiring, [and] an end to unlawful programs that promote crude identity stereotypes").

Dated: June 9, 2025

Respectfully submitted,

<u>s/Tara Ramchandani</u>
Rebecca Livengood*
Glenn Schlactus*
John Relman*
Tara Ramchandani (BBO No. 672351)
RELMAN COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
202-728-1888
tramchandani@relmanlaw.com

*Counsel for Amici Curiae*

*\*Pro hac vice application submitted*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing brief of *amici curiae* was filed through the Court's CM/ECF system on June 9, 2025, and will be sent electronically to registered participants as identified on the Notice of Electronic Filing.

*/s/ Tara Ramchandani*
Tara Ramchandani