# EXHIBIT C

## DECLARATION OF CATHERINE E. LHAMON

I, Catherine E. Lhamon, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I would testify competently to the matters set forth below.

2. I twice served as Assistant Secretary for the United States Department of Education, Office for Civil Rights (OCR). In that role, I served as the principal advisor to the United States Secretary of Education on civil rights matters. I was first nominated to the position in 2013 by President Obama and unanimously confirmed by the Senate. I remained in this position until January 2017. In 2021, I was again nominated to the position by President Biden and confirmed by the Senate, serving until January 2025.

3. I have spent my career of nearly three decades litigating and enforcing civil rights. I have a B.A. in American Studies from Amherst College and a J.D. from Yale Law School. Prior to my second appointment as Assistant Secretary for Civil Rights, from January to October 2021, I was Deputy Assistant to the President for Racial Justice and Equity. Before that, I served as Chair of the United States Commission on Civil Rights from December 2016 to January 2021. Prior to that I was Legal Affairs Secretary to California Governor Gavin Newsom from January 2019 to January 2021. I have spent over fifteen years as a civil rights litigator at offices including National Center for Youth Law, Public Counsel, and ACLU Foundation of Southern California. I began my career as a Law Clerk to the Honorable William A. Norris in the United States Court of Appeals for the Ninth Circuit.

4. As Assistant Secretary for Civil Rights, I enforced federal civil rights laws, including Title VI, Title IX, and Section 504 of the Rehabilitation Act, in schools nationwide. I also supervised and reviewed development of regulations; published policy guidance; and

1

oversaw the Civil Rights Data Collection, a mandatory survey of the nation's P-12 public schools that collects civil rights data about students' experiences. I oversaw a full-time staff of approximately 600 employees in OCR's headquarters in Washington, D.C. and in OCR's 12 regional enforcement offices around the country.

5.  While I was Assistant Secretary, OCR investigated and resolved thousands of cases. Each year from 2022 to 2024, OCR received a historic number of complaints, ending in 2024 with an all-time high of 22,687 complaints.

6.  OCR spent significant time investigating and resolving complaints of antisemitism under my leadership. In addition, OCR published five policy resources during the Biden Harris Administration addressing discrimination of that type. For example, in 2023, OCR issued a Dear Colleague letter reminding schools that Title VI prohibits discrimination against Jewish, Muslim, Sikh, Hindu, Christian, or Buddhist students, or those from any religious group, where that discrimination is based on "their actual or perceived: (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity." Nov. 7, 2023 U.S. Dep't of Educ. Dear Colleague Letter at 1–2. While I was Assistant Secretary, OCR resolved more complaints involving shared ancestry discrimination than it had under any previous administration, and specifically secured resolution agreements in five times as many such as cases as the previous Trump Administration had secured. These resolutions involved agreements to combat allegations of antisemitism at a number of universities, including the University of Vermont, University of California systemwide, Drexel University, Temple University, Brown University, the City University of New York systemwide, Johns Hopkins University, Rutgers University, and the University of Michigan.

7. As I explained in the November 7, 2023 Dear Colleague letter, OCR was careful to respect institutions' academic freedom, complying with the First Amendment while enforcing Title VI's protections. *See* Nov. 7, 2023 Dear Colleague Letter at 2.

8. The goal of the thorough investigation and resolution process the statutes and regulations require, described below, is to evaluate whether unlawful discrimination occurred and if so to reach voluntary resolutions to redress those injuries and prevent their recurrence. We spent significant time investigating and negotiating to achieve this aim. Termination of funds was, as is required in statute and regulation, a last resort, and in the thousands of complaints my office received, we never needed to take this step.

9. OCR's process for investigating and resolving Title VI cases and initiating enforcement actions is prescribed by the Title VI statute, 42 U.S.C. § 2000d, and the Department of Education's regulations, 34 C.F.R. § 100.6–11. Both are binding on OCR, and, as described below, both require seeking voluntary compliance and proceeding to fund termination only in specified circumstances following fair process to all parties, including when sufficient investigation and negotiation has taken place to ensure that voluntary compliance is not possible.

10. While I was Assistant Secretary, OCR's process was detailed in the Department of Education's Case Processing Manual ("CPM"). On February 19, 2025, the current administration issued a CPM substantially similar to the one we used. *See* Case Processing Manual, available at https://www.ed.gov/media/document/ocr-case-processing-manual-us-department-of-education-office-civil-rights-33891.pdf.

11. OCR investigations usually begin with a complaint from someone concerned that civil rights may have been violated, although OCR also has authority to initiate investigations on its own, *see* 34 C.F.R. § 100.7(a), (b).

3

12. OCR must then "make a prompt investigation" of any complaint that indicates a "possible failure to comply" with Title VI, which "should include, where appropriate, a review of the pertinent practices and policies of the [funding] recipient, the circumstances under which the possible noncompliance with [Title VI] occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with [Title VI]." *Id.* at § 100.7(c).

13. Under my tenure, when OCR opened a case for investigation, it typically requested and reviewed documents and relevant information from various parties; interviewed school staff, witnesses, and others; and followed up for additional documents and interviews as necessary. OCR investigative staff would then determine if the law as applied to the facts confirmed a violation or indicated a basis for concern that the law appeared to have been violated.

14. If the investigation "indicate[d] a failure to comply," OCR informed the recipient and was required to attempt to secure voluntary compliance through "informal means." *Id.* at § 100.7(d)(1). The CPM in place when I was Assistant Secretary and the current CPM both specify time periods for conducting these negotiations.

