Rachel Weber
BBO #674057
Law Office of Rachel Weber
PO Box 1565
Northampton, MA 01061
Telephone: 413-325-5431
Email: rweber@rweberlaw.com

Yaman Salahi (*pro hac vice*)
yaman@salahilaw.com
SALAHI PC
505 Montgomery St., 11th Floor
San Francisco, California 94111
Tel: (415) 236-2352

*Attorneys for Amici*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>　　　　　　*Plaintiff*,<br><br>　v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>　　　　　　*Defendants*. | Case No. 1:25-cv-11048-ADB<br><br>**AMICI CURIAE BRIEF OF 27 JEWISH SCHOLARS OF JEWISH STUDIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................................1

II. INTEREST OF AMICI ........................................................................................2

III. DISCUSSION .......................................................................................................3

    A.    Title VI Prohibits Differential Treatment Based on Stereotypes Regarding Race, Color, or National Origin........................................................3

    B.    Jewish Communities Hold Varied and Diverse Opinions and Beliefs about the State of Israel, Zionism, and the Israeli Military's Actions in Gaza ...............................................................................................................4

    C.    Harvard and Other Universities Rely on Stereotypes that Being Jewish Necessitates Being a Zionist or Supporting Israel..............................7

IV. CONCLUSION ..................................................................................................10

## TABLE OF AUTHORITIES

**Cases**

*Feliciano de la Cruz v. El Conquistador Resort & Country Club*,
   218 F.3d 1 (1st Cir. 2000) ............................................................................................. 3

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) ....................................................................................................... 3

*Hazen Paper Co. v. Biggins*,
   507 U.S. 604 (1993) ....................................................................................................... 3

*Jones v. Baystate Health, Inc.*,
   2022 WL 21778544 (D. Mass. Nov. 4, 2022) ................................................................ 4

*Miller v. Johnson*,
   515 U.S. 900 (1995) ....................................................................................................... 4

*Porto v. Town of Tewksbury*,
   488 F.3d 67 (1st Cir. 2007) ........................................................................................... 4

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989) ....................................................................................................... 3

*Schuette v. BAMN*,
   572 U.S. 291 (2014) ....................................................................................................... 3

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ....................................................................................................... 3

*Thomas v. Eastman Kodax Co.*,
   183 F.3d 38 (1st Cir. 1999) ........................................................................................... 3

*Yakoby v. The Trustees of the University of Pennsylvania*,
   No. 23-4789, 2025 WL 1558522 (E.D. Penn. June 2, 2025) ........................................ 5

**Other Authorities**

Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, forthcoming in Harvard Law Review Forum (June 2025), available at https://ssrn.com/abstract=5271044 ................................................................................ 8

Itamar Mann & Lihi Yona, *Defending Jews From the Definition of Antisemitism*, 71 UCLA L. Rev. 1150 (2024), https://www.uclalawreview.org/defending-jews-from-the-definition-of-antisemitism/ ..................................................................................................................... 9

Yaman Salahi & Nasrina Bargzie, *Talking Israel and Palestine on Campus: How the U.S. Department of Education can Uphold the Civil Rights Act and the First Amendment*, 12 Hastings Race & Poverty L.J. 155 (2015) .................................................................... 5

I. **INTRODUCTION**[1]

The undersigned *amici* are Jewish scholars of Jewish studies who hold a variety of views about Judaism, Zionism, and the State of Israel, but share a commitment to protecting the freedom and safety of all people to study, interrogate, and dissent from the notion that being Jewish requires adherence to a specific conception of Zionism or support for the Israeli government or its policies and practices.

For millennia, Jewish communities around the world have promoted traditions of robust debate and intellectual engagement. Unfortunately, political events in recent years have seen the rise of social, political, and religious forces that wish to curb those freedoms by requiring loyalty and adherence to the Israeli government or to a narrow vision of what it means to be Jewish—one that conditions Jewish identity and belonging within Jewish communities on one's support for (or at the very least, one's willingness to remain silent about) the State of Israel, its reigning political ideologies, and its treatment of the Palestinian people.

What makes today's trend so pernicious is that this contestation is occurring not only within Jewish community institutions and advocacy organizations, or within Israeli society itself—but also within government institutions and universities, which increasingly attempt to police the boundaries of Jewish identity, belief, and belonging.

