# EXHIBIT B

**DECLARATION OF DAVID S. TATEL**

I, David S. Tatel, declare as follows:

1. The information set forth in this declaration is based upon my personal knowledge.

2. I served as the director of the Office for Civil Rights ("OCR") in the United States Department of Health, Education, and Welfare ("HEW") from the spring of 1977 through the fall of 1979. In that position I was responsible for enforcing Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.*; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

3. Shortly after I left my position at OCR, Congress created the United States Department of Education in 1980 and renamed HEW the United States Department of Health and Human Services. Each department now has its own Office for Civil Rights.

4. After leaving OCR I founded and led the education practice at Hogan & Hartson, now Hogan Lovells, from 1979 through 1994. I served as a judge on the United States Court of Appeals for the District of Columbia Circuit from 1994 until my retirement in 2024.

5. I chaired the boards of the Spencer Foundation from 1990 to 1997 and the Carnegie Foundation for the Advancement of Teaching from 2005 to 2009. Based in Chicago, the Spencer Foundation is a national foundation that funds education research at many colleges and universities throughout the country.

6. When I became OCR director, I knew that the voluntary compliance element of Title VI was central to the statutory scheme. No matter how egregious the discrimination, Title VI bars the government from cutting off federal funds unless there is no genuine chance of a voluntary resolution. Everybody involved knew this and knew that the requirement had been

critical to the passage of Title VI. The possibility of terminating funds was there, but never the goal. Fund termination was to be used as a matter of last resort, only when all efforts at negotiating a voluntary resolution had been exhausted. And even then, HEW could terminate funds only after there had been proper legal process through an administrative hearing in which a fund recipient had the opportunity to present evidence and make its case.

7. We treated termination as a matter of last resort because we understood that cutting off federal funds was like dropping an atom bomb: everyone gets hurt, especially the students and others the funds were intended to help. Instead of dropping that bomb, HEW Secretary Joseph Califano and I, as well as OCR staff, did everything we could to achieve voluntary compliance with Title VI.

8. My efforts with six rural school districts in Texas and Arkansas are illustrative. My predecessors in the Nixon and Ford administrations had investigated the six districts and determined that each had violated Title VI by firing just Black teachers during the desegregation process. The officials tried to resolve the matters voluntarily, but without success. Accordingly, they drafted letters advising the districts that HEW would terminate their federal funding. When I arrived, all that remained was to put the letters in the mail. But we never sent them because Secretary Califano wanted to give the districts one more opportunity to make things right.

9. I traveled to all six districts, driving for hours from the closest airport and staying in small motels. I met with superintendents and school board members, once in a cramped trailer that functioned as the district office. I explained OCR's findings and why they amounted to Title VI violations. We explored various ways in which the violations could be remedied, and we reached agreements with some of the districts. I am confident that visiting the districts made all the difference. Until I arrived, no one from Washington had come to talk to them—to explain the

violations, to hear their side of the story, and to work with them to identify solutions. Title VI instructed us to go this extra mile. We traveled it, and it yielded results.

10. My efforts to negotiate a resolution with Chicago about its functionally segregated system provide another example of the lengths we went to achieve voluntary compliance. For years, Chicago maintained and reinforced its racially segregated schools through a series of often small but intentional steps. Examples included altering attendance-zone boundaries as neighborhood demographics changed and placing temporary classrooms at overcrowded Black schools instead of diverting the overflow to white schools with space to spare.

11. As OCR director, I oversaw an almost year-long Title VI investigation of the Chicago school system, assembling the detailed evidence needed to prove a violation. I presented that evidence to Secretary Califano and dozens of other HEW officials, seeking a green light to proceed. I got it.

12. Proceeding did not mean bringing the hammer down on Chicago by terminating federal funds or initiating formal administrative proceedings. Instead, we sent a letter to Superintendent Joseph Hannon with a 102-page attachment detailing our findings and began negotiations with the school system.

13. I tried everything to work out an agreement. I even offered Chicago many millions of dollars to fund desegregation efforts, using money appropriated by Congress in the Emergency School Aid Act, Pub. L. No. 92-318 (Title VII), 86 Stat. 235, 354-371 (June 23, 1972). In other words, instead of threatening to terminate federal funding intended for poor students, we offered additional funds to the city as an incentive to reach agreement on a plan that would remedy the system's Title VI violations.

14. This would have been a win-win for everyone: the city, the school system and the kids. But nothing worked. Because Chicago's proposed desegregation plans were woefully inadequate, it became clear that a negotiated resolution was not going to happen. After months of talk and many trips to Chicago to work with city leaders, we had reached a stalemate.

15. As a result, HEW referred the matter to the Department of Justice, which filed suit seeking not termination of funding, but rather a court order requiring Chicago to bring its schools into compliance with Title VI. That gave Chicago a full opportunity to challenge OCR's findings. After I left HEW, DOJ negotiated and entered a consent decree with Chicago. A resolution was thus achieved with no need to terminate federal funding and the damage that would have inflicted on the students the funds were intended to help.

16. Around the time of my arrival at OCR, Judge John Pratt of the federal District Court in Washington, D.C., ordered OCR to move more expeditiously to work out desegregation agreements with the statewide higher education systems of Arkansas, Florida, Georgia, North Carolina, Oklahoma, and Virginia. More than twenty years after *Brown v. Board of Education*, 347 U.S. 483 (1954), vestiges of the racially dual system remained in the higher education systems in all six states. Although *Brown* had forced white colleges to open their doors to Black students, the decision had so far failed to remedy the extreme inequality between historically white universities and historically Black ones. Judge Pratt issued his order in the longstanding *Adams v. Richardson* litigation, *see* 430 F. Supp. 118 (D.D.C. 1977), which civil rights plaintiffs had filed in 1970 to compel HEW to enforce Title VI in the south and fulfill the promise of *Brown*.

