IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et al.

        Defendants.

Case No. 1:25-cv-11048

**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 5

I.    Harvard's failure to meaningfully address antisemitism on its campus. ......................... 5

II.    The agencies terminate Harvard's grants for no longer aligning with the Government's policy against antisemitism. ..................................................................... 10

LEGAL STANDARD ........................................................................................................... 14

ARGUMENT ........................................................................................................................ 15

I.    This Court lacks jurisdiction over Harvard's claims to enforce its contracts. ................ 15

    A.    Under the Tucker Act, contract claims against the federal government must be brought in the Court of Federal Claims. ............................................................ 15

    B.    Harvard cannot circumvent the Tucker Act by supplementing contract claims with constitutional or statutory claims. .......................................................... 18

        1.    Harvard bases its claims on rights that are contractual in nature ................ 19

        2.    The relief Harvard seeks is monetary. ........................................................ 25

II.    Harvard has not sufficiently pleaded an *ultra vires* claim. ............................................. 26

III.    Harvard's challenges to the Government's Offer Letter and the Secretary McMahon Letter do not challenge final agency actions under the APA. .......................................... 28

    A.    The Government's Offer Letter is not final agency action. ................................. 29

    B.    The Secretary McMahon Letter is not final agency action. ................................ 31

IV.    Harvard's First Amendment claims fail. ........................................................................ 32

    A.    Agencies would have terminated Harvard's contracts regardless of the viewpoints Harvard reflected in the Rejection Letter and this lawsuit; and thus, such termination does not constitute unconstitutional retaliation. ................................ 32

    B.    The Government's proposed conditions for waiving its termination rights do not violate the unconstitutional conditions doctrine. ................................................ 37

V.    Title VI does not govern grant terminations based on policy. ......................................... 39

VI.    The freeze orders and terminations do not violate the APA because they were reasonable exercises of the agencies' authority to terminate for nonalignment with the Government's antidiscrimination priorities. ........................................................................................... 45

    A.    The terminations were not arbitrary and capricious. ......................................... 45

    B.    The agencies did not fail to consider important aspects of the problem or reliance interests before terminating funding. .................................................................. 48

VII.    Under the APA, the appropriate remedy is limited to the agency action giving rise to the suit rather than a forward-looking injunction. ............................................................... 50

VIII.    There is no ripe dispute as to Defendants Bondi and U.S. Department of Justice. .......... 52

CONCLUSION ..................................................................................................................... 53

### TABLE OF AUTHORITIES

**Cases**

*Adria Int'l Group, Inc. v. Ferré Dev. Inc.*,
   241 F.3d 103 (1st Cir. 2001) ................................................................................. 15

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
   357 F.3d 62 (D.C. Cir. 2004) ............................................................................... 18

*Am. Ass'n of Univ. Professors v. U.S. Dep't of Justice*
   25-cv-2429 (MKV) (S.D.N.Y. June 16, 2025) ................................................. 3, 41

*Armstrong v. Exceptional Child Center, Inc.*,
   575 U.S. 320 (2015) ....................................................................................... 27, 28

*Ashwander v. Tennessee Valley Auth.*,
   297 U.S. 288 (1936) ............................................................................................. 52

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*,
   518 U.S. 668 (1996) ................................................................................. 32, 33, 37

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................. 29, 30, 31

*Boaz Hous. Auth. v. United States*,
   994 F.3d 1359 (Fed. Cir. 2021) ...................................................................... 18, 23

*Bowen v. Michigan Acad. of Fam. Physicians*,
   476 U.S. 667 (1986) ............................................................................................. 24

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974) ...................................................................................... 46, 48

*Burgos v. Milton*,
   709 F.2d 1 (1st Cir. 1983) .................................................................................... 18

*Burns v. Johnson*,
   829 F.3d 1 (1st Cir. 2016) .................................................................................... 15

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ............................................................................................. 49

*California v. U.S. Dep't of Educ.*,
   132 F.4th 92 (1st Cir. 2025) .......................................................................... 19, 22

*Cepero–Rivera v. Fagundo*,
    414 F.3d 124 (1st Cir. 2005)............................................................................. 33

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)........................................................................................... 45

*City of Dallas v. Stanglin*,
    490 U.S. 19 (1989)............................................................................................. 35

*City of L.A. v. Shalala*,
    192 F.3d  (D.C. Cir. 1999)................................................................................ 50

*Cochran v. Quest Software, Inc.*,
    328 F.3d 1 (1st Cir. 2003).................................................................................. 15

*Consol. Edison Co. of N.Y. v. U.S., Dep't of Energy*,
    247 F.3d 1378 (Fed. Cir. 2001).................................................................... 21, 25

*Crowley Gov't Servs., Inc. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022)..................................................................... 16, 25

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)........................................................................................... 45

*Dep't of Educ. v. California*,
    145 S. Ct. 966 (2025).................................................................................. *passim*

*Department of Homeland Security v. Regents of the University of California*,
    591 U.S. 1 (2020)............................................................................... 44, 48, 49

*Devillier v. Texas*,
    601 U.S. 285 (2024)........................................................................................... 27

*Ethyl Corp. v. Browner*,
    989 F.2d 522 (D.C. Cir. 1993)........................................................................... 50

*FAA v. Cooper*,
    566 U.S. 284 (2012)..................................................................................... 19, 21

*Falcone v. Dickstein*,
    92 F.4th 193 (3d Cir. 2024) ............................................................................... 35

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)........................................................................................... 45

iv

*Fed. Exp. Corp. v. U.S. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ............................................................................ 2, 26

*G.L. Christian & Assocs. v. United States*,
   312 F.2d 418 (Ct. Cl. 1963) ...................................................................................... 33

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*,
   765 F. Supp. 3d 245  (S.D.N.Y 2025), *reconsideration denied*, No. 24 CIV. 2669 (JPC),
   2025 WL 602945 (S.D.N.Y. Feb. 25, 2025) ................................................................ 34

*Genesis Healthcare Corp. v. Symczyk*,
   569 U.S. 66 (2013) .................................................................................................... 30

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) ...................................................................................... 22, 27, 28

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) .................................................................................................. 27

*Guardians Ass'n v. Civil Serv. Comm'n of the City of N.Y.*,
   463 U.S. 582 (1983) .................................................................................................. 43

*Harmon v. Brucker*,
   355 U.S. 579 (1958) .................................................................................................. 52

*Holley v. United States*,
   124 F.3d 1462 (Fed. Cir. 1997) ................................................................................ 24

*Kestenbaum v. President & Fellows of Harvard Coll.*,
   743 F. Supp. 3d 297 (D. Mass. 2024) ...................................................................... 34

*Kidwell v. Dep't of Army*,
   56 F.3d 279 (D.C. Cir. 1995) .................................................................................... 17

*Koontz v. St. Johns River Water Mgmt. Dist.*,
   570 U.S. 595 (2013) .................................................................................................. 38

*Kreis v. Sec'y of the Air Force*,
   866 F.2d 1508 (D.C. Cir. 1989) ................................................................................ 46

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) .................................................................................................. 31

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001) .................................................................................................. 35

*Lovely v. FEC*,
  307 F. Supp. 2d 294 (D. Mass. 2004) ........................................................... 4

*Lowe v. SEC*,
  472 U.S. 181 (1985) ..................................................................................... 35

*March v. Frey*,
  458 F. Supp. 3d 16 (D. Me. 2020) .............................................................. 15

*Massachusetts v. Nat'l Insts. of Health*,
  No. 25-CV-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025)..................... 17

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012)...................................................................................... 16

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ............................................................... 18, 19

*Minneapolis & St. Louis R. Co. v. Columbus Rolling Mill*,
  119 U.S. 149 (1886)...................................................................................... 30

*Modeski v. Summit Retail Sols., Inc.*,
  470 F. Supp. 3d 93 (D. Mass. 2020) ............................................................ 44

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)................................................................................... 45, 48

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977)...................................................................................... 33

*Murray-Nolan v. Rubin*,
  144 S. Ct. 2560 (2024).................................................................................. 35

*Nat'l Foreign Trade Council v. Natsios*,
  181 F.3d 38 (1st Cir. 1999)........................................................................... 44

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003)...................................................................................... 52

*New York v. Trump*,
  --- F. Supp. 3d --- , No. 25-cv-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ........... 51

*New York v. Trump*,
  133 F.4th 51 (1st Cir. Mar. 26, 2025) .......................................................... 51

*Nicopure Labs, LLC v. FDA*,
    944 F.3d 267 (D.C. Cir. 2019) ................................................................... 35

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ...................................................................................... 29

*Nyunt v. Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ................................................................... 26

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*,
    393 U.S. 232 (1968) ............................................................................... 2, 26

*Palisades Gen. Hosp. Inc. v. Leavitt*,
    426 F.3d 400 (D.C. Cir. 2005) ................................................................... 50

*Peguero-Moronta v. Santiago*,
    464 F.3d 29 (1st Cir. 2006) ........................................................................ 33

*Peregrine Myanmar Ltd. v. Segal*,
    89 F.3d 41 (2d Cir. 1996) ........................................................................... 51

*Perry Capital LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ................................................................... 18

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*,
    391 U.S. 563 (1968) .................................................................................... 32

*R.I. Dep't of Env't Mgmt. v. United States*,
    304 F.3d 31 (1st Cir. 2002) ........................................................................ 29

*REO Acquisition Grp. v. Fed Nat'l Mortgage Ass'n*,
    104 F. Supp. 3d 22 (D.D.C. 2015) ............................................................. 30

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, ("*FAIR*"),
    547 U.S. 47 (2006) ...................................................................................... 35

*Rust v. Sullivan*,
    500 U.S. 173 (1991) .................................................................................... 39

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001) ....................................................................... 34

*Sharp v. Weinberger*,
    798 F.2d 1521 (D.C. Cir. 1986) ................................................................. 25

vii

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) ................................................................ 21

*Stephens v. Cnty. of Albemarle*,
   No. 3:04CV00081, 2005 WL 3533428 (W.D. Va. Dec. 22, 2005) ......................................... 38

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
   480 F.3d 1116 (Fed. Cir. 2007).............................................................. 17

*Sustainability Inst. v. Trump*,
   No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ..................................... 23

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
   136 F.3d 641 (9th Cir. 1998) ............................................................... 21

*United States v. Mayendia-Blanco*,
   905 F.3d 26 (1st Cir. 2018) ................................................................ 26

*United States v. O'Brien*,
   391 U.S. 367 (1968)........................................................................ 35

*United States v. Tingey*,
   30 U.S. (5 Pet.) 115 (1831) ................................................................ 40

*United States Conference of Catholic Bishops v. U.S. Dep't of State*,
   1:25-cv-00465, ---F. Supp. 3d ---, 2025 WL 763738 (D.D.C. 2025) ............................ 18, 25

*Up State Fed. Credit Union v. Walker*,
   198 F.3d 372 (2d Cir. 1999)................................................................ 21

*Utah ex rel. Cox v. Env't Prot. Agency*,
   No. 23-1157, 2025 WL 1354371 (D.C. Cir. May 2, 2025) .................................... 50

*Util. Solid Waste Activities Grp. v. Env't Prot. Agency*,
   901 F.3d 414 (D.C. Cir. 2018), *judgment entered*, 2018 WL 4158384
   (D.C. Cir. Aug. 21, 2018) ................................................................. 50

*Van Drasek v. Lehman*,
   762 F.2d 1065 (D.C. Cir. 1985) ............................................................ 23

*Volk v. United States,*
   111 Fed. Cl. 313 (2013) ................................................................... 24

*Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship*, S.E.,
   615 F.3d 45 (1st Cir. 2010)................................................................ 15

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.,*
   --- F. Supp. 3d ---, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157
   (D.R.I. Apr. 15, 2025) ................................................................................ 31, 44

**Constitutional Provisions**

U.S. Const. art. 1, § 9, cl. 7 ........................................................................ 31

**Statutes**

5 U.S.C. § 551 ...................................................................................... 28, 29

5 U.S.C. § 701 .......................................................................................... 31

5 U.S.C. § 704 ...................................................................................... 16, 28

28 U.S.C. § 1346 ...................................................................................... 17

28 U.S.C. § 1491 .............................................................................. 16, 18, 39

37 U.S.C. § 204 ........................................................................................ 24

42 U.S.C. § 2000d ..................................................................................... 41

42 U.S.C. § 2000d-1 .......................................................................... 40, 41, 51

42 U.S.C. § 2000d-2 ........................................................................... *passim*

**Rules**

Fed. R. Civ. P. 56 ...................................................................................... 14

Fed. R. Civ. P. 65 ...................................................................................... 52

