**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

PRESIDENT AND FELLOWS OF HARVARD COLLEGE, *et al.*,

Plaintiffs,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

Defendants.

Case No. 1:25-cv-11048

**BRIEF OF THE STATES OF IOWA AND 15 STATES AS *AMICI CURIAE* SUPPORTING DEFENDANTS**

**(Leave to File granted on June 23, 2025)**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........ ii
TABLE OF AUTHORITIES ........ iii
INTEREST OF AMICI CURIAE ........ 1
ARGUMENT ........ 2
I. Just like Bob Jones University, Harvard's Discrimination is Not Protected by the First Amendment. ........ 3
II. Harvard Is Confused About Fault and Antidiscrimination Laws. ........ 5
CONCLUSION ........ 6

## TABLE OF AUTHORITIES

Cases

*Animal Legal Def. Fund v. Reynolds*,
89 F.4th 1065 (8th Cir. 2024) .......... 4, 5
*Bob Jones U. v. United States*,
461 U.S. 574 (1983) .......... 2, 3
*Breneman v. United States ex rel. FAA*,
381 F.3d 33 .......... 4
*Fantini v. Salem State Coll.*,
557 F.3d 22 (1st Cir. 2009) .......... 5
*Kinzer v. Whole Foods Mkt., Inc.*,
99 F.4th 105 (1st Cir. 2024) .......... 5
*Parents Involved in Community Schools v. Seattle Sch. Dist. No., 1*, 551 U.S. 701 (2007) .......... 5
*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .......... 1, 2
*Wimmer v. Suffolk Cnty. Police Dep't*,
176 F.3d 125 (2d Cir. 1999) .......... 5

**INTEREST OF AMICI CURIAE**

There are apparently three constant truths in American life: death, taxes, and Harvard University's discrimination against Jews. Harvard's own Statement of Undisputed Facts admits that on April 29, 2025, its Presidential Task Force on Combating Antisemitism and Anti-Israel Bias issued a 311-page report ("Harvard's Antisemitism Report") describing in excruciating detail the "'alienating and hostile atmosphere' experienced by many Jewish and Israeli students at Harvard, as well as 'instances where administrators and faculty at certain Harvard Schools seemingly fell short in their responsibility to uphold principles of open inquiry, civility, and respectful disagreement within specific courses, programs, and events.'" Dkt. 71, ¶ 9 (June 2, 2025).

States play a vital role in our system of cooperative federalism to combat invidious discrimination. *See*, *e.g.*, Iowa Code chapter 216. And Harvard holds itself out as an exemplar to institutions of higher learning across the nation. When Harvard is told its discrimination is illegal, the repercussions are national. *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181 (2023). When Harvard publicly and openly commits itself to defending antisemitism and antisemitic practices, that, too, reverberates nationally. *See id.* at 257 (Thomas, J., concurring) (describing Harvard's development of a "'holistic' admissions policy" developed "to exclude Jews"). Harvard's frank acceptance of hate that it would never countenance were it aimed at another group risks influencing institutions in our States.

And unlike Harvard, our States stand against antisemitism.

Our States also have a strong interest in the interaction between antidiscrimination and the First Amendment. Harvard has failed to protect Jewish and Israeli students on its campus since at least October 7, 2023. *See* Dkt. 70 at 7 ("Members of the Jewish and Israeli communities at Harvard experienced treatment that was vicious and reprehensible."). Harvard invokes the First Amendment to distract from its failure to protect Jewish students in violation of Title IV, which the federal government cited as its reason for freezing funding. But the bottom line is that the First Amendment does not allow institutions to violate Title VI. Universities that accept federal funding

must live up to their obligations to protect Jewish students, just like they protect students of other nationalities, ethnicities, and religions. That is why the Attorneys General of Iowa, Alaska, Arkansas, Florida, Georgia, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, and Texas seek to aid the Court as *amici curiae* with a brief highlighting some of the problems with Harvard's First Amendment arguments.

## ARGUMENT

Harvard published a 311-page report on the constant and rampant antisemitism on its campus. This discrimination is in line with Harvard's notorious history of discriminating against Jewish students in admissions. *See SFFA*, 600 U.S. at 257 (Thomas, J., concurring). Like that discrimination, Harvard's current, suffocating atmosphere of antisemitism is illegal. And that illegal conduct is not protected by the First Amendment. The upshot of Harvard's argument is that it can violate laws against invidious discrimination by having the foresight to criticize the enforcers before they enforce the law. That outrageous claim fails: universities that accept federal funds have no First Amendment right to discriminate against Jews.

