IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>        Defendants. | Case No. 1:25-cv-11048<br><br>Leave to File Granted on June 20, 2025 (ECF 188) |

# BRIEF OF *AMICUS CURIAE*
# THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW

**The Louis D. Brandeis Center for Human Rights Under Law**
L. Rachel Lerman*
Jeffrey I. Lang*
Rebecca L. Harris*
1717 Pennsylvania Avenue NW
Suite 1025
Washington, D.C. 20006
rlerman@brandeiscenter.com
jlang@brandeiscenter.com
rharris@brandeiscenter.com

*\* Admitted pro hac vice*

**Libby Hoopes Brooks & Mulvey, P.C.**
Douglas S. Brooks (BBO No. 636697)
260 Franklin Street
Boston, Massachusetts 02110
(617) 338-9300
dbrooks@lhbmlegal.com

*Counsel to Amicus Curiae The Louis D. Brandeis Center for Human Rights Under Law*

# **TABLE OF CONTENTS**

INTERESTS OF *AMICUS CURIAE* .................................................................................................. 1

INTRODUCTION .......................................................................................................................... 2

ARGUMENT .................................................................................................................................. 3

I.     THIS COURT SHOULD REJECT *AMICI*'S CHALLENGES TO HARVARD'S INCORPORATION OF IHRA INTO ITS NON-DISCRIMINATION POLICIES BECAUSE THEY ARE OUTSIDE THE SCOPE OF THIS LITIGATION. ..................... 3

II.    *Amici*'s arguments are, in any event, meritless. .................................................... 3

        A.    *Amici*'s Challenges to Harvard's Incorporation of IHRA into Its Non-Discrimination Policies Are Based on Mischaracterizations of IHRA. .................. 3

            1. Harvard agreed to incorporate IHRA into its non-discrimination policies pursuant to a binding settlement with the Brandeis Center. ............................ 3

            2. IHRA provides a clear understanding of what constitutes anti-Semitism, which is essential to tackle anti-Semitic discrimination and harassment. .................. 6

            3. IHRA does not punish or chill speech. .............................................................. 8

            4. IHRA does not define Jewish identity. ............................................................ 10

# TABLE OF AUTHORITIES

**Cases**

*Dalombo Fontes v. Gonzales,* 498 F.3d 1 (1st Cir. 2007) ....................................................... 2, 3

*Frankel v. Regents of Univ. of California*, 744 F. Supp. 3d 1015 (C.D. Cal. 2024) ................... 6

*Kestenbaum v. President & Fellows of Harvard Coll.*,
    743 F. Supp. 3d 297 (D. Mass. 2024) ..................................................................................... 6

*McClanahan v. Trump*, No. 3:25-CV-05025-MDH, 2025 WL 1643500
    (W.D. Mo. June 9, 2025) ....................................................................................................... 10

*Lane v. First Nat. Bank of Bos*., 871 F.2d 166 (1st Cir. 1989) ................................................ 2, 3

*Louis D. Brandeis Ctr. for Hum. Rts. Under L. v. President & Fellows of Harvard Coll.*,
    No. CV 24-11354-RGS (D. Mass.) ......................................................................................... 1

*Groff v. DeJoy*, 600 U.S. 447 (2023) ......................................................................................... 10

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div*., 450 U.S. 707 (1981) ....................................... 10

*United States v. Sturm, Ruger & Co*., 84 F.3d 1 (1st Cir. 1996) ............................................ 2, 3

**Statutes**

TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d ................................... 3, 5, 10

**Other Authorities**

Anti-Defamation League (ADL), *Anti-Zionist Language Left and Right Vilifies Jews*
    (April 4, 2023), https://www.adl.org/resources/article/anti-zionism-antisemitism-how-anti-zionist-language-left-and-right-vilifies-jews ........................................................................... 6

The Brandeis Center, FAQs About Defining Anti-Semitism, https://brandeiscenter.com/wp-content/uploads/2024/01/guide_faqs_antisemitism-2022c.pdf ............................................ 8

Combat Antisemitism Movement, *Adoptions & Endorsements of the IHRA Working Definition of Antisemitism*, https://ihra.combatantisemitism.org/ .......................................................... 8

Exec. Order No. 13899, 84 Fed. Reg. 68779 (Dec. 11, 2019) ....................................... 2-3, 5, 10

Harvard University, Press Release: *The Brandeis Center and Jewish Americans for Fairness in Education Agree with Harvard to Settle Title VI Litigation* (Jan. 21, 2025) .......................... 4

