**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>　　　　Plaintiff,<br><br>　-vs.-<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br><br>　　　　Defendants. | Case No. 25-cv-11048-ADB<br><br>**LEAVE TO FILE GRANTED ON 6/26/25** |

**AMICUS BRIEF OF THE NATIONAL JEWISH ADVOCACY CENTER, INC.**

## INTEREST OF AMICUS[1]

The National Jewish Advocacy Center, Inc. (NJAC) is a nonprofit organization committed to combating antisemitism. NJAC has particular expertise in the application of the First Amendment on campus. The proper resolution of this case is a matter of utmost concern to NJAC because it involves holding Harvard University accountable for its ongoing failure to protect the Jewish members of its community from acts of anti-Jewish hate, and will set the precedent for other schools that have also been too slow to confront antisemitism.

## SUMMARY OF THE ARGUMENT

No institution is simply entitled to billions of taxpayer dollars. The federal government has the absolute right to attach conditions to the programs that it funds, especially when it comes to compliance with applicable civil rights laws. Harvard has admitted that it has an antisemitism problem and that "there is still much work to do." ECF 59, Amended Complaint ("Amended Compl.") at p. 2. The federal government, for good reason, does not believe that Harvard is adequately protecting Jewish members of its community and does not want to support this obnoxious facade.

Indeed, the Government is not the only one to have reviewed Harvard's "responses" and determine that they were inadequate. Just a short time ago, a federal court did the same:

> [A]s pled, Harvard's reaction was, at best, indecisive, vacillating, and at times internally contradictory. … Indeed, in many instances, Harvard did not respond at all. To conclude that the SAC has not plausibly alleged deliberate indifference would reward Harvard for virtuous public declarations that for the most part, according to the allegations of the SAC, proved hollow when it came to taking disciplinary measures against offending students and faculty. In other words, the facts as pled show that Harvard failed its Jewish students.

---

[1] Counsel of record for Plaintiffs and Defendants both consented to the filing of this amicus brief. No person or entity aside from Amicus, its members, or its respective counsel made a monetary contribution to the preparation or submission of this brief.

1

*Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 309–10 (D. Mass. 2024).

Instead of addressing Defendant's contractually provided for and discretion-based reasons for the termination of the Plaintiff's grants, the Plaintiff conjures a free speech conflict it would prefer to engage in rather than the dispute that pertains to the facts herein.

Contrary to what Harvard's leadership may argue, this is not a First Amendment issue. Harvard is free to keep on discriminating to its own heart's content—just not on the government's dime. The government is not suppressing free speech but exercising its own speech. And the Supreme Court has been crystal clear about this.

To add an element of absurdity to Harvard's refusal to address the Plaintiff's contractual rights, Harvard admits that "[t]he Government has not characterized any of its actions as a 'termination of or refusal to grant or to continue assistance' under 42 U.S.C. § 2000d-1," (ECF 59, Amended Compl. at p. 7) but then proceeds as if the government *had* done so because in Harvard's estimation "the effect of the Government's decisions is the same." That is simply not how laws work. Harvard had specific contracts for each grant, each with specific policy cancellation provisions, which the government *did* invoke. The termination of contracts by a party whose right to terminate is provided for in those very contracts does not become a Title VI or free speech issue simply because the terminated party is a university.

## ARGUMENT

I. **THERE IS NO VIEWPOINT DISCRIMINATION IN THE GOVERNMENT DECIDING NOT TO FUND DISCRIMINATORY BEHAVIOR.**

   A. *Harvard Has an Antisemitism Problem.*

There is no debate that Harvard has had a problem with antisemitic incidents on its campus. Multiple reports, congressional testimony, public investigations, and even statements from university leadership have acknowledged the escalation in harassment, exclusion, and

2

intimidation targeting Jewish students, and the lack of an adequate response on the part of the University.

The Department of Education's Office for Civil Rights (OCR) opened a Title VI investigation into Harvard following widespread documentation of such conduct.[2]  As part of the federal OCR inquiry and recent settlements, Harvard acknowledged a wave of antisemitic acts—including vandalism, exclusion from student organizations, and intimidation of Jewish and Zionist students.[3]  The December 2023 congressional hearings on campus antisemitism further highlighted this reality.  That Harvard has an antisemitism problem is not speculative.

