UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, et al., | * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 25-cv-11048-ADB |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | * * * * * | |
| Defendants. | * | |

| | | |
|---|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS – HARVARD CHAPTER, et al., | * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 25-cv-10910-ADB |
| UNITED STATES DEPARTMENT OF JUSTICE, et al., | * * * * | |
| Defendants. | * | |

## **MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiffs President and Fellows of Harvard College ("Harvard"), the American

Association of University Professors ("AAUP"), the AAUP–Harvard Faculty Chapter ("AAUP-

Harvard"), the International Union, United Automobile, Aerospace and Agricultural Implement

Workers of America ("UAW"), the Harvard Graduate Students Union ("HGSU–UAW"), and

Harvard Academic Workers ("HAW–UAW") (the "Organizational Plaintiffs" and, collectively

with Harvard, "Plaintiffs") bring two related suits against various federal agencies and agency

heads (collectively, the "Defendants"), challenging the decision to freeze and ultimately

terminate nearly $2.2 billion in federal grants to Harvard.[1]

More specifically, Plaintiffs collectively challenge the decision to freeze and then

terminate the grants on three primary grounds, contending that (1) the funding decisions were

made in response to Harvard's refusal to capitulate to Defendants' content- and viewpoint- based

demands and its subsequent decision to file a lawsuit, in violation of the First Amendment; (2)

the grant terminations did not comply with the procedural requirements of Title VI and are thus

invalid; and (3) Defendants acted arbitrarily and capriciously when they froze and subsequently

terminated funding to Harvard, as they failed to provide a reasoned explanation for how or why

freezing and terminating funding would further the goal of ending antisemitism, to weigh the

importance of the grants they sought to terminate, and to consider decades of reliance

engendered through their prior practice of funding research at Harvard.  Defendants' initial and

primary argument in response is that this Court lacks jurisdiction over these claims, all of which

belong in the Federal Court of Claims pursuant to the Tucker Act.

Currently before the Court are the parties' cross motions for summary judgment.  In

particular, Harvard and Defendants both move for summary judgment as to all Harvard's claims.

---

[1] These two related suits are <u>President & Fellows of Harvard College v. United States
Department of Health & Human Services, et al.</u>, 25-cv-11048 (D. Mass. April 21, 2025) and
<u>American Association of University Professors – Harvard Faculty Chapter et al. v. United States
Department of Justice, et al.</u>, 25-cv-10910 (D. Mass. April 11, 2025).  The dockets for the two
suits, when cited, are referred to as "<u>Harvard</u>" and "<u>AAUP</u>."

[Harvard, ECF No. 69; Harvard, ECF No. 185].  Defendants move for summary judgment as to all of the Organizational Plaintiffs' claims, while the Organizational Plaintiffs move for summary judgment only as to their First Amendment, Title VI, and arbitrary and capricious claims, but not their separation of powers, spending clause, and due process claims.  [AAUP, ECF No. 74; AAUP, ECF No. 103].  For the reasons stated herein, Harvard's motion for summary judgment, [Harvard, ECF No. 69], is **GRANTED IN PART** and **DENIED IN PART**; the Organizational Plaintiffs' motion for summary judgment, [AAUP, ECF No. 74], is **GRANTED IN PART** and **DENIED IN PART**; and Defendants' motions for summary judgment, [Harvard, ECF No. 185; AAUP, ECF No. 103], are **GRANTED IN PART** and **DENIED IN PART**.

# I.    BACKGROUND

## A.    Material Facts[2]

### 1.    Harvard and its Task Force on Combatting Antisemitism

Harvard University is the oldest institution of higher learning in the United States and one of the world's leading research universities.  [Harvard SOF ¶ 1].  As of April 14, 2025, as relevant here, Harvard was a recipient of active grants from the following federal agencies: the National Endowment of the Arts ("NEA"); the National Institutes of Health ("NIH"); other subagencies of the Department of Health and Human Services ("HHS"); the National Science Foundation ("NSF"); the Office of Personnel Management ("OPM"); the Department of Justice ("DOJ"); the Department of Agriculture ("USDA"); the Department of Education ("Department of Education"); the Department of Energy ("Energy"); the Department of Defense ("DoD"); the National Aeronautics and Space Administration ("NASA"); and the Department of Housing and Urban Development ("HUD").  [Id. ¶ 4].[3]  Harvard's research programs—funded in part by these government grants—serve as training grounds for the next generation of scientific, technological, medical, and public health leaders, with grants supporting the work of more than a thousand

---

[2] The Court draws facts from the administrative record, see [Harvard, ECF No. 224], which is "the focal point for judicial review," Camp v. Pitts, 411 U.S. 138, 142 (1973), as well as from the parties' Rule 56.1 statements of facts, as far as they are based on the administrative record, and which include 1) Defendants' responses to Harvard's Statement of Material Facts, [Harvard, ECF No. 186-1 ("Harvard SOF")]; 2) Harvard's responses to Defendants' Statement of Material Facts, [Harvard, ECF No. 212 ("Defendants' SOF")]; and 3) Defendants' responses to AAUP's Statement of Material Facts, [AAUP, ECF No. 105 ("AAUP SOF")].  With the consent of the parties, [Harvard, ECF No. 229 at 9], the Court includes certain facts from outside the administrative record in this fact section.  See Bos. Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 48 (1st Cir. 2016).  These are considered infra where relevant or as otherwise explained.

[3] Although not listed in Harvard's statement of facts, the record reflects that Harvard also received grants from the Department of Commerce that were terminated.  See [ECF No. 74-5].

graduate students and postdoctoral fellows who collectively pioneer life-altering advancements that benefit the nation.  [Id. ¶¶ 2–3]; see also [id. ¶ 2 ("Harvard's researchers have pioneered life-altering advancements in improving cancer prevention and treatment, understanding neurodegenerative disorders, creating a new class of antibiotics to treat infections, and studying how spaceflight affects blood cell formation in astronauts.")].

Since Hamas, a well-recognized terrorist organization, violently attacked and kidnapped Israeli citizens on October 7, 2023, Harvard, like many other universities, has experienced increased tensions and violence aimed at its Jewish community.  See generally [HHSHarv_0000013–55]; [GSAHarv_00000137–445].  In response, in January 2024, Harvard President Alan Garber formed a Presidential Task Force on Combatting Antisemitism and Anti-Israeli Bias (the "Harvard Task Force") and charged it with "identifying the root causes of and contributing factors to bias-based behaviors on campus" and "recommending approaches to combat bias and to mitigate its impact on campus."  [Harvard SOF ¶ 8]  Harvard concurrently began making policy and other changes aimed at ensuring that its campus is safe and welcoming for Jewish and Israeli students, including: disciplining students and faculty who violate applicable policies; enhancing programs and policies designed to address bias and promote ideological diversity and civil discourse; adopting new accountability procedures and clarified policies, including specifying that protests are not permitted in classrooms, libraries, dormitories, dining halls, Harvard offices, and other places where they would interfere with normal university activities; expressly prohibiting unauthorized encampments, exhibits, and displays on campus; supplementing existing safety and security measures; refining procedures and protections for reporting misconduct; and making several leadership and personnel changes, all of which were publicly announced and widely reported.  [Id. ¶¶ 5–8].

2.    The Federal Task Force to Combat Antisemitism

On January 29, 2025, President Trump signed Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism."  [HHSHarv_00000001].  It requires the heads of all executive agencies or departments to submit reports identifying all civil and criminal authorities or actions within their jurisdictions "that might be used to curb or combat anti-Semitism, and containing an inventory and analysis of all pending administrative complaints, as of the date of the report, against or involving institutions of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism."  [AAUP SOF ¶¶ 1–2].  Executive Order 14188 explicitly reaffirmed Executive Order 13899, which President Trump issued during his first term, on December 11, 2019, and which invokes Title VI enforcement as the means for agencies to combat antisemitism on university campuses.  [Id. ¶ 3].[4]

Pursuant to Executive Order 14188, on February 3, 2025, DOJ announced the formation of a multi-agency Task Force to Combat Antisemitism ("Federal Task Force"), which included representatives from the Department of Education, HHS, and other agencies.  [Harvard SOF ¶ 19].  Senior Counsel to the Assistant Attorney General for Civil Rights Leo Terrell was selected to lead the Federal Task Force.  [Harvard SOF ¶ 19]; see also [AAUP SOF ¶ 4]; [ECF No. 77-1].  Terrell had previously announced, on October 20, 2024, just prior to the election of President Trump, that "Harvard will lose much more effective January 2025."  [Harvard SOF ¶ 20].

---

[4] The full texts of Executive Orders 14188 and 13899 are not part of the administrative record, but the Court takes judicial notice of them, as they are public records.  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (permitting judicial notice of "official public records"); Michael Cetta, Inc. v. Admiral Indem. Co., 506 F. Supp. 3d 168, 173 (S.D.N.Y. 2020) (taking judicial notice of executive orders as public documents or matters of public record).

On March 31, 2025, Harvard received a letter from the Federal Task Force (the "March 31 Letter") notifying Harvard of a "review" of more than $8.7 billion in federal funding to Harvard.  [Harvard SOF ¶ 21.  The March 31 Letter linked the review of funding to purported antisemitism on Harvard's campus, [id. ¶ 22], stating that it was sent "in light of" the Federal Task Force's "comprehensive review of Federal contracts with certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment," [GSAHarv_00000003]; see also [AAUP SOF ¶ 16.  The same day, HHS, the Department of Education, and the General Services Administration ("GSA") also publicly announced that they were "reviewing" Harvard's federal funding for failing to address antisemitism.  [AAUP SOF ¶¶ 14–15].

### 3. The April 3 Letter

The Federal Task Force followed up several days later, on April 3, 2025, with an "official notice" of certain "pre-conditions" that Harvard was required to satisfy to continue receiving federal funding (the "April 3 Letter").  [Harvard SOF ¶ 23]; see also [AAUP SOF ¶ 19]; [HHSHarv_00000062].  Specifically, the April 3 Letter described "several broad, non-exhaustive areas of reform that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars," including governance reforms "to foster clear lines of authority"; oversight for "biased programs that fuel antisemitism" and to "improve viewpoint diversity"; and "shutter[ing]" diversity, equity, and inclusion ("DEI") programs that "teach" certain things.  [Harvard SOF ¶ 24]; see also [AAUP SOF ¶ 20 (restating all nine areas of proposed reform verbatim)].  It expressly invoked Title VI, alleging that Harvard had "failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964," and it called

for "immediate cooperation in implementing these critical reforms" as a prerequisite for "Harvard University's continued financial relationship with the United States government." [Harvard SOF ¶ 25]; see also [AAUP SOF ¶ 21].  Nowhere in the April 3 Letter did the government 1) acknowledge the reforms and commitments Harvard had already made, including commissioning the Harvard Task Force, which issued its report and recommendations shortly thereafter, 2) identify any specific instances of antisemitism on Harvard's campus, or 3) specify how Harvard failed to respond to any such acts of antisemitism in a way that violated Title VI. [Harvard SOF ¶¶ 26–28]; see also [AAUP SOF ¶ 22].

On the same day, the government sent Harvard's counsel an email asking to schedule a meeting, along with an attached document that contained a "[m]enu" of further demands. [Harvard SOF ¶ 29].  Many of those demands mirrored those contained in the April 3 Letter, such as a "choice" between "install[ing] new leadership in problematic depts" and "receivership."  [Harvard SOF ¶ 30].  The document also stated that the government sought a "[s]enior secured 1st Lien on all Harvard assets which will serve as collateral to pay back government from Harvard in event of non-compliance in the future."  [Harvard SOF ¶ 31].

### 4.  The April 11 Letter

Eight days later, on April 11, 2025, HHS, GSA, and the Department of Education sent another letter to President Garber (the "April 11 Letter").  [Harvard SOF ¶ 32]; see also [AAUP SOF ¶ 23].  The April 11 Letter, which "incorporate[d] and supersede[d]" the April 3 Letter, asserted that Harvard had "failed to live up to . . . [the] civil rights conditions that justify federal investment" and laid out a list of conditions that Harvard had to satisfy to "maintain Harvard's financial relationship with the federal government."  [Harvard SOF ¶ 33]; see also [AAUP SOF ¶ 24].  Specifically, among other demands, the government's conditions included:

- "commission[ing] an external party . . . to audit the student body, faculty, staff, and leadership for viewpoint diversity, such that each department, field, or teaching unit must be individually viewpoint diverse";
- "abolish[ing] all criteria, preferences, and practices, whether mandatory or optional, throughout [Harvard's] admissions and hiring practices, that function as ideological litmus tests"; for departments, fields, and teaching units found to "lack viewpoint diversity";
- "hiring a critical mass of new faculty" and "admitting a critical mass of students" to provide the government's preferred balance of viewpoint diversity; "reform[ing] and restructuring" governance;
- "reducing the power held by students and untenured faculty," as well as "the power held by faculty . . . more committed to activism than scholarship"; and
- "shutter[ing]" all DEI programs "through structural and personnel changes."

[Harvard SOF ¶ 34]; see also [AAUP SOF ¶ 25 (restating demands verbatim)].

The final arbiter of compliance with these conditions would be the federal government, which would retain the right to audit Harvard (or review final audit reports by third parties) until at least the end of 2028. [Harvard SOF ¶ 35]. Like the April 3 Letter, the April 11 Letter stated that the government expected "immediate cooperation in implementing these critical reforms" if the University wanted to "maintain Harvard's financial relationship with the federal government." [Harvard SOF ¶ 36]; see also [AAUP SOF ¶ 26]. Once again, nowhere in the April 11 Letter did the government 1) acknowledge the reforms and commitments Harvard had already made, including around the Harvard Task Force, which by then had issued its preliminary recommendations, 2) identify any specific instances of antisemitism on Harvard's campus, or 3) specify how Harvard failed to respond to any such acts of antisemitism in a way that violated Title VI. [Harvard SOF ¶¶ 37–39].

### 5. Harvard's April 14 Rejection

In short order, on April 14, 2025, Harvard responded with a letter rejecting the terms set forth in the April 3 and April 11 Letters. [HHSHarv_00000104–05]; see also [Harvard SOF ¶ 41]; [AAUP SOF ¶ 27]. Specifically, Harvard's rejection letter explained that it remained

"committed to fighting antisemitism and other forms of bigotry in its community" and detailed "substantial policy and programmatic measures" undertaken in the "past 15 months" to make Harvard "a very different place today from where it was a year ago."  [HHSHarv_00000104].  It objected to the fact that the April 11 Letter "disregard[ed] Harvard's efforts and instead present[ed] demands that, in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court."  [HHSHarv_00000104–05].  Harvard made clear that it would not "accept the government's terms" because it was "not prepared to agree to demands that go beyond the lawful authority of this or any administration," and because "[n]either Harvard nor any other private university can allow itself to be taken over by the federal government."  [HHSHarv_00000105].

That same day, President Garber reiterated Harvard's position in a public message to the Harvard community, in which he explained that "[a]lthough some of the demands outlined by the government are aimed at combating antisemitism, the majority represent direct governmental regulation of the 'intellectual conditions' at Harvard."  [Harvard SOF ¶ 42].  He reaffirmed that Harvard "do[es] not take lightly [its] moral duty to fight antisemitism," noting the steps Harvard had already taken and would continue to take to fulfill that duty, but also declared that "[n]o government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue." [Id.].

6.   The April 14 Freeze Order

Within hours of Harvard's refusal to comply with the government's demands, the Federal Task Force "announc[ed] a freeze on $2.2 billion in multi-year grants and $60M in multi-year contract value to Harvard University" (the "April 14 Freeze Order").  [Harvard SOF ¶ 43]; see

also [AAUP SOF ¶ 31].  The April 14 Freeze Order cited "Harvard's statement today,"
[GSAHarv_00000013], as well "[t]he harassment of Jewish students" and "the troubling
entitlement mindset that is endemic in our nation's most prestigious universities and colleges—
[namely,] that federal investment does not come with the responsibility to uphold civil rights
laws."  [Harvard SOF ¶ 44]; see also [AAUP SOF ¶ 31].  It did not acknowledge Harvard's
communication from earlier that day outlining the measures that Harvard had taken and had
committed to take.  [Harvard SOF ¶ 45].  It also did not identify any specific instances of
antisemitism on Harvard's campus or specify how Harvard's actions violated Title VI.  [Id.
¶¶ 46–47].  The government issued the April 14 Freeze Order without holding any hearing or
submitting any report to Congress.  [Id. ¶ 48].

    In the days following the April 14 Freeze Order, the government immediately began
sending out stop work orders on certain grants, which required the cessation of all activities
related to those projects, seemingly without regard to the consequences for the projects or the
affected employees.  [Harvard SOF ¶ 67].  For instance, on April 14, 2025, Robert Foster,
Deputy General Counsel for HHS, announced to his HHS colleagues that HHS "has taken action
to pause payments on NIH grants to Harvard University . . . These payments are to remain
paused until further notice.  This will impact $2.172B in total grant funding . . . across 658
individual grants."  [AAUP SOF ¶ 61].  On April 16, 2025, DHS terminated two grants "totaling
over $2.7 million to Harvard University, declaring it unfit to be entrusted with taxpayer dollars."
[Harvard SOF ¶ 68].  On April 18, 2025, reports surfaced that the Director of NIH's Office of
Policy for Extramural Research Administration had informed other officials at NIH that the
agency had "received confirmation from HHS/IOS to hold off on making awards to schools
where the funds have been frozen, i.e., Columbia, Brown, Northwestern, Cornell, Weill-Cornell,

Harvard," and that "HHS/IOS has stated that we should not provide any communications to these schools about whether or why the funds are frozen." [Id. ¶ 53]. On April 18 and April 25, 2025, Jamie French of NSF sent emails to the Vice Provost for Research, John Shaw, stating that NSF had terminated six awards with a face value of $3,287,474. [AAUP SOF ¶ 73].

The April 14 Freeze Order was also immediately followed by an intensifying public pressure campaign, including from President Trump, regarding Harvard's federal funding and other federal benefits. On April 15, 2025, the President posted on social media, "[p]erhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness?' Remember, Tax Exempt Status is totally contingent on acting in the PUBLIC INTEREST!" [Harvard SOF ¶ 49]; [AAUP SOF ¶ 89]. The next day, the President further criticized Harvard on social media for "hiring almost all woke, Radical Left, idiots," and declared that Harvard "should no longer receive Federal Funds." [Harvard SOF ¶ 50]; [AAUP SOF ¶ 90]. Within the week, the President again denounced the university as "a Liberal mess," while referencing this lawsuit. [Harvard SOF ¶ 55]; [AAUP SOF ¶ 91]. On May 2, 2025, President Trump posted on social media: "We are going to be taking away Harvard's Tax Exempt Status. It's what they deserve!" [Harvard SOF ¶ 56]; [AAUP SOF ¶ 92].