15. If these negotiation efforts failed, and OCR confirmed the existence of a violation, OCR was then required to make a written finding that the recipient is in violation of Title VI and then, if further attempts at voluntary resolution are not successful, it may either refer the matter to DOJ with a recommendation that proceedings be brought to enforce Title VI or begin administrative proceedings to suspend or terminate federal financial assistance. *Id.* at §§ 100.7(d); 100.8(a). Both options provide the recipient with a full and fair opportunity to present evidence and make their case why they believe there has been no violation, in court or before an administrative law judge.

16. This mandatory pre-termination process affords OCR an opportunity to learn about specific needs of the school community – as distinct merely from a theory about what might work and from imposing predetermined remedies on schools that lack context – in order to best effectuate a remedy that works in practice where the discrimination is occurring. I repeatedly saw this process work to remedy discrimination, including with respect to antisemitism in the higher education context.

17. When OCR had reason to believe discrimination was occurring, we would certainly have preferred for schools to agree with our position and swiftly set about remedying it. But that did not always happen. It was not uncommon for schools, faced with complaints of discrimination, to bristle at the allegations, deny their factual underpinnings, and assert that the schools' actions had been lawful.

18. In those cases, our office – like, to the best of my knowledge, the Office for Civil Rights had in every prior Administration in the history of the Department of Education, along with the Department of Health, Education, and Welfare before it – followed the requirements of the statutes and regulations, which mandate a process of rigorous investigation and attempts to negotiate a voluntary resolution. The investigations and negotiations often proved difficult, taking months, and sometimes years, to complete, but in every case we resolved during my tenure these efforts yielded important results consistent with the statutory nondiscrimination guarantees. What OCR cannot do under the law – and what we never did -- is move to immediate fund termination.

19.     The investigation and resolution process at the University of Vermont (UVM) is illustrative.[1] OCR received a complaint alleging the existence of antisemitic discrimination at UVM in October of 2021. While OCR was investigating, UVM's president issued a statement in which he described the allegations as an "uninformed narrative" and said that "advancing false claims that UVM failed to respond to complaints of antisemitic behavior creates confusion and a sense of insecurity for the entire community."

20.     UVM's response that the allegations were untrue could have suggested that the University would not voluntarily agree to a plan to remedy discrimination, but OCR did not assume that conclusion—which, as the ultimate resolution agreement demonstrates, would have been false.

21.     Instead, as detailed in our April 3, 2023 letter to UVM's President, we began with a careful inquiry, in keeping with the statutory and regulatory requirements, that took several months to resolve.

22.     OCR reviewed UVM's student code of conduct and policies and procedures for resolving complaints of national origin discrimination, along with records relating to alleged antisemitic incidents in 2021 and UVM's responses, including extensive review of social media posts and interviews with campus officials. Additionally, OCR reviewed documents that UVM provided relating to antidiscrimination initiatives as well as publicly available news reports and press releases. And OCR spoke with students and staff regarding their experiences related to antisemitism allegations.

---

[1] UVM, like Harvard, has a large undergraduate student body; UVM has approximately 11,000 undergraduates, while Harvard has about 7,000.

23. During the course of OCR's lengthy investigation, UVM took steps to demonstrate support for Jewish community members, including launching a website "for those who want to learn more about opportunities to explore, connect with, and celebrate Jewish life at" UVM, "to provide information about resources the university has employed to combat antisemitism," and "to support our Jewish students." The website noted that UVM officials had met with and reviewed data from a survey about the climate on campus with Jewish students; had sent leaders to national and international meetings focused on combating on-campus antisemitism; and had begun a review of UVM's Discrimination Policy.

24. Before the investigation was complete, UVM expressed interest in reaching a voluntary resolution.

25. Through extensive negotiations, OCR and UVM ultimately reached a resolution whereby UVM agreed to review and revise its policies and procedures concerning shared ancestry discrimination; develop protocols for improving its ability to respond to discrimination; train UVM staff responsible for investigating Title VI complaints; train UVM senior leadership, staff, and students about shared ancestry discrimination; issue a statement of commitment to addressing shared ancestry discrimination, including antisemitism; review a 2022 survey about the climate on campus to determine whether additional actions were needed for improvement; and annually submit copies of antisemitism complaint case files to OCR during the monitoring period.

26. The provisions in the voluntary agreement, like revising UVM's policies and procedures and training people enforcing them, as well as involving affected community members in evaluating the success of campus changes to eradicate any hostile environment combined with ongoing federal monitoring from OCR to ensure their success, track the relevant

7

Title VI legal standard, are targeted at the source of the violation, and ensure that changes are embedded in the activities of the university going forward, reflecting practices demonstrated to work to change a discriminatory culture.

27. The response of the Jewish community at UVM made clear that this agreement was highly effective in changing the culture and reducing antisemitic discrimination on campus. As the Executive Director of the UVM Hillel wrote in the *Times of Israel* in December of 2024, this investigation transformed the Jewish experience at UVM:

> I can honestly say that this year, things are markedly better. Last year there were 74 reported incidents of antisemitism. This year we are aware of but a few. Last year I coordinated extra security and regularly coordinated with UVM Police to ensure our students were safe. This year, it's quieter thanks to UVM's policy and procedural changes to keep our entire community safe . . . At this moment, and now into our future Jewish life at UVM is thriving.

28. This kind of transformation is possible because of the mandated complaint investigation and resolution process, which requires careful investigation of the specific complaints and the environment in which they happen, and a genuine effort at negotiating a voluntary resolution, even when faced with initial resistance or the prospect of lengthy proceedings. Through that process, OCR staff spent extensive time in discussions with UVM that allowed OCR to understand UVM's concerns and constraints, and permitted UVM to understand OCR's position on what was necessary to remedy the complained-of discrimination.

29. I declare under penalty of perjury that this declaration is true and correct to the best of my knowledge, information, and belief.

Executed in the United States on June __8____, 2025, by:

Catherine E. Lhamon