That is not only deeply troubling—it is also unlawful. Not only does the federal government lack the power to compel a particular definition of what it means to be Jewish, but federally funded institutions, like Harvard, may run afoul of Title VI of the Civil Rights Act of 1964 if they impose, implicitly or otherwise, such a definition on their students, staff, and faculty. Doing so potentially punishes Jewish students, faculty, and others for failing to adhere to a stereotype of what constitutes a "proper" or "correct" set of Jewish beliefs. Antidiscrimination law prohibits reliance on such unlawful stereotypes.

---

[1] No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief. No person, other than *amici curiae* or their counsel, contributed money intended to fund preparing or submitting this brief.

*Amici* agree with Harvard that the federal government's attempt to intrude on academic freedom by withdrawing federal funding is unlawful and should be enjoined. But *amici* object to Harvard's characterization in its self-defense of various steps it has taken to suppress dissent, protest, and criticism of the Israeli government's actions in Gaza since October 2023. This defense assumes that the acts of censorship and suppression Harvard has taken were, in fact, appropriate, necessary, or legally obligatory, to protect Jewish or Israeli students from harassment or discrimination. Yet many Jewish students have themselves borne the brunt of this censorship and discipline, even for passive acts of solidarity like placing protest stickers on laptops while studying in university libraries.

Below, *amici* discuss the broad diversity of viewpoints within Jewish communities and explain how reliance on stereotypes of Jewishness could violate Title VI. *Amici* respectfully request that the Court grant Harvard's motion for summary judgment, but that it reject the language used by both Harvard and the government that states or implies that viewpoint-based speech-restricting activities are required to protect Jewish or Israeli students. To the contrary, such actions hurt many Jewish and Israeli students, impair their ability to engage in scholarly research and critique, and threaten academic freedom and inquiry for all, as well as constitutionally protected rights of free expression.

## II. <u>INTEREST OF AMICI</u>

Amici are identified in the attached Appendix A. All are Jewish scholars of Jewish studies with a strong interest in protecting their ability to conduct their scholarship, design their curricula, engage in campus discussions and debate, and advocate for their viewpoints without facing adverse action from their universities or the government for failing to conform to a stereotype of what it means to be Jewish, or for espousing viewpoints that ought to be protected as extra-mural speech within academic freedom doctrine.

### III.     DISCUSSION

#### A.     Title VI Prohibits Differential Treatment Based on Stereotypes Regarding Race, Color, or National Origin

Antidiscrimination law recognizes that a person may not be treated differently based on their failure to conform to a stereotype in connection with a protected characteristic such as sex, age, race, or national origin.  *See*, *e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (under Title VII, employer's denial of partnership due to female employee's non-compliance with sex stereotypes constituted discrimination on the basis of sex); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (explaining that the Age Discrimination in Employment Act "was prompted by [Congress'] concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes"); *Thomas v. Eastman Kodax Co.*, 183 F.3d 38, 58 (1st Cir. 1999) (under Title VII, the question is whether an employee "has been treated disparately 'because of race'" "whether the employer consciously intended to base the evaluations on race, or simply did so because of unthinking stereotypes or bias"); *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 6 n.2 (1st Cir. 2000) (agreeing that the same applies to stereotypes regarding national origin under Title VII).

That principle also applies under Title VI in higher education.  As the Supreme Court recently explained, "[w]e have long held that universities may not operate their admissions programs on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 219 (2023) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003)).  "In cautioning against 'impermissible racial stereotypes,' this Court has rejected the assumption that 'members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike. . . ." *Id.* (quoting *Schuette v. BAMN*, 572 U.S. 291, 308 (2014) (plurality opinion)).  Decisions based on "stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution" are therefore proscribed. *Id.* (quoting *Miller v. Johnson*, 515 U.S.