17. To facilitate the desegregation process, Judge Pratt directed OCR to identify the criteria for an acceptable plan, and then to negotiate with each state. We didn't just announce the

4

criteria; instead, in meetings in Washington and the states, we consulted higher education leaders and took account of their views in the drafting process. Only then did we publish the criteria in the Federal Register for all to see. 42 Fed. Reg. 40780 (Aug. 11, 1977). Because college and university leaders knew their systems better than the federal government and to respect the independence and autonomy of the six state higher education systems, the criteria did not tell the states how to desegregate. Instead, they set goals, allowing the systems to develop their own plans consistent with the criteria. Secretary Califano and I were determined to enforce Title VI in a way that respected the states' rights to run their schools as they saw fit, most critically regarding issues of academic freedom.

18.     Once the states submitted their plans, we responded in detail, beginning a negotiation that lasted for months. I met with the governors of each state to explain the process and to get their feedback. I also met frequently with their education officials and congressional delegations. This was time-consuming for me and my staff, involving months of work that in some cases stretched to years. It worked. We were able to reach a voluntary agreement with every state except North Carolina.

19.     In North Carolina, historically Black universities lagged far behind historically white universities on almost every metric. Whereas UNC-Chapel Hill and the ten other state schools with predominantly white student bodies were well-funded exemplars of higher learning, the state's five historically Black colleges and universities were decrepit. They lacked basic libraries, laboratories, and athletic facilities.

20.     Negotiations with North Carolina continued for more than a year-and-a-half. I personally spent a great deal of time on them, meeting frequently with Governor Jim Hunt; with William Friday, president of the UNC system; with the heads of the campuses in the system; and

5

with many others. I traveled to North Carolina for several of these meetings, some of which were held at President Friday's and Governor Hunt's homes. Secretary Califano met with them too. Throughout the process, we exchanged countless drafts and memoranda. And throughout, we were careful to ensure that the process of bringing the system into compliance with Title VI respected the university's academic freedom.

21. Over time, although we resolved some issues, we were unable to agree on a plan that satisfied Title VI. It was not for lack of effort. In the end, after nearly two years of contested proceedings in both the administrative process and federal court, the Reagan administration resolved the matter through a consent decree.

22. Half my time at OCR, if not more, was devoted to efforts like those described above to resolve Title VI violations voluntarily. It mattered not how detailed and compelling our findings were or how confident we were that we could prove a statutory violation in an administrative proceeding, which ultimately would have allowed us to terminate funding. That was not what we set out to do. Our goal was to negotiate solutions without terminating federal financial assistance. That is what Title VI requires and what Secretary Califano and President Carter demanded. It is also what members of Congress demanded. It wasn't at all unusual for a senator or member of Congress to call, urging OCR to redouble its efforts to work out a voluntary solution to a complaint of discrimination. Indeed, on occasion I was invited to a congressman's office to meet with a school leader or college president in an effort to reach agreement. To the best of my knowledge, my successors at OCR, including now-Justice Clarence Thomas, shared this same approach. All understood the requirements of Title VI. All, like me, were committed to seeking voluntary resolution of complaints and made every effort to achieve that goal in order to avoid using the nuclear option of last resort.

23. The types of investigations we did in the examples above are representative of the care we took to build a strong factual foundation for findings of discrimination. We took the time necessary to carefully investigate the facts to ensure that our allegations were properly documented.

24. When numerous complaints or other evidence of possible Title VI violations prompted an institutional compliance review, I or the relevant OCR regional director would contact the school superintendent or university counsel—or in some cases its president—to explain why we were initiating the review and what our investigation would entail. We explained that if our investigation found a statutory violation, we would send a letter detailing our findings and then work with them to resolve the matter voluntarily. Keeping the institutions informed from the start helped create an environment conducive to good faith negotiations and demonstrate that the government was committed to eliminating discrimination, not punishing the university.

25. During my time at OCR, I was also responsible for enforcing Title IX, which prohibits sex discrimination in educational programs receiving federal financial assistance, as well as Section 504, which prohibits disability discrimination in all programs receiving federal financial assistance. Both contain enforcement mechanisms like the one in Title VI. Because the prior administration had done little to implement the two statutes, I faced a whole new set of challenges. Instead of launching enforcement actions, we devoted huge amounts of resources and staff time to helping school districts and universities comply on their own. They wanted to comply, but because the two statutes were new and presented a host of unfamiliar issues, we focused our initial efforts not on enforcement, but rather on providing technical assistance and training.

26. We also had a lot to learn ourselves. For example, enforcing Title IX at colleges and universities with football and basketball programs presented unique and challenging issues. My deputy and I met with university presidents and athletic directors to gain a better understanding of such issues and of how we and the university community could ensure equal opportunity for women athletes while preserving the viability and success of intercollegiate football and basketball. To facilitate this objective, we published clear, practical guidance about how to comply with Title IX—much of which is still relied on to this day.

27. Such efforts advanced our pursuit of voluntary compliance under Title IX and Section 504. As under Title VI, we worked with school districts and universities to bring them into compliance with our nation's civil rights laws without resorting to fund termination.

28. I declare under penalty of perjury that this declaration is true and correct to the best of my knowledge, information, and belief.

Executed in the United States on June 9, 2025, by:

/s/ David S. Tatel
David S. Tatel