**Regulations**

2 C.F.R. § 1.105 ........................................................................................ 42

2 C.F.R. § 200.211 ..................................................................................... 39

2 C.F.R. § 200.300 ..................................................................................... 39

2 C.F.R. § 200.340 ............................................................................... *passim*

2 C.F.R. § 200.341 ................................................................................ 14, 44

2 C.F.R. § 200.342 ............................................................................ 14, 44, 45

2 C.F.R. § 200.343 ............................................................................................... 14

28 C.F.R. § 42.107 ............................................................................................... 42

28 C.F.R. § 42.108 ............................................................................................... 42

28 C.F.R. §42.411 ................................................................................................ 42

28 C.F.R. § 42.412 ............................................................................................... 42

28 C.F.R. § 40.3 ................................................................................................... 42

45 C.F.R. § 80.7 ................................................................................................... 42

45 C.F.R. § 80.8 ................................................................................................... 42

48 C.F.R. § 2.101 ................................................................................................. 33

48 C.F.R. § 49.101 ............................................................................................... 33

49 C.F.R. § 49.501 ............................................................................................... 33

49 C.F.R. § 49.502 ............................................................................................... 33

49 C.F.R. § 49.503 ............................................................................................... 33

49 C.F.R. § 49.504 ............................................................................................... 33

49 C.F.R. § 49.505 ............................................................................................... 33

52 C.F.R. § 52.249-1 ............................................................................................ 33

52 C.F.R. § 52.249-2 ............................................................................................ 33

52 C.F.R. § 52.249-3 ............................................................................................ 33

52 C.F.R. § 52.249-4 ............................................................................................ 33

52 C.F.R. § 52.249-5 ............................................................................................ 33

31 Fed. Reg. 5292 (Apr. 2, 1966) ....................................................................... 41

89 Fed. Reg. 30046 (Apr. 22, 2024) .................................................................... 41

Exec. Order No. 14,188, 90 Fed. Reg. 8847 (Jan. 29, 2025) ....................... 10, 12

Federal Acquistion Regulation, Part 2.101 ................................................................. 19

**Other Authorities**

Application to Vacate the Order Issued by U.S. Dist. Ct. for the Dist. of Mass. & Request for
an Immediate Admin. Stay, *Dep't of Education v. California*, 145 S. Ct. 966
(No. 24A910), 2025 WL 945313 (Mar. 2025) ......................................................... 22

Congressional Research Service, "Terminating Contracts for the Government's Convenience:
Answers to Frequently Asked Questions" (Dec. 18, 2015),
https://www.everycrsreport.com/files/20151218_R43055_4eb3d254b3212832
11d130864b6a688c33852dc8.pdf ............................................................................. 33

Harvard University, Final Report: Presidential Task Force on Combating Antisemitism and
Anti-Israeli Bias (2025) ("Harvard Report"),
https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-
Report-4.29.25.pdf ("Harvard Report") ............................................................. *passim*

National Center for Education Statistics, Fast Facts,
https://nces.ed.gov/fastfacts/display.asp?id=73#:~:text=The%20five%20institutions%2
0with%20thePrinceton%20University%20($37%20billion) ....................................... 1

Opposition to Vacate the Order Issued by U.S. Dist. Ct. for the Dist. of Mass. & Request for an
Immediate Admin. Stay, *Dep't of Education v. California*, 145 S. Ct. 966
(No. 24A910), 2025 WL 945313 (Mar. 2025) .................................................... 22-23

Press Release, Civil Rights Division, Justice Department Announces Formation of Task Force to
Combat Anti-Semitism (Feb. 3, 2025),
https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-
combat-anti-semitism .......................................................................................... 10

Press Release, U.S. Embassy in Israel, Anthony J. Blinken, Former Secretary of State
On the Death of the Terrorist Yahya Sinwar (Oct. 17, 2023),
https://il.usembassy.gov/antony-j-blinken-secretary-of-state-on-the-death-of-the-terrorist-
yahya-sinwar/ .......................................................................................................... 5

Uniform Commercial Code § 3-601 ........................................................................... 42

## INTRODUCTION

Harvard, the richest university in the history of world,[1] annually receives billions of dollars in taxpayer dollars from the federal government. As much as Harvard would like to receive these tax dollars with no strings attached, they are not charitable gratuities. Rather, the federal government grants funds to universities through contracts that include explicit conditions requiring the agreements effectuate the policy purposes of the federal government. If they fail to meet these conditions, the grants are subject to cancellation. It is the policy of the United States under the Trump Administration not to fund institutions that fail to adequately address antisemitism in their programs. Because of Harvard's acknowledged failures to address antisemitism, as Harvard itself detailed in a 311-page report, and following failed efforts to negotiate a resolution, the agencies exercised their authority, as set out in the text of Harvard's contracts, to cancel those agreements for no longer aligning with the Government's policy priorities.

Because Harvard only demands money, this Court lacks jurisdiction under the Tucker Act—which commits such suits to the exclusive jurisdiction of the Federal Court of Claims. At its core, Harvard's lawsuit contests whether agencies' terminations of Harvard's contract agreements were lawful, and Harvard seeks an order requiring the Court to reinstate those agreements and continue providing Harvard taxpayer funds pursuant to the terms of those now-cancelled contracts. But that is not a question this Court has jurisdiction to resolve. The Tucker Act of 1887 governs contract claims against the federal government, and it expressly reserves exclusive jurisdiction over claims for greater than $10,000 to the United States Court of Federal Claims. The Court of Federal Claims' exclusive jurisdiction over these government contracts

---

[1] Harvard leads all universities with more than a $50 billion endowment. National Center for Education Statistics, Fast Facts, https://nces.ed.gov/fastfacts/display.asp?id=73#:~:text=The%20five%20institutions%20with%20the,Princeton%20 University%20($37%20billion) (last visited Jun. 15, 2025).

cannot be circumvented by artfully pleading that the terminations were done in violation of federal statutes or the Constitution, as Harvard has attempted to do; otherwise, any aggrieved contractor could render the Tucker Act a nullity through artful pleading. Harvard is too clever by half. Indeed, the Supreme Court just recently rejected an identical argument, concluding that a challenge alleging that a party's contract was terminated in violation of statute and the Constitution was committed to the Tucker Act. *See Dep't of Educ. v. California*, 145 S. Ct. 966 (2025). This jurisdictional barrier disposes of this case.

Realizing its problems with a cause of action under the APA when the Tucker Act is the appropriate avenue, Harvard attempts a workaround. It raises free-standing constitutional and statutory *ultra vires* claims outside of the APA context. Harvard's claims that the grant terminations are *ultra vires* as violative of the First Amendment and Title VI fail because Harvard does not meet the "demanding standard" required for such claims, wherein the violation of law or the Constitution must be "plain on the record and on the face of the statute." *Fed. Exp. Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (alteration removed) (quoting *Ostereich v. Selective Serv. Sys. Loc. Bd. No. 11*, 393 U.S. 232, 238 n.7 (1968)). Additionally, since Harvard's claim of right is based on contract, their claims are actions at *law*—not *equity*—and are precluded by the Tucker Act. Harvard cannot vindicate its rights through freestanding *ultra vires* claims where Congress has provided an alternative means for it to do so. Title VI does not change the analysis, as it provides "judicial review as may otherwise be provided by law for similar action." 42 U.S.C. § 2000d-2. Here, the "law for similar action" is the Tucker Act, which directs review to the Court of Federal Claims.

Even if this court reaches the substance of Harvard's claims, however, those claims fail. *First*, Harvard focuses not upon the terminated contracts themselves, but upon the Joint Task

Force's attempts in an April 11, 2025, letter ("Government's Offer Letter") to negotiate a resolution of its antisemitism concerns. ECF No. 59-1; EDHarvAR_00000003; HHSHarv_0000098; GSAHarv_00000007. Harvard asserts that terminating its contracts after the University rejected the Government's settlement offer constitutes First Amendment retaliation, both as contrary to constitutional right under the Administrative Procedure Act and as a freestanding *ultra vires* claim. But a non-binding, opening offer that was quickly rebuffed is not a final agency action cognizable under the APA. Nor can the decision to terminate Harvard's grants be properly characterized as retaliation for rejecting the terms offered in the Joint Task Force's negotiating letter when the justification for the termination—Harvard's failure to address antisemitism—was established well before the offer was ever made. The Government's non-binding offer of conditions as part of a rejected settlement offer, moreover, do not constitute unconstitutional, viewpoint discriminatory conditions in violation of the First Amendment.

*Second*, Harvard tries to distinguish this case from a typical contracts case by reference to Title VI of the Civil Rights Act, which establishes enforcement procedures for revoking funding when a grantee has been found to violate *that* Act. But the agencies did not cancel their contracts with Harvard under their authority under Title VI; they did so pursuant to their authority under a bargained-for contract clause in each grant allowing cancellation for policy purposes. Here, that policy purpose is to not fund institutions that fail to address antisemitism. Nothing in Title VI forecloses agencies from negotiating terms into a contract that separately address harassment (and other policy concerns) and carry their own consequences. See *Am. Ass'n. Univ. Professors v. U.S. Dep't of Justice*, 1:25-cv-02429-MKV, ECF No. 148 at 30 (June 16, 2025) (it is "unlikely that Title VI is the sole and exclusive 'legal tool[]' available to a President who instructs executive agencies to prioritize 'combat[ting] anti-Semitism . . . on university and college campuses.'").

Title VI is a floor, not a ceiling, and facts relevant to a Title VI claim may also provide a basis for a policy disagreement.  Harvard's arguments to the contrary would severely handicap the protection of civil rights nationwide, contrary to congressional intent.  Even if Title VI could distinguish this from a typical contracts case—and it does not—that statute still directs review to the Court of Federal Claims.  42 U.S.C. § 2000d-2.

*Third*, Harvard claims that the funding pause and grant terminations violate the APA as arbitrary and capricious, arguing that Defendants failed to consider important aspects of the decision to terminate funding and failed to consider Harvard's reliance interests on that funding. The Defendant agencies were not clearly erroneous in deciding to terminate Harvard's grants.  As the record demonstrates, Harvard's grants were terminated due to, in the agencies' estimation, the inadequacy of the measures Harvard had implemented up to that point to address antisemitism. This factual assessment and the subsequent decision to terminate grants are entitled to this Court's deference.  Moreover, the agencies considered the various factors relevant to their decisions, including the actions Harvard had taken to address antisemitism and the University's reliance on federal funding, even though Harvard admits that "[n]o university is entitled to funding."  Mem. in Supp. of Pl.'s Mot. for Summ. J., ECF No. 70, at 45 ("Pl. MSJ Memo).  The APA's deferential standard requires no more.

Finally, should the Court rule in Harvard's favor, the appropriate remedy in this matter is vacatur of the specific termination decisions only.  It is well-established that vacatur is the favored remedy where an agency is found to have violated the APA.  *Lovely v. FEC*, 307 F. Supp. 2d 294, 301 (D. Mass. 2004).  This Court should therefore reject Harvard's arguments to forever prohibit agencies from taking "any similar action," Pl. MSJ Mot. at 17, as such a prospective remedy

precluding the agencies from correcting any errors this Court may identify is not consistent with the APA.

## BACKGROUND

### I.      Harvard's failure to meaningfully address antisemitism on its campus.

On October 7, 2023, Hamas, a designated foreign terrorist organization, launched a surprise attack on the State of Israel that resulted in the brutal slaughter of more than a thousand innocent Israeli citizens as well as the taking of more than two-hundred hostages.  Then-Secretary of State Antony J. Blinken described the day as "the largest massacre of Jews since the Holocaust."  *See* Press Release, U.S. Embassy in Israel, Anthony J. Blinken, Former Secretary of State On the Death of the Terrorist Yahya Sinwar (Oct. 17, 2023), https://il.usembassy.gov/antony-j-blinken-secretary-of-state-on-the-death-of-the-terrorist-yahya-sinwar/.  Israel immediately declared war on Hamas, and the ongoing conflict has resulted in a significant loss of Palestinian lives, sparking waves of protests against the war across the world and, most notably, on college campuses across the United States.

On many campuses, including Harvard, student and faculty activism devolved into anti-Jewish and anti-Israeli harassment and even outright condonation of Hamas and the October 7 attack.  As Harvard's own report on antisemitism puts it,

> for some protestors, at times the anti-Zionism enunciated in the student protests crossed a line . . . [in]to a stereotyped notion: that Israel is not a state, but rather a 'settler colony' of white Europeans who have no real connection with the land they had stolen, that epitomized aggression, and was bereft of virtues. This view had support among segments of Harvard's faculty, staff, and students . . .. It can also be found in some Harvard curricula and study abroad programs.

Harvard University, Final Report: Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias 8 (2025) ("Harvard Report"), https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-Report-4.29.25.pdf.  As Harvard documented,

this antisemitism has made many Jewish students feel unwelcome and unsafe in the Harvard

community.  *See id*. at 7 ("Many Jews at Harvard felt this vulnerability with a particular

intensity.").  This is unsurprising, given that

> Jewish students were informed by peers, teaching fellows, and in some cases, faculty, that
> they were associated with something offensive, and, in some cases, that their very presence
> was an offense.  Many Jewish Harvard affiliates were routinely asked to clarify that they
> were "one of the good ones" by denouncing the State of Israel and renouncing any
> attachment to it.