At least some Harvard professors might be familiar with the concept of revealed preferences; that choosing among options shows what the chooser values. For example, Harvard could easily enforce its own rules and policies to stop the virulent antisemitism on its campus. Doing so would protect the vital research, education, and more that, according to Harvard itself, relies on federal grants and subsidies. Yet it chooses to place that research and education at risk to instead protect virulent antisemitism. Harvard's revealed preferences are revealing indeed. The First Amendment, however, does not oblige the federal government to fund institutions the privilege antisemitism over federal dollars. Receiving federal dollars is contingent upon obeying federal antidiscrimination laws—and the First Amendment does not nullify that.

### I. Just like Bob Jones University, Harvard's Discrimination is Not Protected by the First Amendment.

Just like Harvard today, Bob Jones University asserted that the First Amendment prohibited a prospective removal of federal benefits—there, tax exempt status. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 603 (1983). Just like Harvard today, Bob Jones University contended that revoking those benefits after a finding of discrimination did not follow the proper process. *Id.* at 596. And just like Harvard today, despite the First Amendment defense, "the Government has a fundamental, overriding interest in eradicating [] discrimination in education," *id.* at 604—there, based on race; here, based on ethnicity. As the Supreme Court did with Bob Jones, the Court should find that the federal government need not continue to shower benefits on institutions that continue to practice illegal discrimination. Instead, it is whether the federal government is obligated to continue to provide grants and funding while Harvard insists on discriminating against Jews—or, most charitably, contends that it is working to fix its discrimination issue.

Even viewing Harvard's position in the most sympathetic manner—that its flow of federal cash should not be cut off while it works to combat antisemitism—does nothing for it. For Harvard's contention that it is working to combat antisemitism on campus is unserious: it continues to reward those perpetuating the antisemitic smog choking its campus. For example, a group of protesters surrounded an identifiably Jewish student in Harvard Square, yelling "shame" at him as he was assaulted by the protesters. Harvard's Antisemitism Report, at 108, https://perma.cc/2QS7-4YE6. Two graduate students were "charged with assault in connection with the incident." *Id.* Yet Harvard has not punished those students. Instead, one of them was "appointed as class marshal by Harvard Divinity School at the upcoming graduation ceremony;" the other "was awarded a $65,000 Harvard Law School fellowship." Mathilda Heller, *Two Harvard Students Who Assaulted Jewish Peer Receive Honors, $65,000 Fellowship*, The Jerusalem Post, http://bit.ly/4e0gQcQ (May 26, 2025). Even Bob Jones University's discrimination did not extend to rewarding assault.

Harvard's 311-page report on itself is littered with incidents demonstrating the frequency and severity of the antisemitic conduct on campus—conduct unjustifiable and appalling in both

content and scope. And one cannot imagine that had two graduate students been charged with assault for their role in surrounding an identifiably Hindu, or Muslim, or Sikh student in Harvard Square and yelling "shame" at him as he was attacked—much less a black student—Harvard would bestow them with fellowships or graduation honors.

Harvard both admits that it has a problem with antisemitism and acknowledges that problem as the reason it needs a multi-agency Task Force to Combat Antisemitism. *See* Dkt. 70 at 11–12. Yet when the federal government acted to rectify that acknowledged violation of federal law through a negotiated process, Harvard cried retaliation. *Id.* at 23 ("Harvard engaged in constitutionally protected conduct (1) when it refused the Government's demands . . . and (2) when it filed this lawsuit."). Its characterization of its refusal to follow federal nondiscrimination law as First Amendment speech is sheer chutzpah. *See Breneman v. United States ex rel. FAA*, 381 F.3d 33, 36 n.4 (1st Cir. 2004) (acknowledging the "chutzpah doctrine"); *see also Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 937 & n.5 (D.C. Cir. 1991) (subcontractor claimed contractor was negligent for relying on subcontractor's assurances).

Illegal conduct accomplished through speech is still illegal conduct. For example, in *Animal Legal Defense Fund v. Reynolds*, the Eighth Circuit upheld an Iowa law that prohibited false or deceptive speech used to commit a trespass. 89 F.4th 1065, 1068 (8th Cir. 2024). While a law criminalizing the speech alone could have faced different scrutiny, the challenged law tied the speech to the illegal conduct and thus was constitutional. *Id.* Similarly, Harvard cannot inoculate itself from responsibility for its illegal discrimination by contending that the punishment is retaliatory: If the punishment is retaliation for violating federal antidiscrimination law, there is no First Amendment issue. Even more is this so if Harvard contends, as it appears to, that the federal government's merely undertaking a proceeding to determine whether the law was broken is itself barred by the First Amendment.