Harvard University Office for Community Conduct, Frequently Asked Questions, https://hwpi.harvard.edu/communityconduct/frequently-asked-questions ............................ 5

Hearing on Examining Anti-Semitism on College Campuses, U.S. House of Representatives Committee on the Judiciary, *Statement of Paul Clement* (Nov. 17, 2017) ............................ 9

IHRA, Working Definition of Anti-Semitism, https://holocaustremembrance.com/resources/working-definition-antisemitism .......... 1, 7, 8

K. L. Marcus, The Definition of Anti-Semitism (Oxford University Press 2015) ........... 6, 8

K. L. Marcus, *The Legally Binding Character of the [IHRA] Working Definition of Anti-Semitism*, 27 Lewis & Clark L. Rev. 1265 (2024) ......................................................... 5

K. L. Marcus, *Why Universities Need a Definition of Anti-Semitism*, The Jerusalem Post (July 6, 2015), https://www.jpost.com/opinion/why-universities-need-a-definition-of-anti-semitism-408178 ................................................................................................ 7

*Transcript: What Harvard, MIT and Penn Presidents Said at Antisemitism Hearing*, Roll Call (Dec. 13, 2023), https://rollcall.com/2023/12/13/transcript-what-harvard-mit-and-penn-presidents-said-at-antisemitism-hearing/ ................................................................................ 4

This *amicus* brief is submitted on behalf of The Louis D. Brandeis Center for Human Rights Under Law (the "Brandeis Center"), a nonprofit, non-partisan organization established to advance the civil and human rights of the Jewish people and promote justice for all.

## INTERESTS OF *AMICUS CURIAE*

The Brandeis Center engages in research, education, and legal advocacy to combat anti-Semitism on college and university campuses and in K-12 schools, the workplace, and other aspects of American life. It empowers Jewish Americans by training them to understand their legal rights and educates administrators and employers on best practices to combat racism and anti-Semitism. A clear and common understanding of anti-Semitism is essential to the Brandeis Center's mission to protect Jewish students, faculty and other members of college and university campuses from the pernicious forms of anti-Semitism. The Brandeis Center is uniquely qualified to address the surging tide of anti-Semitism on college and university campus, as well as the application of civil rights laws to stem the tide.

The Brandeis Center has a specific interest in ensuring that Harvard meets its legal obligations to take action against anti-Semitic discrimination and harassment. On May 22, 2024, the Brandeis Center filed an action in this Court against Harvard because of its failure to address an egregious pattern of anti-Semitic harassment. *Louis D. Brandeis Ctr. for Hum. Rts. Under L. v. President & Fellows of Harvard Coll.*, No. CV 24-11354-RGS (D. Mass.). On January 21, 2025, the Brandeis Center and Harvard announced that they had entered into a settlement resolving those claims. Under the terms of that agreement, Harvard agreed to incorporate the International Holocaust Remembrance Alliance definition of anti-Semitism ("IHRA"),[1] including accompanying examples, applied in the manner described in guidance issued by the U.S. Department

---

[1] *See* IHRA, Working Definition of Anti-Semitism, https://holocaustremembrance.com/resources/working-definition-antisemitism ["the Definition"].

1

of Education's Office for Civil Rights ("OCR") in 2021 and 2024. Based on that agreement, this Court granted the parties' joint motion to dismiss that action. The Brandeis Center thus has a direct interest in the administration and enforceability of its agreement with Harvard, aspects of which have been misrepresented in the briefs of certain *amici curiae* submitted in support of Harvard.

## INTRODUCTION

The Brandeis Center submits this brief for the limited purpose of responding to the briefs submitted by *amici curiae* A Jewish Voice for Peace, Inc. ("JVP"), Harvard Undergraduate Palestine Solidarity Committee ("PSC"), the Middle East Studies Association of North America, Inc. ("MESA") and 27 Jewish Scholars of Jewish Studies ("27 Scholars") (collectively, "*Amici*"). *Amici*'s briefs improperly challenge Harvard University's ("Harvard") binding agreement with the Brandeis Center to incorporate IHRA into its existing Non-Discrimination and Anti-Bullying Policies, consistent with its obligations under federal law.