      B. *The Federal Government has Determined that Harvard is not Taking its Antisemitism Problem Seriously.*

The federal government has formally determined that Harvard University has not taken the problem of antisemitism on campus seriously.  In December 2023, the U.S. Department of Education's Office for Civil Rights (OCR) opened a Title VI investigation into Harvard following credible allegations that the university failed to respond appropriately to antisemitic harassment, exclusion, and intimidation targeting Jewish students.[4]

---

[2] *See, e.g.* U.S. Dep't of Educ., Office for Civil Rights, *U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment* (Mar. 10, 2025), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-sends-letters-60-universities-under-investigation-antisemitic-discrimination-and-harassment.

[3] *See* Jacob Gershman, *Harvard University Reaches Campus Antisemitism Settlements*, Wall St. J., Jan. 21, 2025, https://www.wsj.com/us-news/education/harvard-university-antisemitism-settlements-c0c9c1ed?utm;
see also Sebastian B. Connolly & Julia A. Karabolli, Harvard, *Kestenbaum Agree to Confidential Settlement in Antisemitism Lawsuit*, CAD Panama News (May 16, 2025), https://www.cadpanama.com/harvard-kestenbaum-agree-to-confidential-settlement-in-antisemitism-lawsuit/.

[4] *See* U.S. Department of Education, Office for Civil Rights, *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools*, https://ocrcas.ed.gov/open-investigations?field_ois_state=All&field_ois_discrimination_statute=All&field_ois_type_of_discrimination=All&items_per_page=20&field_ois_institution=harvard&field_ois_institution_type

This is the determinative basis for the government's decision. That Harvard may disagree with that basis is immaterial vis-a-vis the government's determination that its contracts with Harvard no longer serve the public interest and the government's concomitant exercise of its termination rights.

However, even under Harvard's own First Amendment theory, the government's decision to reassess funding and tax-exempt status is entirely lawful. The university's conduct raises serious concerns not only under Title VI but also under the public policy doctrine that governs eligibility for § 501(c)(3) tax-exempt status. Institutions that fail to uphold basic civil rights obligations cannot simultaneously claim entitlement to federal funds while insulated from scrutiny.

These issues are of course entirely beside the point as they pertain to the Plaintiff as a contractor of the federal government. Even in the absence of explicit breach, the government may invoke the termination for convenience clauses to cease performance if doing so serves the public interest. Accordingly, even if a technical breach or no breach by Harvard of its contract with the U.S. government is all that exists, which is not the case here, the government has the authority to terminate contracts for convenience when it is in the public interest.

As the Federal Circuit noted, the government may act to protect public funds from being used to subsidize noncompliant or harmful behavior. *See Bob Jones University v. United States*, 461 U.S. 574 (1983). The Court presumes "that government contract officials exercise their duties in good faith." *BWhit Infrastructure Solutions, LLC v. United States*, 2023 WL 7179267, at *8 (Fed. Cir. Oct. 31, 2023) (*quoting Am-Pro Prot. Agency, Inc. v. United States*, 281 F.3d

---

=All&field_open_investigation_date_1=&field_open_investigation_date_2=&field_open_investigation_date=&field_open_investigation_date_3=.

1234, 1239 (Fed. Cir. 2002)); *see also Sanders v. U.S. Postal Serv.*, 801 F.2d 1328, 1331 (Fed. Cir. 1986).

The government not only has the right to act but an obligation to do so where federal dollars are implicated in potential violations of law and public trust. Moreover, such action is to be presumed under law to be in good faith. *See Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995). To overcome that presumption, a contractor must show through "well-nigh irrefragable proof" that the government had a specific intent to injure it. *Id. See also JKB Solutions & Servs., LLC v. United States,* 18 F.4th 704 (Fed. Cir. 2021).

Under federal common law, bad faith and abuse of discretion present high bars. The Federal Circuit has held that government officials are presumed to "act[] in good faith when contracting." *JKB Solutions & Servs., Inc. v. United States*, 18 F.4th 704, 709 (Fed. Cir. 2021). *See also T & M Distributors*, *Inc. v. United States*, 185 F.3d 1279, 1285 (Fed. Cir. 1999) (affirming summary judgment where plaintiff had provided "just bald assertions and speculation of wrongful conduct"); *see also Caldwell*, 55 F.3d at 1581. The government breaches this standard when, for example, it terminates a contract for convenience "simply to acquire a better bargain from another source." *JKB Solutions & Servs.*, 18 F.4th at 709 (citation and quotation omitted).