### 7. The Harvard Task Force Report

On April 29, 2025, the Harvard Task Force released its final 311-page report that noted "numerous examples of students, staff, and faculty dedicated to renewing and strengthening the Harvard community" but also explicitly acknowledged the "alienating and hostile atmosphere" experienced by many Jewish and Israeli students at Harvard, as well as "instances where administrators and faculty at certain Harvard Schools seemingly fell short in their responsibility

to uphold principles of open inquiry, civility, and respectful disagreement within specific courses, programs, and events." [Harvard SOF ¶ 9]. To address these troubling findings, the Harvard Task Force recommended comprehensive changes to "campus culture and student experience" and "governance" at Harvard. [Id. ¶ 10]. The report called for changes in nine specific areas related to "campus culture and student experience": 1) admissions, 2) early student experiences, 3) academics, 4) academic offerings, 5) "co-curricular activities and residential life," 6) "building a pluralistic community," 7) religious life, 8) administrative infrastructure, and 9) "protests, complaints, and discipline." [Id.]. The report further recommended that Harvard:

- Create a dedicated leadership position "specifically tasked with addressing antisemitism and anti-Israel bias";
- Provide students with "substantially more opportunities to learn about antisemitism, Jewish history and culture, the history and politics of Israel, Zionism, and the Israeli-Palestinian conflict," and encourage classes to be cotaught where possible to help students ground their views "in established facts, rigorous scholarship, and adequately considered perspectives";
- Develop a channel for informal grievances and anonymous complaints;
- Ensure "greater consistency in disciplinary procedures" across Harvard's schools; and
- Provide more oversight by tenured faculty over "educational programs and instructor training."

[Id. ¶ 11]. The Harvard Task Force made clear that "the resolutions and the reforms" must come from Harvard. [Id. ¶ 12]. If "external parties . . . seek to compel adoption of some of [the] proposed reforms," the report observed, it "will make it more difficult for Harvard to fix itself." [Id.].

After the report's release, President Garber, on behalf of the university, stated that "Harvard cannot—and will not—abide bigotry" and that it was committed to "address[ing] with determination at every level of the University" the challenges identified in the report and would "act decisively" to do so. [Harvard SOF ¶ 13].

To that end, since the release of the report, Harvard has taken steps to centralize and strengthen its disciplinary procedures, including by empowering the President to call on a faculty panel of the University Committee on Rights and Responsibilities ("UCRR") to investigate, find facts, and impose discipline where students are alleged to have violated university policies. [Harvard SOF ¶ 14]. Harvard's Academic Council (the president, provost, deans, and other senior leaders) have also "develop[ed] and implement[ed] new recommendations" in order to "nurtur[e] a widespread sense of belonging and promot[e] respectful dialogue; revis[e] and implement[] policies, procedures, and training; and strengthen[] academic and residential life." [Id. ¶ 15]. Harvard's deans have reviewed recommendations concerning admissions, appointments, curriculum, and orientation and training programs, and were directed to submit "action plans" by June 2025 for each of Harvard's schools. [Id. ¶ 16].

           8.   The May 5 Freeze Order

On May 5, 2025, approximately one week following the release of the Harvard Task Force report, the Secretary of Education sent Harvard another letter (the "May 5 Freeze Order"), claiming that "[i]n every way, Harvard has failed to abide by its legal obligations" and stating that (1) "Harvard should no longer seek GRANTS from the federal government, since none will be provided," (2) "Harvard will cease to be a publicly funded institution," and (3) "today's letter marks the end of new grants for the University." [Harvard SOF ¶ 57]; see also [AAUP SOF ¶ 32]. The May 5 Freeze Order recited the government's objection to what it characterized as an imbalance of viewpoints in Harvard's governance, reiterated its earlier demands from the April letters, and stated that "[t]he Administration's priorities have not changed." [Harvard SOF ¶ 58];

see also [AAUP SOF ¶ 33].[5]  Once again, nowhere in the May 5 Freeze Order did the

government 1) acknowledge the reforms and commitments Harvard had already made, including

commissioning the Harvard Task Force and beginning to act on its recommendations, 2) identify

any specific instances of antisemitism on Harvard's campus, or 3) specify how Harvard failed to

respond to any such acts of antisemitism in a way that violated Title VI.  [Harvard SOF ¶¶ 59–

61].  The government issued the May 5 Freeze Order without holding any hearing or submitting

any report to Congress.  [Harvard SOF ¶ 62].

### 9.    The Termination Letters

Even before the May 5 Freeze Order, the Federal Task Force and the White House had

initiated an effort to identify both the total universe of grants to Harvard and those which were

eligible for termination.  [Harvard SOF ¶¶ 69–70].  Beginning as early as April 30, 2025, GSA,

in particular, was tasked with coordinating agency efforts to identify grants to Harvard, which

included compiling data points on grants, tracking their gross award value, and providing

template termination letters.  [May 19, 2025, Declaration of Josh Gruenbaum[6] ("Gruenbaum

Decl.") ¶ 10]; [AAUP SOF ¶ 34]; [NASA-AR03541 (GSA representative explaining he was

directed to "work with agencies to collect a few data points" on grants)].  On May 8, 2025, GSA

sent Defendant agencies a spreadsheet containing detailed information on 1,056 federal grants to

Harvard with a total face value of over $2.8 billion.  [AAUP SOF ¶¶ 36–37].  GSA then

identified a set of grants at each agency that GSA "asked [the Defendant agencies] to prepare . . .

_____

[5] On May 12, 2025, President Garber sent a letter to the Secretary of Education in response to the
May 5 Freeze Order, explaining that Harvard had implemented "meaningful reform and
recommendations designed to eliminate antisemitism and other forms of hate from our campus."
[Harvard SOF ¶ 63].
[6] Although not Bates-stamped, the Gruenbaum Declaration was provided to this Court as part of
the parties' joint administrative record.  [Harvard, ECF No. 224-23 at 52–55].

for . . . termination awaiting final greenlight from the White House," [AAUP SOF ¶ 38];
[USDA-HARV-AR-00001]; [GSAHarv_00000125–26], and then provided a template
termination letter, [Gruenbaum Decl. ¶ 10], which, in at least one instance, was described as "the
form the WH wants to see it in," [USDA-HARV-AR-00084]. Then at least one such proposed
termination letter was to be sent to White House officials for "review" by a "WH deadline of
5pm" on May 8, 2025, [NASA-AR03679, NASA-AR03682], before being sent to Harvard on
May 9, 2025, [AAUP SOF ¶ 71].

     Harvard ultimately received termination letters in early and mid-May from NIH, USDA,
Energy, DoD, NSF, HUD, the Department of Education, the Department of Commerce, and the
Centers for Disease Control and Prevention (collectively, the "Termination Letters").[7] [Harvard
SOF ¶ 73]; [AAUP SOF ¶¶ 42, 49, 57, 62, 68, 71, 75, 81]. The terminated grants related to all
manner of medical, scientific, technological, and other projects—including projects on breast
cancer detection and prevention, biological threats, overcoming antibiotic resistance, improving
neurologic outcomes for pediatric cancer survivors, developing drugs to treat long-term radiation
exposure and for chemotherapy, studying the effects of particulate matter exposure on military
veterans, and creating "technologies that provide energy-relevant minerals for economic and
national security." [Harvard SOF ¶ 74].

     Almost all of the Termination Letters cited a purported change in program goals or
agency priorities as justification for the terminations and invoked 2 C.F.R. § 200.340(a)(4),

---

[7] The majority of these Termination Letters appear in the administrative record.
[DoDHARV_00000039–40]; [EDHarvAR_0000011–12]; [ENERGY AR3932–33, 40–41
(duplicate)]; [HHSHarv_00000473–74]; [HUDHarvAR_0000063–64]; [NSF_Harvard000039–
40]; [USDA-HARV-AR00008–09]. Harvard has submitted two further Termination Letters that
do not appear in the record. [Harvard, ECF Nos. 74-5, 74-6].

which, as discussed further <u>infra</u>, provides that a federal agency may terminate an award "pursuant to the terms and conditions of the . . . award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." [Harvard SOF ¶ 77]; see also [AAUP SOF ¶¶ 42, 49, 57, 62, 68]. But see [AAUP SOF ¶¶ 78, 81, 85]. That said, no termination letter presented any program-specific rationale for the terminations or reflected that any program-specific consideration had occurred. [Harvard SOF ¶ 76]; see also [AAUP SOF ¶¶ 46, 53, 59, 65, 69, 72]. In support of the claim that Harvard's grant awards "no longer effectuate agency priorities," all but one of the Termination Letters cited to "recent events at Harvard University involving antisemitic action," "Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students," and Harvard's "refus[al] to take appropriate action . . . or implement necessary reforms." [Harvard SOF ¶ 78]; see also [AAUP SOF ¶¶ 43–44, 50–51, 57, 63, 69, 72, 74, 76, 83–84]. The Termination Letter that did not cite such concerns contained no explanation as to which agency priorities purportedly had changed or why Harvard's grant awards no longer aligned with agency priorities. [Harvard SOF ¶ 79]; see [AAUP SOF ¶¶ 71–72, 74, 79, 87]. Several of the Termination Letters specifically noted that no modification of the projects "could align the projects with agency priorities" because Harvard had failed to take "appropriate" action. [ENERGY AR3932]; [USDA-HARV-AR00008]; see also [HHSHarv_00000474 ("[N]o corrective action is possible here. That is because . . . the University has refused to take appropriate action.")].

None of the Termination Letters identified any specific instance of antisemitism on Harvard's campus, specified how Harvard failed to respond to any such acts of antisemitism in a way that violated Title VI, or reflected any effort to follow the Title VI procedural requirements that govern the termination of federal funding. [Harvard SOF ¶ 81]

17

On May 13, 2025, the Federal Task Force (which, again, is distinct from the Harvard Task Force) issued a press release stating that "Harvard University has repeatedly failed to confront the pervasive race discrimination and anti-Semitic harassment plaguing its campus" and that "[t]he Task Force fully supports the Trump Administration's multi-agency move to cut funding to Harvard, demonstrating the entire Administration's commitment to eradicating discrimination on Harvard's campus." [Harvard SOF ¶ 64]. The government did not engage with or acknowledge the many reforms and commitments Harvard had already made and committed to make, nor did it claim to be adhering to Title VI's detailed procedural requirements. [Harvard SOF ¶ 64]; see also [AAUP SOF ¶ 94].

### 10. Examples of Terminated Projects

As a result of the Termination Letters, work has been ordered to stop on a vast number of research projects across fields that are critical both nationally and worldwide. There is no obvious link between the affected projects and antisemitism. By way of example (although by no means an exhaustive list), Defendants have ordered immunologists overseeing a multi-school tuberculosis consortium to immediately stop research, [Harvard SOF ¶ 88]; a researcher at the Wyss Institute to halt his development of an advanced chip designed to measure NASA astronauts' radiation exposure during the upcoming Artemis II mission to the moon, [id. ¶ 89]; and another Wyss Institute scientist, a recipient of the nation's highest honor for technological achievement, to cease his research into Lou Gehrig's disease, [id. ¶ 90]. Officials at the Department of Veterans Affairs have begun the process of cutting funding for research into,

among other life-saving measures, "a predictive model to help V.A. emergency room physicians decide whether suicidal veterans should be hospitalized." [Id. ¶ 91].[8]

Harvard has submitted the details of one such grant termination to illustrate the chaotic impact of Defendants' rush to terminate funding without first considering its purpose, which specifically involves the Assured Microbial Preservation in Harsh or Remote Areas ("AMPHORA") Program. AMPHORA is managed by the Defense Advanced Research Projects Agency ("DARPA") and is aimed at increasing awareness of emerging biological threats. [Harvard SOF ¶¶ 84, 86]. A day after sending a termination letter to Harvard on May 12, 2025, DoD leadership informed officials at the agency that the Secretary of Defense had directed the cancellation of the grants and asked them to issue notices and stop work orders to individual grant recipients. [Id. ¶ 85]. The director of contracting at DARPA immediately followed up, imploring the agency to save the AMPHORA grant. [Id. ¶¶ 84, 86]. Specifically, he explained that:

> Harvard is currently the top performing team on the AMPHORA program. Inadequate knowledge of the biological threat landscape poses grave and immediate harm to national security. Development of critical technologies that enables bio surveillance and biocollection in austere, field forward locations bolsters national security and warfighter safety and lethality by enabling medical countermeasure development to new and emerging threats and provides biological threat intelligence to the deployed warfighter. This technology is significantly

---

[8] The Organizational Plaintiffs' SOF contains many other facts regarding research projects that Defendants do not dispute were terminated, and the Court refers the reader to these as well. They include, among others, grants related to: the health of young people, [AAUP SOF ¶ 123]; treating tuberculosis, [id. ¶¶ 124, 168]; reducing health disparities, [id. ¶ 134]; the effects of antiretroviral treatment for mothers with HIV and their children, [id. ¶ 140]; how different chromosomal backgrounds result in different risk for disease, [id. ¶ 146]; the health effects of environmental exposures on brain health, [id. ¶ 154]; how diets and lifestyle relate to cancer risk, [id. ¶ 162]; the effects of microgravity and radiation on astronauts, [id. ¶ 175]; understanding the neural circuits underlying motor skills, [id. ¶ 184]; and the impact of climate change-related heat stress on people worldwide, [id. ¶ 192].

outpacing the state-of-the art and provides a novel leap-ahead capability to the force. Harvard's effort is at a pivotal juncture in Phase 1 as they are just starting the microfluidic experiments that will give first indications of whether the program goal is achievable. They are also a critical integrator of multiple technologies that enable this effort and could not be readily reproduced.

[Id. ¶ 86]. Although nothing in the administrative record indicates that the Secretary of Defense acted on the DARPA director's request, [id. ¶ 87], and despite the termination notice from the government, DARPA personnel continued to engage with Harvard researchers, including requesting samples and a research update, [Harvard, ECF No. 221 ("Suppl. Shaw Decl.") ¶ 4]. Since it was continuing to work on the project at the direction of DARPA, Harvard requested payment, submitting a "Request for Advance or Reimbursement" for approximately $373,000 to DARPA on July 2, 2025. [Id. ¶ 5]. This reflected work performed on the AMPHORA project from May 1 through May 31, 2025, some of which was performed after the grant was purportedly terminated on May 12, 2025. [Id.]. On July 2, 2025, Harvard sent an email to the Director of DARPA's Contracts Management Office, asking DARPA to confirm whether the AMPHORA grant was still active, but received no response. [Id. ¶ 6]. Harvard did, however, receive full payment from DARPA for the July 2 invoice on July 8, 2025. [Id. ¶ 7].

11.     Grant Terminations and Threats Thereof Continue

After the flurry of termination letters in early- and mid-May 2025, the government's broadscale reductions in federal funding to Harvard continued. On May 20, 2025, HHS announced it was cutting an additional $60 million in multiyear grants to Harvard. [Harvard SOF ¶ 92]. On May 27, 2025, GSA targeted approximately $100 million in contracts, instructing agencies to "consider [their] contracts with Harvard University and determine whether Harvard and its services efficiently promote the priorities of the agency." [Id. ¶ 94]. Since Defendants first began sending the Freeze Orders and Termination Letters, Harvard has received notices of

termination for over 950 already-awarded federal research projects, [id. ¶ 82], including some notices that were received after the filing of the Amended Complaint, [id. ¶ 83].

Further, the government has continued to pressure Harvard in other ways. As examples, on May 26, 2025, the President stated that he was considering taking away "Three Billion Dollars" from "a very antisemitic Harvard," which he would then give to "TRADE SCHOOLS." [Harvard SOF ¶ 93]. On May 28, 2025, Defendant McMahon described the government's funding conversations with Harvard to date, stating:

> When we looked at different aspects of what Harvard was doing relative to anti-Semitism on its campuses they were not enforcing Title VI the way it should be. And we had conversations with President Garber and I expected that we would have more, but Harvard's answer was a lawsuit so that's where we find ourselves . . . I think the President is looking at this as, OK, how, how can we really make our point, and what are the things that Harvard and other universities are doing that we, that we have to call attention to?

[AAUP SOF ¶ 95]. That same day, during an interview in the Oval Office, President Trump said that Harvard is "hurting [itself]" by "fighting," and noted that "Columbia has been, really, and they were very, very bad . . . . But they're working with us on finding a solution." [Harvard SOF ¶ 95]. He further stated that Harvard "wants to fight. They want to show how smart they are, and they're getting their ass kicked"; "every time [Harvard] fight[s], they lose another $250 million"; and "[a]ll they're doing is getting in deeper and deeper and deeper." [Id.].

## B.    Procedural History

The Organizational Plaintiffs sued first, filing a complaint and a motion for a temporary restraining order on April 11, 2025, [AAUP, ECF Nos. 1, 4], although they withdrew the motion for a temporary restraining order on April 15, 2025, [AAUP, ECF Nos. 27, 29]. Harvard filed its action on April 21, 2025. [Harvard, ECF No. 1]. The Organizational Plaintiffs have since filed two amended complaints, one on May 5, 2025, [AAUP, ECF No. 50], and the other on May 20,

2025, [AAUP, ECF No. 64].  Harvard filed an amended complaint on May 13, 2025, [Harvard, ECF No. 59].

The Court held a status conference on April 28, 2025, at which time the parties elected to proceed directly to summary judgment.  [Harvard, ECF No. 47].  Pursuant to an agreed upon expedited briefing schedule, Plaintiffs filed their motions for summary judgment on June 2, 2025, [Harvard, ECF No. 69; AAUP, ECF No. 74]; Defendants opposed and filed cross motions for summary judgment on June 16, 2025, [Harvard, ECF No. 185; AAUP, ECF No. 103]; Plaintiffs replied on June 30, 2025, [Harvard, ECF No. 211; AAUP, ECF No. 110]; and Defendants replied on July 14, 2025. [Harvard, ECF No. 223; AAUP, ECF No. 130].