900, 911-12 (1995)). Although *Students for Fair Admission* focused its discussion on the Equal Protection Clause, the Court expressly noted that the same prohibition applies under Title VI of the Civil Rights Act. *See id.*, at 198 n.2. *See also Jones v. Baystate Health, Inc.*, 2022 WL 21778544, at *6 (D. Mass. Nov. 4, 2022) (agreeing that "intentional discrimination may be shown [under Title VI] by establishing that the defendant acted 'with animus or stereotyped thinking or other forms of less conscious bias'"). There is no reason to think this principle applies with less force when a stereotype is based on color or national origin, rather than race. Indeed, even the definition of antisemitism adopted by Harvard condemns such stereotypes.[2]

Title VI, of course, does not only regulate admissions—it prohibits any differential treatment in connection with all the educational opportunities or benefits of a federally funded program and indifference to a hostile educational environment on the basis of race, color, or national origin. *Cf. Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007).

### B. Jewish Communities Hold Varied and Diverse Opinions and Beliefs about the State of Israel, Zionism, and the Israeli Military's Actions in Gaza

Regrettably, Harvard's complaint and motion for summary judgment perpetuate the misleading and pernicious notion that student and faculty protests against the Israeli government's actions in Gaza since October 7, 2023 are motivated not by moral opposition or political disagreement, but rather, prejudice against Jewish or Israeli students. *See*, *e.g.*, Compl. ¶¶ 46-59; Mem. ISO Mot. for Summary Judgment, ECF No. 70 at 7-11.

This narrative suffers from a series of logical flaws, including the implicit assumptions (1) that "Jewish students monolithically hold one opinion, a positive one, about Israel or its policies," (2) that "even if Jewish students monolithically identified with or supported Israel in

---

[2] *See* Newell Decl. ¶ 11 (stating that Harvard has committed to using the International Holocaust Remembrance Alliance's definition of antisemitism in applying its anti-harassment policies); *see also* Int'l Holocaust Remembrance Alliance, *Working definition of antisemitism* (examples include "[m]aking mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective," "[a]ccusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group," and "[h]olding Jews collectively responsible for actions of the state of Israel"), https://holocaustremembrance.com/resources/working-definition-antisemitism. Other aspects of the IHRA definition have been rightly criticized for running afoul of the First Amendment or proscribing dissent against Israel and Zionism.

the same way, such identification would render them absolutely intolerant of other perspectives," and (3) that "students who are *not* able to tolerate other perspectives then suffer a civil rights injury when exposed to those views." Yaman Salahi & Nasrina Bargzie, *Talking Israel and Palestine on Campus: How the U.S. Department of Education can Uphold the Civil Rights Act and the First Amendment*, 12 Hastings Race & Poverty L.J. 155, 176-78 (2015). The first two assumptions are empirically disprovable, and the latter is simply an incorrect statement of law, *see*, *e.g.*, *Yakoby v. The Trustees of the University of Pennsylvania*, No. 23-4789, 2025 WL 1558522, at *7 (E.D. Penn. June 2, 2025) (holding no plausible violation of Title VI based on alleged antisemitism was stated where the plaintiffs' allegations "[a]t worst . . . accuse Penn of tolerating and permitting the expression of viewpoints which differ from their own").

*Amici* focus their contributions here on the aforementioned empirical questions to highlight the diversity of Jewish communities today and throughout history with respect to their engagement with the questions of Zionism and the modern state of Israel.

That diversity of thought is reflected on Harvard's own campus today. Years before the current conflagration, undergraduate students "formed the Harvard Jewish Coalition for Peace, an 'anti-Zionist' group that aims to show solidarity with the Palestinian people and combat anti-Semitism."[3] And over the years, a vocal contingent of Jewish students at Harvard has spoken out to question the state of Israel's policies and practices, as well as different conceptions of Zionism.[4] Vibrant engagement with these issues within the Jewish community at Harvard

---

[3] Juliet E. Isselbacher & Amanda S. Yu, *Amid Criticism, Jewish Harvard Students Create Pro-Palestinian Rights Group*, The Harvard Crimson (Feb. 11, 2020), https://www.thecrimson.com/article/2020/2/11/jewish-coalition-for-peace/.