*Id*. at 5.  This has led some Jewish students to feel the need "to hide their identities on campus[.]"

*Id*. at 8.

The consequences of antisemitism have severely interfered with Jewish students' ability to

obtain a Harvard education, leading some to "turn[] down offers of admission at Harvard Schools."

*Id*. at 9.  Other students in the midst of obtaining PhDs have "decided to leave for private industry

because of the perception and experience of academia being unfriendly to Jews. Some . . . Jewish

candidates turned down post-doctoral fellowships at Harvard . . . [and] Jewish medical school

students . . . shied away from residencies at Harvard's hospitals[.]"  *Id*.

Unfortunately, as the University documented, this Jewish withdrawal from student life at

Harvard is the result of a concerted "strategy" by "student activists to drive Israeli students (and

Jewish students who feel connected to Israel) out of student life [through] . . . 'shunning.'"  *Id*. at

18.  Jewish students express "great difficulties participating in student organizational and club

life," and have shared "alarming stories of people walking away from them mid-conversation as

soon as it came up that they were from, for instance, Tel Aviv."  *Id*.  In addition, they report

experiencing, "verbal abuse, intimidation, and bullying." *Id*. at 25.

> Pro-Palestine activists
>
> disrupt[ed] classes in Harvard Yard . . . defac[ed] [] hostage posters around campus with
> antisemitic slogans . . . and . . . post[ed] a classic antisemitic cartoon on social media . . .

[that was] reshar[ed] [] by Harvard Faculty and Staff for Justice in Palestine - ke[eping] many Jewish students on edge.

*Id*.  In the spring semester, they set up an "encampment" that purported to show solidarity with Palestine, which made Jewish students "feel[] uncomfortable walking near" and some even experienced being followed and verbally harassed.  *Id*. at 114.  "Several Jewish first-year students residing near the encampment expressed distress over its proximity, noise level, and the nature of the chants."  *Id*.  Protestors led antisemitic chants calling for violence against Jews, such as "Long live Palestine; long live the intifada; intifada, intifada; globalize the intifada[,]" "From the river to the sea, Palestine will be free," and "more explicit variations of the [same] slogan were employed that substituted the word 'Arab' for 'free.'"  *Id*. at 110.  There were also "instances of vandalism on campus and the posting of swastika stickers near Harvard Hillel's Rosovsky Hall."  *Id*. at 26.

The antisemitic climate cannot be pinned upon student activists alone, however.  Indeed—again, as Harvard itself acknowledged—blame also falls upon Harvard faculty and administrators who frequently dismissed Jewish students' concerns or even actively engaged in antisemitic activities.  *See id*. at 12.  The report described certain "Harvard Schools, departments, institutes, centers, and instructors . . . as promoting or tolerating anti-Israeli critiques that blend into animosity towards Jews." *Id*. at 27.  Furthermore, "[o]stracism of many Zionist and Israeli students [] adversely affected their participation in both classroom and co-curricular settings."  *Id* at 28.

With respect to faculty and classroom instruction, "[p]oliticization of instruction or academic settings . . . effectively made a specific view on the Israel-Hamas conflict a litmus test for full classroom participation and ended up disparately impacting many Jewish and Israeli students." *Id*.  Certain "Harvard Schools, departments, centers, and instructors" were described as "promoting or tolerating anti-Israeli critique that they felt was problematic and, in some cases

blurred into animosity towards Jews." *Id*. at 122. Jewish students also raised concerns about "specific faculty and teaching fellows" who

> "gave time at the end of class for students to promote various solidarity groups, including the Palestine Solidarity Committee (PSC)" or "ended class early on the day of a protest, which seemed like an encouragement to join the protest." Some students complained of "one-sided syllabi" concerning the Israeli-Palestinian conflict and expressed apprehension about taking courses from instructors who had signed pro-Palestinian statements.. . . The antisemitic cartoon . . . was a particular source of anxiety for some students due to its reposting by the organization Harvard Faculty and Staff for Justice in Palestine.

*Id*. at 126-127.

With respect to the response from administration, students complained that it was "unclear and unconscionably slow." *Id*. at 27. There were "widespread perceptions that anti-Israeli and anti-Jewish expression are tolerated in a way that hostile rhetoric towards other groups would not be; that . . . Harvard's offices for Equity, Diversity, Inclusion, and Belonging have not taken antisemitism seriously; and that discipline . . . [for] engag[ing] in bullying, harassment, and intimidation has been lax." *Id*. Harvard's Report highlights the experience of one student who "expressed frustration with the administrative response [and] not[ed] that after they brought this to administrators' attention eight times, 'their response was that slogans and chants can mean different things to different people. I wonder if they would ever say the same to a member of another minority group.'" *Id*. at 127.

The administration also failed to ensure proper safeguards at its Commencement Week events, which effectively provided a platform to "two controversial Commencement Week addresses (one at Commencement itself) whose remarks appeared to engage with antisemitic themes." *Id*. at 25. Even after the end of the tumultuous academic year, "[c]ontroversies about student discipline continued into the summer. In July, administrative boards at the College and various Schools eliminated or reduced penalties that they had imposed on undergraduate and

graduate students in connection with various protests and related events of the previous year, and in the same month the Harvard Corporation conferred degrees on 11 of the 13 seniors whose degrees had been withheld." *Id.*  The Report found that "Harvard's response to the spring encampment protests fueled perceptions of inconsistency and a lack of transparency in its disciplinary processes, with some Schools declining to impose sanctions while others faced internal disagreements and reversals." *Id*. at 117.  Additionally,

> A widespread sentiment emerged that anti-Israeli and anti-Jewish expression was tolerated to a greater degree than similar hostility toward other minority groups, such as Black or LGBTQ+ students. Numerous participants did not perceive Harvard's offices for Equity, Diversity, Inclusion, and Belonging (EDIB) as adequately addressing antisemitism or considering it a serious form of bias within their purview.

*Id*. at 122.

> The impact on Jewish students has been devastating.

> Among Jewish students, substantial numbers reported having the following feelings to at least some extent:
>     • Not at home at Harvard (39%).
>     • Physically unsafe (26%).
>     • Mentally unsafe (44%).
>     • Unsupported in their well-being at Harvard (49%).
>     • Uncomfortable expressing their beliefs or opinions to people "whose political views may be in conflict with mine and/or go against my sense of identity/nationality (46%).

*Id*. at 26-27.

"Jewish students were twice as likely as their non-Jewish, non-Muslim peers to feel unwelcome and unsafe at Harvard." *Id*. at 27.  "Almost 60% of Jewish students reported experiencing 'discrimination, stereotyping, or negative bias on campus due to [their] views on current events,' and only 25% believed that there was no 'academic or professional penalty' at Harvard for expressing their views. *Id*. "Substantial numbers of Jewish students feel that since October 7th they have lived in an increasingly hostile atmosphere in their residences, classes,

organizations, and clubs, as well as in the public spaces of Harvard Yard and the Science Center Plaza." *Id.*

## II.     The agencies terminate Harvard's grants for no longer aligning with the Government's policy against antisemitism.

Harvard receives more than $8.7 billion from the federal government in the form of multi-year grant agreements and contract awards. *See* GSAHarv_00000003-4. Each of these contracts contains a provision restating or incorporating by reference 2 C.F.R. § 200.340, which states, "[t]he Federal award may be terminated in part or its entirety . . . [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a); *see, e.g.,* HHSHarv_00000511; NASA-AR00 895; NSF_Harvard000022.

When President Trump took office, he issued an Executive Order announcing, "It shall be the *policy* of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." Exec. Order No. 14,188, *Additional Measures to Combat Anti-Semitism*, 90 Fed. Reg. 8847, 8847 (Jan. 29, 2025) (emphasis added). Days later, the Administration announced the creation of a Joint Task Force to Combat Antisemitism ("Joint Task Force"), which stated that its "first priority will be to root out anti-Semitic harassment in schools and on college campuses." *See* Press Release, Civil Rights Division, Justice Department Announces Formation of Task Force to Combat Anti-Semitism (Feb. 3, 2025), https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism.

On February 28, 2025, the Joint Task Force announced it would be visiting 10 universities, including Harvard, to investigate "allegations that the schools may have failed to protect Jewish

students and faculty members from unlawful discrimination" and "consider[] whether remedial action is warranted." HHSHarv_00000003. Following the visit, on March 31, the Department of Education ("ED"), the Department of Health and Human Services ("HHS"), and the General Services Administration ("GSA"), all of which are represented on the Joint Task Force, announced "a comprehensive review of federal contracts and grants at Harvard University and its affiliates." HHSHarv_00000007. The announcement added that "The Task Force remains committed to awarding federal funds responsibly and holding institutions accountable for taking decisive action against anti-Semitic harassment." HHSHarv_00000008. The same day, GSA sent a letter to Harvard informing it that "GSA is leading a Task Force comprehensive review of Federal contracts with certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment, including Harvard." GSAHarv_00000003.

Later that week, on April 3, HHS's Acting General Counsel, a member of the Joint Task Force, met with representatives from Harvard to attempt to negotiate a resolution of the Joint Task Force's concerns that its agreements with Harvard no longer aligned with the Government's priorities and that Harvard may be engaging in unlawful discrimination. *See* HHSHarv_00005230. The Joint Task Force shared its desires to see Harvard implement disciplinary reform, student group accountability, governance reforms, a "[l]egacy of antisemitism initiative," and other changes. *See* HHSHarv_00005233-5235. The same day, the Joint Task Force sent a letter to Harvard, as "follow up to the March 31, 2025, letter," conveying much of the same information discussed at the meeting and "outlin[ing] immediate next steps that we [the Joint Task Force] regard as necessary for Harvard University's continued financial relationship with the United States government." GSAHarv_00000005.

On April 11, the Joint Task Force sent another letter to Harvard that "incorporate[d] and supersede[d] the terms of the federal government's prior letter of April 3, 2025." Government's Offer Letter, GSAHarv_00000007. The letter offered modified terms that, if met, then agencies would agree not to exercise their termination rights under Harvard's contracts. *See id*. It stated, "If acceptable to Harvard, this document will constitute an agreement in principle, which the parties will work in good faith to translate into a more thorough, binding settlement agreement." Government's Offer Letter at 1. On April 14, Harvard sent a reply letter ("Harvard's Rejection Letter") squarely rejecting the terms of the Government's Offer Letter. HHSHarv_0000104-105. It stated, "Harvard will not accept the government's terms as an agreement in principle." Harvard's Rejection Letter at 2.

Upon receiving Harvard's Rejection Letter, the Joint Task Force issued a press release stating, "The Joint Task Force to combat anti-Semitism is announcing a freeze on $2.2 billion in multiyear grants and $60M in multi-year contract value to Harvard University." HHSHarv_0000010. This failure to agree and subsequent announcement prompted the Defendant agencies to begin taking steps to freeze and eventually terminate their agreements with Harvard. *See, e.g.,* HHSHarv_0000110; NSF_Harvard000001-37. This included efforts by the agencies to compile data on every funding agreement subject to possible termination. *See* GSAHarv_00000041-118.

On May 5, 2025, Education Secretary Linda McMahon sent another letter to Harvard ("Secretary McMahon Letter") that echoed the Government's Offer Letter and expressed disappointment with Harvard for its failure to adequately address discrimination in its programs. *See* EDHarvAR_0000008 (remarking that Harvard had become an "incubator[] of discrimination that encourage[s] resentment and instill[s] grievance[s] and racism into our wonderful young

Americans."). She offered her perspective that Harvard should no longer bother seeking federal grant funding, as none would be provided to an institution that acted contrary to the Government's priorities. *See* Secretary McMahon Letter at 2.