**II. Harvard Is Confused About Fault and Antidiscrimination Laws.**

This suit is not the only example of Harvard's lack of understanding of its federal-law antidiscrimination obligations. On May 13, 2025, the U.S. Department of Justice began investigating reports of racial discrimination by the Harvard Law Review after receiving evidence from a whistleblower. Aaron Sibarium, *Harvard Law Review Retaliates Against Alleged Leaker—And Demands He Press Free Beacon to Destroy Documents*, The Washington Free Beacon, https://perma.cc/ZW3W-T252 (June 6, 2025). The Law Review on May 22, in a passionate embrace of irony, formally reprimanded the whistleblower for speaking to the DOJ—a violation not just of federal law, but its own non-retaliation policy. It also ordered the whistleblower to spoliate documents despite DOJ's litigation hold. *Id.* After DOJ reminded the Law Review that retaliation was illegal, it withdrew the reprimand and contended that its order to "delete or return" the documents was not an order to destroy documents. *Id.*; *see also* 42 U.S.C. § 2000e-3.

Antidiscrimination law prohibits "retaliation against an individual who has complained about discriminatory practices." *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 115 (1st Cir. 2024) (quoting *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009)). Such a complaint need not prove a violation; it must merely "rest on a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Id.* (quoting *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999)). Here, a law student who saw what he believed to be discriminatory practices, at a University that recently was held by the U.S. Supreme Court to have systematically violated antidiscrimination law, alerted the authorities to the violation. And Harvard Law Review's response was to retaliate against the whistleblower.

Contrast the Harvard Law Review's retaliation with the federal government's actions. Harvard Law Review must follow antidiscrimination law; it acted against the whistleblower because he reported a violation of the law—a reprimand that itself violated the law. Similarly, as a recipient of federal funds, Harvard must follow antidiscrimination law. The federal government's

acting against Harvard is not illegal retaliation—it is enforcement of the antidiscrimination law that Harvard is flouting.

There is strong evidence of Harvard's discriminatory animus, and the First Amendment does not shield it from consequences. This Court should deny summary judgment and allow the federal government to proceed with enforcing the law. Perhaps if Harvard faces consequences for violating federal antidiscrimination law, it will finally stop violating federal antidiscrimination law. After all, "[t]he way to stop discrimination [against Jews] is to stop discriminating [against Jews]." *Parents Involved in Community Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007).

**CONCLUSION**

The Court should render summary judgment for the defendants.

By: */s/ Nathaniel M. Lindzen*

BRENNA BIRD
*Attorney General*
*State of Iowa*
ERIC WESSAN
*Solicitor General*
Iowa ICIS: AT0014313
(515) 823- 9177
eric.wessan@ag.iowa.gov
1305 E Walnut Street

NATHANIEL M. LINDZEN
MA Bar No. 689999
Law Office of Nathaniel M. Lindzen
57 School Street
Wayland, MA 01778
Phone: (212) 810-7627
Email: nlindzen@corpfraudlaw.com

Dated: June 23, 2025

**ADDITIONAL COUNSEL**

TREG TAYLOR
Attorney General of Alaska

JAMES UTHMEIER
Attorney General of Florida

TIM GRIFFIN
Attorney General of Arkansas

CHRIS CARR
Attorney General of Georgia

THEODORE E. ROKITA
Attorney General of Indiana

KRIS KOBACH
Attorney General of Kansas

LIZ MURRILL
Attorney General of Louisiana

ANDREW T. BAILEY
Attorney General of Missouri

AUSTIN KNUDSEN
Attorney General of Montana

MICHAEL T. HILGERS
Attorney General of Nebraska

DREW WRIGLEY
Attorney General of North Dakota

GENTNER DRUMMOND
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

MARTY JACKLEY
Attorney General of South Dakota

KEN PAXTON
Attorney General of Texas

**LOCAL RULE 7.1 CERTIFICATION**

I hereby certify that counsel for amicus curiae has conferred with counsel for the parties who did not oppose the motion.

*/s/ Nathaniel M. Lindzen*
NATHANIEL M. LINDZEN

**CERTIFICATE OF SERVICE**

I certify that on June 23, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which automatically sends email notification of such filing to registered participants. Any other counsel of record will receive the foregoing via email in PDF format.

*/s/ Nathaniel M. Lindzen*
NATHANIEL M. LINDZEN