Because the Brandeis Center's settlement agreement with Harvard is not at issue in the amended complaint or any of the parties' motions, *Amici*'s challenges are improper. *See Dalombo Fontes v. Gonzales,* 498 F.3d 1, 2 (1st Cir. 2007) ("[W]e will not address an issue raised by an amicus that was not seasonably raised by a party to the case."); *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 6 (1st Cir. 1996) ("[A]n amicus cannot introduce a new argument into a case."); *see also Lane v. First Nat. Bank of Bos.*, 871 F.2d 166, 175 (1st Cir. 1989).

To the extent the Court nevertheless decides to consider Harvard's incorporation of IHRA into its non-discrimination policies, *Amici*'s arguments should be rejected as meritless. Even before entering into its settlement agreement with the Brandeis Center, Harvard had pledged to take account of IHRA in its non-discrimination policies by certifying that it was in compliance with Executive Order ("EO") 13899, issued in 2019, which states that OCR "shall" consider the

2

IHRA definition in response to claims of anti-Semitic harassment and discrimination, 84 Fed. Reg. 68779 (Dec. 11, 2019), and with similar guidance issued by the Office of Civil Rights of the Department of Education ("OCR"), the office responsible for enforcing Title VI of the Civil Rights Act of 1964 ("Title VI").

## ARGUMENT

### I. THIS COURT SHOULD REJECT *AMICI*'S CHALLENGES TO HARVARD'S INCORPORATION OF IHRA INTO ITS NON-DISCRIMINATION POLICIES BECAUSE THEY ARE OUTSIDE THE SCOPE OF THIS LITIGATION.

*Amici*'s briefs, purportedly in support of Harvard's motion for summary judgment, challenge Harvard's incorporation of IHRA into its existing non-discrimination policies. But that issue is not before the Court. Neither Harvard nor the Government has raised the issue in their respective pleadings or motions. Because *Amici* do not address a case or controversy among the parties to the action, their challenges are improper. *Dalombo,* 498 F.3d at 2; *Sturm*, 84 F.3d at 6; *Lane,* 871 F.2d at 175. In asking the Court to decide a claim that no party has asserted, and which none of *Amici* has standing to raise, *Amici* improperly seek an advisory opinion on a matter not in controversy. The Court should disregard these arguments for this reason alone.

### II. *AMICI*'S ARGUMENTS ARE, IN ANY EVENT, MERITLESS.

**A.** ***Amici*'s Challenges to Harvard's Incorporation of IHRA into Its Non-Discrimination Policies Are Based on Mischaracterizations of IHRA.**

**1. Harvard agreed to incorporate IHRA into its non-discrimination policies pursuant to a binding settlement with the Brandeis Center.**

The Brandeis Center's action against Harvard arose out of its failure to apply its non-discrimination policy to anti-Semitic discrimination. As detailed in the Brandeis Center's complaint in that case, even before Hamas' October 7, 2023 terrorist attack on Israel, an outside investigator hired by Harvard concluded that Harvard's Kennedy School had created "a hostile learning environment" and "denigrated" students "on the basis of their Israeli national origin and Jewish ethnicity and ancestry," in violation of guidance provided by OCR and the White House.

3

*Brandeis Ctr. v. Harvard*, Complaint ¶¶ 4-5, 68-69 (D. Mass. May 22, 2024).  Harvard formally accepted the investigative findings but refused to take remedial action because, in its view, the discrimination against Israelis and Jews raised "complex issues of pedagogy."  *Id.* ¶ 76.  And in the immediate aftermath of the Hamas terrorist attacks, as harassment of Jews and Israelis on Harvard's campus turned violent, Harvard not only refused to enforce its non-discrimination policy; it provided support to the perpetrators.  *Id.* at ¶¶ 10-12, 111, 158.  Harvard's toleration of anti-Semitism crystalized in then-President Claudine Gay's testimony before the House Committee on Education and the Workforce, when she was unable to say whether a call for the genocide of Jews would violate Harvard's rules on bullying and harassment.[2]

After the Brandeis Center defeated Harvard's motion to dismiss, the parties entered into settlement negotiations that resulted in a binding agreement.  A keystone of the agreement was Harvard's incorporation of IHRA into its non-discrimination policies to ensure a clear and transparent understanding of anti-Semitism.  In its press release announcing the settlement, Harvard explained that it had "agreed to implement a series of steps, building on measures that [it] has undertaken over the past year as part of its commitment to combatting anti-Semitism"— including, "consistent with [its] existing Non-Discrimination and Anti-Bullying Policies ("NDAB"), which prohibit discrimination on the basis of ancestry, religion, national origin, or political beliefs, [the incorporation of IHRA] including accompanying examples applied in the manner described in guidance issued by [OCR] in 2021 and 2024.[3]

---

[2] *Transcript: What Harvard, MIT and Penn Presidents Said at Antisemitism Hearing*, Roll Call (Dec. 13, 2023), https://rollcall.com/2023/12/13/transcript-what-harvard-mit-and-penn-presidents-said-at-antisemitism-hearing/.
[3] Harvard University, Press Release: *The Brandeis Center and Jewish Americans for Fairness in Education Agree with Harvard to Settle Title VI Litigation* (Jan. 21, 2025), https://www.harvard.edu/media-relations/2025/01/21/press-release-settlement-harvard-brandeis-ctr-jafe/.