In *Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002), the United States Court of Appeals for the Federal Circuit held that the presumption that Government officials act in good faith may only be overcome by clear and convincing evidence. *Id.* at 1239 ("[W]e believe that clear and convincing most appropriately describes the burden of proof applicable to the presumption of the government's good faith."). In addition, the plaintiff must show "specific intent to injure" the plaintiff. *Id.* at 1241. No demonstration of intent to

5

injure has been credibly alleged nor can misplaced arguments about First Amendment protections be contorted to aver bad faith in the rescission of federal contracts terminable for convenience.

      C. *The Decision not to Fund is a Decision About Government Speech, not Private Speech.*

As a matter of law, there is a fundamental difference between the government suppressing free speech and the government simply choosing how to spend its own dollars. To argue otherwise would be to suggest that the federal government is constitutionally *obligated* to fund programs it disagrees with, which is not only irrational but also has no basis in law.

As previously stated, the Supreme Court in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.* held that "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." 576 U.S. 200, 200 (2015); *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009). Without this exemption, the government "would [simply] not work." *Walker*, 576 U.S. at 207 (expressing the impossibility of ever creating or running a program with which even one person disagreed). "[I]t is not easy to imagine how government could function if it lacked th[e] freedom to select the messages it wishes to convey." *Id*. (internal quotations removed) (*citing Summum*, 555 U.S. at 468).

In this case, the government does not even seek to fund a controversial program. Instead, it seeks merely to *not* fund; it desires to disassociate itself and its public funds from divisive and discriminatory practices. The Court has consistently held that doing so is permissible for the government because it "'can speak for itself.'" *Walker*, 576 U.S. at 208 (*quoting Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000)).

Furthermore, in *Walker*, the state decided it did not want to convey a message, real or imagined, of racism, hatred, or discrimination by allowing a Confederate flag on its license

plates. *See id*. at 207-08. The federal government desires to do exactly the same thing here: "[P]romote a program, espouse a policy, [and] take a position" that distances the state from divisive, harmful, and often hateful discriminatory speech and conduct that run counter to its message and its core values. *Id.* at 208. The government wishes to do so because it has direct control over the messages conveyed with its funding, sole control over the medium of funding decisions, and because the public often associates the medium of federal funding with government speech and government support. *Id.* at 212-14.

The federal government is no different than the State of Texas or any other government entity. In order to operate, it requires the ability to make decisions that promote the values of its constituents without having to cater to every opposing interest. Moreover, the government is not requiring Harvard to cease supporting the blatant antisemitism on its campus; the government just doesn't have to pay for it.

And finally, for those who would raise the specter of viewpoint discrimination, the answer is once again right there in *Walker*:

> When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says . . . . Were the Free Speech Clause interpreted otherwise, government would not work…."[I]t is not easy to imagine how government could function if it lacked th[e] freedom". . . . We have therefore refused [t]o hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals."

*Id.* at 207-08 (*quoting Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467–68 (2009); *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)).

II. <u>HARVARD'S PROCEDURAL CLAIMS FAIL</u>

    A. *<u>The District Court Lacks Jurisdiction Because the Tucker Act Requires That Claims to Enforce Contracts with the Federal Government Be Brought in the Court of Federal Claims.</u>*

7

Harvard's claims seek to enforce grant contracts and demand continued federal funding. However, this is a contractual dispute over monetary relief, which falls under the exclusive jurisdiction of the U.S. Court of Federal Claims—not the District Court.

Harvard is wrongly attempting to use the Administrative Procedure Act (APA) to circumvent the Tucker Act. The APA only permits review where no other adequate court remedy exists. But when a party seeks funds allegedly owed under a contract or grant, the Tucker Act provides that remedy, thereby barring review under the APA. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985).

If another statute (like the Tucker Act) provides a specific process or remedy, then APA review is typically precluded. *See Widakuswara v. Lake*, No. 25-5144 (D.C. Cir. May 3, 2025), which found that an APA claim cannot be advanced in lieu of claims under the Tucker Act where claims of non-payment by the government are being challenged.

      B. *Harvard's Ultra Vires Claims Lack Merit.*

Harvard argues that it can enforce its contractual rights via a freestanding non-statutory ultra vires claim with respect to both its constitutional and statutory claims, outside the scope of the APA. Title VI, however, allows judicial review only as otherwise provided by law, making the APA a fallback mechanism when no other statute applies. Here, the Tucker Act supplies the governing review framework and Harvard cannot circumvent this by asserting an ultra vires claim even on constitutional grounds.