## II.    LEGAL STANDARD

Summary judgment is normally appropriate if the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "However, in cases involving review of agency action under the [Administrative Procedure Act ("APA")], the traditional Rule 56 standard does not apply due to the limited role of a court in reviewing the administrative record."  Bennett v. Murphy, 166 F. Supp. 3d 128, 139 (D. Mass. 2016) (citing Int'l Jr. Coll. of Bus. and Tech., Inc. v. Duncan, 802 F.3d 99, 106 (1st Cir. 2015)).  In particular, for summary judgment motions under the APA, the Court's review is ordinarily "limited to the administrative record," Lovgren v. Locke, 701 F.3d 5, 20 (1st Cir. 2012), and "[t]he 'entire case' on review is a question of law," Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citation omitted); id. ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal."); see also Doe v. U.S. Citizenship & Immigr. Servs., 239 F. Supp. 3d 297, 305 (D.D.C. 2017) ("Summary judgment is [] the mechanism for deciding whether as a matter of law the agency

22

action is supported by the administrative record and is otherwise consistent with the APA standard of review." (citation omitted)).

Judicial review of an APA claim "is narrow" because "the APA standard affords great deference to agency decisionmaking and because the [agency's] action is presumed valid." Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997). "Under this deferential standard of review, a court may set aside an administrative action if that action is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." 5 U.S.C. § 706(2)(A). When reviewing such an action, the Court "may not substitute [its] judgment for that of the agency, even if [it] disagree[s] with [the agency's] conclusions." Sig Sauer, Inc. v. Brandon, 826 F.3d 598, 601 (1st Cir. 2016) (quoting Craker v. DEA, 714 F.3d 17, 26 (1st Cir. 2013)).

## III.    DISTRICT COURT JURISDICTION

As a threshold matter, Defendants assert that this Court lacks subject matter jurisdiction over Plaintiffs' claims because the waiver of sovereign immunity in the APA, 5 U.S.C. § 702, does not extend to contract actions, which are within the exclusive jurisdiction of the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491. [Harvard, ECF No. 47 at 6–8]; [AAUP, ECF No. 104 at 22–28]. Plaintiffs, who contend they have brought a proper challenge under the APA, disagree that the Tucker Act divests this Court of jurisdiction. [Harvard, ECF No. 19 at 24–29]; [Harvard, ECF No. 53 at 7–10]; [AAUP, ECF No. 75 at 28–31]; [AAUP, ECF No. 110 at 13–16].

The APA "confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702). The APA's waiver of sovereign

immunity, however, "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" Dep't of Educ. v. California, 145 S. Ct. 966, 968 (2025) (per curiam) (quoting 5 U.S.C. § 702). As relevant here, the Tucker Act vests jurisdiction in the Court of Federal Claims over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Although "[t]he 'jurisdictional boundary' between the Tucker Act and [the APA] is well-traversed by litigants seeking relief against the federal government . . . the boundary's precise contours remain elusive," Massachusetts v. Nat'l Insts. of Health, 770 F. Supp. 3d 277, 292 (D. Mass. 2025) (quoting Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev., 480 F.3d 1116, 1117 (Fed. Cir. 2007)), even following recent rulings by the Supreme Court on its emergency docket.

Defendants maintain that the instant cases must be sent to the Court of Federal Claims because it "is, after all, about the money." [Harvard, ECF No. 223 at 14]; see also [Harvard, ECF No. 186 at 26 ("This case is about money.")]. As Defendants acknowledge, however, whether a case is, in some sense, "about the money" is not necessarily dispositive of the issue of jurisdiction. See, e.g., [Harvard, ECF No. 186 at 27 (explaining the "essential facts" involve whether "Harvard is seeking to enforce contractual rights and is seeking contractual remedies")]. Longstanding precedent indicates that monetary disputes against the government may, in some circumstances, play out in Article III courts. Bowen v. Massachusetts, 487 U.S. 879, 900–01 (1988) ("The fact that the mandate is one for the payment of money must not be confused with the question whether such payment, in these circumstances, is a payment of money as damages or as specific relief."). The parties agree that the determinative jurisdictional question is

"[w]hether [the Plaintiffs'] claim is 'at its essence' contractual," which "'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" Crowley Gov't Servs., Inc. v. Gen. Servs. Admin., 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982)). In other words, for present purposes and simply put, contract claims against the federal government must be brought in the Court of Federal Claims, but claims that do not sound in contract or seek contract-based relief stay in federal district court.

With regards to the instant case, Defendants contend that "[h]ere, both factors support a finding that the Court lacks jurisdiction over what are essentially claims that lie in contract because: 1) the source of Harvard's right to funds previously awarded are grant and contract agreements, and 2) the relief sought in this case amounts to the remaining, undisbursed value of those agreements." [Harvard, ECF No. 186 at 30]; see also [AAUP, ECF No. 104 at 24, 27]. Plaintiffs disagree and maintain that their action "arises from the [g]overnment's violation of rights protected by the Constitution and federal statutes, not the terms of any express or implied contract with the United States," [Harvard, ECF No. 211 at 12], and seeks "'neither the prototypical contractual remedy of damages' nor the 'classic contractual remedy of specific performance,'" [id. at 15 (quoting Crowley, 38 F.4th at 1110)]; see also [AAUP, ECF No. 110 at 13–15]. In response, Defendants accuse Plaintiffs of "artful pleading," ultimately contending that "the underlying rights [Harvard] seeks to enforce are based in contract and the relief sought would have the effect of compelling the government to pay money." [Harvard, ECF No. 223 at 7]; see also [AAUP, ECF No. 104 at 27 (asserting that Plaintiffs are "attempt[ing] to disguise their claims as ones for forward-looking equitable relief from conduct in violation of" constitutional and statutory rights (citation omitted))].

After the summary-judgment motions in this case were fully briefed, the Supreme Court issued a per curiam stay order in National Institutes of Health v. American Public Health Association ("APHA"), No. 25A103, 2025 WL 2415669 (Aug. 21, 2025) (per curiam), which concerned the termination of approximately $800 million in NIH grants. The issues were whether the district court likely had jurisdiction to vacate NIH guidance documents and/or to find the individual grant terminations to be arbitrary and capricious under 5 U.S.C. § 706(2)(A). Ultimately, a very divided Court bifurcated the issue. Namely, the Court stayed those portions of the district court's orders that vacated the grant terminations, but otherwise denied the government's stay application, leaving intact the district court's vacatur of the agency guidance documents. APHA, 2025 WL 2415669, at *1. In a (controlling) concurrence, Justice Barrett explained that, although the district court had jurisdiction to vacate the NIH guidance documents that set out agency funding priorities, it "likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims." Id. at *2 (Barrett, J. concurring in the partial grant of the application for stay); see also Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976))). She reasoned that "[b]oth logic and law . . . support channeling challenges to the grant terminations and guidance to different forums." APHA, 2025 WL 2415669, at *2. As to logic, Justice Barrett explained that "[v]acating the guidance does not reinstate the terminated grants," noting that "[i]f one simply flowed from the other, the District Court would have needed only to vacate the guidance itself," rather than separately vacating the grant terminations as it did. Id. As to law, Justice Barrett wrote that "[e]ven if the guidance and

grant terminations are linked, vacating the guidance does not necessarily void decisions made under it" such that "the claims are legally distinct." Id.

Plaintiffs here bring substantially similar arbitrary and capricious claims pursuant to 5 U.S.C. § 706(2)(A), through which they challenge both the Freeze Orders and Termination Letters, and ask the Court to vacate and set aside both the guidance within those documents and, separately, the resulting grant terminations.  [Harvard, ECF No. 59 at Prayer for Relief]; see also [AAUP, ECF No. 64 at Prayer for Relief].  In light of the Supreme Court's per curiam decision in APHA, the Court holds that it has jurisdiction over Plaintiffs' arbitrary and capricious claims that challenge the Freeze Orders, because it views those orders, as discussed further infra, as agency guidance documents that set the federal government's policy moving forward as to grant funding at Harvard.  It also holds, however, that, given the current guidance from the Supreme Court, it lacks jurisdiction over the arbitrary and capricious claims as they pertain to the Termination Letters, and that any such claim based on the grant terminations must be brought in the Court of Federal Claims.

That said, while this Court is endeavoring to follow the Supreme Court's reasoning in APHA,[9] the per curiam opinion in APHA, like the Supreme Court's prior decision in California,

---

[9] The Court is mindful of Justice Gorsuch's comments in his opinion in APHA and fully agrees that this Court is not free to "defy" Supreme Court decisions and is, in fact, "duty-bound to respect 'the hierarchy of the federal court system.'"  APHA, 2025 WL 2415669, at *3 (Gorsuch, J., concurring in part and dissenting in part) (citation omitted).  Consistent with these obligations, this Court (and likely all district courts) endeavors to follow the Supreme Court's rulings, "no matter how misguided [it] may think [them] to be." Hutto v. Davis, 454 U.S. 370, 375 (1982) (per curiam).  That said, the Supreme Court's recent emergency docket rulings regarding grant terminations have not been models of clarity, and have left many issues unresolved.  California was a four-paragraph per curiam decision issued in the context of a stay application.  It cited Bowen as good law, stated that the Tucker Act gave the Court of Federal Claims jurisdiction over contract claims against the federal government, and then stated that the district court likely

involved only arbitrary and capricious claims brought under § 706(2)(A).  Plaintiffs here have

also brought and seek summary judgment on APA claims based on the First Amendment and

violations of Title VI pursuant to § 706(2)(B) and (C), which seem to this Court materially

different from the more contract-based claims asserted in <u>California</u> and <u>APHA</u>.

     First, the rights at issue in First Amendment and Title VI claims do not ordinarily fall

within the ambit of the Tucker Act, which is very specifically contract-focused.  As to the First

Amendment, "[t]he Tucker Act confers subject matter jurisdiction to [the] Court [of Federal

Claims] over money-mandating constitutional claims . . . [and t]he Federal Circuit has expressly

held the Court of Federal Claims lacks jurisdiction over claims arising under the First

Amendment . . . as they are not money-mandating."  <u>Stephens v. United States</u>, 165 Fed. Cl. 341,

348 (2023).  Nor does the Tucker Act's waiver of sovereign immunity strike the Court as

relevant to Title VI, which itself expressly authorizes "judicial review" of agency action

---

lacked jurisdiction "to order the payment of money under the APA," without purporting to
explain how the case was distinguishable from <u>Bowen</u> or other related, longstanding precedents.
<u>California</u>, 145 S. Ct. at 968.  Then, in <u>APHA,</u> four justices thought grant-termination cases
belong, in full, in the Court of Federal Claims, and four justices thought they belong, in full, in
federal district court, and the decision was controlled by the vote of a single justice.  2025 WL
2415669, at *1–16.  The outcome, which no party had requested, was, thus, inconsistent with the
views of eight justices, <u>id.</u> at *16 (Jackson, J., concurring in part and dissenting in part), and,
again, provided little explanation as to how <u>Bowen</u>, which the controlling concurrence again
cited as good law, <u>id.</u> at *2, applied or was distinguishable.  This Court understands, of course,
that the Supreme Court, like the district courts, is trying to resolve these issues quickly, often on
an emergency basis, and that the issues are complex and evolving.  <u>See</u> <u>Trump v. CASA, Inc.</u>,
145 S. Ct. 2540, 2567 (2025) (Kavanaugh, J., concurring) ("In justiciable cases, this Court, not
the district courts or courts of appeals, will often still be the ultimate decisionmaker as to the
interim legal status of major new federal statutes and executive actions.").  Given this, however,
the Court respectfully submits that it is unhelpful and unnecessary to criticize district courts for
"defy[ing]" the Supreme Court when they are working to find the right answer in a rapidly
evolving doctrinal landscape, where they must grapple with both existing precedent and interim
guidance from the Supreme Court that appears to set that precedent aside without much
explanation or consensus.

"terminating or refusing to grant or to continue financial assistance," including through the APA, in an Article III court.  42 U.S.C. § 2000d-2; see also Colwell v. Dep't of Health & Hum. Servs., 558 F.3d 1112, 1128 (9th Cir. 2009) ("Judicial review of any [Title VI] funding termination is available in an Article III court."); Adams v. Bell, 711 F.2d 161, 189 (D.C. Cir. 1983) (Wright, J., dissenting) (noting that "the traditional mode" for review under 42 U.S.C. § 2000d-2 is "the APA").

Second, Plaintiffs seek relief beyond enforcement of an "'obligation to pay money' pursuant to . . . grants."  APHA, 2025 WL 2415669, at *1 (citation omitted).  They seek prospective relief that, among other things, mandates that Defendants comply with the First Amendment and Title VI's procedural requirements.  Because of this, the Court of Federal Claims, if confronted with Plaintiffs' First Amendment and Title VI claims, could not "fully adjudicate the claims over which it [would have] jurisdiction," id. at *2 n.1 (Barrett, J., concurring), as it "does not have the general equitable powers" to grant prospective injunctive relief, Me. Cmty. Health Options v. United States, 590 U.S. 296, 327 (2020).

Third, the logical and legal considerations underlying the APHA decision, as explained in Justice Barrett's concurrence, do not graft cleanly onto Plaintiffs' First Amendment and Title VI claims, which likely makes splitting the claims between two forums procedurally unworkable.  Bifurcating the APA claims as to the guidance and the terminations was possible in APHA because vacating the guidance as arbitrary did not necessarily render the terminations arbitrary.  APHA, 2025 WL 2415669, at *2.  In other words, the guidance and the terminations did not need to rise or fall together.  This is what required the district court to enter two separate orders, one vacating the guidance and the other vacating the terminations, and what then allowed the Supreme Court to put the two issues on separate tracks going forward.  In contrast, if this Court

were to grant summary judgment to Plaintiffs on their First Amendment and Title VI claims, it would not have to issue separate orders. Rather, assuming a First Amendment violation, it could issue a single order invalidating Defendants' course of unlawful conduct, which would include both the Freeze Orders and the Termination Letters. Similarly, as to Title VI, it could issue an order addressing the Termination Letters but stand silent on the Freeze Orders, as the Title VI violations would be the termination decisions rather than the freezes. See Bowen, 487 U.S. at 911 (reviewing court need not "split" case into "two parts" where it "had the authority to hold unlawful and set aside agency action that it found to be not in accordance with law" (citation omitted)); APHA, 2025 WL 2415669, at *2 (citing Bowen as distinct from APHA and characterizing Bowen as involving "one judgment vacating HHS decision").[10] In other words, as to the First Amendment, the Termination Letters are not "legally distinct" as they constitute part of the pattern of retaliatory conduct and, as to the Title VI claim, the Termination Letters form the sole basis of the claim. Cf. APHA, 2025 WL 2415669, at *2.

It may well be that these differences would not distinguish these claims in the eyes of the Supreme Court, although that remains unclear under existing caselaw. But this is not Calvinball and there are rules. Under those rules, which are set by existing Supreme Court precedent, this Court cannot conclude that core First Amendment claims or pure statutory violations fall within the exclusive jurisdiction of the Court of Federal Claims. A contract claim is, by its nature about money and, for present purposes, whether the government is obligated to pay money under a

---

[10] California is also not dispositive on these issues as it did not involve a Title VI claim and because, in the underlying preliminary-injunction decision, the district court "did not reach the likelihood of success as to any constitutional claims," including claims brought under the First Amendment. Thakur v. Trump, No. 25-cv-04737, 2025 WL 1734471, at *21 (N.D. Cal. June 23, 2025).

contract. The First Amendment claims here are about speech and whether the federal government is improperly infringing on the free speech rights of an academic institution and its employees. The resolution of these claims might result in money changing hands, but what is fundamentally at issue is a bedrock constitutional principle rather than the interpretation of contract terms. Similarly, resolution of the Title VI claims here will merely determine whether statutory procedural requirements were satisfied. Regardless of how these claims are resolved, the government will not necessarily be obligated to disburse any additional funds nor will any contract terms need to be considered as part of the analysis.

Given the nature of the First Amendment claims (purely constitutional) and the Title VI claims (statutory), these claims do not belong in the Court of Federal Claims, which in any event, cannot fully adjudicate either set of claims. Under these circumstances, the Megapulse factors tip to Plaintiffs. This Court therefore holds that it has jurisdiction over Plaintiffs' First Amendment and Title VI challenges as to both the Freeze Orders and Termination Letters, as well as over Plaintiffs' arbitrary and capricious challenges to the Freeze Orders (but not the Termination Letters).[11]

---

[11] Defendants move for summary judgment as to the Organizational Plaintiffs' separation of powers claims (Counts V and VI) and due process claims (Counts VII and VIII), each pair of which is fashioned as both an APA claim and an ultra vires claim. For similar reasons as those articulated herein, and given the Defendants' limited focus on these causes of action in their summary judgment briefing, see [AAUP, ECF No. 104 at 22–28, 47–52], the Court, on this record, is hesitant to find that the Court of Federal Claims has jurisdiction over these APA claims. More specifically, the Organizational Plaintiffs request the same relief for these claims as for their APA claims for violations of the First Amendment and Title VI; the rights at issue are constitutional and do not require the Court to consider to the terms of the grants; both claims are brought pursuant to 5 U.S.C. § 706(2)(B); and at least the separation of powers claim appears to be premised solely on the Freeze Orders, not the grant terminations, [AAUP, Am. Compl. ¶¶ 338 ("None of the funds received by Harvard University have a congressionally authorized condition requiring them to comply with any of the demands in the April 3, April 11, or May 5 Letters or

## IV.    STANDING

The Constitution gives the judiciary power to hear "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  The Supreme Court has interpreted this language to mean that courts may decide only "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998).  A plaintiff's standing to sue is "part of the common understanding of what it takes to make a justiciable case."  Id.  Therefore, "the absence of standing sounds the death knell for a case." Microsystems Software, Inc. v. Scandinavia Online AB, 226 F.3d 35, 39 (1st Cir. 2000). The standing determination is "claim-specific," meaning that an individual plaintiff "must have standing to bring each and every claim that [he or] she asserts."  Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012).