[4] *See*, *e.g.*, Violet T.M. Barron & Charlotte P. Ritz-Jack, *Not All Jews Are Zionists. Harvard Can't Keep Ignoring This Truth*, The Harvard Crimson (Dec. 29, 2023), https://www.thecrimson.com/article/2023/12/29/barron-ritz-jack-jews-zionists/ ("Characterizations of the Jewish community and external efforts to ensure our safety have been made blindly, neglecting the broad diversity of Jewish perspectives. As Jews critical of Israel, our views have been ignored—and our very existence has gone unacknowledged—by the same institutions that claim to protect us. As far as we know, [former President Claudine] Gay has shown no interest in meeting with anti-Zionist, non-Zionist, or Zionist-questioning students despite our continuous requests that she do so, including our 24-hour occupation of University Hall."); Samuel A. Church & Cam N. Srivastava, *In Annual Elections, Students Debate Role of Zionism at Harvard Hillel*, The Harvard Crimson (Jan. 24, 2025), https://www.thecrimson.com/article/2025/1/24/harvard-hillel-elections-2025/ (describing

continues to this day.  For example, Harvard Law School recognizes a student organization named *Tzedek* (the Hebrew word for "justice"), which describes itself as "a progressive Jewish organization" that is "a home on campus for a liberatory approach to Judaism, which guides us toward social justice.  This space is home for anti-Zionist, non-Zionist, and Zionist-questioning Jewish students looking for a supportive community to explore current events and find support and solidarity."[5]  Harvard College recognizes the Harvard Forward-Thinking Jewish Union, which aims "to create a space for students to engage in discussions questioning Zionism and Jewish life in campus," and was formed after one student claimed that "he felt he was 'not allowed' to 'question our support for the state of Israel and question Zionism' in Hillel, where he attends religious services."[6]  Students from these groups often report marginalization by Harvard.  Recently, for example, administrators reportedly attempted to stop a Passover seder organized by anti-Zionist Jewish students.[7]

These are just a handful of illustrative examples.  Of course, these are not the only perspectives held by Jewish students at Harvard or elsewhere.  Many Jewish students—like students of other backgrounds—do support Israel's actions in Gaza, have reservations about them but may support Zionism or Israel generally, are ambivalent or conflicted, are vocally opposed, or have no strong views at all.  Jewish viewpoints vary and constitute a complex mosaic of differentiated and sometimes conflicting perspectives.  *Amici*'s point is not that their

---

divisions between progressive-leaning Jewish students and others regarding role of Zionism and Israel in campus life for Jewish students).

[5] *See* Harvard Law School Events Calendar, *Tzedek GBM*, https://hls.harvard.edu/events/tzedek-gbm/.

[6] Caroline K. Hsu, *Harvard Undergraduates Form Forward-Thinking Jewish Union*, The Harvard Crimson (Feb. 2, 2024), https://www.thecrimson.com/article/2024/2/2/forward-thinking-jewish-union-undergraduates/.

[7] *See* Tate Miller, *Harvard students hold anti-zionist Passover despite being told to cancel*, The Center Square (Apr. 21, 2025) (describing controversy surrounding Harvard's attempt to prevent "a seder for liberation" organized by Jewish students who stated, "We engage in ritual practice and look to our historical struggle in our present fight for liberation, amidst Israel's ongoing genocide in Gaza and occupation of Palestine," and "We observe this Passover, a celebration of our liberation from slavery in Egypt, by remembering those who remain subjugated – and by continuing to call for the total liberation of all people, from every river to every sea"), https://www.thecentersquare.com/massachusetts/article_3dc7dcc8-7d96-471a-a826-8123b9589b78.html.

views should be taken to be the only "true" or "real" Jewish viewpoints, nor that their views are the most representative of the Jewish people generally. Rather, *amici*'s claim is simply that any attempt by Harvard to treat one set of views as more quintessentially Jewish than the others relies on stereotypes of what it means to be Jewish, as if being Jewish implies a particular viewpoint on the State of Israel. This may run afoul of Title VI if it results in unequal access to educational opportunities or benefits or indifference to hostility for failure to conform to those stereotypes.