On May 6, NIH Director of Policy for Extramural Research Administration, Michelle Bulls, sent a letter to Harvard (the "NIH Letter") providing notice that a list of NIH-funded projects would be terminated pursuant to the NIH Grants Policy Statement and 2 C.F.R. § 200.340(a)(4). NIHHarv_00000473-5. This letter confirmed that the listed grants were being terminated for a number of reasons, including that they no longer effectuated agency priorities; NIH's policy that grant funding should only support institutions that comply with principles of nondiscrimination; that Harvard continues to discriminate on the basis of race in certain of its practices and programs; and that recent events indicated that antisemitism was continuing to persist on Harvard's campus; about which Harvard had exhibited a "lack of concern for the safety and wellbeing of Jewish students" and "inaction in the face of repeated and severe harassment of Jewish students." *Id.* The NIH Letter also cited the Harvard Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias report on Harvard's response to antisemitic conduct on its campus during the 2023-2024 academic year. *Id.*

On May 8, the National Aeronautics and Space Administration (NASA) began working on a request from GSA to compile information on NASA's existing grants with Harvard. GSAHarv_00000019-40. NASA identified twenty-one existing grants and determined that it would terminate five of them. GSAHarv_00000134. On May 9, NASA Administrative Grant Officer, Rachael Down, issued a notice of termination to Harvard listing the five grants that were being terminated. NASA-AR03748-50. This notice informed Harvard that NASA continuously reviews its grants for alignment with Administration policy and for opportunities to reduce

spending, and that these five grants were "not mission essential or needed . . . to support mission activities," and, thus, no longer effectuated NASA's program goals or agency polices. *Id.*; *see also* NASA-AR03682 (NASA's terminations were based on "mission impacts").  On May 12, the Department of Education, through its Office of Planning, Evaluation and Policy Development, sent a letter to Harvard notifying it that it was terminating a single award pursuant to 2 C.F.R. § 200.340-43.  EDHarvAR_0001735-36.  In doing so, the Department of Education cited ongoing racial discrimination in certain of its practices and programs and concerns involving the persistence of antisemitism on Harvard's campus.  *Id.*  The letter also cited the findings of the report published by the Harvard Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias.  *Id.*

On May 13, the Joint Task Force issued a press release is support of each of the agencies that acted to terminate funding to Harvard in response to Administration policy.  *See* GSAHarv_00000014-15.  The press release confirmed that this "multi-agency move" was aimed at "eradicating discrimination on Harvard's campus" and was a result of Harvard's "repeated[] fail[ure] to confront the pervasive race discrimination and anti-Semitic harassment plaguing its campus."  *Id.*  The press release also relied on Harvard's own report on antisemitism and its response thereto, which found that Jewish students had been subject to continued acts of discrimination with "no meaningful response from Harvard's leadership."  *Id.*  As of the date of this filing, the grants administered by components of the Department of Justice have not been frozen or terminated.  *See* Henneberg Decl. ¶ 3; Jamison Decl. ¶ 3; Lorah Decl. ¶ 3.[2]

## LEGAL STANDARD

Summary judgment is properly granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

---

[2] These declarations certify the administrative record and will be provided alongside it to the Court.

Civ. P. 56(a).  On a motion for summary judgment, courts must construe the record in the light most favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor.  *Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016).

"Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply 'require [the Court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'"  *Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship*, S.E., 615 F.3d 45, 51 (1st Cir. 2010) (quoting *Adria Int'l Group, Inc. v. Ferré Dev. Inc.*, 241 F.3d 103, 107 (1st Cir. 2001)).  However, "each motion should not be considered in a vacuum. Rather, a district court ordinarily should consider the motions 'at the same time, applying the same standards to each motion.'"  *March v. Frey*, 458 F. Supp. 3d 16, 30 (D. Me. 2020) (quoting *Wells Real Estate*, 615 F.3d at 51); *see also Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003) (explaining that the summary judgment standard is "not altered by the presence of cross-motions for summary judgment" because the court considers distinctly each motion and draws inferences against each movant in turn).

## ARGUMENT

**I.     This Court lacks jurisdiction over Harvard's claims to enforce its contracts.**

**A.     Under the Tucker Act, contract claims against the federal government must be brought in the Court of Federal Claims.**

This case is about money.  Harvard argues it is entitled to the payment of billions of dollars pursuant to now-terminated grant agreements and contract awards.  In challenging those terminations, Harvard seeks an order to enforce agencies' contractual obligations to pay. Specifically, Harvard seeks the vacatur of agency decisions to freeze or terminate grant funding and an injunction preventing government officials from "issuing any other termination, freezing of funds, stop work orders, or withholding of payment on existing grants or other federal funding."

*See* Proposed Order, ECF No. 69-1.  While Harvard asserts that these freeze or termination decisions violate the APA or the Constitution, its relief is premised on—and ultimately seeks to enforce—existing contracts with the United States.  In short, Harvard asks for specific performance of contractual agreements.

Those essential facts—that Harvard is seeking to enforce contractual rights and is seeking contractual remedies—triggers jurisdiction in the Court of Federal Claims under the Tucker Act. Review under the APA is meant as a fallback option when a plaintiff seeks to challenge "final agency action *for which there is no other adequate remedy in a court* . . .."  5 U.S.C. § 704 (emphasis added).  Where a party seeks funding that it believes the government is obligated to pay pursuant to a contract or grant, however, the Tucker Act already affords an adequate remedy in a court, therefore judicial review is not available under the APA in such circumstances.  The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).  And the Tucker Act's jurisdiction, and its waiver of sovereign immunity for monetary relief, is exclusive.

The federal government is also generally "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity."  *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022).  Although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *id.*, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (citation omitted); *Dep't of Educ. v. California*, 145 S. Ct. at 968.  That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other

statutes." *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 215.  Moreover, Congress has by statute explicitly forbidden district court jurisdiction for such contractual claims.  28 U.S.C. § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States [unless it is for less than $10,000].").  In sum, by statute and by virtue of the United States' sovereign immunity, if this action is founded upon a contract with the United States, this Court must dismiss for lack of jurisdiction.

While the "jurisdictional boundary between the Tucker Act and the Administrative Procedure Act" is not always clear, when a plaintiff tries to "frame [a] suit as one for declaratory or injunctive relief, this kind of litigation should be understood for what it is.  At bottom it is a suit for money for which the Court of Federal Claims can provide an adequate remedy, and it therefore belongs in that court."  *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1117-18 (Fed. Cir. 2007).  "By clarifying that [5 U.S.C.] § 702's waiver of sovereign immunity applied only to actions seeking relief other than money damages and where there is no other adequate remedy in a court, Congress sought to pull together the patchwork of various statutory waivers of federal sovereign immunity into one coherent scheme." *Massachusetts v. Nat'l Insts. of Health*, No. 25-CV-10338, 2025 WL 702163, *5 (D. Mass. Mar. 5, 2025), *appeal docketed*, No. 25-1343 (1st Cir. Apr. 9, 2025) (internal quotations and citations omitted).  Thus, the APA and Tucker Act waivers work in concert where a plaintiff seeks a monetary remedy for alleged harm by a federal agency action in violation of the APA.

Harvard, to be sure, alleges constitutional and statutory violations as the reason why their contract terminations were allegedly unlawful.  But that is of no moment.  Courts must look to the claims' "substance, not merely [their] form."  *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C.

Cir. 1995). Thus, regardless of how a claim is styled, a district court lacks jurisdiction if a case "is in 'its essence' contractual." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004). Harvard cannot escape the Tucker Act's jurisdictional bar by formulating its contract claims as APA claims. *See California*, 145 S. Ct. at 968 ("[T]he APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money . . .. Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.' 28 U.S.C. § 1491(a)(1)."); *see also Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983) (holding that the Tucker Act, and not the APA, applies where a plaintiff argues that "the government violated its bargain with him."). This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). The proper recourse for asserted violations of these grant agreements is a "suit in the Claims Court for damages relating to [the] alleged breach." *Id.*

### B. Harvard cannot circumvent the Tucker Act by supplementing contract claims with constitutional or statutory claims.

Harvard's claims, and the relief requested, are of the type over which the Tucker Act has granted the Court of Federal Claims exclusive jurisdiction. *See* 28 U.S.C. § 1491(a).

"[T]he party invoking a federal court's jurisdiction has the burden of proving it. Federal courts start from the presumption that they lack such jurisdiction." *United States Conference of Catholic Bishops v. U.S. Dep't of State*, 1:25-cv-00465, ---F. Supp. 3d ---, 2025 WL 763738, at *3 (D.D.C. 2025) (citation omitted). The Supreme Court has "said on many occasions that a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text . . . Any ambiguities in

the statutory language are to be construed in favor of immunity, so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (citation omitted). Thus, if there is ambiguity over whether the Government consented to suit only in the Court of Federal Claims and not elsewhere, the statutory text must construed narrowly to only waive sovereign immunity in the court Congress specified.

Courts apply a straightforward test, followed in this Circuit, for determining whether a claim falls within the exclusive Tucker Act jurisdiction of the Court of Federal Claims. "The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on [1] the source of the rights upon which the Harvard bases its claims, and upon [2] the type of relief sought (or appropriate)." *Megapulse,* 672 F.2d at 968; s*ee also California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025) (following and applying the Tucker Act analysis in *Megapulse*). Here, both factors support a finding that the Court lacks jurisdiction over what are essentially claims that lie in contract: (1) the source of Harvard's right to funds previously awarded are grant and contract agreements, and (2) the relief sought in this case amounts to the remaining, undisbursed value of those agreements.

### 1. Harvard bases its claims on rights that are contractual in nature.

The source of Harvard's right to each grant that Harvard claims was unlawfully frozen or terminated is found in each original grant and contract[3] agreement between Harvard and the federal agency from which it was awarded.

---

[3] With respect to contracts for procurement and services, there is no question that such contracts are contractual in nature. *See* Federal Acquisition Regulation, Part 2.101 (governing "acquisitions," which are defined as "the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated.").

*First,* the source of the rights Harvard asserts are the grant agreements themselves. Specifically, Harvard challenges the termination of grants under a variety of legal theories, but all ultimately stem from contracts without which no claims would exist.  Harvard acknowledges in its Amended Complaint that what it is alleging the agencies have done is terminate funding "agreements," attendant to each of which is a series of terms and conditions with which Harvard must comply. *See* Pl. Am. Compl., ¶ 15, ECF No. 59 ("By accepting federal funds, Harvard agreed to abide by the provisions in Title VI and the relevant agencies' corresponding regulations."); ¶ 122 ("Defendants subjected Harvard to adverse action by freezing $2.2 billion in multi-year grants and $60 million in multi-year contracts previously awarded to Harvard."); ¶ 137 ("Defendants' actions . . . terminating funding agreements").

Indeed, the grant agreements that Harvard seeks to enforce are contractual agreements replete with the unmistakable hallmarks of bilateral exchanges.  For example:

- "This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference…"  HHSHarv_00000511.

- "Acceptance of this award, including the 'Terms and Conditions,' is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system." *See, e.g.,* HHSHarv_00000509-10;

- "A recipient indicates acceptance of this award and its associated terms and conditions by drawing or requesting funds from the designated NASA payment system or office." *See, e.g.*, NASA-AR00857, NASA-AR00860.

- "By signing this application…[Applicant] provide[s] the required assurances * and agree[s] to comply with any resulting terms if [Applicant] accept[s] an award." EDHarvAR_0001235.

Underlying each grant termination that Harvard challenges is (1) an application, *i.e.*, offer, to conduct research, perform a particular study, develop a particular technology, or conduct some other activity and (2) an acceptance by the Government, once it has determined that the activity

20

proposed in the application serves the Government's interest. The payment of a grant award comes with it a series of terms and conditions that allow the Government to exercise some degree of oversight over the awardee and ensure stewardship of taxpayer dollars.[4]  Absent the Defendant agencies' decisions to award grants to Harvard, Harvard would have no rights to the terminated federal awards they challenge here.

Because the Defendants' obligation is in the first instance dependent on the contract, these claims are "contractually-based," and therefore this Court "lacks jurisdiction under the Tucker Act."  *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (concluding that district court lacked jurisdiction under the Tucker Act over constitutional claims where the right is based upon the contractual agreement).  In other words, "it is likely that no cause of action would exist at all," in the absence of the contracts.  *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (citation omitted).  That Harvard's claims could not "exist[] prior to and apart from rights created under the [agreements]" weighs sharply against district court jurisdiction.  *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)*; see also Consol. Edison Co. of N.Y. v. U.S., Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir. 2001) (directing court to transfer case asserting constitutional, including due process, claims to the Court of Federal Claims in a case sounding in contract).  This is especially so in light of courts' mandate to read waivers of sovereign immunity narrowly.  *See Cooper*, 566 U.S. at 290.

---

[4] The maintenance of an extensive suite of federally-funded research programs at Harvard is part of the bargained-for benefit that Harvard, as an institution, receives in return for its delivery of goods or services pursuant to grant agreements because "[f]ederal research grants support Harvard's ability to recruit and retain faculty, maintain labs, and support graduate students and other researchers." Decl. of John Shaw ¶ 4, ECF No. 72.