4

Harvard's incorporation of IHRA was an overdue and necessary response to the virulent and unchecked anti-Semitic discrimination and harassment on its campus. As Harvard acknowledged, the application of IHRA was consistent with guidance issued by OCR, the federal agency directly responsible for enforcing Title VI, and with EO 13899 issued on December 11, 2019, which affirmed that Jewish students are covered by Title VI and stated that OCR "shall" consider the IHRA definition, including its examples, in responding to claims of anti-Semitic harassment and discrimination. On January 19, 2021, OCR notified recipients of federal funds that OCR had incorporated IHRA into its guidance as required by EO 13899 and would consider it when evaluating anti-Semitism claims. *See* K. L. Marcus, *The Legally Binding Character of the [IHRA] Working Definition of Anti-Semitism*, 27 Lewis & Clark L. Rev. 1265, 1278-81 (2024) (citations omitted). Like other post-secondary educational institutions, Harvard regularly files certifications with OCR agreeing to follow federal statutes, executive orders and OCR guidance as a condition of receiving federal funding. *Id.* at 1281-83 (citations omitted).

Harvard also agreed to post online a Frequently Asked Questions ("FAQs") document relating to its NDAB, recognizing that "[f]or many Jewish people, Zionism is a part of their Jewish identity," and stating that "[c]onduct that would violate the [NDAB] if targeting Jewish or Israeli people can also violate the policy if directed toward Zionists." Harvard Univ. Office for Community Conduct, FAQs, https://hwpi.harvard.edu/communityconduct/frequently-asked-questions. Examples include: "excluding Zionists from an open event, calling for the death of Zionists, applying a 'no Zionist' litmus test for participation in any Harvard activity, using or disseminating tropes, stereotypes, and conspiracies about Zionists (*e.g.*, 'Zionists control the media'), or demanding a person who is or is perceived to be Jewish or Israeli to state a position on Israel or Zionism" to escape harassment or discrimination. *Id*. These examples provide clear

notice that discriminatory conduct targeting Jewish or Israeli students, even if couched as an attack on "Zionists," will not shield perpetrators from discipline.

### 2. IHRA provides a clear understanding of what constitutes anti-Semitism, which is essential to tackle anti-Semitic discrimination and harassment.

Misunderstandings about what anti-Semitism means—and the forms it takes—have long plagued efforts to address anti-Semitic conduct. Modern versions of anti-Semitism draw not only on ancient tropes, but also coded attacks on Zionism and the Jewish State, which often stand in for the Jewish people in modern anti-Semitic parlance. Sadly, this is nothing new: Soviet propogandists have for decades used the term "Zionist" or "zio" in this coded way. *See* K. L. MARCUS, THE DEFINITION OF ANTI-SEMITISM, p. 175 (Oxford University Press 2015). This practice has become commonplace among anti-Semites in academia who seek to avoid being labeled as racists.[4]

Since October 7, 2023, anti-Semitism has proliferated in the educational sphere, very often in the guise of attacks on "Zionists." *See, e.g., Frankel v. Regents of Univ. of California*, 744 F. Supp. 3d 1015, 1026 (C.D. Cal. 2024) (ruling that UCLA could be liable for allowing students to bar Jewish peers from common areas unless they disavowed the state of Israel); *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 311, 304 n.4 (D. Mass. 2024) (denying Harvard's motion to dismiss a complaint challenging its decisions to permit a speaker who claimed "that Israelis and Zionist Jews … harvest organs of dead Palestinians" (internal quotations omitted) and to allow anti-Semitic messages to proliferate on a

---

[4] *See, e.g.*, Anti-Defamation League (ADL), *Anti-Zionist Language Left and Right Vilifies Jews* (April 4, 2023), https://www.adl.org/resources/article/anti-zionism-antisemitism-how-anti-zionist-language-left-and-right-vilifies-jews (Because "anti-Zionism is much more socially acceptable than classic antisemitism … many anti-Zionist activists can embed historic antisemitic tropes in their criticism of Israel without significant pushback.").