Although courts of equity may enjoin unconstitutional actions by the government, that principle does not apply to claims seeking to enforce contractual rights which are legal in nature—not equitable. As such, the type of relief available in equity is not available here, and any such remedy is displaced by the Tucker Act.

### C. *Harvard's APA Claims Fail Because the Government's Offer Letter and Secretary McMahon's Letter Are Not Final Agency Actions.*

Harvard cannot challenge the Government's Offer Letter or the Secretary McMahon Letter under the APA because neither constitutes final agency action. Only the termination letters, which end specific contracts, qualify as final and are potentially reviewable under the APA.

### D. *Regardless, Harvard is Not Entitled to a Permanent Injunction Under the APA.*

Under the APA, remedies are limited to correcting the specific agency action at issue—not granting forward-looking injunctive relief. Courts may vacate unlawful agency actions, but they may not order specific performance of a contract or impose vague, open-ended prohibitions on future conduct. The proper remedy, if a violation is found, is to remand the matter to the agency for reconsideration.

Harvard's request to "permanently enjoin any similar action" is vague and impermissibly broad. It would constrain the Executive Branch from exercising its lawful discretion in future grant decisions, including its ability to correct past errors or pursue valid enforcement actions. Multiple federal agencies are currently investigating Harvard for potential violations. An injunction would also undermine ongoing civil rights enforcement actions and effectively immunize Harvard from future enforcement.

Harvard's requested relief would create a dangerous precedent, potentially shielding universities from meaningful enforcement of antisemitism protections. Granting such sweeping relief would embolden future inaction and strip federal agencies of their ability to protect vulnerable student populations. Courts must preserve the government's ability to take decisive action when civil rights are at risk.

E.  *Harvard's Motion for Summary Judgment Should be Rejected.*

Even under Harvard's flawed reasoning, its motion for immediate judgment fails the strict summary judgment test.  A court may only grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In evaluating such a motion, the court must view all evidence in the light most favorable to the non-moving party (here, the Government) and draw all reasonable inferences in that party's favor.  *Id*.

Detailed records of antisemitic incidents, coupled with the University's varied responses (or lack thereof), reveals material facts that are genuinely and adamantly disputed.  These disputes are directly determinative of whether a hostile environment, actionable under Title VI, in fact existed and whether Harvard acted with "deliberate indifference" to it.  Harvard therefore cannot assert that these facts are "undisputed".

The very question of whether protected speech becomes unprotected conduct is fact dependent.  For example, in *Kestenbaum v. President and Fellows of Harvard College*, No. 1:24-cv-10092 (D. Mass. prior to its settlement on May 16, 2025), the court's decision to deny Harvard's motion to dismiss in part underscored that allegations of pervasive antisemitic incidents on college campuses, coupled with claims of inadequate institutional response, raise complex factual questions regarding Title VI compliance that cannot be summarily dismissed or decided as a matter of law.

## CONCLUSION

For the above reasons, the Plaintiff's Motion for Summary Judgment should be denied, and the Defendants' Cross-Motion for Summary Judgment should be granted.

Dated: June 26, 2025                               Respectfully submitted,

/s/ George W. Vien
George W. Vien (BBO No. 547411)
Pietro A. Conte (BBO No. 707055)
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
T: (617)-720-2880
F: (617)-720-3554
gwv@dcglaw.com
pac@dcglaw.com

/s/ Mark Goldfeder
Mark Goldfeder (*pro hac vice* forthcoming)
Tel: (917)-301-8746
mark@njaclaw.org
Anat Beck (*pro hac vice* forthcoming)
Tel: (518)-258-0560
Anat@njaclaw.org
Lauren Israelovitch (*pro hac vice* forthcoming)
Tel: (914)-222-3828
Lauren@njaclaw.org
Ben Schlager (*pro hac vice* forthcoming)
Tel: (917)-495-5790
ben@njaclaw.org
National Jewish Advocacy Center, Inc.
3 Times Square
New York, NY 10036

*Attorneys for Amicus Curiae National Jewish Advocacy Center, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), on June 26, 2025.

/s/ Pietro A. Conte
Pietro A. Conte

11