Article III standing requires that three conditions be satisfied.  "First and foremost, there must be alleged (and ultimately proved) an 'injury in fact.'"  Steel Co., 523 U.S. at 103 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)).  This injury "must be concrete in both a qualitative and temporal sense," "distinct and palpable" as opposed to "abstract," and "actual or imminent" as opposed to "conjectural or hypothetical."  Whitmore, 495 U.S. at 155 (citation modified).  Second, standing requires causation, defined as a "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant."  Steel Co., 523

---

that subject them to review in the manner Defendants have undertaken as alleged herein.")]. This Court likewise retains jurisdiction over the ultra vires versions of these claims, pursuant to its "equitable power[]" to "enjoin unconstitutional actions by state and federal officers." Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327–28 (2015).  That said, this Court recognizes that if it is incorrect in its assessment that it can exercise jurisdiction over APA claims premised on Title VI and the First Amendment, the Organizational Plaintiffs' separation of powers and due process claims may likewise need to be adjudicated, at least in part, in the Court of Federal Claims.

U.S. at 103.  Finally, standing requires "redressability—a likelihood that the requested relief will redress the alleged injury."  Id.

Defendants contend that the Organizational Plaintiffs "lack standing as they have not shown sufficient harm to themselves or their members resulting from the agencies' actions," as they "are not parties to the grants issued to Harvard, lack any protected interest, and fail to establish any legally cognizable harm."  [AAUP, ECF No. 104 at 13].[12]  The Organizational Plaintiffs counter that they "have standing based on both injuries to their members—whose research funding has been cut with disastrous impacts and whose speech and academic freedom are chilled—and injuries [the Organizational] Plaintiffs have incurred directly."  [AAUP, ECF No. 75 at 21].

The Court finds that the Organizational Plaintiffs have Article III standing to assert the claims in their Amended Complaint against Defendants.  "[A]n association may have standing solely as the representative of its members even in the absence of injury to itself, in certain circumstances."  Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 10 (1st Cir. 1986) (citing Warth v. Seldin, 422 U.S. 490, 511 (1975)).  Specifically, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Advert.

_____

[12] Defendants also argue that the Organizational Plaintiffs lack standing to "enforce payments" on "agreements that do not belong to them" but instead belong to non-party Harvard.  [AAUP, ECF No. 104 at 20–22].  For the reasons discussed in determining that the Tucker Act does not foreclose jurisdiction, the Organizational Plaintiffs' suit is largely not one to enforce payments under a contract; rather, it is one for injunctive relief to remedy constitutional and statutory violations.

33

Comm'n, 432 U.S. 333, 343 (1977).  The first two <u>Hunt</u> prongs are constitutional, and the third

is prudential.  <u>United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.</u>, 517

U.S. 544, 555–57 (1996).  Only one member of an organization need have individual standing

for that organization to satisfy the first <u>Hunt</u> factor.  <u>See</u> <u>Playboy Enters., Inc. v. Pub. Serv.</u>

<u>Comm'n of P.R.</u>, 906 F.2d 25, 34 (1st Cir. 1990) ("[T]he Supreme Court has never required that

every member of an association have standing before it can sue on behalf of its members. 'The

association must allege that its members, or any one of them, are suffering immediate or

threatened injury as a result of the challenged action of the sort that would make out a justiciable

case had the members themselves brought suit.'" (emphasis omitted) (quoting <u>Warth</u>, 422 U.S. at

511)).

 As to the first <u>Hunt</u> prong, the Organizational Plaintiffs point to three harms that its

members have suffered that they contend are sufficient for Article III standing.  [<u>AAUP</u>, ECF

No. 75 at 22–23].  First, some of the Organizational Plaintiffs' members "have been forced to

cease research activities and have not been able to resume them, causing them 'continuing direct

injury' sufficient to support a request for injunctive relief."  [<u>Id.</u> at 22 (quoting <u>Ocasio v. City of</u>

<u>Lawrence</u>, 788 F. Supp. 99, 100 (D. Mass. 1992))].  Second, "Defendants terminated funding

supporting many of [the Organizational] Plaintiffs' other members, who expect to immediately

experience these same harms once they exhaust their limited, short-term funds."  [<u>Id.</u> at 23].

Third, "Defendants have chilled some of the [Organizational] Plaintiffs' members' protected

speech and academic freedom," as the Organizational "Plaintiffs' members have begun to avoid

speech and subject matter[s] that might draw the wrath of the Trump administration directly or

cause them to become the University's next target in its concession to Defendants' demands."

[<u>Id.</u> at 24].

Defendants do not appear to contest that the first two harms the Organizational Plaintiffs have identified constitute injury in fact; rather, they assert that the Organizational Plaintiffs' members lack standing as "redressability and causation are lacking," where "[the Organizational] Plaintiffs' members [have] alleged personal harms that are too attenuated to support jurisdiction because any asserted harms must flow from independent choices made by the nonparty educational institution (Harvard), or their injury is otherwise too speculative." [AAUP, ECF No. 104 at 17]. Specifically, Defendants contend that "[u]ltimately, it is the choice of a nonparty, Harvard, whose funding was cut, to determine what to do. If, for example, Harvard chooses to continue funding the project, then no harm flows to Plaintiffs' members from the termination." [Id. at 18].

"The Supreme Court has explained that the fairly traceable standard requires 'a causal connection between the injury and the conduct complained of.'" Conservation L. Found., Inc. v. Acad. Express, LLC, 129 F.4th 78, 90 (1st Cir. 2025) (quoting Lujan, 504 U.S. at 560). It does not, however, require "a tort-like showing of proximate causation," and, as such, "[a] plaintiff can satisfy traceability by showing that the defendant's conduct is one among multiple causes of the alleged injury." Id. (citation omitted). "[W]hen (as here) a plaintiff challenges the government's 'unlawful regulation . . . of someone else' . . . causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 383 (2024) (quoting Lujan, 504 U.S. at 562). "Therefore, to thread the causation needle in those circumstances, the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." Id. (quoting California v. Texas, 593 U.S. 659, 675 (2021)). Thus, "[t]he causation requirement precludes speculative links—that

is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs, as well as "attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." Id.

The Organizational Plaintiffs have adequately demonstrated that their members' harms are fairly traceable to Defendants' conduct. Although the Court recognizes that Defendants' actions ultimately impact grant agreements that are awarded, in name, to the "President and Fellows of Harvard College," see, e.g., [NSF_Harvard000681], the notion that the resultant harm to professors and graduate students is at best speculative or attenuated is divorced from the reality of how federal research grants function. The professors and graduate students—who are responsible for funding their own research—apply for federal grants, are awarded the grants on the strength of their credentials and proposed research, and then build their professional reputations on those grants. See, e.g., [AAUP, ECF No. 77-16 ¶ 2 (["I]n 1992 I applied for and received a prestigious Special Emphasis Research Career Award to work on the Human Genome Project. I have had continuous federal funding to support my research ever since.")]; [AAUP, ECF No. 77-22 ¶¶ 6–9 (describing process of research scientist applying for grants)]. As such, it is their names that appear directly on the face of the grant agreements, their labs that receive the funding, and their research that is eliminated when funding is discontinued. See, e.g., [NSF_Harvard000060 (noting that the PI and Site Director, whose name is redacted, is the "Mallinckrodt Professor of Applied Physics and Physics," who "has ultimate responsibility for implementation of all aspects" of the grant)]. To that end, at least one AAUP member received notice directly from the federal government that his research was to stop. [AAUP SOF ¶ 176]; see also [DoDHarv_00000005 ("Attached is a copy of the grant termination notice. Please

36

ensure the Principal Investigator, courtesy copied herein, receives a copy of this document.")];
cf. Am. Ass'n of Univ. Professors v. U.S. Dep't of Just. ("AAUP"), No. 25-cv-2429, 2025 WL
1684817, at *6 (S.D.N.Y. June 16, 2025) ("Indeed, Plaintiffs' evidence reflects that all
communication about the termination of grants has been either between an executive agency and
Columbia, or between Columbia and its faculty.").  His injuries, like those of other similarly
situated researchers, are clearly traceable to Defendants' conduct via the stop work order and tied
to the grant that bears his name.

The Organizational Plaintiffs' members are at least as connected to the grants and
funding at issue here as is Harvard and, by virtue of this relationship, their standing, more so than
in the typical third-party standing case, hinges on a "predictable chain of events leading from the
government action to the asserted injury."  All. for Hippocratic Med., 602 U.S. at 385.  It was
entirely predictable that Defendants' sudden revocation of funding would immediately and
directly harm the Organizational Plaintiffs' members, and, indeed, the summary judgment record
reflects that it has.  See, e.g., [AAUP SOF ¶¶ 128, 136, 141, 143, 147–50, 156, 158, 164–65,
168–70, 177–79, 188, 196].  And while Defendants would like to minimize this injury by
claiming that Harvard has unlimited funds to replace the withdrawn funds, the summary
judgment record does not reflect that.  See, e.g., [AAUP, ECF No. 77-18 ¶¶ 27–28 ("I have no
guarantee of funding from Harvard in writing, and any funding Harvard can provide will be far
from sufficient to replace my federal grants or allow me to bring these projects to completion.
The only long-term alternative to federal funding would be to find emergency philanthropic
support, which is exceedingly unlikely.  If federal funding is not restored, project staff for the
third grant will soon have to explain to participants that projects are ending, and I will soon have
to let the team in Peru go.")]; [AAUP, ECF No. 77-23 ¶ 14 ("Harvard has also informed me that

they will not be able to provide funding to supplement what we are losing in federal funds.")]; cf. AAUP, 2025 WL 1684817, at *13 ("Plaintiffs' own evidence also demonstrates that Columbia has relied on 'generous alumni' to alleviate certain 'unanticipated expenses.'").

Moreover, even if the Court were to accept Defendants' premise that Harvard could theoretically bridge the gap for all $2.2 billion in terminated grants in perpetuity, the Organizational Plaintiffs have adequately established that their members will still experience concrete harm by virtue of the grant terminations. For instance, the Organizational Plaintiffs point to the fact that "[w]ithout federal funding, [members] who are coming up for tenure may not be competitive applicants for that crucial promotion," explaining that "[f]ederal grants impact tenure decisions beyond just the dollars themselves—tenure candidates must demonstrate that they have served as principal investigators on federal research grants and are capable of performing the sort of rigorous research that federal grant study sections (peer reviewers) approve for scarce federal dollars." [AAUP, ECF No. 77-19 ¶ 17]; see also [id. ¶ 22 ("[R]eceiving federal grants is not just about the funds themselves—it is a key indication that your peers recognize the rigor and caliber of your work because federal grant applications are always peer-reviewed.")]; [AAUP, ECF No. 77-21 ¶ 22 ("[F]or faculty who are working towards tenure (as I am), the loss of federal funding for public health research restricts the ability to create the type of broad, high-impact program of research required for tenure.")]. As such, the Organizational Plaintiffs have successfully alleged that their members will suffer harm to their research as well as their careers by virtue of losing the opportunity to work with and receive funding from the federal government. "The loss of professional opportunities or income may certainly constitute an injury in some cases," Nat. Res. Def. Council, Inc. v. Wheeler, 367 F. Supp. 3d 219, 232 (S.D.N.Y. 2019), and the loss of the opportunity to be a principal investigator

on a federal, peer-reviewed grant is solely traceable to the grant funding terminations.  Cf.
AAUP, 2025 WL 1684817, at *13 (finding no standing where plaintiffs had not "demonstrated
that it makes a difference to their members whether the funding for their research and salaries
comes from" the federal government or other funding sources).

     The Organizational Plaintiffs have also adequately established that they have experienced
harm sufficient to maintain their First Amendment claim.  Defendants argue that "[i]t is well-
settled that 'allegations of subjective chill are not an adequate substitute for a claim of specific
present objective harm or a threat of specific future harm.'"  [AAUP, ECF No. 104 at 16
(quoting Laird v. Tatum, 408 U.S. 1, 13–14 (1972))].  This ignores, however, a long line of
Supreme Court case law recognizing standing in cases where "the challenged exercise of
governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant
was either presently or prospectively subject to the regulations, proscriptions, or compulsions
that he was challenging."  Laird, 408 U.S. at 11 (1972); see also Speech First, Inc. v. Cartwright,
32 F.4th 1110, 1120 (11th Cir. 2022) ("[T]o determine whether a First Amendment plaintiff has
standing, we simply ask whether the operation or enforcement, of the government policy would
cause a reasonable would-be speaker to self-censor—even where the policy fall[s] short of a
direct prohibition against the exercise of First Amendment rights." (citation modified)).  As
discussed further infra, the record reflects that Defendants' viewpoint-based demands have
resulted in the Organizational Plaintiffs' members being well beyond "subjectively chilled."
Rather, the Organizational Plaintiffs have established that their members have been and likely
will continue to be compelled to forgo certain research and discussion topics or at least parse
their words carefully to maximize any chance of maintaining funding.  [AAUP SOF ¶¶ 137,
210–17, 235–37, 247–48].

Defendants argue in their reply brief that these First Amendment harms are not fairly traceable to them because "Harvard exercised independent judgment in deciding which [of the government's] demands to accept."  [AAUP, ECF No. 130 at 15].  Again, the Court is unconvinced.  As discussed infra, the April 11 Letter unambiguously links funding to the demand that Harvard rebalance viewpoints on campus.  The professors' and researchers' fears that adverse consequences may follow their decision not to abandon certain viewpoints are far from speculative.  Rather, they are directly "caused by the [Freeze Orders' and Terminations Letters'] vagueness, the steep penalties [Defendants] have announced for [Harvard's] noncompliance with [their] requirements, and the measures [Defendants] ha[ve] already taken" demonstrating they expect Harvard to comply.  Nat'l Educ. Ass'n v. Dep't of Educ., 779 F. Supp. 3d 149, 181 (D.N.H. 2025).

Finally, Defendants contend that, even if their members have experienced injury, the Organizational Plaintiffs fail on the second and third Hunt prongs, arguing that they have "failed to establish that the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed," [AAUP, ECF No. 104 at 19], and that "the claims [the Organizational] Plaintiffs have asserted require the participation of individual members," [id. at 20].  The Court disagrees.  The Organizational Plaintiffs have submitted evidence that the primary mission of AAUP (and AAUP-Harvard) is "to advance academic freedom and shared governance in higher education, define fundamental professional values and standards for higher education, promote the security of academic workers, and ensure higher education's contribution to the common good."  [AAUP SOF ¶¶ 96, 103; see also [id. ¶ 96 ("Plaintiff AAUP 'regularly consults, works with, and represents local chapters and individual members regarding academic freedom, faculty governance, and other issues involving the employment relationship between

40

AAUP members and their employers, including but not limited to collective bargaining.'"

(citation omitted))].[13]  Pursuing litigation to end an alleged government intrusion on protected

and well-established First Amendment rights in higher education, as well as to stop alleged

arbitrary funding cuts that could end careers, furthers those purposes.  Additionally, the

injunctive and declaratory relief the Organizational Plaintiffs request will not need to be tailored

to each member individually as blanket relief will largely suffice and the relief sought will not

require any individualized proof from any particular member.  See Camel Hair, 799 F.2d at 12

("Actions for declaratory, injunctive and other forms of prospective relief have generally been

held particularly suited to group representation."); see also Playboy Enters., 906 F.2d at 35

("[J]ust because a claim may require proof specific to individual members of an association does

not mean the members are required to participate as parties in the lawsuit." (emphasis omitted)).

As such, the Court finds that the Hunt factors are satisfied, and the Organizational

Plaintiffs have associational standing.  Because of this, the Court does not reach their arguments

regarding direct standing.

## V.    FINAL AGENCY ACTION

The APA entitles any person "suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action" to judicial review.  5 U.S.C. § 702.  Such

review, however, is limited to final agency actions unless otherwise specified by statute.  See id.

§ 704.

---

[13] Having found the germaneness requirement met for AAUP and AAUP-Harvard, the Court will
not consider whether it is also met for UAW, as "[a] proper case or controversy exists . . . when
at least one plaintiff establishes . . . standing to sue."  Murthy v. Missouri, 603 U.S. 43, 57 (2024)
(citation modified).

An agency action is final if two conditions are met: first, the action must "mark the consummation of the agency's decisionmaking process" and not be "of a merely tentative or interlocutory nature," and, second, it must be "one by which rights or obligations have been determined, or from which legal consequences will flow." Harper v. Werfel, 118 F.4th 100, 117 (1st Cir. 2024) (internal quotation marks omitted) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Brnovich v. Biden, 630 F. Supp. 3d 1157, 1171 (D. Ariz. 2022) (quoting Or. Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006)).

Defendants contend that "[t]o the extent that an APA challenge can be properly brought in this Court, only final agency action is reviewable under the APA, and the only final items are letters terminating specific contracts." [Harvard, ECF No. 186 at 39]; see also [AAUP, ECF No. 104 at 29 (same)]. In particular, they argue that the April 11 Letter and May 5 Freeze Order do not constitute final agency action and thus are not reviewable under the APA. [Harvard, ECF No. 186 at 40–42]. In their view, the April 11 Letter "was merely the starting bid in a negotiation that Harvard has rejected, which is not agency action under the APA, let alone final agency action," because "[t]he opening offer of a negotiation does not determine rights or obligations, nor does it have its own legal consequences." [Harvard, ECF No. 186 at 40]; see also [AAUP, ECF No. 104 at 31 (same)]. Defendants assert that the Court should view this whole matter as a "contract dispute" and that "[f]undamental principles of contract law . . . demonstrate" that the April 11 Letter did not have "binding legal effect" under the first Bennett prong. [Harvard, ECF No. 186 at 41]; see also [AAUP, ECF No. 104 at 31 (same)]. Regarding the May 5 Freeze Order, Defendants appear to argue that it is not final agency action because it

42

purports to speak on behalf of the entire federal government, which the Secretary of Education cannot do. [Harvard, ECF No. 186 at 42–43].[14]

Harvard counters that Defendants' argument regarding the April 11 Letter misses the mark.[15] It contends that "[e]ven assuming the April 11 Letter was not a final agency action the day the [g]overnment sent it, the [g]overnment certainly took final action three days later when it

---

[14] Defendants additionally argue that the May 5 Freeze Order is unreviewable because it is the sort of funding decision committed to agency discretion by law under 5 U.S.C. § 701(a)(2). [Harvard, ECF No. 186 at 42]. The Court disagrees. Even assuming that the decision to block Harvard from all future federal funding could be considered an "administrative decision traditionally regarded as committed to agency discretion," Lincoln v. Vigil, 508 U.S. 182, 192 (1993), and the Court is not convinced that it is, Planned Parenthood of N.Y.C., Inc. v. HHS, 337 F. Supp. 3d 308, 324 (S.D.N.Y. 2018) ("While the Supreme Court has held that certain allocations of funds from lump-sum appropriations may be committed to agency discretion, this narrow exception does not 'typically' or 'presumptively' extend to all allocations of appropriated funds."), the exception is typically limited to those "rare circumstances" where "no meaningful standard" exists by which a reviewing judge could cabin that agency discretion, Dep't of Com. v. New York, 588 U.S. 752, 772 (2019). Here, "applicable regulations cabin the [Education] Department's discretion as to when it can terminate existing grants," which "create meaningful standards by which to judge the agency's action." California, 132 F.4th at 97 (citation modified); see Pol'y & Rsch., LLC v. HHS, 313 F. Supp. 3d 62, 75–78 (D.D.C. 2018) (K.B. Jackson, J.) (holding that agency's otherwise-presumptively unreviewable decision to halt funding to an agency program was reviewable under the APA because applicable regulations cabined its termination authority).