### C. Harvard and Other Universities Rely on Stereotypes that Being Jewish Necessitates Being a Zionist or Supporting Israel

Atalia Omer, one of the undersigned *amici*, was previously a T.J. Dermot Dunphy Visiting Professor of Religion, Violence, and Peacebuilding at the Harvard Divinity School, and teaches courses on Jewish Politics and Modernity as well as the Israeli-Palestinian Conflict, among others.[8] After a task force at Harvard published a report on antisemitism on campus—a report that Harvard touts in this litigation, *see* Compl. ¶¶ 57-59 and ECF No. 70 at 9-11—she published an op-ed critiquing the task force report for identifying her own classes as contributing to a climate of hostility:

> When I first saw the Harvard report on antisemitism and anti-Israel bias, I didn't expect to find myself in it. But I did, albeit without my name, my scholarship, or even my identity as a Jewish Israeli academic being acknowledged.
>
> The report was compiled and published in response to widespread pressure from donors and pro-Israel advocacy groups. It claims to document a crisis of antisemitism on campus. But what it actually reveals is Harvard's willingness to redefine Jewish identity in narrow, ideological terms: to exclude and erase Jews who dissent from Zionism.
>
> I know this because I am one of them. For several years, I taught in the Religion, Conflict, and Peace Initiative (RCPI) at Harvard Divinity School. Our program approached peacebuilding through deep engagement with histories of structural violence and power, with Palestine/Israel as our central case study. Our students read widely, traveled to the region, and met with a range of voices – including Jewish Israeli veterans from Breaking the Silence, Palestinian artists resisting cultural erasure, and Mizrahi and Ethiopian Jewish activists challenging racism within Israeli society.

---

[8] *See* Keough School of Global Affairs, *Atalia Omer*, https://keough.nd.edu/about/faculty-staff-directory/atalia-omer/.

> It was, by design, intellectually and politically challenging. It exposed students to the complexity of the region and the diverse, often conflicting, ways Jews and Palestinians narrate their pasts and imagine their futures.
>
> But according to the authors of Harvard's report, this was not legitimate scholarship nor responsible pedagogy; it was, essentially, simply antisemitic ideological indoctrination.
>
> How the report supposedly arrives at and justifies such characterizations of our program illustrates how slanderous distortions are routinely deployed to suppress the arguments and identities of 'the wrong kind' of Jews. The report quotes from public events we hosted as part of RCPI, including a webinar on my book about American Jewish activists who engage in Palestinian solidarity work *because of*—not in spite of—their Jewish identity. […] Yet the report reduced that event to a vague description of "one speaker" praising "Jewish pro-Palestinian activists," ignoring that the speaker was me—a Jewish Israeli professor—and that my interlocutors were also Jewish. […]
>
> This selective framing is neither accidental nor a one-off act of malice. It reflects a broader pattern. . . . [T]he university has not only taken steps to further suppress important political and ethical speech that confronts the reality of Israeli violence against Palestinians; it also effectively embraced a political litmus test for who counts as a legitimate Jew on campus.
>
> It's clear that I'm the 'wrong kind of Jew' at Harvard. […]
>
> In short, Harvard's report does not just mischaracterize a program. It attempts to redraw the boundaries of Jewish legitimacy.[9]

What Professor Omer describes is not a unique experience, but rather a symptom of the movement to redefine antisemitism to include virtually all speech critical of Israel or Zionism, primarily to support the use of hostile environment law to suppress academic inquiry and political protest supportive of the Palestinian people.[10] Israeli law professors Itamar Mann and Lihi Yona recently analyzed this issue, arguing that while "antisemitism is often weaponized against Palestinians and their liberation struggle," there is "an additional layer of harm, imposed upon U.S. Jews," namely, that by "[c]onstructing Jewish identity along rigid and fixed lines, the

---

[9] Atalia Omer, *I'm an Israeli professor. Why is my work in Harvard's antisemitism report?*, The Guardian (May 9, 2025), https://www.theguardian.com/commentisfree/2025/may/09/im-an-israeli-professor-why-is-my-work-in-harvards-antisemitism-report.