The conclusion that Harvard is seeking to enforce contractual agreements, regardless of the framing of their claim, accords with recent Supreme Court instruction. The Court recently granted a stay of an order to make payments based on certain grant agreements, concluding that the government was likely to succeed in showing that the district court "lacked jurisdiction to order the payment of money under the APA." *California*, 145 S. Ct. at 968. That reasoning, which applies with full force here, required a finding that grant terminations were essentially contract actions. In *California*, a number of states challenged the Department of Education's termination of various education-related grants for "discriminatory practices—including in the form of DEI" as violative of the APA. Application to Vacate the Order Issued by U.S. Dist. Ct. for the Dist. of Mass. & Request for an Immediate Admin. Stay at *5, *California*, 145 S. Ct. 966 (No. 24A910), 2025 WL 945313 (Mar. 2025) (quotation omitted). The district court temporarily enjoined the grant terminations, and the district court and the First Circuit denied motions to stay that injunction. *See California*, 132 F.4th at 101. The Supreme Court, however, concluded that the lower court likely lacked jurisdiction because the remedy sought was ultimately an order to "enforce [the Government's] contractual obligation to pay money." *Id.* at 968. (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). The contracts at issue in *California* were government grants awards. *Id.* The Court identified the contractual grant award, considered the remedy sought, and concluded jurisdiction was likely precluded. Moreover, the Court saw no difference between jurisdiction over plaintiffs' pre-termination claims and post-termination claims. A request to enjoin any future termination still seeks contractual money. *Id.* In fact, plaintiffs in *California* also sought "an injunction against further unlawful terminations" along with their request for reinstatement of already terminated grants. Opp'n to Application at 25, *Dep't*

*of Educ. v. California*, No. 24A910 (U.S. Mar. 28, 2025). Tellingly, the Supreme Court stayed the injunction in full.

After *California*, the Fourth Circuit recently stayed a district court injunction effectively identical to the one sought here. *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025). Plaintiffs there brought APA and *ultra vires* constitutional claims against Federal defendants and, by virtue of those purported legal infirmities, sought to reverse or prevent grant terminations. *Id.* Looking to *California*, and the law it applied, the Fourth Circuit concluded that those defendants were likely to succeed in showing that the district court lacked jurisdiction. "While the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds." *Id.* The same is true here. Moreover, the Circuit concluded that the *ultra vires* claims that alleged constitutional violations did not change this calculus, as they were still subsumed by the contracts and foreclosed by Congress's statutory scheme. *See id.*

Similarly, here jurisdiction is committed to the Court of Federal Claims notwithstanding the fact that Harvard argues that the terminations of its agreements was done for unconstitutional reasons or in excess of statutory authority. *See Van Drasek v. Lehman*, 762 F.2d 1065, 1071 (D.C. Cir. 1985) ("The proper inquiry, then, is whether the statute or statutes relied upon by the Harvard manifest a congressional intent to consent to suits for money claims against the United States in the district courts notwithstanding the limitations found in the Tucker Act."). But that is not dispositive. Rather, it is the grant agreements, issued pursuant to statutes, that authorize the disbursement of federal funds, that are money-mandating. *See Boaz Hous. Auth.*, 994 F.3d at 1364 ("For claims founded upon the Constitution, a statute, or a regulation, a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the federal

government for the damages sustained. But for claims founded upon a contract, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement. This presumption normally satisfies the money-mandating requirement for Tucker Act jurisdiction, with no further inquiry being necessary." (citations omitted)). To be sure, Harvard asserts that their agreements were terminated in violation of their constitutional and statutory rights—but the Court of Federal Claims can consider those constitutional and statutory issues in the context of determining whether Harvard is entitled to relief, *e.g.*, whether the agreements were improperly terminated. *Cf. Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 680 (1986) ("we will not indulge the . . . assumption that Congress contemplated review . . . of 'trivial' monetary claims but intended no review at all of substantial statutory and constitutional challenges").

The Federal Circuit's decision in *Holley v. United States*, 124 F.3d 1462 (Fed. Cir. 1997) is informative. There, the plaintiff claimed an entitlement to funds under 37 U.S.C. § 204, which confers upon military officers a right to pay until properly discharged, and which is a money-mandating provision (just like a contract). *See id.* at 1465. The plaintiff claimed his discharge was unconstitutional, and thus he was not properly discharged and was still entitled to federal funds. *Id.* The Federal Circuit noted that "[t]he presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the discharge was wrongful. The determination of Mr. Holley's entitlement to remedy under 37 U.S.C. § 204 may include consideration of whether his removal violated constitutional rights." *Id.*; *see also Volk v. United States,* 111 Fed. Cl. 313 (2013) (holding that the Court of Federal Claims had proper jurisdiction over claims based upon the money-mandating Military Pay Act but

24

not the non-money-mandating constitutional claims).  So too here, Harvard nominally brings First Amendment and excess of Title VI statutory authority claims, but the substance of its claims is that the terminations of its agreements violate the Constitution; such claims are properly within the scope of the Tucker Act. *See Crowley Gov't Servs.* 38 F.4th at 1107; *Consol. Edison Co.*, 247 F.3d at 1385.  Harvard cannot evade the Federal Court of Claim's mandatory jurisdiction over its money claim through tactical briefing, and this Court should "not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims." *Consol. Edison Co. of New York*, 247 F.3d at 1385.

### 2.    The relief Harvard seeks is monetary.

Harvard also satisfies the second factor of the *Megapulse* analysis because the relief it seeks is essentially a monetary remedy.  This inquiry "boils down to whether the plaintiff effectively seeks to attain monetary damages in this suit." *Crowley*, 38 F.4th at 1107.  Here, Harvard purports to seek injunctive relief—but the effect of that injunctive relief is to order specific performance of grant agreements, i.e., for the government to pay money.

At bottom, in seeking an injunction to maintain payments pursuant to the schedule in a contract with the United States, Harvard "wants the Government to keep paying up." *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, --- F. Supp. 3d ---, 2025 WL 763738, at \*5-6 (D.D.C. Mar. 11, 2025), *injunction pending appeal denied*, No. 25-5066 (D.C. Cir. Mar. 28, 2025) (per curiam). Because the claims here are "founded upon a contract" they "must be heard in Claims Court." *Id.* at \*7 (citing *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) ("We know of no case in which a court has asserted jurisdiction . . . to issue an injunction compelling the United States to fulfill its contractual obligations.")).  That is true regardless of whether Defendants are ordered to reinstate the agreements cited by Harvard or are prevented from exercising contractual discretion for other grants.  Either way, granting Harvard's request would amount to

25

an order to "enforce [the Government's] contractual obligation to pay money." *California*, 145 S.

Ct. at 968 (citation omitted), and cannot move forward in this Court.

## II.    Harvard has not sufficiently pleaded an *ultra vires* claim.

Harvard briefly asserts that it can enforce its contractual rights via a freestanding

nonstatutory *ultra vires* claim with respect to both its constitutional and statutory claims outside

the scope of the APA.  Pl. MSJ Memo at 46.  This it cannot do.

Turning first to their purported claims that the government violated Title VI, *i.e.*, "ignored

the mandatory statutory requirements," *id.*, Harvard makes no attempt to satisfy the demanding

standard for statutory *ultra vires* review.  Such review is not APA review outside the context of

the APA—rather, it is a "demanding standard" where "[t]he agency overstep must be 'plain on the

record and on the face of the [statute]." *Fed. Exp. Corp.*, 39 F.4th at 765 (quoting *Oestereich*, 393

U.S. at 238 n.7).  "An *ultra vires* challenge, in other words, is 'essentially a Hail Mary pass.'"  *Id.*

(quoting *Nyunt v. Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).  Harvard fails to

address this standard, much less establish how it satisfies it—it merely cites back to the APA

section of its brief, which operates under different standards—and thus this argument is effectively

waived.  *See United States v. Mayendia-Blanco,* 905 F.3d 26, 32 (1st Cir. 2018) ("[I]t is a well-

settled principle that arguments not raised by a party in its opening brief are waived.").

Harvard cannot bring a statutory *ultra vires* claim because the plain language of Title VI

limits judicial review of the challenged agency actions here to the Court of Federal Claims.  Title

VI provides: "Any department or agency action taken pursuant to section 2000d–1 of this title shall

be subject to such judicial review *as may otherwise be provided by law for similar action taken by

such department or agency on other grounds.*"  42 U.S.C. § 2000d-2 (emphasis added).  While the

agencies did not act pursuant to Title VI, *see infra* Section V, even if they had, the plain language

of the statute directs that the cause of action "shall be" the Tucker Act because it is "provided by

law for similar action [*i.e.*, contract terminations] taken by such department or agency on other grounds."  Only if the challenged agency action is "not otherwise subject to judicial review" can an entity "obtain judicial review of such action in accordance with chapter 7 of title 5 [the APA]."  Under the Title VI scheme, the APA is only a backup if another statute does not already provide for judicial review, but in this case, the Tucker Act's judicial review provisions govern.

Nor can Harvard bring an *ultra vires* claim to challenge alleged constitutional violations in the context of their grant terminations, as such a claim is precluded by the Tucker Act.  Harvard's reliance on *Armstrong v. Exceptional Child Center, Inc.* is misplaced.  575 U.S. 320, 327 (2015).  That decision provides that the "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of *courts of equity*."  *Id.* (emphasis added).  Congress's grant of equity jurisdiction to the federal courts is confined to the relief that "was traditionally accorded by *courts of equity*," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-19, 329 (1999) (emphasis added).  Actions to enforce contractual rights are actions at law.  *See Devillier v. Texas*, 601 U.S. 285, 292 (2024) ("the mere fact that the Takings Clause provided the substantive rule of decision for the equitable claims in those cases does not establish that it creates a cause of action for damages, a remedy that is legal, not equitable, in nature.").  Regardless, "[t]he power of federal courts in equity to enjoin unlawful executive action is subject to express and implied statutory limitations."  *Armstrong*, 575 U.S. at 328.

Here, Harvard requests the nullification of agency actions terminating awards—relief that would reimpose the agencies' obligations to pay money to Harvard.  As discussed above, claims for money owed for work undertaken in the past under the agency funding instruments are contract-based claims for money damages that belong in the Claims Court.  *California*, 145 S. Ct. 966 (2025) (citing *Knudson*, 534 U.S. at 210-12).

27

Faced with the *California* Court's adherence to *Knudson*, Harvard cannot show that the executive actions violating contract provisions could be remedied by relief "traditionally" granted in equity, because "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity." *Knudson*, 534 U.S. at 210-11. Hence, a traditional court of equity would not have enforced the provisions of the grant or contract agreements, and the equitable relief described in *Armstrong* is not available here. The Tucker Act thus "displace[d] the equitable relief" that may have otherwise been available. *Armstrong*, 575 U.S. at 329. And, in any event, the Tucker Act remains available to Harvard; this is not a situation where there is no court that could provide a remedy or a forum. Under these circumstances—where Congress has provided another vehicle for Harvard to effectuate its rights—there is no basis to provide freestanding, equitable remedies absent (and contrary to) congressional direction.

## III. Harvard's challenges to the Government's Offer Letter and the Secretary McMahon Letter do not challenge final agency actions under the APA.

Harvard purports to challenge the government's "Freeze Orders and Termination Letters." To the extent that an APA challenge can be properly brought in this Court, only final agency action is reviewable under the APA, and the only final items are letters terminating specific contracts. Harvard cannot challenge the Government's Offer Letter or Secretary McMahon's Letter because neither constitutes reviewable final agency action.

The APA directs courts to review only "[a]gency action made reviewable by statute and final agency action." 5 U.S.C. § 704. "Agency action" is a defined term of art under the APA and most often manifests in the form of a rule or order. *Id*. § 551(13) (defining "agency action" as including "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"). Agency action that is cognizable and judicially reviewable under

the APA does not include any and all actions that an agency takes.  Rather, judicial review under the APA is limited to "circumscribed, discrete" and concrete actions.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).

Unless agency action is made reviewable by statute, a plaintiff who fails to challenge "final agency action" lacks a cause of action under the APA.  *See R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 40 (1st Cir. 2002).  Final agency actions are those that "mark the consummation of the agency's decisionmaking process" and "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (cleaned up).

### A.     The Government's Offer Letter is not final agency action.

Harvard's challenge to the Government's Offer Letter is not cognizable under the APA. The Government's Offer Letter was merely the starting bid in a negotiation that Harvard has rejected, which is not agency action under the APA, let alone final agency action.  The opening offer of a negotiation does not determine rights or obligations, nor does it have its own legal consequences.

Harvard—which carries the burden to show agency action—fails to demonstrate how the Government's Offer Letter meets the criteria for agency action.  The act of a grantor sending a contract or grant proposal to a grantee is not an "agency action" as defined by the APA.  It does not itself have legal effect; it is not akin to a binding rule or government order.  *See* 5 U.S.C. § 551.  Treating it as final agency action would massively expand the types of actions that would be potentially reviewable under the APA and transform any contract negotiation or proposal between the Government and another party into a series of potential APA challenges and lawsuits.  Such a result would be paralyzing for agency operations.