university-wide group app, *e.g.,* "claiming that 'all of you Zionists' are '[k]illers and rapists of children'"). A clear and analytically effective definition of anti-Semitism is necessary to address modern anti-Semitism. The definition must capture the ancient tropes and modern euphemisms while allowing for free expression, debate, and nuance in particular cases. *See*, *e.g.*, K. L. Marcus, *Why Universities Need a Definition of Anti-Semitism*, The Jerusalem Post (July 6, 2015), https://www.jpost.com/opinion/why-universities-need-a-definition-of-anti-semitism-408178.

The International Holocaust Remembrance Alliance, a group of over 30 countries that joined together in 1998 to combat anti-Semitism globally, worked to come up with a definition that fits this bill. IHRA, issued in 2016, is the result of a 15-year-long democratic decision-making process involving intergovernmental bodies, governments, parliaments, scholars and civil society leaders. Holocaust survivor and Nobel Peace Prize laureate Elie Wiesel was a leading inspiration for the definition and a key initiator of a process that ultimately led to its approval by the Alliance.

IHRA is comprised of a prefatory statement followed by a series of examples. The prefatory statement provides that "Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities." *See* the Definition, *supra*. IHRA expressly states that criticism of Israel akin to criticism of any other state is **not** anti-Semitic. To distinguish legitimate political speech from anti-Semitism, it includes examples that illustrate when attacks on Israel cross the line into anti-Semitism—*e.g.*, when they are phrased in terms of classic anti-Semitic tropes that portray the State of Israel as possessed of demonic powers, that call for the destruction of the Jewish State along with its Jewish inhabitants, or that apply standards to the State of Israel that are applied to no other country. *Id*.

7

The Israel-specific examples are necessary ***not*** because anti-Israel rhetoric invariably is anti-Semitic—IHRA is clear it is not—but because modern anti-Semitism is often masked as "anti-Zionism." While it has been socially unacceptable since World War II to engage in explicit anti-Semitic discourse, or Jew-hatred, anti-Semitism continues to rise, often disguised through veiled references to Israel or "Zionists." *See* K. L. MARCUS, THE DEFINITION OF ANTI-SEMITISM, p. 175 (Oxford University Press 2015). Distinguishing between what is and what is not anti-Semitic enhances and promotes free expression, allowing persons to freely criticize the policies of the State of Israel, while enabling anti-Semitic attacks to be recognized and identified.

Since 2016, over 1,200 governments and non-governmental entities across the globe, including many in the U.S., have adopted IHRA.[5] IHRA has been endorsed by world leaders and U.S. Presidents of both parties and is used by numerous federal departments and agencies, including the State Department and OCR. Given this widespread usage and bi-partisan support, IHRA is widely viewed as the gold standard for defining anti-Semitism. A rigorously studied and widely accepted definition enhances enforcement of non-discrimination policies by promoting clarity; increasing consistency and predictability of enforcement; improving data collection through uniform standards across jurisdictions; and facilitating further research and policy making.[6]

### 3. IHRA does not punish or chill speech.

IHRA recognizes that mere "criticism of Israel similar to that leveled against any other country" is ***not*** anti-Semitic. *See* the Definition, *supra*. *Amici* simply ignore this statement in

---

[5] *See* Combat Antisemitism Movement, *Adoptions & Endorsements of the IHRA Working Definition of Antisemitism*, https://ihra.combatantisemitism.org/ ("As of February 1, 2025, 1,266 entities worldwide have adopted the definition [including] 37 [U.S.] state governments … along with 98 city and county governments.").
[6] *See* The Brandeis Center, FAQs About Defining Anti-Semitism, https://brandeiscenter.com/wp-content/uploads/2024/01/guide_faqs_antisemitism-2022c.pdf.

8

arguing that IHRA prevents them from making such criticism. *Amici* couch their arguments in terms of the First Amendment, which does not apply to private entities like Harvard. Harvard's use of IHRA, consistent with federal civil rights laws, does not violate Harvard's own robust free speech rules either.