[15] The Court focuses on Harvard's arguments regarding final agency action but notes that the Organizational Plaintiffs urge the Court to also consider Defendants' March 31 Letter, the April 3 Letter, and the April 11 Letter as final agency actions. [AAUP, ECF No. 110 at 26]. On this issue, the Court disagrees with the Organizational Plaintiffs. The March 31 Letter, in essence, announced an investigation into higher education funding and noted that "any institution found to be in violation of federal compliance standards may face administrative actions, including contract termination." [GSAHarv_00000002 (emphasis added)]. The First Circuit has been clear that "investigatory measures are not final agency action;" rather, the opening of a review or investigation is a preliminary step, "leading toward the possibility of a final action in the form of an enforcement or other action." Harper v. Werfel, 118 F.4th 100, 116 (1st Cir. 2024). As to the April 3 Letter, the April 11 Letter, by its terms, "incorporates and supersedes the terms of" the April 3 Letter, [HHSHarv_00000098], such that the Court considers the April 3 Letter to be non-final. The April 11 Letter itself poses a closer question. Ultimately, however, in light of the Court's conclusion that the April 14 and May 5 Letters are final agency action, the Court need not resolve this question.

made good on the threats and froze Harvard's funding." [Harvard, ECF No. 211 at 33]. It

further clarifies that "it is the culmination of the [g]overnment's actions—punishing Harvard on

April 14 and thereafter for not acceding to unlawful demands made on April 3 and April 11—

that Harvard's APA claim challenges." [Id.]. As to the May 5 Freeze Order, Harvard contends

that Defendants' argument "is not a claim about finality at all" but rather a concession that the

May 5 Freeze Order was "not in accordance with law" and ultra vires. [Id. at 34].

        Given that Defendants offer no response regarding the finality of the April 14 Freeze

Order or the May 5 Freeze Order at least as to the Department of Education, the Court will not

spill too much ink on this issue. It is satisfied that both freeze orders constituted final agency

action such that they are reviewable under the APA. On the first Bennet prong, the text of each

document is clear. The April 14 Freeze Order unambiguously states that "[t]he Joint Task Force

to combat anti-Semitism is announcing a freeze on $2.2 billion in multi year grants and $60M in

multi-year contract value to Harvard University." [GSAHarv_00000012–13]. The May 5 Freeze

Order states that "today's letter marks the end of new grants for the University," that "this letter

is to inform you that Harvard should no longer seek GRANTS from the federal government,

since none will be provided," and that "Harvard will cease to be a publicly funded institution."

[EDHarv_0000009]. This language is not "merely tentative or interlocutory" in nature, Harper,

118 F.4th at 116; rather, it is prescriptive and "mandatory," Union of Concerned Scientists v.

Wheeler, 377 F. Supp. 3d 34, 42 (D. Mass. 2019), aff'd in part, rev'd in part, and remanded, 954

F.3d 11 (1st Cir. 2020), in that it unequivocally states that Defendants have made a decision and

are moving forward with it.

        As to the second Bennett prong, again, the plain text of the April 14 and May 5 Letters

communicates that consequences will be very shortly forthcoming. Moreover, if these

announcements left room for doubt as to whether Plaintiffs would experience any legal effect, Defendants' conduct immediately following the announcements removed any such doubt, as the record reflects that Harvard immediately started to receive stop work orders following the issuance of the April 14 Freeze Order, [Harvard SOF ¶ 67], and a termination letter from the Department of Education arrived within the week, [EDHarvAR_0000011]. As such, this Court is satisfied that both freeze orders constitute reviewable final agency actions as they set policies that brought forth near immediate legal consequences. Brnovich, 630 F. Supp. 3d at 1171; Woonasquatucket River Watershed Council v. USDA, No. 25-cv-00097, 2025 WL 1116157, at *15 (D.R.I. Apr. 15, 2025); see also New York v. Trump, 133 F.4th 51, 69 (1st Cir. 2025) (funding freeze constituted "final agency action[]").

As such, the Court is satisfied that both Freeze Orders constitute final agency action such that the Court can review them under the APA.[16]

---

[16] Defendants also argue there is no "ripe dispute" between Harvard and DOJ because DOJ "grants . . . have not been frozen or terminated." [Harvard, ECF No. 186 at 63]. The Court disagrees, as DOJ is a member of the Federal Task Force that was ultimately responsible for freezing and terminating Harvard's federal funding. Various documents in the administrative record also reveal that at least one DOJ official was a central figure in the effort to terminate Harvard's funding. See, e.g., [NASA-AR03733 (May 8 email from NASA to DOJ official A. Kambli (OASG))]; [NASA-AR03742 (May 8 email from A. Kambli to NASA)]; [GSAHarv_00000035 (May 8 email from GSA addressed to the White House and DOJ)]. As such, the Court is satisfied that, in enjoining DOJ, it is not "entangling [itself] in [an] abstract dispute disagreement[] over administrative policies;" rather, as part of the Federal Task Force responsible for the Freeze Orders, DOJ's "administrative decision has been formalized and its effects felt in a concrete way by [Harvard]," such that the dispute is ripe. Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 807–08 (2003) (citation omitted).

# VI.    DISCUSSION

## A.    First Amendment[17]

Harvard asserts that the Defendants' actions in this case "violated Harvard's First Amendment rights in at least two ways: 1) by retaliating against Harvard based on the exercise of its First Amendment rights, and 2) by imposing content- and viewpoint-based burdens on those rights through the imposition of funding conditions that are unrelated to any legitimate government interest in combating antisemitic harassment or otherwise." [Harvard, ECF No. 70 at 34–35]. Because of this, Harvard contends that "[t]he Freeze Orders and Termination Letters should be vacated and set aside, and any further similar action against Harvard should be permanently enjoined." [Harvard, ECF No. 70 at 35]. The Organizational Plaintiffs proceed under the same two First Amendment theories, but also base their claim on an unconstitutional coercion theory.[18] [AAUP, ECF No. 75 at 51–58]. The parties have filed cross motions for summary judgment on these claims. [Harvard, ECF Nos. 69, 185; AAUP, ECF Nos. 74, 103].

---

[17] This section addresses Plaintiffs' respective First Amendment claims under the APA, which is Count 1 in Harvard's action and Count IV in the Organizational Plaintiffs' action. Their equitable causes of action for violation of the First Amendment—Count 2 in the Harvard action and Count III in the Organization Plaintiffs' action—are addressed in the Court's analysis of the ultra vires claims, infra.

[18] At the summary-judgment hearing, the Organizational Plaintiffs conceded that a victory for Harvard on the retaliation and viewpoint discrimination claims would provide the Organizational Plaintiffs with the relief they seek, [Harvard, ECF No. 229 at 12:23–13:12], and their arguments mirror those advanced by Harvard in its motion. Defendants also oppose the Organizational Plaintiffs' claims for retaliation and viewpoint discrimination by reference to their briefs in the Harvard action. [AAUP, ECF No. 104 at 35]; [AAUP, ECF No. 130 at 34–35]. As such, the Court focuses its analysis for those claims on Harvard's briefing as well. The Organizational Plaintiffs also noted at the hearing, however, that they bring a claim for unconstitutional coercion, [Harvard, ECF No. 229 at 10:19–11:11], which is a theory that Harvard does not advance. The Court addresses that argument infra with reference to the Organizational Plaintiffs' briefing.

1.  Retaliation

As a threshold issue, the parties disagree on the relevant standard to be used in assessing Harvard's First Amendment retaliation claim, that is, its claim that Defendants retaliated against it based on the exercise of its First Amendment rights.  Harvard recites the typical framework applicable to private citizens.  [Harvard, ECF No. 70 at 35].  Defendants, on the other hand, assert that Harvard, as a recipient of federal grant funding, is a "government contractor" and, as such, its First Amendment rights "are circumscribed to the same extent as those of government employees," [Harvard, ECF No. 186 at 43 (citing Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 675 (1996))].  Specifically, Defendants contend that Harvard's First Amendment rights "are governed by the balancing test announced in Pickering v. Board, which weighs the 'interests of the [contractor], as a citizen, in commenting upon matters of public concern and the interest of the State, as [a contracting entity], in promoting the efficiency of the public services it performs through its [contractors].'"  [Id. (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968))].

Defendants point the Court to no binding authority, however, to support the notion that a private research university becomes a government "contractor" for First Amendment purposes by accepting the government's invitation to apply for and thus collaborate on federal research grants.  In the absence of clear precedent, the Court will not adopt such a rule, particularly given that the First Amendment right to and protection of academic freedom is squarely in play.  As Harvard notes, "the Supreme Court has applied Pickering only after it has ensured that the affected speech 'does not raise questions of academic freedom that may or may not involve 'additional' First Amendment 'interests' beyond those captured by [the Pickering] framework.'" [Harvard, ECF No. 211 at 23 (quoting Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 528 (2022))].  Indeed, the Supreme Court, in a seminal government employee speech case, Garcetti

47

v. Ceballos, 547 U.S. 410 (2006), noted that "[t]here is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." Id. at 425. Given this, the Court declines to apply Umbehr here.[19]

As such, to establish a prima facie case of First Amendment retaliation, Harvard must prove that 1) "[it] engaged in First Amendment-protected conduct," 2) "[it] suffered an adverse action," and 3) "[its] protected conduct played a 'substantial or motivating' part in the adverse action." Berge v. Sch. Comm. of Gloucester, 107 F.4th 33, 37 n.4 (1st Cir. 2024) (citation omitted). Defendants "may then avoid a finding of liability by showing that '[they] would have reached the same decision . . . even in the absence of the protected conduct.'" D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012) (quoting Powell v. Alexander, 391 F.3d 1, 17 (1st Cir. 2004)); see also McCue v. Bradstreet, 807 F.3d 334, 339, n.2 (1st Cir. 2015) (noting that "two-step framework" applied outside "the context of public employment, where it originated"). Defendants do not dispute that the Freeze Orders and Termination Letters constitute an adverse action, see generally [Harvard, ECF No. 186]; [Harvard, ECF No. 223], and thus the Court focuses on the first and third prongs of the retaliation analysis.

On the first prong, whether Harvard engaged in First Amendment protected activity, this Court has previously written on Harvard's relevant protected conduct in a separate action, President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec. ("DHS"), No. 25-cv-

---

[19] That said, out of an abundance of caution, for the reasons articulated herein, the Court finds that Harvard's claim would survive under Umbehr. Harvard has sufficiently demonstrated that it engaged in constitutionally protected conduct that was a substantial or motivating factor in the grant terminations, and Defendants have failed to meet their burden to show that they would have taken the same action even in the absence of the protected conduct, or that there are sufficiently strong legitimate countervailing government interests. Umbehr, 518 U.S. at 675.

11472, 2025 WL 1737493, at *15 (D. Mass. June 23, 2025), and thus endeavors or at least aspires to be brief.  That said, it warrants repeating that Harvard engaged in constitutionally protected conduct 1) when it refused the terms set forth in the April 11 Letter, which sought to control viewpoints at Harvard, and 2) when it filed this lawsuit.  Defendants do not dispute that the latter constitutes protected conduct.[20]  As to the April 11 Letter rejection, there is "a zone of First Amendment protection for the educational process itself," Asociación de Educación Privada de P.R., Inc. v. Garcia-Padilla, 490 F.3d 1, 8 (1st Cir. 2007) (citation omitted), that encompasses not only "the independent and uninhibited exchange of ideas among teachers and students," but also Harvard's "autonomous decisionmaking," Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 226 n.12 (1985).  The rights protected by the First Amendment include the right to "manage an academic community and evaluate teaching and scholarship free from [governmental] interference," Blasdel v. Nw. Univ., 687 F.3d 813, 816 (7th Cir. 2012) (citation omitted), as well as Harvard's "prerogative 'to determine for itself on academic grounds who may teach,'" Lieberman v. Gant, 630 F.2d 60, 67 (2d Cir. 1980) (Friendly, J.) (emphasis added) (quoting Sweezy v. New Hampshire, 354 U.S. 234, 263 (1957)), and what is taught in the "college classroom," Healy v. James, 408 U.S. 169, 180 (1972).

Defendants' April 11 Letter, on its face, was directed at these core freedoms, and Harvard's April 14 rejection, on its face, was aimed at preserving them.  The April 11 Letter

---

[20] Contesting this would be difficult as the filing of a lawsuit is quintessential First Amendment protected conduct.  The First Amendment protects the right "to petition the Government for a redress of grievances," U.S. Const. amend. I, that is, "the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes," Borough of Duryea v. Guarnieri, 564 U.S. 379, 387 (2011).  Put simply, "[f]iling and pursuing lawsuits are forms of protected petitioning," Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President, No. 25-917, 2025 WL 1502329, at *18 (D.D.C. May 27, 2025), that are "integral to the democratic process," Borough of Duryea, 564 U.S. at 388.

stated, in no uncertain terms, that the letter would constitute an "agreement in principle that

w[ould] maintain Harvard's financial relationship with the federal government" but only if

Harvard agreed to "audit the student body, faculty, and leadership for viewpoint diversity,"

report that audit to the government, and "hir[e] a critical mass of new faculty" and "admit[] a

critical mass of students . . . who will provide viewpoint diversity." [HHSHarv_00000098–

100]. It further required Harvard to "abolish all criteria, preferences, and practices, whether

mandatory or optional, throughout its admissions and hiring practices, that function as

ideological litmus tests;" to audit "programs and departments that . . . reflect ideological

capture;" to "immediately shuttter all diversity, equity, and inclusion (DEI) programs,

committees, positions, and initiatives . . . including DEI-based . . . speech control policies," and

to demonstrate that it had done so "to the satisfaction of the federal government."

[HHSHarv_00000099–100]. In brief, the April 11 Letter purported to require Harvard to

overhaul its governance, hiring, and academic programs to comport with the government's

ideology and prescribed viewpoint.

     As to Harvard's rejection, Defendants contend that it cannot constitute protected activity

because the April 11 Letter was nothing more than an "offer" in an ongoing negotiation, and

"rejection of an offer is not protected expression; it is a legal act extinguishing the original

offer." [ECF No. 186 at 46]. They further contend that "[t]he consequences that followed

flowed directly from the 'noncommunicative impact' of this legal act of rejection." [Id. (quoting

States v. O'Brien, 391 U.S. 367, 382 (1968)]. This Court has previously made clear that it views

the characterization of the April 11 Letter as an "offer" to be disingenuous, given that the letter

was not at all tentative as to what rejection would mean nor did it open the door to continued

discussion. DHS, 2025 WL 1737493, at *15. That said, even accepting Defendants'

characterization of the April 11 Letter as an "offer," the Court disagrees that such a rejection cannot constitute protected conduct when, as here, the rejection was repeatedly and explicitly based on Harvard's refusal to surrender its First Amendment freedoms in the face of government pressure.  Harvard's rejection was clear, stating:

> It is unfortunate . . . that your letter . . . presents demands that, in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court. . . . The university will not surrender its independence or relinquish its constitutional rights. Neither Harvard nor any other private university can allow itself to be taken over by the federal government. Accordingly, Harvard will not accept the government's terms as an agreement in principle.

[HHSHarv_00000104–105].  In other words, Harvard's rejection communicated that it would not tolerate the government's attempt to control "who may teach, what may be taught, how it shall be taught, and who may be admitted to study," Regents of Univ. of California v. Bakke, 438 U.S. 265, 312 (1978), and that unequivocal expression of core First Amendment values in the face of government overreach constitutes protected speech.

Defendants further contend that, even if the April 11 Letter and the filing of this lawsuit constitute protected conduct (which the Court has now found), Harvard has not shown that the protected conduct was a substantial or motivating factor in the final agency action at issue.  This is difficult to square, however, with the text of the April 11 Letter, which explicitly conditioned federal funding on Harvard's acceding to the government's demands, and the fact that the April 14 Freeze Order came within hours of Harvard's refusal to do so.  In fact, Defendants acknowledge in their opposition brief that the April 11 Letter "was clear that if an agreement was not reached, [the government] would exercise its termination rights." [Harvard, ECF No. 186 at 48].  It is also difficult to square with the texts of the Freeze Orders and Termination letters, which blatantly link Harvard's April 14 rejection of the government's demands to the funding cuts.  The April 14 Freeze Order made this clear right from its start, opening with, "Harvard's

51

statement today reinforces the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges." [GSAHarv_ 00000012–13 (emphasis added)]. The May 5 Freeze Order similarly links its issuance to Harvard's refusal to make "proposed common-sense reforms," referencing substantially similar reforms as those outlined in the April 11 Letter, [EDHarvAR_0000009], and it makes no secret of the government's ideological disagreements with Harvard, calling attention to, among other things, Harvard's decision to hire "failed Mayors Bill [d]e Blasio and Lori Lightfoot, perhaps the worst mayors ever to preside over major cities in our country's history," and to allow "strongly left-leaning Obama political appointee Penny Pritzker, a Democrat operative," to manage the Harvard Corporation, [EDHarvAR_0000008–09]. And many of the Termination Letters reiterate that the impetus for the terminations was Harvard's refusal to adopt "reforms" that the government deemed "appropriate." See, e.g., [HHSHarv_00000473–75 ("the University has refused to take appropriate action" (emphasis added))]; [USDA-HARV-AR-00008–09 (same)]; [ENERGY AR3932 ("Harvard has refused to take immediate, definitive and appropriate remedial action" (emphasis added))].