[10] New scholarship by Harvard Law Professor Benjamin Eidelson and University of Virginia Law Professor Deborah Hellman casts doubt on the legal merits of such claims given ambiguities in hostile environment law. *See* Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, forthcoming in Harvard Law Review Forum (June 2025), available at https://ssrn.com/abstract=5271044.

contemporary legal definition of antisemitism imposes upon Jews a straitjacket of Zionism." Itamar Mann & Lihi Yona, *Defending Jews From the Definition of Antisemitism*, 71 UCLA L. Rev. 1150 (2024), https://www.uclalawreview.org/defending-jews-from-the-definition-of-antisemitism/.  Mann and Yona draw upon the sex stereotyping jurisprudence established by *Price Waterhouse*, *supra*, to argue:

> When Jewish employees are told they have betrayed their own race, or they are not acting Jewish enough by supporting Palestine, at play are not only associational discrimination or harm to their interracial solidarity interests.  Such remarks are disciplinary apparatuses that subject Jews to stereotypes regarding legitimate Jewish identity.

*Id.* at 1212-13.  Mann and Yona cite examples of Jewish professors and teachers who alleged they lost their jobs for being insufficiently pro-Israel and other accounts of students and others being accused of being "self-hating Jews" or "not a real Jew" to argue that courts should "develop the stereotype doctrine to recognize discrimination and protect the overarching principle of equality" when responding to such allegations.  *Id.* at 1213-15.  Although Mann and Yona's examples focus primarily on employees facing discipline, the same principle applies to students and scholars in educational institutions.

As demonstrated, Jewish scholars and students are already facing a crisis of indifference or differential treatment from university administrators when they do not conform with a preconceived and politicized notion of what it means to be Jewish—namely, pro-Israel or Zionist.  Often, their views are dismissed as token, marginal, or inconsequential, even though there is reason to think that is not the case.  For example, a poll conducted in May 2024 by the right-wing think tank, the Jerusalem Center for Security and Foreign Affairs, found that nearly a third of surveyed Jewish Americans agreed with the statement that Israel is committing a genocide in Gaza, and over half agreed with President Biden's decision to withhold arms shipments to Israel, with younger respondents more likely to hold these views.[11]  In 2021, a

---

[11] See The Jerusalem Center, *Survey Among American Jews: Over 51% Support for Biden's Decision to Withhold Arms Shipments to Israel* (May 31, 2024), https://jcpa.org/survey-among-american-jews-over-51-support-for-bidens-decision-to-withhold-arms-shipments-to-israel/.

representative survey of Jewish Americans by the Pew Research Center found that only 45% of respondents agreed that "caring about Israel is essential to what being Jewish means to them."[12] Even then, however, caring about Israel is not identical to unconditional agreement with its legal and military policies and practices. Moreover, there is a growing body of literature exploring many of these themes, demonstrating that interest in these issues and the critical perspectives described herein are anything but marginal.[13]

Pressuring Jewish scholars and students to conform to a particular notion of Jewishness, one that conflates identity with a specific viewpoint, results in mistreatment and unfairness to them today, and is also a disservice to a history of diversity and dissent within Jewish communities, including the robust debates about Zionism within Jewish communities since the mid-1890s. While *amici* identify many relevant anecdotes, a very rich body of academic literature engages with many of these questions throughout history.

## IV.    CONCLUSION

*Amici* respectfully request that the Court grant Plaintiff's motion for summary judgment, but that it do so in a way that respects *amici*'s freedom to define for themselves the meaning of their Jewish identity and its relationship to Israel and Zionism.

---

[12] *See* Justin Nortey, *U.S. Jews have widely differing views on Israel*, Pew Research Center (May 21, 2021), https://www.pewresearch.org/short-reads/2021/05/21/u-s-jews-have-widely-differing-views-on-israel/.

[13] *See, e.g.*, Peter Beinart, *Being Jewish After the Destruction of Gaza: A Reckoning* (2025); Marjorie N. Feld, *The Threshold of Dissent: A History of American Jewish Critics of Zionism* (2024); Oren Kroll-Zeldin, *Unsettled: American Jews and the Movement for Justice in Palestine* (2024); Eliana Rubin, *Taking the State Out of the Body: A Guide to Embodied Resistance to Zionism* (2024); Daniel Boyarin, *The No-State Solution: A Jewish Manifesto* (2023); Jonathan Graubart, *Jewish Self-Determination Beyond Zionism: Lessons from Hannah Arendt and Other Pariahs* (2023); Geoffrey Levin, *Our Palestine Question: Israel and American Jewish Dissent, 1948-1978* (2023); Eric Alterman, *We Are Not One: A History of America's Fight Over Israel* (2022); Atalia Omer, *Days of Awe: Reimagining Jewishness in Solidarity with Palestinians* (2019); Carolyn L. Karcher, ed., *Reclaiming Judaism from Zionism: Stories of Personal Transformation* (2019); Penny Rosenwasser, *Hope Into Practice: Jewish Women Choosing Justice Despite Our Fears* (2013); Judith Butler, *Parting Ways: Jewishness and the Critique of Zionism* (2012); Laurence Silberstein, *Postzionism: A Reader* (2008).