Fundamental principles of contract law further demonstrate that the letters sent to Harvard attempting to either negotiate a resolution of a contract dispute or resolve a broader dispute between the Government and Harvard, depending on how it is characterized, did not have any binding legal effect such that either parties' "rights or obligations [were] determined." *Bennett¸* 520 U.S. at 178.  The Government's attempt to negotiate is governed by the familiar requirements in contract formation of offer and acceptance.  "An unaccepted settlement offer—like any unaccepted contract offer—is a legal nullity, with no operative effect. As every first-year law student learns, the recipient's rejection of an offer 'leaves the matter as if no offer had ever been made.'" *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66 (2013) (Kagan, J., dissenting) (quoting *Minneapolis & St. Louis R. Co. v. Columbus Rolling Mill,* 119 U.S. 149, 151 (1886)).  Sending proposed terms to a counterparty does not create a binding contract.  Rather, that proposal must be *accepted* by the other party for it to have legal effect.  *See, e.g.*, Restatement (Second) of Contracts §§ 17, 50 (1981); *REO Acquisition Grp. v. Fed Nat'l Mortgage Ass'n*, 104 F. Supp. 3d 22, 28 (D.D.C. 2015) ("an enforceable contract requires both the intention of the parties to be bound and also agreement as to all material terms") (internal citations, emphasis, and alteration omitted).

Here, the Government offered terms that Harvard rejected, extinguishing any legal effect the offer may have had.  *See* Gov.'s Offer Letter ("If acceptable to Harvard, this document will constitute an agreement in principle, which the parties will work in good faith to translate into a more thorough, binding settlement agreement."); Harvard's Rejection Letter ("Harvard will not accept the government's terms as an agreement in principle.").  Accordingly, the proposed terms are just that, a proposal.  As the offered terms do not have legal effect as a contract, they cannot have legal effect as final agency action.  Harvard's theory, by contrast, would hold that a contract proposal *does* have legal effect—notwithstanding centuries of the common law to the contrary.

30

This Court should reject such a construction and thus Harvard cannot enjoin the Government's Offer Letter under the APA.

### B.    The Secretary McMahon Letter is not final agency action.

The Secretary McMahon Letter is similarly not final agency action.  The letter informed Harvard that it should "no longer seek GRANTS from the federal government, since none will be provided."  EDHarvAR_0000009.  The letter describes future grants to which Harvard has no present entitlement, as the Government's decisions about what to do with unobligated and unappropriated federal funding are, with respect to the former, committed to agency discretion by law, and with respect to the latter, up to future sessions of Congress.  *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.,* --- F. Supp. 3d ---, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *16 (D.R.I. Apr. 15, 2025) ("Decisions about appropriated but not-yet-awarded funds likely fall into that bucket" of "'committed to agency discretion by law'"); (quoting  5 U.S.C. § 701(a)(2));  *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."); U.S. Const. art. 1, § 9, cl. 7. ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law").[5]  Without any legal right to future funding, *see* Pl. MSJ Memo at 45 ("[n]o university is entitled to funding"), it is impossible for the letter to have determined Harvard's "rights or obligations" from which "legal consequences will flow."  *Bennett*, 520 U.S. at 177-178.

Additionally, although the letter purports to speak on behalf of the entire federal government, the Secretary of Education is not positioned to bind the entire federal government; it

---

[5] This discussion presumes that Title VI is not the vehicle for which APA review is obtained, since Title VI provides that review of actions taken pursuant to it "shall not be deemed committed to unreviewable agency discretion[.]."  42 U.S.C. § 2000d-2.

is therefore clear that she was expressing a rhetorical point echoing the Government's Offer Letter, and that the letter was not an exercise of any of the actual authority Congress has delegated to the Secretary. In other words, even if the letter had any effect with respect to the Department of Education—though it does not definitively purport to exercise prospective legal effect—it has no effect with respect to any other entity of the United States Government. For both these reasons, the Secretary McMahon letter also does not constitute final agency action. Because the Government's Offer Letter and Secretary McMahon Letter were not final agency actions, Harvard fails to state a claim for relief from the letters under the APA.

## IV.    Harvard's First Amendment claims fail.

Harvard raises two First Amendment claims. Harvard first argues that the contract terminations were unconstitutional retaliation because Harvard rejected the Government's Offer Letter and filed the present suit, and it further argues that the attempted imposition of the Offer Letter constituted an unconstitutional condition. Even assuming there is final agency action with respect to these claims, they fail on the merits.

### A.    Agencies would have terminated Harvard's contracts regardless of the viewpoints Harvard reflected in the Rejection Letter and this lawsuit; and thus, such termination does not constitute unconstitutional retaliation.

The First Amendment rights of government contractors—including non-personal services contractors, such as Harvard—are circumscribed to the same extent as those of government employees. *See Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 675 (1996). Claims alleging retaliation against a contractor for protected speech are governed by the balancing test announced in *Pickering v. Board*, which weighs the "interests of the [contractor], as a citizen, in commenting upon matters of public concern and the interest of the State, as [a contracting entity], in promoting the efficiency of the public services it performs through its [contractors]." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968).

32

But "absent contractual, statutory, or constitutional restriction, the government is entitled to terminate [a contractor] for no reason at all." *Umbehr*, 518 U.S. at 674.[6] Thus, a contractor is similarly situated to an at-will employee. *See id*. As with at-will employees, even if a contractor's "protected conduct played a 'substantial part' in the actual decision" to terminate them, it "would [not] necessarily amount to a constitutional violation justifying remedial action." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977). Accordingly, "the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." *Umbehr*, 518 U.S. at 675; *see also Peguero-Moronta v. Santiago*, 464 F.3d 29, 46 (1st Cir. 2006) (a "'defendant [that] has produced enough evidence to establish that the plaintiff's dismissal would have occurred in any event for nondiscriminatory reasons [will prevail].'" (quoting *Cepero–Rivera v. Fagundo*, 414 F.3d 124, 132 n.1 (1st Cir. 2005)).

At the threshold, it is a questionable premise for a retaliation claim that the breakdown of a settlement negotiation and the consequences that flow from it can be considered retaliatory. It is as akin to claiming that a criminal defendant has a retaliation claim in a criminal trial because the prosecutor decided to move forward with the charges or asked for a higher sentence than contemplated in a plea agreement after he rejected the plea bargain. After settlement broke down here, the agencies terminated the grants. That is profoundly unremarkable.

---

[6] *See also* 48 C.F.R. § 2.101 (defining "termination for convenience" as "the exercise of the Government's right to completely or partially terminate performance of work under a contract when it is in the Government's interest"); 48 C.F.R. §§ 49.101, 49.501-05, 52.249-1-5 (requiring agencies to include clauses in contracts regarding termination for convenience); *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426-27 (Ct. Cl. 1963) (reading termination clause into contract as a matter of law); Congressional Research Service, "Terminating Contracts for the Government's Convenience: Answers to Frequently Asked Questions" (Dec. 18, 2015), at 1-6, *available at* https://www.everycrsreport.com/files/20151218_R43055_4eb3d254b3212832 11d130864b6a688c33852dc8.pdf (indicating that "[t]erminations in almost any . . . circumstance[] could . . . be found to be in the government's interest").

In any event, Harvard fails to establish that its rejection letter or this lawsuit played a substantial role in the agencies' termination decision. The administrative record makes clear that the agencies were contemplating termination because of Harvard's actions related to antisemitism before Harvard engaged in either rejecting the offer letter or filing this suit and that they did not do so in retaliation for those actions. GSAHarv_00000001 (beginning review of Harvard funding on March 31, 2025). That is dispositive of Harvard's First Amendment retaliation claim.

Moreover, the agencies' terminations are explained by a nonretaliatory purpose: opposing antisemitism. Unlawful discrimination finds no safe haven under the First Amendment, even though it may involve speaking or other expressive activity; accordingly, the Government's policy against entities that do not take adequate action against discriminatory acts of antisemitism was a constitutionality valid basis for the agencies' termination decision. *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 309 (D. Mass. 2024) ("The court consequently is dubious that Harvard can hide behind the First Amendment" to cover for its "indecisive, vacillating, and at times internally contradictory [response to antisemitism]."). Indeed, "preventing discrimination in the workplace—and in the schools—is not only a legitimate, but a compelling, government interest." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3d Cir. 2001); *see also Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 263 (S.D.N.Y 2025) ("there is no question that the elimination of discriminatory harassment in employment and in programs receiving federal funding is a compelling government interest."), *reconsideration denied*, No. 24 CIV. 2669 (JPC), 2025 WL 602945 (S.D.N.Y. Feb. 25, 2025).

The viewpoints expressed in Harvard's Rejection Letter, and the filing of this lawsuit, did not play a substantial role in the agencies' decision to terminate Harvard's grants. Rather, it is the fact that Harvard refused to take adequate actions to respond to antisemitism on its own campus

34

that justified the agency action.  *See* Harvard Report; HHSHarv_00000474; EDHarvAR_0000011; NSF_Harvard000039; USDA-HARV-AR-00008; ENERGY AR3929;  NASA-AR03748-50.

Moreover, rejection of an offer is not protected expression; it is a legal act extinguishing the original offer.  *See supra* at 30; *Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring in the result) ("[O]ffer and acceptance are communications incidental to the regulable transaction called a contract  .  .  ."). The consequences that followed flowed directly from the "noncommunicative impact" of this legal act of rejection.  *United States v. O'Brien*, 391 U.S. 367, 382 (1968).

The Supreme Court has "rejected the view that 'conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.'"  *Rumsfeld v. F. for Acad. & Institutional Rts., Inc. ("FAIR")*, 547 U.S. 47, 65-66 (2006) (quoting *O'Brien*, 391 U.S. at 376). The Court instead "has limited First Amendment protections to what it has called 'inherently expressive' conduct."  *Falcone v. Dickstein*, 92 F.4th 193, 206 (3d Cir. 2024) (quoting *FAIR*, 547 U.S. at 66), *cert denied sub nom. Murray-Nolan v. Rubin*, 144 S. Ct. 2560 (2024).  "It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."  *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).  Any incidental effect that the terminations following Harvard's rejection had on speech were "imposed 'for reasons unrelated to the communication of ideas.'"  *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 291 (D.C. Cir. 2019) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 569 (2001)).

To the extent Harvard argues that it is the viewpoints expressed in Harvard's Rejection Letter, not the act of rejection, that the Government is retaliating against, Harvard has put forth

insufficient evidence to demonstrate such a causal connection, let alone establish that it was "substantial." Grasping for a causal link between the terminations and the viewpoints expressed in Harvard's Rejection Letter, Harvard cites to three agency termination letters, HHSHarv_00000472-75 ("the University has refused to take *appropriate* action"); USDA-HARV-AR-00008-9 (same); ENERGY AR3932-3933 ("Harvard has refused to take immediate, definitive and *appropriate* remedial action" (emphasis added by Harvard)). Pl. MSJ Memo at 26. But these excerpts explicitly focus on the "action" of Harvard's "refus[al]," and not the views expressed in Harvard's Rejection Letter.

Harvard's allegation that the terminations were retaliation for the filing of this lawsuit is similarly unpersuasive. First and foremost, the agencies' terminations had already begun by the time Harvard filed this lawsuit on April 21—and these actions were the apparent basis for filing the lawsuit in the first place. *See* Pl. MSJ Memo at 15-16 ("On April 16 . . . DHS terminated two grants 'totaling over $2.7 million to Harvard University, declaring it unfit to be entrusted with taxpayer dollars.'"); Pl. Compl. ¶ 6, ECF No. 1 ("Just yesterday [April 20], it was reported that the Government is 'planning to pull an additional $1 billion of [Harvard]'s funding for health research.'"). Indeed, Harvard acknowledges that the Government began contemplating terminating its agreements long before this suit; it states, "The March 31 Letter linked the review of funding to Defendants' allegations about antisemitism on Harvard's campus." Pl. MSJ Memo at 12. Second, the public comments by federal officials discussing how Harvard's unwillingness to negotiate are harming it, *see id*. at 19, are not the smoking gun Harvard thinks they are. These observations merely express the view that Harvard would be better off financially if it negotiated with the Government rather than sue it. They are not statements that funding cuts are *because* of this lawsuit. The agencies were already set to exercise their termination rights prior to its attempts

36

to negotiate with the school and needed no further justification to do so.  Thus, Harvard fails to show that either Harvard's views in its letter or the filing of this suit played a substantial role in agencies' termination decisions.

Even if the Court is persuaded that the protected activities played a substantial role in the terminations, it must still find that the agencies would not have "taken the same action even in the absence of the protected conduct" before deciding that it engaged in unconstitutional retaliation. *Umbehr*, 518 U.S. at 675.  As the administrative record demonstrates, plans to terminate Harvard's funding for failing to align with the Government's priorities opposing antisemitism were being discussed as early as March 31.  GSAHarv_00000001.  The Government's Offer Letter was clear that if an agreement was not reached, it would exercise its termination rights.  Accordingly, it is only possible to conclude that the terminations would have gone forward even in absence of the viewpoints expressed in Harvard's Rejection Letter and the bringing of the present suit.

Critically, Harvard's argument that it has been uniquely targeted for retaliation based on its protected speech is fatally undermined by the fact that agencies had also been reviewing grants at many other universities that have similarly failed to address antisemitism on campus or protect the civil rights of students and employees.  This undermines any causal link that Harvard purports to read into the timeline[7] of the agencies' actions.