Simply put, the incorporation of IHRA into Harvard's non-discrimination policies does not regulate speech. Speech—even when it delegitimizes, demonizes or applies double standards to Jews—remains protected under the First Amendment as well as private school policies and rules protecting speech in similar terms. As former Solicitor General Paul Clement explained to the U.S. House Committee on the Judiciary—as it considered the proposed Anti-Semitism Awareness Act, which incorporates IHRA—IHRA "offers a rule of evidence, not a restriction on speech":

> Current law already requires universities to prevent severe, pervasive, and objectively offensive peer-to-peer harassment motivated by several forms of prohibited animus, including anti-Semitism. The Act does not alter what qualifies as sufficient harassment under that statute or the relevant precedents that distinguish between prohibited harassment and protected speech. All the Act does is help Education Department and university officials figure out which severe, pervasive, and objectively offensive harassing conduct actually reflects anti-Semitic intent. In that way, this bill offers a rule of evidence, not a restriction on speech. The fact that certain speech is protected does not mean that officials have to close their eyes to that speech entirely when determining the impetus behind a particularly severe act of harassment.[7]

The incorporation of IHRA into Harvard's non-discrimination policies provides greater transparency and clarity as to the meaning of anti-Semitism while honoring the University's rules protecting free speech and expression.

---

[7] U.S. House of Representatives Committee on the Judiciary, Hearing on Examining Anti-Semitism on College Campuses, *Statement of Paul Clement* at 4-5 (Nov. 17, 2017), https://www.congress.gov/115/meeting/house/106610/witnesses/HHRG-115-JU00-Wstate-ClementP-20171107.pdf.

### 4. IHRA does not define Jewish identity.

*Amici* 27 Scholars and JVP argue that incorporation of IHRA into Harvard's NDAB imposes a standard for determining Jewish religious belief or practice. Not so. A federal court already has rejected similar arguments challenging EO 13899, which, as noted above, directs OCR to apply IHRA when assessing claims of anti-Semitic discrimination or harassment. In *McClanahan v. Trump*, No. 3:25-CV-05025-MDH, 2025 WL 1643500 (W.D. Mo. June 9, 2025), the plaintiff argued, *inter alia*, that the EO violates the Establishment Clause by favoring one sort of religious tenet. The court disagreed, pointing to the order's wholly secular purpose—namely, to enforce the mandate of Title VI, not to put the government's imprimatur on any specific belief or practice. *Id*. at *6 (citations omitted); *see also id.* at *3-4, 7-8 (rejecting free speech claims).

By the same token, when the U.S. Supreme Court acknowledged the right of a Seventh Day Adventist to honor the Sabbath by abstaining from work, *Groff v. DeJoy*, 600 U.S. 447 (2023), it was protecting a religious practice that other members of the community might not share. But in applying the Constitution and laws that protected Groff's practices and beliefs as a Seventh Day Adventist, the Court was not imposing that identity and religious practices on all other members of the community who do not follow Groff's Sabbath observance. *Cf. Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715 (1981) ("Intrafaith differences ... are not uncommon among followers of a particular creed" and resolution of such differences is outside the scope of judicial review).

### **CONCLUSION**

For the foregoing reasons, the Court should disregard the briefs filed on behalf of *amici* A Jewish Voice for Peace, Inc., Harvard Undergraduate Palestine Solidarity Committee, Middle East Studies Association of North America, Inc., and 27 Jewish Scholars of Jewish Studies.

| | |
|---|---|
| Dated: June 23, 2025 | Respectfully submitted, |
| **THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW** | **LIBBY HOOPES BROOKS & MULVEY, P.C.** |
| L. Rachel Lerman* <br> Jeffrey I. Lang* <br> Rebecca L. Harris* <br> 1717 Pennsylvania Avenue NW <br> Suite 1025 <br> Washington, D.C. 20006 <br> rlerman@brandeiscenter.com <br> jlang@brandeiscenter.com <br> rharris@brandeiscenter.com | /s/ *Douglas S. Brooks* <br> Douglas S. Brooks (BBO # 636697) <br> 260 Franklin Street <br> Boston, Massachusetts 02110 <br> (617) 338-9300 <br> dbrooks@lhbmlegal.com |

*\* Admitted pro hac vice*

*Counsel to Amicus Curiae The Louis D. Brandeis Center for Human Rights Under Law*

11

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the Court's CM/ECF system on June 23, 2025 and will be sent electronically to registered participants on the Notice of Electronic Filing.

**LIBBY HOOPES BROOKS & MULVEY, P.C.**

/s/ *Douglas S. Brooks*
Douglas S. Brooks
260 Franklin Street
Boston, Massachusetts 02110
dbrooks@lhbmlegal.com