Based on this administrative record, the Court is satisfied that Harvard's protected conduct was a substantial and motivating factor in the Freeze Orders and Termination Letters. Defendants contend, however, that Harvard's retaliation claim nonetheless fails because "the agencies' terminations are explained by a nonretaliatory purpose: opposing antisemitism," [Harvard, ECF No. 186 at 45], such that the government "would have terminated" the grants irrespective of Harvard's viewpoints, [id. at 43]. This argument does not carry the day. Defendants have failed to meet their burden to show they acted with a non-retaliatory purpose for several reasons. First, as discussed, the April 11 Letter specifically conditioned funding on agreeing to its ten terms, only one of which related to antisemitism, [HHSHarv_00000100

("Reforming Programs with Egregious Records of Antisemitism or Other Bias")], while six

related to ideological and pedagogical concerns, including who may lead and teach at Harvard,

[HHSHarv_00000098–99 ("Governance and leadership reforms;" "Merit-Based Hiring

Reform")], who may be admitted, [HHSHarv_00000099 ("Merit-Based Admissions Reform;"

"International Admissions Reform")], and what may be taught, [HHSHarv_00000099–100

("Viewpoint Diversity in Admissions and Hiring;" "Discontinuation of DEI")].  Additionally,

Defendants' argument ignores that Harvard's April 14 letter rejected only the conditions it

viewed as infringing on its First Amendment rights and, in fact, specifically agreed to discuss

measures aimed at combatting antisemitism, [HHSHarv_00000104–105 ("Harvard remains open

to dialogue about what the university has done, and is planning to do" to combat antisemitism)],

an offer Defendants similarly disregarded when instituting the first funding freeze on the basis of

"Harvard's statement[s]" hours later.  [GSAHarv_00000012].

Moreover, although combatting antisemitism is indisputably an important and worthy

objective, nothing else in the administrative record supports Defendants' contention that they

were primarily or even substantially motivated by that goal (or that cutting funding to Harvard

bore any relationship to achieving that aim).  As discussed further infra, before the April 14

Freeze Order, Defendants had announced a funding review consistent with the goals of

combatting antisemitism; the record, however, does not reflect that Defendants engaged in such a

review, weighed the value of any grant, gathered any data regarding antisemitism at Harvard, or

considered if and how terminating certain grants would improve the situation for Jewish students

at Harvard.  Rather, all that Defendants learned between March 31 and April 14, 2025 was that

Harvard would not capitulate to government demands that it audit, censor, or dictate viewpoints

of staff and students.  The fact that Defendants' swift and sudden decision to terminate funding,

ostensibly motivated by antisemitism, was made before they learned anything about antisemitism on campus or what was being done in response, leads the Court to conclude that the sudden focus on antisemitism was, at best (and as discussed infra), arbitrary and, at worst, pretextual.

Thus, the Court is satisfied that Harvard is entitled to summary judgment on its claim for First Amendment retaliation on the face of the administrative record.  The Court would be remiss, however, if it did not note that the summary judgment record also contains numerous exhibits and undisputed facts that go beyond the administrative record that speak to Defendants' retaliatory motive in terminating Harvard's funding.[21]  Although Defendants now contend that Harvard's April 14 rejection and subsequent lawsuit had nothing to do with their decision to cut its funding, numerous government officials spoke publicly and contemporaneously on these issues, including about their motivations, and those statements are flatly inconsistent with what Defendants now contend.  These public statements corroborate that the government-initiated

---

[21] It is not entirely clear whether the Court can consider undisputed facts in the summary judgment record that go beyond the administrative record in deciding Plaintiffs' First Amendment claim brought under 5 U.S.C. § 706(2)(B).  See, e.g., Chiayu Chang v. U.S. Citizenship & Immigr. Servs., 254 F. Supp. 3d 160, 161 (D.D.C. 2017) ("As to plaintiffs' constitutional claims, there appears to be some disagreement among district courts whether the assertion of constitutional claims takes a case outside the procedural strictures of the APA, including the record review rule.").  Here, however, Defendants agreed at the hearing that such undisputed facts could be considered by the Court, [ECF No. 229 at 9:7–23], nor have they objected in subsequent motion practice.  See Bos. Redevelopment Auth., 838 F.3d at 48 (considering supplemental information where "the parties—by mutual consent—conducted additional discovery" and "cite[d] to and rel[ied] on this supplemental information throughout their . . . briefs").  Thus, while the Court is satisfied that the administrative record alone fully supports its decision, it includes some of the additional undisputed information here.  Additionally, Plaintiffs have brought equitable claims for First Amendment violations, which the Court does not reach because it finds that they are entitled to relief under the APA.  That said, it is the Court's understanding that these additional facts would be available and relevant to the Court's analysis in equity if Plaintiffs' APA claims were not successful.

onslaught against Harvard was much more about promoting a governmental orthodoxy in violation of the First Amendment than about anything else, including fighting antisemitism.

For instance, in the forty-eight hours following the April 14 Freeze Order, the President took to social media multiple times to talk about Harvard. He posted on Truth Social that Harvard is "a JOKE" that "should no longer receive Federal Funds." [AAUP SOF ¶ 90]; [ECF No. 77-9]. His stated concerns (which would later be echoed in the May 5 Freeze Order) were untethered from antisemitism and instead based entirely on Harvard's "hiring almost all woke, Radical Left, idiots and 'birdbrains' who are only capable of teaching FAILURE to students," including "two of the WORST and MOST INCOMPETENT mayors in the history of our Country," referring to Democratic mayors Bill de Blasio and Lori Lightfoot. [AAUP SOF ¶ 90]; [ECF No. 77-9]. This post echoed his comments from a day earlier, when he opined, again on Truth Social, that "[p]erhaps Harvard should lose its Tax Exempt status and be Taxed as a Political Entity." [Harvard SOF ¶ 49]. Again, that post did not reference antisemitism explicitly but rather was focused on Harvard's "pushing political, ideological, and terrorist inspired/supporting 'Sickness[.]'" [Id.]. It was not until nearly ten days later that the President would call Harvard "Anti-Semitic," doing so in a Truth Social post that, in the same breath, called Harvard a "Far Left Institution" and a "Liberal mess, allowing a certain group of crazed lunatics to enter and exit the classroom and spew fake ANGER AND HATE." [AAUP SOF ¶ 91]; [ECF No. 77-10].[22]

---

[22] On May 7, 2025, Linda McMahon made a statement in which she denied that the funding cuts were "about [the] First Amendment" and were in fact "about civil rights." [AAUP SOF ¶ 93]. In that same statement, however, she noted that, in addition to civil rights concerns, the government "also wanted to make sure some of the other things that [the government] talked [to Harvard] about" were resolved, including whether Harvard was "vetting students who are

A similar barrage followed Harvard's decision to litigate rather than settle this case, with Administration officials being clear about the connection between that decision and the funding cuts.  In particular, on May 28, 2025, the Secretary of Education summarized the situation with Harvard, stating:

> When we looked at different aspects of what Harvard was doing relative to anti-Semitism on its campuses they were not enforcing Title VI the way it should be. And we had conversations with President Garber and I expected that we would have more, but Harvard's answer was a lawsuit so that's where we find ourselves. . . . I think the President is looking at this as, OK, how, how can we really make our point[?]

[AAUP SOF ¶ 95 (emphasis added)].  The same day, during an interview in the Oval Office, the President himself said that Harvard is "hurting [itself]" by "fighting," contrasting Harvard with Columbia, who he noted "has been . . . very, very bad . . . . But they're working with us on finding a solution."  [Harvard SOF ¶ 95].  He declared that Harvard "wants to fight. They want to show how smart they are, and they're getting their ass kicked."  [Id.].  His conclusion: "[E]very time [Harvard] fight[s], they lose another $250 million."  [Id.].

In brief, Defendants' contention that Harvard's First Amendment activities were not a "substantial and motivating" factor in the funding terminations, or that those terminations were animated by non-retaliatory motives, does not square with the government's communications regarding its decision, which specifically and repeatedly linked the coordinated funding cuts to Harvard's decision to "fight."  That "fight" (Harvard's decision to speak out and litigate its case in the courts and the marketplace of ideas), however, is indisputably protected by the First

---

coming in from outside of the country to make sure they're not activists" and "vetting professors that [it is] hiring to make sure that they're not teaching ideologies."  [Id.]. In other words, she again tied the government's actions to viewpoint-related conditions similar to those within the April 11 Letter.

Amendment.  <u>Borough of Duryea</u>, 564 U.S. at 387.  To the extent the Court can consider these public statements, they provide additional support for granting Plaintiffs' summary judgment motion as to their First Amendment claims; to the extent it cannot, however, the administrative record, standing alone, is more than sufficient to demonstrate that Defendants impermissibly retaliated against Harvard for refusing to capitulate to the government's demands.  Plaintiffs are thus entitled to summary judgment on their First Amendment retaliation claims.

### 2.    Unconstitutional Conditions

Given that Harvard is entitled to summary judgment on its retaliation-based First Amendment claim, the Court need not reach Harvard's unconstitutional conditions-based theory, that is, its claim that Defendants impermissibly imposed on Harvard content- and viewpoint-based funding conditions that were unrelated to any legitimate government interest.  [Harvard, ECF No. 70 at 40–42].  That said, having found that the Freeze Orders and Termination Letters resulted from Harvard's exercise of its First Amendment rights, it is evident that Defendants impermissibly imposed unconstitutional conditions on Harvard's receipt of federal funds.[23]

<u>Perry v. Sindermann</u>, 408 U.S. 593, 597 (1972) ("[T]his Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons . . . [i]t may not deny a benefit to a person on a

---

[23] It is, in fact, unclear to this Court that these two claims are distinct from one another.  <u>Best Payphones, Inc. v. Dobrin</u>, 410 F. Supp. 3d 457, 511 (E.D.N.Y. 2019) ("At the outset, this Court notes that it is entirely unclear how a claim alleging a First Amendment unconstitutional condition differs from First Amendment retaliation. Indeed, many opinions suggest that they are one and the same.").  Out of an abundance of caution, however, the Court addresses Harvard's unconstitutional conditions theory separately.

basis that infringes . . . his interest in freedom of speech."); see also Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc., 570 U.S. 205, 214 (2013) ("[A] funding condition can result in an unconstitutional burden on First Amendment rights.").  Moreover, it is worth noting that the conditions here are particularly concerning because, as discussed, many of them were based on Harvard's "particular beliefs," Nat'l Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 188 (2024), and sought to dictate the content of speech on campus and the "particular views taken by speakers on [particular] subject[s]," Rosenberger v. Rectors & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995).  "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." Moody v. NetChoice, LLC, 603 U.S. 707, 719, 741–42 (2024).

Defendants in opposition offer only that "[i]t is an open question whether the unconstitutional conditions doctrine can even be properly applied to settlement negotiations at all."  [Harvard, ECF No. 186 at 49].  Defendants' cited authority, however, notes that the "mere fact that one agrees to the challenged condition, even in a settlement, cannot by itself render the bargain constitutional because the unconstitutional conditions doctrine focuses on the propriety of the condition, not the fact that the claimant agreed to it."  Stephens v. Cnty. of Albemarle, No. 04-cv-00081, 2005 WL 3533428, at *6 (W.D. Va. Dec. 22, 2005); see also Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595, 608 (2013) (holding that a constitutional claim may rest on "an unconstitutionally extortionate demand").  Here, Defendants' focus on whether the April 11 Letter was a final agency action or whether it was a simple settlement term is misplaced; rather, the issue is the impropriety of conditioning Harvard's federal funding, even as part of settlement negotiations, on Harvard's realigning its campus to better reflect a viewpoint favored

by the government.  As such, the Court finds that Defendants imposed unconstitutional

conditions on Harvard's receipt of federal funding in violation of the First Amendment.

> ### 3.    Unconstitutional Coercion

The Organizational Plaintiffs also assert a First Amendment claim based on a theory of

unconstitutional coercion, relying primarily on National Rifle Association of America v. Vullo,

which held that "[a] government official cannot directly or indirectly coerce a private party to

punish or suppress disfavored speech on her behalf."  602 U.S. at 190; see also id. at 189 ("The

First Amendment prohibits government officials from relying on the 'threat of invoking legal

sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech."

(quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963))).  Defendants contend that

Vullo is distinguishable because, "unlike Vullo, [this case] does not involve the government

threatening coercive action against one party to get at the protected speech of a third; instead, the

government is using its enforcement authority to act directly upon a regulated entity because of

that entity's own conduct."  [AAUP, ECF No. 104 at 33].  They further assert that "[u]nlike in

Vullo, there are no plausible allegations here that any of the actions taken by the agencies were

done 'in order to' suppress or punish protected speech, rather than to pursue a legitimate

interest," namely combatting antisemitism.  [Id. at 34].

The Court disagrees.  Vullo is instructive on this issue, if not determinative.  In that case,

the Superintendent of the New York Department of Financial Services ("DFS"), Maria Vullo, in

the wake of a high-profile school shooting allegedly criticized the National Rifle Association

("NRA"), urging insurance companies and other financial institutions regulated by DFS to

discontinue any arrangements they had with the NRA or face investigation for technical

regulatory infractions.  602 U.S. at 182–84.  DFS subsequently entered into consent decrees with

two insurers, who agreed not to any provide NRA-endorsed insurance programs and then cut ties with the NRA. Id. at 185. The Court held that the government cannot threaten or impose legal sanctions or use other means of coercion to suppress speech. Id. at 180. Although "Vullo was free to criticize the NRA and pursue the conceded violations of New York insurance law," id. at 187, as a government official, she could not "attempt to coerce private parties in order to punish or suppress views that the government disfavors," id. at 180.

Defendants' contention that this case "is different in kind" than Vullo, [AAUP, ECF No. 104 at 33], is unavailing. As discussed at length, the administrative record reflects that, via the April 11 Letter, Defendants unconstitutionally sought to force Harvard to better manifest the government's favored worldview. To do so, Defendants (like Maria Vullo) urged and threatened Harvard (in the position of the insurer) to hire faculty and make curricula and research choices that better aligned with the government's preferred viewpoints, to the detriment of professors and researchers with competing views (like the NRA). Pursuant to Vullo, using this type of coercion to suppress speech, third-party or otherwise, is not permissible. 602 U.S. at 180–81. Because the Defendants required the Organizational Plaintiffs' members to rebalance and alter their speech to save Harvard's funding, the Court finds the Organizational Plaintiffs are entitled to summary judgment on their unconstitutional coercion claim.

Based on the foregoing, the Court **GRANTS** summary judgment to Plaintiffs on their First Amendment claims for retaliation, unconstitutional conditions, and unconstitutional coercion, and it **DENIES** Defendants' competing motions.

### B.    Title VI

Plaintiffs and Defendants have filed cross motions for summary judgment on Plaintiffs' Title VI claims. Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of

race, color, or national origin in "any program or activity receiving Federal financial assistance."

42 U.S.C. § 2000d.[24]  In Title VI, Congress identified specific procedures that an agency must

follow <u>before</u> "terminating, or refusing to grant or continue, assistance" based on an alleged

failure to comply with a requirement adopted pursuant to Title VI.  <u>Id.</u> at § 2000d-1.

Specifically, Title VI provides that no action terminating financial assistance "shall be taken until

the department or agency concerned has" 1) "advised the appropriate person or persons of the

failure to comply with the requirement," and 2) "determined that compliance cannot be secured

by voluntary means."  <u>Id.</u>  If the relevant department or agency determines that voluntary

compliance is not possible, it may then terminate grants, but only if "there has been an express

finding on the record, after opportunity for hearing, of a failure to comply with such

requirement," and the termination must be "limited to the particular . . . recipient as to whom

such a finding has been made," as well as "the particular program, or part thereof, in which such

noncompliance has been so found."  <u>Id.</u>  Further, once these procedural steps have been met, "the

head of the Federal department or agency shall file with the committees of the House and Senate

having legislative jurisdiction over the program or activity involved a full written report of the

circumstances and the grounds for such action."  <u>Id.</u>  After this report is filed with Congress, the

action still may not "become effective until thirty days have elapsed."  <u>Id.</u>  Only then may an

agency terminate funding because of concerns about discrimination.

It is undisputed that Defendants did not comply with these requirements before issuing

the Freeze Orders or Termination Letters.  The administrative record contains no evidence of a

---

[24] The parties do not dispute that Title VI protects Jewish students from harassment.
"[D]iscrimination based on actual or perceived Israeli identity is of course discrimination based
on national origin."  <u>Kestenbaum v. President & Fellows of Harvard Coll.</u>, 743 F. Supp. 3d 297,
307 (D. Mass. 2024).

notice of noncompliance, an assessment that compliance could not be achieved by voluntary means, a hearing, a finding on the record, or a report to Congress.  See generally [Harvard, ECF No. 224]; see also [Harvard SOF ¶¶ 96, 98–101].  Thus, to the extent Defendants were required to comply with Title VI, Plaintiffs are indisputably entitled to summary judgment on their Title VI claims.  See, e.g., City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir. 2020) ("Any action that an agency takes outside the bounds of its statutory authority is ultra vires . . . and violates the Administrative Procedure Act." (citation omitted)).

Defendants contend, however, that they, rather than Plaintiffs, are entitled to summary judgment on the Title VI claims because they were not required to comply with Title VI at all. See [Harvard, ECF No. 186 at 51].  Rather, they argue that they terminated Harvard's funding pursuant to 2 C.F.R. § 200.340(a)(4), which provides that a "Federal award may be terminated in part or its entirety. . . . [b]y the Federal agency . . . pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  [Harvard, ECF No. 186 at 52–55].  Notably, however, neither the April 14 nor the May 5 Freeze Order contains any reference to 2 C.F.R. § 200.340, and it is a fundamental principle of administrative law that "the post hoc rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action."  Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 539 (1981).

This lack of reference to 2 C.F.R. § 200.340 in the Freeze Orders does not reflect an isolated or accidental oversight; in fact, this Court's diligent review of the administrative record has not identified a single document predating the Termination Letters that references 2 C.F.R. § 200.340 as a basis for ending Harvard's funding.  Rather, the record is replete with documents calling on Harvard's funding to be investigated and terminated pursuant to Title VI (not 2 C.F.R.