                                                Respectfully submitted,

Dated:  June 9, 2025                          */s/ Yaman Salahi*

                                                Yaman Salahi (*pro hac vice*)
                                                **SALAHI PC**
                                                yaman@salahilaw.com
                                                505 Montgomery St., 11th Floor
                                                San Francisco, California 94111
                                                Tel: (415) 236-2352

                                                Rachel Weber
                                                BBO #674057
                                                Law Office of Rachel Weber
                                                PO Box 1565
                                                Northampton, MA 01061
                                                Telephone: 413-325-5431
                                                Email: rweber@rweberlaw.com

                                                *Counsel for Amici*

## **APPENDIX A: LIST OF AMICI**

1. **Rebecca T. Alpert** is a Professor Emerita of Religion at Temple University, known for her work on 20th-century Judaism with a focus on issues of sports, race, and sexuality. She is one of the first American women ordained as a rabbi.

2. **Joel Beinin** is the Donald J. McLachlan Professor of History and Professor of Middle East History, Emeritus at Stanford University, whose scholarship focuses on the social and cultural history and political economy of modern Egypt, Israel, and Palestine.

3. **Daniel Boyarin** is the Taubmann Professor of Talmudic Culture (emeritus) at the University of California, Berkeley.

4. **Judith Butler** is a Distinguished Professor in the Graduate School at the University of California, Berkely, and a world-renowned philosopher and gender theorist whose work in feminist and queer theory has profoundly influenced contemporary social thought. She is also the author of the book, *Parting Ways: Jewishness and the Critique of Zionism*.

5. **Hasia R. Diner** is Professor Emerita at the Departments of History and the Skirball Department of Hebrew and Judaic Studies at New York University, and the Director of the Goldstein-Goren Center for American Jewish History. She is the former series editor for the Goldstein-Goren series in American Jewish History. Her books include, *Hungering for America: Italian, Irish and Jewish Foodways in the Age of Migration*, *The Jews of the United States, 1654 to 2000*, *We Remember with Reverence and Love: American Jews and the Myth of Silence After the Holocaust, 1945-162*, and *Immigration: An American History*, with Carl Bon Tempo.

6. **Marjorie Feld** is Professor of History at Babson College, where she teaches courses on U.S. gender, labor, and social history, food justice, and sustainability. Her most recent book in U.S. Jewish History focuses on the history of American Jewish dissent over Israel and Zionism.

7. **Maura Finkelstein** is an independent scholar, writer, ethnographer, and editor with a Ph.D. in cultural anthropology from Stanford University.

8. **Emmaia Gelman** is the Executive Director of the Institute for the Critical Study of Zionism. Her research focuses on ideas about race and rights and their deployment as political levers in transnational U.S. politics.

9. **Maxwell Greenberg** is an Assistant Professor of American and Jewish Studies at Goucher College with expertise in comparative ethnic studies, American Jewish history, and American Zionism.

10. **Eli Jany** is a Ph.D. student in Yiddish Studies at the University of Toronto's Department of Germanic Languages and Literatures and the Centre for Jewish Studies. His research focuses on modern Yiddish literature and Eastern European Jewish history.

11. **Brett Ashley Kaplan** is the Director of the Initiative in Holocaust, Genocide, and Memory Studies at the University of Illinois at Urbana-Champaign.

12. **Deeanna Klepper** is a Professor of History and Professor of Religion, Core Faculty in the Elie Wiesel Center for Jewish Studies, and Chair of the Religion Department, at Boston University.  She is a historian of religion and religious conflict in medieval Europe, with special expertise on Christian-Jewish interaction.