### B. The Government's proposed conditions for waiving its termination rights do not violate the unconstitutional conditions doctrine.

For the same reasons the Government's Offer Letter is not final agency action, it does not

---

[7] Harvard suggests that the timing of many of the terminations following "swift[ly]" after it filed suit indicates they were retaliatory, Pl. MSJ Mot. at 24.  But one of the primary bases on which the agencies relied to terminate funding—Harvard's Report—was released 8 days after the lawsuit commenced. *See, e.g.*, GSAHarv_00000136-445

violate the unconstitutional conditions doctrine. The offer, having been rejected, is a nullity. *See supra* at 30. The Court should decline Harvard's invitation to analyze it as though the proposed terms were finalized conditions of binding contract agreement. Harvard's argument that the Government's *proposed* conditions in a settlement agreement that was *never adopted* nevertheless violate the unconstitutional conditions doctrine calls upon the Judiciary to thrust itself into the Executive's preliminary negotiations and further underscores how Harvard is challenging unreviewable, non-final agency action. *See supra* Section III.

Indeed, it is an open question whether the unconstitutional conditions doctrine can even be properly applied to settlement negotiations at all; "[T]he unconstitutional conditions doctrine could never apply as an absolute rule [with respect to settlements] because all settlements between the government and citizen litigants involve a waiver of constitutional rights, such as the right to pursue further litigation in court." *Stephens v. Cnty. of Albemarle*, No. 3:04CV00081, 2005 WL 3533428, at *5-7 (W.D. Va. Dec. 22, 2005). The Supreme Court, moreover, has drawn a distinction between unconstitutional conditions that have been "consummated" and those where "the condition is never imposed." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013). Drawing such a distinction makes eminent sense because, like with treating mere offers as final agency action, *see supra* at 30-31, treating unconsummated conditions the same as consummated ones would similarly transform any contract negotiation or proposal between the Government and another party into a series of potential APA challenges and lawsuits.

Even if the unconstitutional conditions doctrine were to apply,

> it is well-established that [t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.

*Rust v. Sullivan*, 500 U.S. 173, 193 (1991).  The Government is entitled to discern between programs of higher education and to fund only those that effectively deal with the problem of antisemitic discrimination.  This is not conditioning funding on *viewpoints* articulated by a contracting party, but on actions taken by that party—just like how agencies have long imposed a number of substantive requirements on government contractors via those contractual agreements. 2 C.F.R. §§ 200.211(c)(1)(ii), 200.300 (requiring agencies to include terms advancing policies and priorities outlined in statutes and executive orders).  Furthermore,  Harvard's  Report  identified that its curriculum and discriminatory harassment by faculty and students fueled the antisemitic climate on campus, *see supra* Background Section I, thus it was only reasonable that the Joint Task Force would have wanted to see these things addressed in its opening negotiation to resolve its antisemitism concerns.

**V.    Title VI does not govern grant terminations based on policy.**

Harvard also contests that the agencies' termination of certain agreements pursuant to explicit contractual authority is precluded by the separate Title VI scheme.  As a threshold matter, the government has broad power to contract, which includes the power to impose conditions as part of those contracts;  any question Harvard seeks to raise about the extent to which this authority may be curtailed by Title VI should be answered by the Court of Federal Claims, *see supra* Section I, as it concerns the availability of a defense in "a dispute concerning termination of a contract," 28 U.S.C. § 1491, and, as has already been discussed, Title VI itself direct judicial review to the Court of Federal Claims, *see supra* 26-27.  This notwithstanding, Harvard's argument about the preclusive effects of Title VI on the Government's ability to contract lack merit.

Early in our republic's history, the federal government's authority to enter intro contract was questioned.  Justice Story delivered the opinion of the Supreme Court:

> The United States have in their political capacity a right to enter into a contract . . .. It is an incident to the general right of sovereignty; and the United States being a body politic, may, within the sphere of the constitutional powers confided to it, and through the instrumentality of the proper department to which those powers are confided, enter into contracts not prohibited by law, and appropriate to the just exercise of those powers.

*United States v. Tingey*, 30 U.S. (5 Pet.) 115, 125 (1831).  The Government's authority to bargain for the clause appearing in all of Harvard's contracts allowing for termination for convenience and its authority to include alignment with policy priorities as a term and condition in its grant awards,[8] then, is also "an incident to the general right of sovereignty." *Id*.  This sovereign power is only limited by any "prohibit[ions] by law." *Id*.  As has already been discussed, *see supra* 36-37, the agencies properly determined that the clause was triggered and exercised its termination authority. The only question remaining is whether the sovereign power to contract into this clause was limited by any "prohibit[ions] by law." *Tingey*, 30 U.S. at 125.  It was not.

Harvard suggests Title VI of the Civil Rights Act, which provides procedures for grant terminations taken *pursuant to that Act*, limits the Government's sovereign authority. 42 U.S.C. § 2000d-1 (discussing a contractor's "failure to comply with a requirement imposed pursuant to *this section*") (emphasis added).  It is wrong.  The contract terminations at issue were not taken pursuant to Title VI; they were taken pursuant to the agencies' authority to terminate for nonalignment with priorities under a bargained-for contract clause. *See, e.g.,* EDHarvAR_0000012; HHS Harv 00000473; NSF_Harvard000039; USDA-HARV-AR-00008; ENERGY AR3929; HUDHarvAR_00000067; DoDHarv_00000003; NASA-AR03748.

Harvard's claim that if the agencies identify inadequate institutional concern for antisemitism as a reason for grant termination, then Title VI's procedures are the only mechanism by which the termination can be effectuated lacks merit. *See* Pl. MSJ Memo at 37 (characterizing

---

[8] *See supra* at 10.

Title VI as mandating "overriding procedures"). Title VI's separate procedures do not preclude or abrogate the agencies' separate contract authorities. There is no basis in Title VI to suggest that facts that are relevant to a finding of a violation of that Act cannot also be relevant to the Government's determination that certain uses of funding no longer align with its priorities. *See Am. Ass'n. Univ. Professors v. U.S. Dep't of Justice*, 1:25-cv-02429-MKV, ECF No. 148 at 29 (June 16, 2025) (unable to find "authority for [any] particular limitation" holding that "the Executive Branch may not count repudiating antisemitism among "agency priorities" within the meaning of 2 C.F.R. § 200.340(a)(4)."). Indeed, it is "unlikely that Title VI is the sole and exclusive 'legal tool[]' available to a President who instructs executive agencies to prioritize 'combat[ting] anti-Semitism . . . on university and college campuses.'" *Id*. at 30.

Title VI and contract terminations for policy are based on different legal authorities and entail different procedures. Title VI of the Civil Rights Act enacted a general requirement for recipients of federal funding that applies to all funding agreements, regardless of whether it is included as a provision of the agreement. 42 U.S.C. § 2000d. It leaves no discretion to agencies to waive its requirements, as it uses mandatory language stating that each agency is "directed to effectuate the provisions of section 2000d of this title." *Id*. § 2000d-1. Agencies are instructed to do so through the implementation of "rules, regulations, or orders of general applicability." *Id*. Notably, 2 C.F.R. § 200.340 is not a rule that was promulgated under the Title VI authority. *See Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046, 30047-48 (Apr. 22, 2024) (citing statutory authorities). Finally, the remedies under Title VI are much broader than just funding

41

terminations and include the prospect of an enforcement action brought by the Attorney General.[9]

Thus, it is clear that the remedies under Title VI are floor and not a ceiling.

Contractual requirements, in contrast to Title VI, are based on the provisions authorized by the instruments themselves. It is a discretionary choice by the agency to include the terms of 2 C.F.R. § 200.340 as a provision of the contracts it executes. While the regulations under 2 C.F.R. Subpart B may make the inclusion of the terms mandatory, those regulations themselves are a product of the agencies' discretionary choice to promulgate them. *Id.* § 1.105(c) ("Federal agency regulations in subtitle B may give regulatory effect to the OMB guidance"). The contract provisions at issue here state that "The Federal award may be terminated . . . if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4). And, as with most contractual terms, the party to whose benefit those terms inure can chose to enforce or waive them as appropriate. *Cf.* Uniform Commercial Code § 3-601 ("The obligation of a party . . . is discharged . . . by an act or agreement with the party which would discharge an obligation to pay money under a simple contract."). The agency priority of not funding entities that fail to address antisemitism does not depend on the finding of a Title VI violation, therefore there is no reason that Title VI procedures would govern these terminations or "overrid[e]," Pl. MSJ Memo at 37, the termination framework spelled out by 2 C. F.R. § 200.340. To conclude otherwise would imply that prior to Title VI, agencies had no ability to terminate funding for discrimination. The

---

[9] If informal resolution is not possible, agencies may refer matters to the Department of Justice ("DOJ") to bring "appropriate proceedings" (including lawsuits) against Title VI violators. 45 C.F.R. §§ 80.7(d), 80.8(a); 28 C.F.R. §§ 42.107(d), 42.108(a). Similarly, DOJ's Guidelines for Enforcement of Title VI cite "appropriate court action" against noncompliant recipients of federal financial assistance as among the available "alternative courses of action" that agencies should consider before terminating federal funding. 31 Fed. Reg. 5292 (Apr. 2, 1966) (28 C.F.R. § 50.3(c)(I)(A)-(B)); *see also* 28 C.F.R. §§ 42.411(a), 42.412(b) (DOJ regulations coordinating Title VI enforcement).

better reading is that Title VI made it mandatory for agencies to terminate funding for discriminating entities in certain circumstances. Harvard's alternative reading of Title VI would require concluding that Congress intended discriminators to have *more* protections than those whose contract are terminated for different policy reasons under 2 C.F.R. § 200.340, which would conflict with Congress's intent of achieving maximal civil rights protections.

Harvard's myopic view of the Government's contracting authority appears nowhere in the text of Title VI. While "Congress intended Title VI to be a typical 'contractual' spending-power provision," *Guardians Ass'n v. Civil Serv. Comm'n of the City of N.Y.*, 463 U.S. 582, 599 (1983), there is nothing to suggest Title VI was meant to be exclusive of any contractual provisions that may also be used to address discrimination. Harvard's narrow view that Title VI provides the exclusive mechanism to address ongoing or rampant civil rights violations is at odds with congressional intent, which was to provide an independent basis to enforce its provisions, even where individual contracts failed to include such language, in an effort to maximally protect civil rights. Moreover, it is in tension with the Supreme Court's *Department of Education v. California* decision, which held that ED's termination of grants ED understood to unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic were governed by 2 C.F.R. § 200.340 and belonged in the Court of Federal Claims. Given that the terminations here were not taken pursuant to Title VI, there was no obligation for the Government follow any of the procedures prescribed by that Act.

Harvard claims that the legal authority invoked by the agency at the time of the terminations was a "post-hoc" rationalization. Pl. MSJ Memo at 37. But the agencies were clear in their terminations they were not relying on Title VI, but on Part 200 of Title 2 of the C.F.R. as well as their termination for convenience authority. *See supra* at 13-14. Harvard's argument that

these contemporaneous explanations were somehow "post hoc" thus requires a serious misreading of *Department of Homeland Security v. Regents of the University of California*, which discusses "post hoc justifications [that] are raised in court by those appearing on behalf of the agency or by agency officials themselves," not situations in which there are "contemporaneous explanations." 591 U.S. 1, 23 (2020). The contemporaneous explanations by the agencies justifying terminations were based on contractual language, not Title VI. As Title VI does not govern terminations based on contract provisions entered into under 2 C.F.R. § 200.340, and the agencies' reliance upon that that authority was stated contemporaneously with the challenged actions, Harvard's argument that the Government violated Title VI must fail.

Finally, in a footnote, Pl. MSJ Memo at 37 n.67, Harvard contends that even if the Title VI procedures do not apply, the Government also failed to follow the procedures required by 2 C.F.R. § 200.340. The First Circuit has "repeatedly held that arguments raised only in a footnote are 'waived.'" *Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *8 (quoting *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 n. 17 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)); *see also Modeski v. Summit Retail Sols., Inc.*, 470 F. Supp. 3d 93, 110 (D. Mass. 2020) (same), *aff'd*, 27 F.4th 53 (1st Cir. 2022). Even if Harvard had not waived the argument, however, its contentions are wrong. First, Harvard says that the Government failed to comply with 2 C.F.R. § 200.341, which requires agencies to provide written notice of the termination including the reasons for it. But each of the agencies that terminated funds sent such termination notices. *See, e.g.*, EDHarvAR_0000011; HHS Harv 000004 73; NASA-AR03748-50. Indeed, it is these notices that triggered Harvard's lawsuit and from which Harvard seeks relief. *See* Pl.'s Proposed Order, ECF No. 69-1 at 1 (requesting an injunction that "declares unlawful, vacates, and sets aside the Freeze Orders and Termination Letters."). Second,

Harvard claims that the Government did not follow 2 C.F.R. § 200.342, which requires an opportunity for the grantee to be heard.  But Harvard has had opportunity both before and after the termination letters were sent to object and provide information on its behalf.  *See, e.g.*, HHSHarv_00005230-35 (meeting to discuss Task Force's concerns); EDHarvAR_0000012 (notice referencing appeal rights) NASA-AR03748-50 (notice referencing appeal rights); NASA-AR03512 (describing appeals process).