§ 200.340) or, more generally, "civil rights laws" (like Title VI).  This includes a December 2024

Congressional Staff Report on Antisemitism, [HHSHarv_00000030 ("The Executive Branch

Should Aggressively Enforce Title VI")]; Executive Order 14188, [HHSHarv_00000001 (calling

on the Attorney General to "employ appropriate civil rights enforcement," referencing Title VI

complaints, and incorporating prior executive order discussing Title VI at length)]; see also

Exec. Order No. 14188, 90 Fed. Reg. 8857 (Jan. 29, 2025); the April 3 Letter (which, as

discussed, was incorporated into the April 11 Letter), [GSAHarv_00000005 (claiming Harvard

"has fundamentally failed to protect American students and faculty from antisemitic violence and

harassment in addition to other alleged violations of Title VI")]; the April 11 Letter,

[GSAHarv_00000007 (federal investment "depends on Harvard upholding federal civil rights

laws")]; and, the April 14 Freeze Order, [GSAHarv_00000013 (noting that federal investment

comes with "the responsibility to uphold civil rights laws")].  To conclude that 2 C.F.R.

§ 200.340(a)(4) served as the basis for these terminations, rather than Title VI, is simply

"incongruent with what the record reveals about the agenc[ies'] priorities and decisionmaking

process."  Dep't of Com. v. New York, 588 U.S. 752, 785 (2019).

 Defendants maintain that the Termination Letters are the relevant final agency action, and

that those letters do cite to 2 C.F.R. § 200.340(a)(4) as the basis for the terminations.  [Harvard,

ECF No. 223 at 8 n.1].  Even accepting the premise that invoking 2 C.F.R. § 200.340(a)(4) at the

last moment was not a post hoc attempt to remedy the failure to follow Title VI's procedures, the

argument that this regulation authorizes Defendants' conduct is, at best, circular.  The regulation

permits an agency to terminate federal grants for no longer effectuating "agency priorities," and

to do so "to the extent authorized by law."  2 C.F.R. § 200.340(a)(4).  The agency priority

identified in the Termination Letters is, almost uniformly, Harvard's purported failure to combat

antisemitism.  [Harvard SOF ¶ 78]; see also [AAUP SOF ¶¶ 43–44, 50–51, 57, 63, 69, 72, 74, 76, 83–84].  Congress has, however, passed a law that explicitly provides for when and how an agency can terminate federal funding to address this type of discrimination—and that law is Title VI, which dictates that "no such action shall be taken until the department or agency" has gone through the appropriate procedures.  42 U.S.C. § 2000d-1.  In other words, allowing Defendants to use 2 C.F.R. § 200.340(a)(4) to cancel grants based on discrimination is not authorized by law, as it would result in the regulation wholly nullifying an explicit statutory scheme, which is impermissible.  P. Gioioso & Sons, Inc. v. Occupational Safety & Health Rev. Comm'n, 115 F.3d 100, 105 (1st Cir. 1997) ("[R]egulations cannot alter th[e] statutory scheme.").

Defendants disagree with the Court's reading of the interplay between Title VI and 2 C.F.R. § 200.340(a)(4), contending that it "would require concluding that Congress intended discriminators to have more protections than those whose contract[s] are terminated for different policy reasons under 2 C.F.R. § 200.340, which would conflict with Congress's intent of achieving maximal civil rights protections."  [Harvard, ECF No. 186 at 54].  It is Congress's role, however, to circumscribe agency authority as it sees fit, and here it has, passing a statute aimed at "avoid[ing] a punitive . . . application of the termination power" by imposing "procedural limitations . . . designed to [e]nsure" that end.  Bd. of Pub. Instruction v. Finch, 414 F.2d 1068, 1075 (5th Cir. 1969).  "Discriminators" are not afforded more protections; rather, people and entities receiving federal funding are shielded against being labeled with the "irreversible stigma" of "discriminator" until a certain level of agency process has determined that there was misconduct that warranted termination.  Bowman v. EPA, 712 F. Supp. 375, 383 (S.D.N.Y. 1989); see also Foster v. Mydas Assocs., Inc., 779 F. Supp. 614, 620 (D. Mass. 1991) ("To charge racial discrimination is to accuse a person of a most despicable and disreputable act.

Thus, one who seeks to secure his own civil rights must, in turn, be equally sensitive to the rights of the innocent to preserve their good name and not, without sufficient legal basis, rob them of that which not enriches him but makes them poor indeed." (citation modified)).  This Court's role is not to second guess Congress's judgment, and it may not disregard an explicit statutory scheme aimed at exactly the harm at issue, namely addressing discriminatory conduct.[25]

As such, the Court **GRANTS** Plaintiffs' motions for summary judgment as to their Title VI claims and **DENIES** Defendants' motions.

### C.    Arbitrary and Capricious

Plaintiffs further contend that Defendants' actions violate the APA because they were arbitrary and capricious.  Plaintiffs raise three main arguments: 1) Defendants failed to provide a reasoned explanation as to why it was necessary to freeze funding to Harvard; 2) Defendants failed to consider the consequences of freezing funding to Harvard, namely, "whether any putative benefits from terminating Harvard's funding could outweigh the costs of terminating critical research programs;" and, 3) Defendants failed to consider serious reliance interests before freezing funding to Harvard.  [Harvard, ECF No. 70 at 50–58]; see also [AAUP, ECF No. 75 at 35–51 (similar)].  Defendants' counterargument is similarly three-fold.  They contend that 1) deciding to freeze grants was not arbitrary and capricious because they followed a

---

[25] Count 3 of Harvard's Amended Complaint cites 5 U.S.C. § 706(2)(A) and (C), while Count 4 cites 5 U.S.C. § 706(2)(A) and (D).  [Harvard, ECF No. 59 at ¶¶ 140–92].  Because the Defendant agencies failed to follow the procedures prescribed in Title VI, their actions were "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," and "without observance of procedure required by law," 5 U.S.C. § 706(2)(A), (C), (D); see also Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 117–21, 121 n.15 (1st Cir. 2002) (holding that agency's failure to follow explicit statutory procedural requirement in enacting regulations would violate 5 U.S.C. § 706(2)(D)), and thus Harvard's motion is granted as to both counts.

"comprehensive review of Federal contracts with certain institutions of higher education that [were] being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment," including Harvard, citing to the Federal Task Force's March 31 Letter informing Harvard of the funding review; 2) Defendants weighed the cost of cutting research; and 3) Harvard cannot have a serious reliance interest in grant programs that are discretionary under 2 C.F.R. § 200.340.  [Harvard, ECF No. 186 at 56–60]; [AAUP, ECF No. 104 at 41–46].

"An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" Ohio v. Env't Prot. Agency, 603 U.S. 279, 292 (2024) (quoting FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)).  "In reviewing an agency's action under that standard, a court may not 'substitute its judgment for that of the agency.'" Id. (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009)).  "But it must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" Id. (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Penobscot Air Servs., Ltd. v. FAA, 164 F.3d 713, 719 (1st Cir. 1999) ("The task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and 'articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" (quoting State Farm, 463 U.S. at 43)).  "While this is a highly deferential standard of review, it is not a rubber stamp." Penobscot Air Servs., 164 F.3d at 720 (quoting Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1285 (1st Cir. 1996)).

Starting with the choice made, the Freeze Orders base the decision to end funding on the Defendant agencies having set a new priority, that is, to combat antisemitism, and their

determination that Harvard had not taken sufficient steps to address antisemitism.  Combatting antisemitism is, without question, a laudable and important goal.  Even an indisputably worthy goal, however, does not allow Defendants to change course on decades of federal funding for critical research without providing a reasoned explanation as to how the agency determined that freezing funding would advance that goal, or, in other words, help combat antisemitism.  Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").  On that front, the Freeze Orders come up short for several reasons.

First, the Court is cognizant that, as Defendants contend, it "must 'uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned,'" [Harvard, ECF No. 186 at 57 (quoting Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974))], and that weighing the costs and benefits of terminating funding is "vested in the agencies, even if the plaintiff (or the court) would have weighed those interests differently," [id. at 59].  Here, however, the administrative record does not support that such a "path" was charted or that such weighing occurred.  Although it is true that the Federal Task Force announced on March 31, 2025 that it would be embarking on a comprehensive review of federal contracts at Harvard to combat antisemitism, [GSAHarv_00000002], the record does not reflect that such a review occurred between that March 31 Letter and the Freeze Orders.  Defendants have not pointed to a single document, nor has the Court's review of the record located one, that indicates that they weighed the value of the research funded by a particular grant against the goal of combating antisemitism at Harvard.  Several documents, in fact, indicate that such a weighing likely did not occur before the assault on Harvard began or even by the time of the eventual Termination Letters (although, to be clear, the Court is not purporting to rule on the Termination

Letters as part of its arbitrary and capricious analysis).  For instance, DoD did not inform its officials that the Secretary of Defense had directed the cancellation of grants until the day after sending their termination letter, [DoDHarv_00000039–46, DoDHarv_00000033], leading, as discussed supra, the director of DARPA to plead with her supervisors to save a grant with Harvard aimed at preparing the country for emerging biological threats.  [DoDHarv_00000047 ("Development of critical technologies that enables bio surveillance and biocollection in austere, field forward locations bolsters national security and warfighter safety and lethality.")].  Presumably, had any grant-based weighing occurred in advance, these concerns would have been raised, and, in any case, the record contains no information that this grant or any other DoD grant was discussed at all before being terminated.[26]

Second, the record reflects that Defendants had essentially no information about the prevalence of antisemitism at Harvard before issuing the Freeze Orders.  DHS v. Regents of the Univ. of Cal., 951 U.S. 1, 30 (2020) (holding agency action was arbitrary and capricious where agency "entirely fail[ed] to consider [an] important aspect[] of the problem" that was "the centerpiece of the policy" (citation omitted)).  The administrative record contains two documents which discuss antisemitism at Harvard: 1) the December 2024 Congressional Staff Report on Antisemitism, [HHSHarv_00000013–55], and 2) the April 29, 2025 Harvard Task Force Report.[27]  As to the former, there is no indication in the record that the agencies considered the

---

[26] While not part of the administrative record, it is again worth noting that, per post-motion filings, this grant appears to have continued, despite nominally being cancelled.  [ECF No. 221].
[27] Although neither party points to it in briefing, the Court's review of the record reveals one other document outlining methods of "[a]ddressing [a]ntisemitism and [a]nti-Americanism" at Harvard, produced bearing an HHS bates stamp.  [HHSHarv_00000083–97].  The Court cannot discern on the face of the document, however, which agency, if any, created it or considered it. In any event, of the many methods it proposes to address antisemitism and anti-Americanism, none of those methods involve terminating federal grants.  [Id.].

Congressional Staff Report in deciding to freeze funding.  The Freeze Orders make no mention of it, and even the Termination Letters almost uniformly cite to the Harvard Task Force Report as support, rather than anything that came before Harvard's own report.  See, e.g., [USDA-HARV-AR-00008 (basing finding that Harvard failed to combat antisemitism on the conclusions of the "the Harvard Presidential Task Force on combating Antisemitism and Anti-Israeli Bias")]; [DoDHarv _ 00000039 (same)]; [EDHarvAR_0000011 (same)]; [ENERGY AR3932 (same)]. And that Harvard Task Force Report cannot serve as the justification for the April 14 Freeze Order because it was released on April 29, 2024, two weeks after the Freeze Order.  As discussed supra, the agencies at issue here simply cannot rely on a post hoc rationalization for having frozen funding, and a report that postdated an action would certainly qualify as post hoc.[28]

Third, even accepting the premise that Defendants relied on the Congressional Staff Report and the Harvard Task Force Report to identify antisemitism as a problem, the administrative record contains no evidence that Defendants considered any of the steps Harvard had taken to research or address antisemitism on campus before declaring that funding would be frozen because Harvard had failed to address the issue.[29]  The record reflects that Harvard was, in fact, working to respond to and ameliorate antisemitism, that it continued to do so each time the government raised concerns, and that it remained (and seemingly remains) open to dialogue as to what more it could do in the government's eyes to combat the problem.  For instance, after

---

[28] Moreover, timing aside, allowing Defendants to rely solely on the Harvard Task Force Report would have raised other concerns, including the disincentive it could create for universities to assess and remedy their own shortcomings regarding issues like antisemitism.

[29] There is one document in the administrative record which appears to have been circulated by counsel for HHS entitled "Already Done by Harvard," which does describe some steps Harvard had taken to address antisemitism.  [HHSHarv_00005232–35].  This document, however, is undated, and it was not circulated until May 29, 2025; thus, its only appearance in the administrative record is, necessarily, after the Freeze Orders were issued.

the Congressional Staff Report raised antisemitism concerns at Harvard, Harvard began

implementing reforms, which were publicly announced and widely reported.  These included:

- creating the Harvard Task Force;
- disciplining students and faculty who violate applicable policies; enhancing programs and policies designed to address bias and promote ideological diversity and civil discourse;
- adopting new accountability procedures and clarified policies, including specifying that protests are not permitted in classrooms, libraries, dormitories, dining halls, Harvard offices, and other places where they would interfere with normal activities, and they expressly prohibit unauthorized encampments, exhibits, and displays on campus;
- supplementing existing safety and security measures;
- refining procedures and protections for reporting misconduct; and making several leadership and personnel changes.

[Harvard SOF ¶¶ 5–8].[30]  Yet, the record does not reflect that Defendants ever acknowledged or

considered these reforms or what impact Harvard's own efforts should have on the decision to

terminate funding.  When Defendants accused Harvard of failing to combat antisemitism in the

April 11 Letter, Harvard responded by detailing the steps taken and progress made, both via a

letter and in President Garber's public statements.  See [HHSHarv_00000104–05 (Harvard April

14 rejection letter outlining steps to combat antisemitism on campus and noting "[i]t is

unfortunate, then, that [the April 11 L]etter disregards Harvard's efforts")]; [Harvard SOF ¶ 42

(President Garber's April 14 statements outlining university response to antisemitism)].  Again,

there is no evidence in the record that Defendants ever considered these reforms or Harvard's

---

[30] The Court notes that the administrative record does not include all of Harvard's various statements and announcements regarding measures it has taken or will take to combat antisemitism, including President Garber's April 14, 2025 statement outlining those efforts.  The Court takes those statements into account, however, as it finds that Harvard's response to antisemitism is a factor that Defendants should have considered when deciding whether to terminate funding based on Harvard's response to antisemitism.  See Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989) ("[E]xceptions to the general rule [against going beyond the administrative record] have been recognized . . . when the agency failed to consider factors which are relevant to its final decision.").

attention to the problem of antisemitism, despite declaring on April 14, 2025 that Harvard had

not done enough.[31]

     Fourth, the administrative record does not indicate that Defendants considered the

potential societal costs to Harvard, the American public generally, Jews in particular, or even the

government itself of freezing the underlying research.  Cf. Michigan v. EPA, 576 U.S. 743, 759

(2015) ("The Agency must consider cost—including, most importantly, cost of compliance—

before deciding whether regulation is appropriate and necessary.").  As Harvard explains,

> In addition to canceling military research pivotal to national security, the
> [g]overnment ordered immunologists overseeing a multi-school tuberculosis
> consortium to immediately stop research, HHSHarv_00005181, told a Harvard
> researcher at the Wyss Institute to halt his development of an advanced chip
> designed to measure NASA astronauts' radiation exposure during the upcoming
> Artemis II mission to the Moon, HHSHarv_00004937, and directed yet another
> Wyss Institute scientist, a recipient of the nation's highest honor for technological
> achievement, to cease his research into Lou Gehrig's disease, HHSHarv_00005228.
> Officials at the Department of Veterans Affairs have begun the process of cutting
> funding for research into, among other lifesaving measures, "a predictive model to
> help V.A. emergency room physicians decide whether suicidal veterans should be
> hospitalized." See HHSHarv_00002326. This is sadly just the tip of the iceberg, as
> future projects at Harvard of a similar caliber are now categorically barred from
> even being considered for federal support.

[Harvard, ECF No. 70 at 55 (footnotes omitted)].  It is difficult if not impossible to conclude that

Defendants considered all important aspects of the problem where the record reveals that they

cancelled this broad swath of critical research without any consideration as to whether there were

less restrictive alternatives or alternatives that would preserve the value and continuity of

research already in progress.  Research that has been frozen could save lives, money, or the

---

[31] The Harvard Task Force Report itself contains an appendix that details the actions Harvard has
taken to combat antisemitism, which Defendants do not seem to have considered even by the
time they terminated funding.  [GSAHarv_00000327–34 ("Appendix 1: Recent Progress on
Addressing Antisemitism and Anti-Israeli Bias Across Harvard.")].

environment, to name a few.  And the research was frozen without any sort of investigation into whether particular labs were engaging in antisemitic behavior, were employing Jews, were run by Jewish scientists, or were investigating issues or diseases particularly pertinent to Jews (such as, for example, Tay-Sachs disease), meaning that the funding freezes could and likely will harm the very people Defendants professed to be protecting.  And it is unlikely that any Jew, even one directly impacted by antisemitism would be in favor of stopping research on, for example, Alzheimer's disease, heart disease, or autism to name a few, as a means of redressing their unrelated harm.

Finally, the decades of reliance interests that have been engendered by the government's prior practice of supporting Harvard as a research institution compound the problem of Defendants' lack of reasoned explanation and failure to consider important aspects of freezing funding.  Housatonic River Initiative v. U.S. Env't Prot. Agency, 75 F.4th 248, 270 (1st Cir. 2023) ("A more detailed justification may be required . . . when the agency's prior position has engendered serious reliance interests." (citation modified)).  Harvard scientists and other researchers have operated for years under the assumption that they would be able to continue to compete on fair terms for federal funding, build and staff their labs, create collaborations with other university research teams, and continue to be financially able to engage in and complete cutting-edge work aimed at important and beneficial scientific advances.  To upend the longstanding, collaborative relationship between the government and Harvard and its partner institutions without considering alternatives or articulating a connection to the problem of antisemitism sounds in arbitrariness and reeks of pretext.

In sum, the Freeze Orders, on their face, purport to explain the decision to terminate funding as based on Harvard's failure to address antisemitism or uphold civil rights laws.  It is

difficult, however, if not impossible, for this Court to view that explanation as "reasoned" when the administrative record reflects that, before freezing nearly $2.2 billion in federal grants, the agencies considered little, if any, data regarding the antisemitism problem at Harvard, disregarded the substantial policy and other changes Harvard had taken and was continuing to take to address the issue, and failed to weigh the importance of any particular grant or to evaluate whether a particular grant recipient had engaged in antisemitic behavior before cutting off critical research.  Although this Court may not "substitute its judgment for that of the agenc[ies]," Fox Television Stations, 556 U.S. at 513 (quoting State Farm, 463 U.S. at 54), "it must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made,'" Ohio, 603 U.S. at 292 (quoting State Farm, 463 U.S. at 43).  It is that rational connection between the grant terminations and the fight against antisemitism that is wholly lacking here.  Therefore, Plaintiffs' motions for summary judgment are **GRANTED** as to their arbitrary and capricious claims regarding the Freeze Orders, and Defendants' corresponding motions are **DENIED**.