13. **Aaron Kreuter** is an Assistant Professor of English Literature at Trent University who works on Jewish literature and Israel/Palestine.

14. **Tsiona Lida** is a Ph.D. Candidate in History at Harvard University.  Her work studies the relationship between affect, ethics, and settlement in the 20th century transnational history of Zionism.

15. **Atalia Omer** is a Professor of Religion, Conflict, and Peace Studies in the Keough School of Global Affairs at the University of Notre Dame.  Her work focuses on the relationship between religion, nationalism, and peacebuilding, particularly in the context of the Israeli-Palestinian conflict.

16. **Penny Rosenwasser** is an educator and activist who was a founding board member of Jewish Voice for Peace and a former chair of the National Women's Studies Association's Jewish Caucus.  She teaches at City College of San Francisco and is known for her feminist and anti-racist Jewish social justice advocacy.  Her work focuses on antisemitism, internalized antisemitism, and collective Jewish trauma.  She is also a leader of racial justice work at Kehilla Community Synagogue (Oakland, California).  Her most recent book is *Hope into Practice: Jewish women choosing justice despite our fears*.

17. **Michael Rothberg** is a Professor of English and Comparative Literature at the University of California, Los Angeles whose research and teaching focus on the history and memory of the Holocaust.

18. **Alice Rothchild, MD** is a retired Assistant Professor at Harvard Medical School, and the author of books and essays related to the issues in this brief, including *Broken Promises, Broken Dreams: Stories of Jewish and Palestinian Trauma and Resilience* and a contributor to *Reclaiming Judaism from Zionism: Stories of Personal Transformation*.

19. **Daniel A. Segal** is the Jean M. Pitzer Professor Emeritus of Anthropology and Professor Emeritus of History at Pitzer College of the Claremont Colleges; his scholarly work focuses on the social construction of race and the building of state power in post-Columbian world history.

20. **Raz Segal** is Associate Professor of Holocaust and Genocide Studies and Endowed Professor in the Study of Modern Genocide at Stockton University in New Jersey.  An

Israeli-American historian, his research focuses on the Holocaust, modern genocide, and state violence, particularly in central and southeast Europe and Palestine/Israel.

21. **Victor Silverman** is Emeritus Professor of History at Pomona College.  His scholarship includes works on Jewish-American history, Jewish identity, and Sephardic migration.  He taught multiple courses on the history of the Israel-Palestine conflict.

22. **Jessie Stoolman** is a Ph.D. candidate in Anthropology at the University of California, Los Angeles.  Her research focuses on how the Moroccan archival landscape shapes collective memory of Black-Jewish history and related to the preservation of Jewish heritage across the Western Mediterranean, including Spain, Morocco, and Tunisia.  She has taught coursework on medieval and contemporary Jewish Studies topics at the University of California, Los Angeles and the Academy of Jewish Religion at Loyola Marymount University.

23. **Barry Trachtenberg** is the Michael R. and Deborah K. Rubin Presidential Chair of Jewish History at Wake Forest University, specializing in modern European and American Jewish history and Holocaust studies.

24. **Johanna Ray Vollhardt** is an Associate Professor of Psychology at Clark University, where she is also affiliated with the Strassler Center for Holocaust and Genocide Studies.  Her research probes collective victimization and how Jewish Americans, and other groups, perceive and respond to experiences of mass violence and genocide.

25. **Melissa Weininger** is an Assistant Professor of Jewish Studies at the California State University, Northridge.  Her area of expertise is Israeli literature and culture.

26. **Orian Zakai** is an Associate Professor of Hebrew/Israeli Literature and Culture at George Washington University, where she coordinates the Hebrew program and specializes in modern Hebrew literature, gender, and nationalism.

27. **Michael Zank** is Professor of Religion, Medieval, and Jewish Studies at Boston University where he served as the Director of the Elie Wiesel Center for Jewish Studies.  His research ranges from biblical reception and the history of Jerusalem to medieval Islamicate and modern Jewish philosophy of religion.

## CERTIFICATE OF SERVICE

      In accordance with Local Rule 5.2(b), I, Yaman Salahi, hereby certify that this document was filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

_/s/ Yaman Salahi_
Yaman Salahi