The Government followed the procedures required by 2 C.F.R. § 200.342, the authority that governs this case, not Title VI.

**VI.    The freeze orders and terminations do not violate the APA because they were reasonable exercises of the agencies' authority to terminate for nonalignment with the Government's antidiscrimination priorities.**

**A.    The terminations were not arbitrary and capricious.**

Even if the Court concludes that it has jurisdiction to review the challenged actions under the APA, the challenged grant and contract terminations are not unlawful.  Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).  Review under the arbitrary and capricious standard is "deferential," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), and simply examines whether the agency's decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  Moreover, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* at 43.  Because the Defendant agencies' grant and contract terminations were both reasonable and reasonably

explained, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021), they satisfy the deferential "arbitrary and capricious" standard.

As discussed above, Defendant agencies' individual termination decisions are the only challengeable final agency actions, and they meet the APA's limited standard. The administrative record demonstrates that the termination decisions followed a "comprehensive review of Federal contracts with certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment, including Harvard University" pursuant to the February 3, 2025, Executive Order on combatting antisemitism. GSAHarv_00000003-4. In the context of discretionary grants, each agency enjoys wide latitude to determine how best to implement their respective program and the decision-making process for each termination. *Cf. Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989) ("the question whether a particular action is arbitrary or capricious must turn on the extent to which the relevant statute, or other source of law, constrains agency action").

Harvard contends that Defendants' freezing and termination of funding was arbitrary and capricious because the agencies failed to explain how the Government's concerns about antisemitism relate to these actions and failed to consider remedial actions Harvard had taken to address antisemitism on Harvard's campus.[10] Pl. MSJ Memo at 38-42. But a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), and here it is clear that each agency terminated its grants and contracts with Harvard pursuant to a broader government policy concerning antisemitism at institutions of higher education and the insufficiency of Harvard's

---

[10] Harvard also contends that the freezing and termination of grants to Harvard was arbitrary and capricious because it was done in response to Harvard's refusal to accept the Government's Offer Letter. This is wrong for the reasons stated above. *See supra* Section IV.A.

compliance with that policy. Agencies articulated that basis for grant termination in their termination letters. *See, e.g.,* HHSHarv_00000473-4; EDHarvAR_0000011-12; ENERGY AR3929-30 (stating that each agency is "aware of recent events at Harvard University involving antisemitic action that suggest the institution has a disturbing lack of concern for the safety and wellbeing of Jewish students. Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students has ground day-to-day campus operations to a halt, deprived Jewish students of learning and research opportunities to which they are entitled, and brought shame upon the University and our nation as a whole. Indeed, as the Harvard Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias concluded, actions at Harvard during the 2023-2024 academic year resulted in widespread abuse of Jewish and Israeli students by an institution 'that mainstreamed and normalized what many Jewish and Israeli students experience as antisemitism and anti-Israeli bias.'"). As Harvard observes in its motion, all but one of the termination letters cited "'Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students,' coupled with Harvard's 'refus[al] to take appropriate action . . . or implement necessary reforms." Pl. MSJ Memo at 18 (citation omitted). And the connection between the Administration's antisemitism prevention policy goals and specific Harvard grants was also explained: government agencies do not, as a matter of policy, want to fund entities that do not take adequate actions to prevent antisemitism. GSAHarv_00000001-03; GSAHarv_00000015. Moreover, government agencies further concluded that Harvard's actions to date were inadequate, thus refuting Harvard's argument that its efforts were not considered. *See id.*; HHSHarv_00000474; ENERGY AR3929-30. Harvard may disagree with this conclusion, but it is both documented in and supported by the administrative record, which is all that the APA requires.

The record, therefore, demonstrates that "the agenc[ies] . . . articulate[d] a 'rational connection between the facts found and the choice made.'" *Bowman Transp.*, 419 U.S. at 285 (citation omitted).  Under this permissive standard, the Court must uphold the agencies' grant terminations.

### B.    The agencies did not fail to consider important aspects of the problem or reliance interests before terminating funding.

Harvard also raises two related APA challenges: that Defendants did not consider "important aspects of the problem," namely, (1) the benefits provided by the Harvard grants and (2) the reliance interests of the grantees.  *See* Pl. MSJ Memo at 42-43, 45 (citing *Regents of the Univ. of Cal.*, 591 U.S. 1).  But the record demonstrates that the agencies adequately considered these interests.

First, the Administrative Record reflects that Defendants considered the benefits that federally funded research at Harvard University provides to the Government and the public.  *See* Government's Offer Letter, HHSHarv_00000098 ("The United States has invested in Harvard University's operations because of the value to the country of scholarly discovery and academic excellence.").  In making its decision, however, the agencies concluded that the inadequacy of Harvard's efforts to address antisemitism on campus—an important government interest— outweighed the Government's interests in maintaining certain existing federal grants and contracts. *See* "April 14 Press Release", GSAHarv_00000012-13.  This weighing of interests is vested in the agencies, even if the plaintiff (or the court) would have weighed those interests differently.  *See State Farm*, 463 U.S. at 43 ("[The court] may not supply a reasoned basis for the agency's action that that agency itself has not given ... [and should] ... uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  (internal citations omitted)).

48

Second, as to Harvard's reliance interests, Harvard does not persuasively explain how it reasonably developed reliance interests in grant programs that may be terminated at any time at the agency's policy discretion or for the grant recipient's performance.  Each grant incorporates, as part of its terms and conditions, the termination provisions of 2 C.F.R. § 200.340.  Most significantly, this regulation states that an award could be terminated at any time "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).  The federal agency making the award may also terminate the award for specific terms and conditions that it incorporates into the grant agreement.  *Id*. § 200.340(a)(1).  In fact, Harvard admits in their motion that they have no entitlement to the terminated grants. Pl. MSJ Memo at 45 ("[N]o university is entitled to Government funding.").

This case is not like *Regents*, upon which Harvard principally relies. Pl. MSJ Memo at 45-46. That case featured a challenge to the recission of the Deferred Access to Childhood Arrivals (DACA) program.  The Supreme Court noted that DACA recipients had made significant economic, personal, and financial commitment "in reliance on the DACA program." *See Regents of Univ. Of Cal.,* 591 U.S. at 31.  But even there, the Supreme Court emphasized that while "[t]hese are certainly noteworthy concerns, . . . they are not necessarily dispositive." *Id.*  Rather, the agency may determine that other interests and policy concerns outweigh any reliance interests, or it may accord them no or diminished weight.  *Id.* at 32.  Harvard's reliance interests in existing and continued federal funding must be judged in light of the legal framework under which they are given and taken away.  Because federal grants and the terms and conditions to which they are subject provide the agencies substantial discretion in their termination and because there is no right to future grants, the agencies did not clearly err in judging that any reliance interest in continued federal funding would be unjustified.

**VII.    Under the APA, the appropriate remedy is limited to the agency action giving rise to the suit rather than a forward-looking injunction.**

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The remedy for a successful APA challenge is limited to relief from the challenged the agency action. The APA does not provide district courts "jurisdiction to order specific relief," including the award of or performance of a contract. *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005). "Thus, 'under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards.'" *Id.* (quoting *City of L.A. v. Shalala*, 192 F.3d 1045, 1011 (D.C. Cir. 1999). Accordingly, any relief should be limited to remedying improper agency action and must leave intact the Executive Branch's discretion to engage in further consideration of the topic at hand and consider other future agency actions consistent with law.

A permanent injunction would constitute an extraordinary remedy in this case and the relief that Harvard seeks—that this Court "permanently enjoin any similar action"—is far too vague. Pl. MSJ Memo at 48. As the D.C. Circuit has observed, a "decision by the court to vacate an agency's adjudication . . . would usually result in a remand for further administrative proceedings, and we have explained that it is sometimes appropriate to let an agency correct an error before judicial determination of the merits." *Utah ex rel. Cox v. Env't Prot. Agency*, No. 23-1157, 2025 WL 1354371, at *4 (D.C. Cir. May 2, 2025); *see also Util. Solid Waste Activities Grp. v. Env't Prot. Agency*, 901 F.3d 414, 436 (D.C. Cir. 2018) ("Remand has the benefit of allowing agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete." (quoting *Ethyl Corp. v. Browner*, 989

F.2d 522, 524 (D.C. Cir. 1993))), *judgment entered*, 2018 WL 4158384 (D.C. Cir. Aug. 21, 2018). These same principles apply for grant terminations were this Court to find that such terminations constituted final agency action and violated the APA.  If any relief is warranted, it should be targeted to the challenged grant terminations and permit the agency to revisit their decisions, with any corrections as necessary.  Vacatur of the challenged actions achieves the aims of judicial efficiency and appropriately circumscribes the relief to the challenged agency actions.

On the other hand, a permanent injunction barring Defendants from taking "any similar action" is a vague and unreasonable request for relief. *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 52 (2d Cir. 1996) (vacating an injunction as vague and requiring that injunctions "be specific in terms" and "describe in reasonable detail . . . the acts or acts sought to be restrained."). It would also potentially prevent the Defendants from curing any potential violation in the future, *i.e.*, with additional explanation or after additional or different process.  *See, e.g., New York v. Trump*, --- F. Supp. 3d --- , No. 25-cv-39, 2025 WL 715621, at *16 (D.R.I. Mar. 6, 2025) ("The Court's order does not prevent the Defendants from making funding decisions in situations under the Executive's actual authority in the applicable statutory, regulatory, or grant terms[.]") (citation omitted), *appeal filed*, No. 25-1413 (1st Cir. Apr. 28, 2025)); *see also New York v. Trump*, 133 F.4th 51, 71 n. 16 (1st Cir. Mar. 26, 2025) (emphasizing that "the preliminary injunction clearly refers to a 'categorical pause or freeze of funding,' which, by its terms, could not apply to a pause or freeze based on an individualized determination under an agency's actual authority to pause such funds").

Here, there already active Title VI investigations into Harvard being conducted by multiple federal agencies, and the requested permanent injunction would prevent the agencies from carrying out their statutory responsibilities of ensuring a grantee does not discriminate.  42 U.S.C. § 2000d-

51

1.  The requested permanent injunction would effectively give Harvard a free pass to discriminate with no recourse for the United States to address it.  The Court should not enjoin the Defendant agencies from exercising the authorities granted to them under applicable statutes, regulations, and agreements to confront civil rights abuses.

To the extent that this Court does enter injunctive relief pursuant to Rule 65, however, it should order Harvard to post a bond adequate to compensate the government in the event that the injunction is overturned on appeal or otherwise.  *See* Fed. R. Civ. P. 65(c).

Finally, to the extent that the Court determines that the challenged grant terminations require vacatur under the APA—and it should not—the Court need not, and therefore should not, reach any constitutional claims under principles of constitutional avoidance.  *See Harmon v. Brucker*, 355 U.S. 579, 581 (1958); *see also Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (J. Brandeis, concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

## VIII.   There is no ripe dispute as to Defendants Bondi and U.S. Department of Justice.

As stated herein, grants administered by the grantmaking components of the Department of Justice, and the Attorney General as the principal officer of the Department, have not been frozen or terminated.  *See supra* at 14.  "Determining whether administrative action is ripe for judicial review requires [the evaluation of] the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  Here, there is no agency action taken by the Department of Justice or the Attorney General that this court could review under the relevant standard or for which Harvard has been harmed.  Therefore, Harvard's claims as to the Department of Justice and the Attorney General are not ripe.

## CONCLUSION

The Government respectfully requests the Court deny Harvard's Motion for Summary Judgment and grant the Government's Cross-Motion for Summary Judgment.


Dated:  June 16, 2025                              Respectfully submitted,

                                                  CHAD MIZELLE
                                                  Acting Associate Attorney General

                                                  ABHISHEK KAMBLI
                                                  Deputy Associate Attorney General

                                                  BRETT A. SHUMATE
                                                  Assistant Attorney General
                                                  Civil Division

                                                  JOSEPH E. BORSON
                                                  Assistant Director, Federal Programs Branch

                                                  /s/ *Eitan R. Sirkovich*
                                                  EITAN R. SIRKOVICH
                                                  RYAN M. UNDERWOOD
                                                  Trial Attorneys
                                                  United States Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  1100 L Street, NW
                                                  Washington, DC 20005
                                                  Tel: (202) 353-5525
                                                  E-mail:  eitan.r.sirkovich@usdoj.gov

                                                  *Counsel for Defendants*

## CERTIFICATE OF SERVICE

Counsel for Defendants certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiff hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

_/s/ Eitan R. Sirkovich_

EITAN R. SIRKOVICH
Trial Attorney