### D.    Ultra Vires Claims for First Amendment and Title VI Violations

Both Harvard and the Organizational Plaintiffs move for summary judgment on their ultra vires First Amendment claims, and Harvard additionally moves for summary judgment as to its ultra vires claim for violations of Title VI.  Defendants cross move for summary judgment on the same claims.

"Before enactment of the APA, those challenging agency action often lacked a statutory cause of action," but "courts recognized a right to equitable relief where an agency's action was ultra vires—that is, 'unauthorized by any law and . . . in violation of the rights of the individual.'"  Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 680 (2025) (quoting Am. Sch. of

Magnetic Healing v. McAnnulty, 187 U.S. 94, 110 (1902)).  "Since the APA was enacted,

however, the Supreme Court has 'strictly limited nonstatutory ultra vires review' to avoid

creating an 'easy end-run around the limitations of . . . judicial-review statutes.'"  Am. Ctr. for

Int'l Lab. Solidarity v. Chavez-DeRemer, No. 25-cv-1128, 2025 WL 1795090, at *27 (D.D.C.

June 30, 2025) (quoting Nuclear Regul. Comm'n, 605 U.S. at 681).  As it currently stands, ultra

vires review "applies only when an agency has taken action entirely 'in excess of its delegated

powers and contrary to a specific prohibition' in a statute."  Nuclear Regul. Comm'n, 605 U.S. at

681 (quoting Ry. Clerks v. Ass'n for Benefit of Non-Contract Emps., 380 U.S. 650, 660 (1965)).

Such review is unavailable if "a statutory review scheme provides aggrieved persons 'with a

meaningful and adequate opportunity for judicial review.'"  Id. (quoting Bd. of Governors of the

Fed. Rsrv. Sys. v. MCorp Fin., Inc., 502 U.S. 32, 43 (1991)).  An ultra vires challenge "requires

satisfying the traditional factors for injunctive relief, since this type of review 'is a suit in

equity.'"  Am. Ctr. for Int'l Lab. Solidarity, 2025 WL 1795090, at *27 (quoting Am. Foreign

Serv. Ass'n v. Trump, No. 25-cv-5184, 2025 WL 1742853, at *2 (D.D.C. June 20, 2025)).

The Organizational Plaintiffs offer no particularized argument in support of their

equitable cause of action under the First Amendment, essentially conflating it with their APA

claim.  Harvard, likewise, offers little argument in support of its ultra vires claims, arguing them

primarily in the alternative to its claims under the APA.  See [Harvard, ECF No. 70 at 58 ("Even

if APA review were not available here (it is), the [g]overnment's actions should still be set aside

as ultra vires.")].  It overall contends that "the [g]overnment's actions are flagrantly in violation

of the First Amendment.  And it has ignored the mandatory statutory requirements to revoke

federal funding to a university based on allegations of antisemitism."  [Id.].  Defendants respond

that 1) by failing to engage with the ultra vires standard, Harvard has effectively waived the

argument, 2) the plain language of Title VI provides for judicial review, and 3) the constitutional claims are barred by the Tucker Act.  [ECF No. 186 at 37–39].

The Court finds neither party's arguments particularly helpful.  Given, however, Plaintiffs' limited briefing on the issue, their success on their APA challenges, and the Supreme Court's guidance that "ultra vires review is not available [where Plaintiffs] ha[ve] an alternative path to judicial review," Nuclear Regul. Comm'n, 605 U.S. at 682, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiffs' equitable and ultra vires claims, which are Count 2 in the Harvard action and Count III in the Organizational Plaintiffs' action.

### E.    Due Process Claims

Defendants move for summary judgment on the Organizational Plaintiffs' procedural due process claims, one of which is brought under the APA and the other ultra vires, arguing primarily that the Organizational Plaintiffs do not have a protected property interest in their federal grants.  [AAUP, ECF No. 104 at 50–52; AAUP, ECF No. 130 at 36].  The Organizational Plaintiffs did not move for summary judgment on their due process claims, but they oppose (albeit briefly) Defendants' motion on the grounds that they have a protected liberty interest (as distinct from a property interest)—referring to their First Amendment interests, discussed at length supra.  [AAUP, ECF No. 110 at 41].  Because Defendants' arguments largely talk past the Organizational Plaintiffs' claims,[32] the Court cannot find that they are entitled to judgment as a

---

[32] Defendants' response to the Organizational Plaintiffs' assertion of a liberty interest is limited to arguing that a void for vagueness challenge can only be brought against statutes or regulations that govern primary conduct.  [AAUP, ECF No. 104 at 50].  Defendants' cited authority, however, is not so narrow, and given, as discussed supra, that the Organizational Plaintiffs' viewpoints and related research are the targets of the April 11 Letter's unclear and unconstitutional demands, the Court is unconvinced that summary judgment should be granted in favor of Defendants as to the due process claims at this stage.  San Francisco A.I.D.S. Found. v.

matter of law.  See Bauer v. Montgomery, 215 F.3d 656, 662 (6th Cir. 2000) (reversing district

court grant of summary judgment on procedural due process claim where plaintiff had otherwise

"established sufficient facts to preclude summary judgment on his First Amendment claim");

Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 25 (1st Cir. 2006) (summary judgment

appropriate only where moving party "has met its burden to demonstrate undisputed facts

entitling it to summary judgment as a matter of law" (citation omitted)).  As such, Defendants'

motion for summary judgment as to Count VIII, the Organizational Plaintiffs' APA claim, is

**DENIED**.  That said, because the Organizational Plaintiffs have a remedy at law, the Court

**GRANTS** Defendants' motion as to the ultra vires claim, Count VII.

### F.    Separation of Powers/Spending Clause Claims

Defendants move for summary judgment as to the Organizational Plaintiffs' separation of

powers claims, one of which is styled as an ultra vires claim (Count V) and the other of which is

brought pursuant to the APA (Count VI).  Defendants argue that 1) "the Executive has both

express and implied authority to terminate individual grants," 2) the Organizational Plaintiffs'

"separation of powers and spending clause arguments are merely repackaged claims under Title

VI, which fail for the reasons outlined above," and 3) "the [g]overnment's cancellation of

funding due to concerns regarding compliance with antidiscrimination laws is entirely proper."

[AAUP, ECF No. 104 at 47–49].  Defendants, however, cite no legal authority to support their

purported express and implied authority to terminate individual grants, and this Court has already

---

Trump, No. 25-cv-01824, 2025 WL 1621636, at *20 (N.D. Cal. June 9, 2025) (rejecting
defendants' primary conduct argument where challenged directives implicated "the traditional
concerns under the vagueness doctrine, i.e., that they d[id] not give fair notice so that grantees
can act accordingly, and they encourage[d] arbitrary and discriminatory enforcement by the
implementing agencies").

found that the termination violated Title VI and the First Amendment.  As such, the Court finds

Defendants arguments unavailing and **DENIES** their motion for summary judgment as to Count

VI.  That said, as explained supra, the Organizational Plaintiffs' substantially similar ultra vires

claim cannot proceed where the Organizational Plaintiffs have "an alternative path to judicial

review," Nuclear Regul. Comm'n, 605 U.S. at 682, in this instance under the APA.  Defendants'

motion for summary judgment as to Count V is therefore **GRANTED**.

### G.    Permanent Injunction

In addition to seeking vacatur of the Freeze Orders and Termination Letters under 5

U.S.C. § 706, Plaintiffs also request a permanent injunction against any unconstitutional

conditions imposed to date, and which prohibits Defendants from "[i]ssuing any other

termination, freezing of funds, stop work orders, or withholding of payment on existing grants or

other federal funding, or refusal to award future grants, contracts, or other federal funding to

[Harvard] in retaliation for the exercise of its First Amendment rights, or on purported grounds

of discrimination without compliance with the terms of Title VI."  [Harvard, ECF No. 69-1 at 2];

see also [AAUP, ECF No. 64 at Prayer for Relief (similar)].  "Where a plaintiff seeks permanent

injunctive relief, the test is the same [as for preliminary injunctive relief], except that 'the

movant must show actual success on the merits of the claim, rather than a mere likelihood of

success.'" Esso Standard Oil Co. v. Freytes, 467 F. Supp. 2d 156, 159 (D.P.R. 2006) (citation

omitted), aff'd sub nom. Esso Standard Oil Co. v. Lopez-Freytes, 522 F.3d 136 (1st Cir. 2008).

The plaintiff must also demonstrate that it "would be irreparably injured in the absence of

injunctive relief," that "the harm to [plaintiff] from defendant's conduct would exceed the harm

to the defendant accruing from the issuance of an injunction," and "that the public interest would

not be adversely affected by an injunction."  Id. at 168 (citation omitted).

Defendants do not dispute that the loss of First Amendment freedoms would constitute irreparable harm to Plaintiffs, nor do they dispute that the balancing of harms and the public interest favor granting permanent injunctive relief.  [Harvard, ECF No. 186 at 61–63; Harvard, ECF No. 223 at 33]; [AAUP, ECF No. 104 at 52–55; AAUP, ECF No. 130 at 37].  Rather, Defendants oppose Plaintiffs' request on the grounds that "any relief should be limited to remedying improper agency action and must leave intact the Executive Branch's discretion to engage in further consideration of the topic at hand and consider other future agency actions consistent with law."  [Harvard, ECF No. 186 at 61].  Harvard, in particular, responds that it "does not request an injunction that would prevent the [g]overnment from initiating proper investigations in full conformance with the Title VI process."  [Harvard, ECF No. 211 at 40]. Rather, "[i]t simply requests that the [g]overnment be enjoined from depriving Harvard of funding as a form of retaliation for Harvard's exercise of its First Amendment rights, in a repeat of what has transpired over the last several months and in a manner that fails to follow the procedural requirements set forth in Title VI and the individual agency Defendants' implementing regulations."  [Id.].  Harvard further asserts that Defendants' suggestion that "the only improper agency action to be remedied is the agencies' decisions to terminate existing grants," is incorrect and that "injunctive relief is necessary here because of the [g]overnment's further categorical, across-the-board policy that Harvard is ineligible for any future grants."  [Id. at 39].

The Court agrees with Plaintiffs.  They have succeeded on their First Amendment claims, as well as their Title VI claims.  It goes without saying that this Court cannot and will not enjoin Defendants from acting within their constitutional, statutory, or regulatory authority, nor does it construe Plaintiffs as requesting that it do so.  But, given the First Amendment violations, the

harms to Harvard's research, and the benefit to the public of that research continuing, the Court grants Harvard's request for a permanent injunction that prevents Defendants reimposing any unconstitutional conditions imposed to date, and enjoins Defendants from issuing any other termination, freezing of funds, stop work orders, or withholding of payment on existing grants or other federal funding, or refusal to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights, or on purported grounds of discrimination without compliance with the requirements of Title VI.

## VII.    CONCLUSION

This case, of course, raises complicated and important legal issues, but, at its core, it concerns the future of grants sponsoring research that promises to benefit significantly the health and welfare of our country and the world.  Through the government's statements and actions, the fate of that research has now become intertwined with the issue of antisemitism at Harvard. Antisemitism, like other types of discrimination or prejudice, is intolerable.  And it is clear, even based solely on Harvard's own admissions, that Harvard has been plagued by antisemitism in recent years and could (and should) have done a better job of dealing with the issue.  That said, there is, in reality, little connection between the research affected by the grant terminations and antisemitism.  In fact, a review of the administrative record makes it difficult to conclude anything other than that Defendants used antisemitism as a smokescreen for a targeted, ideologically-motivated assault on this country's premier universities, and did so in a way that runs afoul of the APA, the First Amendment and Title VI.  Further, their actions have jeopardized decades of research and the welfare of all those who could stand to benefit from that research, as well as reflect a disregard for the rights protected by the Constitution and federal statutes.

With respect to the difficult jurisdictional issues in this case, the Court has done its best to follow the Supreme Court's limited recent guidance, which is preliminary and might well change over the course of this litigation (and the many other cases involving similar issues)—an outcome that seems not unlikely given the seeming lack of consensus in APHA and the procedural challenges posed by having substantially similar cases proceed in two different forums.  Although the doctrinal framework that applies to these threshold issues is certainly important, the issue of jurisdiction is something of a red herring.  Whether this case plays out in this Court or in the Court of Federal Claims, what lies at the core of this dispute is the fact that Defendants are trying to pressure Harvard to accede to the government's demands in a way that squarely violates Plaintiffs' First Amendment rights and ignores the procedural requirements of Title VI and, to a certain extent, the APA.  The idea that fighting antisemitism is Defendants' true aim is belied by the fact that the majority of the demands they are making of Harvard to restore its research funding are directed, on their face, at Harvard's governance, staffing and hiring practices, and admissions policies—all of which have little to do with antisemitism and everything to do with Defendants' power and political views.

The First Amendment is important and the right to free speech must be zealously guarded.  Free speech has always been a hallmark of our democracy.  The Supreme Court itself has recognized that efforts to educate people, change minds, and foster tolerance all benefit from more open communication, not less.  As Justice Brandeis wrote in the seminal case of Whitney v. California, "[i]f there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence," 274 U.S. 357, 377 (1927) (Brandeis, J., concurring), or, in this case, the forced adoption of a political orthodoxy.  As pertains to this case, it is important to recognize and remember that

if speech can be curtailed in the name of the Jewish people today, then just as easily the speech of the Jews (and anyone else) can be curtailed when the political winds change direction.

Defendants and the President are right to combat antisemitism and to use all lawful means to do so. Harvard was wrong to tolerate hateful behavior for as long as it did. The record here, however, does not reflect that fighting antisemitism was Defendants' true aim in acting against Harvard and, even if it were, combatting antisemitism cannot be accomplished on the back of the First Amendment. We must fight against antisemitism, but we equally need to protect our rights, including our right to free speech, and neither goal should nor needs to be sacrificed on the altar of the other. Harvard is currently, even if belatedly, taking steps it needs to take to combat antisemitism and seems willing to do even more if need be. Now it is the job of the courts to similarly step up, to act to safeguard academic freedom and freedom of speech as required by the Constitution, and to ensure that important research is not improperly subjected to arbitrary and procedurally infirm grant terminations, even if doing so risks the wrath of a government committed to its agenda no matter the cost.

The Court rules as follows:

1. The Court **<u>GRANTS</u>** Harvard's motion for summary judgment, [<u>Harvard</u>, ECF No. 69], as to Counts 1, 3, and 4 and Defendants' cross motion for summary judgment, [<u>Harvard</u>, ECF No. 185], as to Counts 2 and 6. As to Count 5, the Court **<u>GRANTS IN PART</u>** Harvard's motion with respect to the Freeze Orders and **<u>GRANTS IN PART</u>** Defendants' motion with respect to the Termination Letters, which it lacks jurisdiction to review under 5 U.S.C. § 706(2)(A). Harvard's and Defendants' summary judgment motions in Case No. 25-cv-11048 are otherwise **<u>DENIED</u>**.

2. The Court **GRANTS** the Organizational Plaintiffs' motion for summary judgment, [AAUP, ECF No. 74], as to Counts I and IV and Defendants' cross motion for summary judgment as to Counts III, V, and VII.  It **DENIES** Defendants' cross motion, [AAUP, ECF No. 103], as to Counts VI and VIII.  As to Count II, the Court **GRANTS IN PART** the Organizational Plaintiffs' motion with respect to the Freeze Orders and **GRANTS IN PART** Defendants' motion with respect to the Termination Letters, which it lacks jurisdiction to review under 5 U.S.C. § 706(2)(A).  The Organizational Plaintiffs' and Defendants' summary judgment motions in Case No. 25-cv-10910 are otherwise **DENIED**.

The Court orders the following relief:

1. The Court vacates and sets aside the Freeze Orders as arbitrary and capricious under 5 U.S.C. § 706(2)(A).

2. The Court vacates and sets aside the Freeze Orders and Termination Letters as violative of the First Amendment under 5 U.S.C. § 706(2)(B).  All freezes and terminations of funding to Harvard made pursuant to the Freeze Orders and Termination Letters on or after April 14, 2025 are vacated and set aside.

3. The Court vacates and sets aside the Termination Letters as violative of Title VI under 5 U.S.C. § 706(2)(C), (D).  All terminations of funding to Harvard made pursuant to the Termination Letters are vacated and set aside.

4. Defendants, their agents, and anyone acting in concert or participation with Defendants are hereby permanently enjoined from:

   a. Implementing, instituting, maintaining, or giving any force or effect to Defendants' Freeze Orders, Termination Letters, and attendant unconstitutional

conditions, as well as any terminations of, freezes of, or refusing to grant or to continue federal funding undertaken pursuant to the Freeze Orders and Termination Letters, including but not limited to:

    i.   The April 3, 2025 Letter from the Federal Task Force to Combat Antisemitism;

    ii.   The April 11, 2025 Letter from the Federal Task Force to Combat Antisemitism;

    iii.   The April 14, 2025 Freeze Order;

    iv.   The May 5, 2025 Freeze Order;

    v.   The May 6, 2025 Termination Letter from the National Institutes of Health;

    vi.   The May 9, 2025 Termination Letter from the United States Department of Agriculture;

    vii.   The May 12, 2025 Termination Letter from the Department of Commerce;

    viii.   The May 12, 2025 Termination Letter from the Department of Defense;

    ix.   The May 12, 2025 Termination Letter from the Department of Energy;

    x.   The May 12, 2025 Termination Letter from the Department of Housing and Urban Development;

    xi.   The May 12, 2025 Termination Letter from the National Science Foundation;

    xii.   The May 12, 2025 Termination Letter from the Department of Education;

    xiii.   The May 12, 2025 Termination Letter from the Centers of Disease Control and Prevention;

xiv. The May 20, 2025 announcement by the Department of Health and Human Services to cut $60 million in multi-year grants to Harvard; and

xv. The May 27, 2025 Termination Letter from the General Services Administration.

b. Issuing any other termination, fund freezes, stop work orders, or otherwise withholding payment on existing grants or other federal funding, or refusing to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights, or on any purported grounds of discrimination without compliance with the terms of Title VI.

**SO ORDERED.**

September 3, 2025

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE